ACCEPTED
14-14-00345-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
3/27/2015 5:02:41 PM
CHRISTOPHER PRINE
CLERK

14-14-00345-CV

IN THE FOURTEENTH COURT OF APPEALS

Albert Lujan d/b/a Texas Wholesale Flower Co.

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
3/27/2015 5:02:41 PM
CHRISTOPHER A. PRINE
Clerk

*Appellant*

v.

Navistar, Inc., Navistar International Corporation,
Navistar International Transportation Corp.,
International Truck and Engine Corporation and Santex Truck Centers, Ltd.

*Appellees*

## APPELLANT'S BRIEF

CODDOU & CODDOU
A Professional Corporation

Wesley S. Coddou
04468300
1206 Neck Road
Ponte Vedra Beach, Florida 32082
Telephone:  713.993.0208
Facsimile:   713.993.0209
wsc@coddouandcoddou.com
ATTORNEYS FOR APPELLANT

# IDENTITY OF PARTIES AND COUNSEL

<u>Plaintiff & Appellant</u>

Albert Lujan d/b/a Texas Wholesale Flower Company

<u>Trial & Appellate Counsel</u>

CODDOU & CODDOU
A Professional Corporation

Wesley S. Coddou
04468300
1206 Neck Road
Ponte Vedra Beach, Florida 32082
wsc@coddouandcoddou.com
Telephone:  713.993.0208
Facsimile:  713.993.0209


<u>Defendants & Appellees</u>

Navistar, Inc.
Navistar International Corporation
Navistar International Transportation Corp.
International Truck and Engine Corporation
Santex Truck Centers, Ltd.

<u>Trial & Appellate Counsel</u>

SHEEHY, SERPE & WARE, P.C.

William J. Collins, III (Trial)
wcollins@sheehyware.com
Richard A. Sheehy (Appellate)
rsheehy@sheehyware.com
2500 Two Houston Center
909 Fannin
Houston, Tx 77010-1008

# TABLE OF CONTENTS

Identity of Parties & Counsel                                             1

Index of Authorities                                                     4

Statement of the Case                                                    8

Issues Presented                                                        10

Statement of Facts                                                      12

Summary of the Argument                                                 18

    Issue 1  Appellees' Warranty Disclaimer Defense              18

    Issue 2  Appellant's Warranty Claims                           20

    Issue 3  Appellant's Claims not Presented to Trial Court       24

    Issue 4  Disputed Transfer of Appellant's Trucks & Assets      25

    Issue 5  Sanctions Against Appellant                           26

    Issue 6  Appellant's Conclusory Testimony                      28

    Issue 7  Appellees' Untimely Evidence                         28

Argument                                                               30

    Issue 1  Appellees' Warranty Disclaimer Defense              30

        Standard of Review                                  31

        Retail Buyer's Order                                32

        Limited Standard Warranty                           36

    Issue 2  Appellee's Warranty Claims                           39

        Standard of Review                                  40

        Appellees' Warranty Summary                         41

        Correlation of Warranty Data                        42

        Breach of Express & Implied Warranties              47

Issue 3  Appellant's Claims not Presented to Trial Court     54

      Failure of Essential Purpose     59

      Duress & Business Coercion     60

      Damages: In Support of Issues 2 & 3     63

Issue 4  Disputed Transfer of Appellant's Trucks and Assets     64

      Standard of Review     66

      Appellant's Sole Proprietorship     67

      Section 351 Election     67

Issue 5  Sanctions Against Appellant     69

      Standard of Review     69

      "Sham" Affidavit     70

      Tex. R. Civ. P. 13     74

      Tex. Civ. Prac. & Rem. Code 10.001 *et seq*     75

      Opportunity to Amend     76

Issue 6  Appellant's Conclusory Testimony     77

Issue 7  Appellees' Untimely Evidence     78

      Tex. R. Civ. P. 166a(d)     79

Prayer     82

Certificate of Compliance     83

Certificate of Service     84

Appendix

# INDEX OF AUTHORITIES

Rules

Tex. R. Civ. P. 166a            18, 20, 24, 25, 27, 28, 29, 30, 31, 39, 40
                                54, 64, 66, 70, 71, 76, 77, 78, 79, 80, 81

Tex. R. Civ. P. 13                              26, 27, 65, 69, 74

Codes

Tex. Bus. & Com. Code Sec. 1.201(10)                        35

Tex. Bus. & Com. Code Sec. 2.313                            47

Tex. Bus. & Com. Code Sec. 2.314                            49

Tex. Bus. & Com. Code Sec. 2.315                            52

Tex. Bus. & Com. Code Sec. 2.316(b)                   34, 35, 36

Tex. Bus. & Com. Code Sec. 2.715                            59

Tex. Bus. & Com. Code Sec. 2.719(b)                     59, 60

26 U.S.C. § 351                                         67, 68

Tex. Civ. Prac. & Rem. Code § 10.001               26, 27, 65 69, 74

Tex. Civ. Prac. & Rem. Code § 10.005                    27, 74

Tex. Transp. Code Sec. 501.021                             67

Tex. Transp. Code Sec. 501.071                             67

<u>Cases</u>

*Alder v. Laurel*, 82 S.W.3d 372 (Tex.App.-Austin 2002, no pet.)            55

*Broadnax v. Kroger Texas*
No. 05-04-01306-CV (Tex. App.-Dallas 2005)            76

*Brown v. Cain Chem., Inc.*
837 S.W.2d 239 (Tex.App.-Houston [1st Dist.] 1992, writ denied)      61, 62

*Chessher v. Southwestern Bell Telephone Company*
658 S.W.2d 563 (Tex. 1983)            54, 55

*City of Keller v. Wilson*
168 S.W.3d 802 (Tex. 2005)            31, 40, 66

*Comm'rs Court of Titus County v. Agan*
940 S.W.2d 77 (Tex. 1997)            31

*Dale v. Simon*
267 S.W. 467 (Tex. Comm'n App. 1924)            62

*Dewayne Rogers Logging, Inc. v. Propac Industries, Ltd.*
299 S.W.3d 374 (Tex.App.-Tyler 2009)            38, 39

*Duerr v. Brown*
262 S.W.3d 63 (Tex. App.-Houston [14th Dist.] 2008, no pet.)            40

*Farroux v. Denny's Rests., Inc.*
962 S.W.2d 108 (Tex. App.-Houston [1st Dist.] 1997, no pet.)            70

*Fieldtech Avionics & Instruments v. Component Control.com*
262 S.W.3d 813 (Tex.App.-Fort Worth 2008)            38

*Gulf, Colorado & Santa Fe Railway Co. v. Bliss*
368 S.W.2d 594 (Tex. 1963)            57

*Housing Authority of City of Dallas v. Hubbell*
325 S.W.2d 880 (Tex.Civ.App.-Dallas 1959, writ ref'd n.r.e.)                    61

*John Wood Group USA, Inc. v. ICO, Inc.*
26 S.W.3d 12 (Tex. App.-Houston [1st Dist.] 2000, pet. Denied)                 32

*Johnson v. Brewer & Pritchard, P.C.*
3 S.W.3d 193 (Tex. 2002)                                              31, 40, 66

*King v. Bishop*
879 S.W.2d 222 (Tex.App.-Houston [14th Dist.] 1994, no writ)                   62

*Mann, Frankfort, Stein & Lipp Advisors, Inc. v. Fielding*
289 S.W.3d 844 (Tex. 2009)                                                     31

*Mansfield v. Ohio Casualty Insurance Company*
40 S.W.3d 528 (Tex. App.-Houston [14th Dist.] 2000)                            81

*Matthews v. Matthews*
25 S.W.2d 275 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.)       61, 62

*McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337 (Tex.1993)          55

*Mercedes-Benz of N. Am., Inc. and Ryan Oldsmobile v. Dickenson*
720 S.W.2d 844 (Tex.App.-Fort Worth 1986, no writ)          36, 37, 59, 60, 66

*Parker Drilling Co.v. Romfor Supply Co.*
316 S.W.3d 68 (Tex. App.-Houston [14th Dist.] 2010, pet. Denied)               32

*Provident Life & Accident Ins. Co. v. Knott*
128 S.W.3d 211 (Tex. 2003)                                                 31, 66

*Randall v. Dallas Power & Light Co.*
752 S.W.2d 4 (Tex. 1988) (per curiam)                                          70

*Roark v. Allen*
633 S.W.2d 804 (Tex. 1982)                                                     56

*State National Bank of El Paso v. Farah Manufacturing Company, Inc.*
678 S.W.2d 661 (Tex.App.-El Paso 1984)       60, 61

*Stone v. Lawyers Title Insurance Corp.*
554 S.W.2d 183 (Tex. 1977)       56

*Thompson v. City of Corsicana Housing Authority*
57 S.W.3d 547 (Tex.App.-Waco 2001)       70

*Timpte Indus., Inc. v. Gish*
286 S.W.3d 306 (Tex. 2009)       40

*Valence Operating Co. v. Dorsett*
164 S.W.3d 656 (Tex. 2005))       40

*Windham v. Alexander, Weston & Poehner, P.C.*
887 S.W.2d 182 (Tex.App.-Texarkana 1994, writ denied)       61, 62

*Womco Inc. v. Navistar Internat'l Corp.*
84 S.W.3d 272 (Tex. App.-Tyler 2002)       37, 38

*Zarsky v. Zurich Management, Inc.*
829 S.W.2d 398 (Tex.App.-Houston [14 Dist.] 1992)       69

Desk Reference

Black's Law Dictionary 1510 (8th ed. 2004)       32

## STATEMENT OF THE CASE

This is a suit to recover damages resulting from Appellant's purchase of trucks manufactured and sold by Appellees. Appellant alleges breach of implied and express warranties, failure of essential purpose, duress and business coercion. (CR 24-26, *Plaintiff's Third Amended Original Petition*) Appellees answers with a large basket of defenses. (CR 27-32, *Defendants' Navistar, Inc. and Santex Truck Centers, Ltd.'s Second Amended Answer*) Pertinent to this appeal are Appellees' "disclaimer of warranties" (CR 28) and "no standing" (CR 31) defenses.

Appellees filed *Defendants' Motion for Summary Judgment pursuant to Rules 166a(b) and 166a(i)* (CR 47-103). Appellees' 166a(b) motion is based on their "disclaimer of warranties" defense, (CR 47), and their 166a(i) motion is directed to the elements of Appellant's expressed and implied warranties claims (CR 56).

Appellant filed his *Motion for Summary Judgment* demonstrating that the disclaimers are inoperable to bar Appellant's warranty claims.

Later Appellees filed *Defendants' Motion for Summary Judgment Pursuant to Rules 166a(b) and 166a(e)* based on their "no standing" defense. (CR 545-562) Appellant filed a response. Thereafter Appellees filed a reply

to Appellant's response and objected to Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* as a "sham" and as a sanction for violation of Tex. R. Civ. P. 13 and Tex. Civ. Prac. & Rem. Code § 10.001. (CR 856-857)

The Trial Court struck Appellant's affidavit and granted *Defendants' Motion for Summary Judgment Pursuant to Rules 166a(b) and 166a(e)*. (CR 856-857) The Trial Court also granted *Defendants' Motion for Summary Judgment pursuant to Rules 166a(b) and 166a(i)*. (CR 858-859)

The Trial Court did not sign an order denying *Plaintiff's Motion for Summary Judgment*, although requested*;* but did include on one of the dispositive orders a handwritten note, "This is the final judgment, it disposes of all claims and parties, and is appealable". (CR 858-859; See also CR 862, paragraph 5, 1ˢᵗ Supp. CR 44)

Appellant filed a motion for new trial that was overruled by operation of law. (CR 860-863, Exhibits CR 864-2005) Appellant timely filed his notice of appeal to this Court of Appeals. (CR 2118)

# ISSUES PRESENTED

## ISSUE 1

The Trial Court erred in granting *Defendants' Motion for Summary Judgment Pursuant to Rule 166a(b)* and in denying *Plaintiff's Motion for Summary Judgment* pursuant to Tex. R. Civ. P. 166a(a), because (1) the disclaimer is inoperative as a matter of law; (2) Paragraph 10 of the Retail Buyer's Order on which Appellees rely is not conspicuous; (3) the disclaimer in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series was not communicated to Appellant *before* the Retail Buyer's Order; (4) the disclaimer in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series was not communicated to Appellant *before* the trucks were delivered. (CR 858-859, CR 862, paragraph 5, 1ˢᵗ Supp. CR 44)

## ISSUE 2

The Trial Court erred in granting *Defendants' Motion for Summary Judgment Pursuant to Rule 166a(i)*, because there are genuine issues of material fact as to Appellees' breach of express warranty, implied warranty of merchantability and implied warranty of fitness. (CR 858-859)

## ISSUE 3

The Trial Court erred in adjudging Appellant's claims of failure of essential purpose, economic coercion and duress, because Appellees did not expressly present the claims to the Trial Court. (CR 858-859)

## ISSUE 4

The Trial Court erred in granting *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)*, because (1) Appellee's summary judgment evidence is legally insufficient to prove a transfer of assets; (2) there is a genuine issue of material fact whether or not Appellant transferred his assets. (CR 856-857)

ISSUE 5

The Trial Court erred in striking Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* as a "sham", as a Tex. R. Civ. P. 13 sanction and as a Tex. Civ. Prac. & Rem. Code § 10.001 sanction, because (1) Appellant's material sworn deposition testimony is not inconsistent with Appellant's affidavit testimony; (2) Appellant's counsel's unsworn hearing statements are not inconsistent with Appellant's affidavit testimony; (3) Appellant's counsel's unsworn hearing statements do not trigger application of the "sham" affidavit notion; (4) if counsel's unsworn statements may form a basis for application of the notion, then counsel satisfactorily explained any perceived inconsistency at the subsequent hearing on January 27, 2014; (5) Appellant's affidavit is neither groundless nor brought in bad faith; (6) Appellant's affidavit is warranted by the evidence. (CR 856-857, CR 862, paragraph 5, 1ˢᵗ Supp. CR 44)

ISSUE 6

The Trial Court erred in ruling that the statements contained in Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* are conclusory, because Appellant's affidavit contains clear, positive and direct statements of fact. (CR 856-857)

ISSUE 7

The Trial Court erred in overruling Appellant's objection to Appellee's *Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment*; the Trial Court erred in denying Appellant's motion to strike Appellees' *Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment*; the Trial Court erred in denying Appellant's alternative request for resetting of the hearing for *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)*, because Appellees introduced additional summary judgment evidence less than twenty one days before the hearing in violation of Tex. R. Civ. P. 166a. (RR Vol. 05, Page 11, Lines 21-25,-Page 12, Lines 1-3)

11

## STATEMENT OF FACTS

In September 2005 Appellant purchased Texas Wholesale and Tune Wholesale. At all times thereafter Appellant did business as Texas Wholesale Flower Company, a sole proprietorship. (CR 568, *Affidavit of Albert Lujan In Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*) Appellant sold and delivered perishable floral products and floral hard goods primarily in underserved markets throughout central and south Texas, from Appellant's distribution facility and headquarters located in San Antonio, Texas. (CR 199, *Affidavit of Albert Lujan In Support of Plaintiff's Response to Defendants' Motion for Summary Judgment*)

Delivery routes were extensive, east to Columbus, west to Del Rio, south to Brownsville, and north to San Angelo. The delivery fleet that came with the companies was old and past its useful life. Appellant had to replace the fleet with reliable long-distance trucks to be a primary supplier. (CR 198) Appellant required delivery vehicles that were fit and suitable for regular, long-distance service, while fit and suitable to refrigerate, preserve and market perishable floral products. (CR 199)

Appellee Navistar, Inc. ("Navistar") is the manufacturer of the CF600 trucks made the basis of Appellant's claims. Appellee Santex Truck Centers,

Ltd. ("Santex") is Navistar's agent for the finance, purchase, sale and warranty service of Navistar's trucks in San Antonio. Navistar Financial Corporation ("NFC") is the wholly owned subsidiary of Navistar. Its function is to finance sales of trucks manufactured by Navistar and sold by Santex. NFC is not a party to this suit. When Appellant purchased the trucks, Richard "Rick" DeNolf ("DeNolf") held the position of Santex's Truck Sales Associate. (CR 197) DeNolf was responsible for all matters related to the finance, purchase, sale and warranty service of Appellant's trucks. (CR 198)

DeNolf and Appellant met a number of times after Appellant bought the companies. At each meeting they discussed Appellant's business plan and the importance of reliable long-distance transportation. During one meeting Appellant presented a map of Texas and showed the exact routes and delivery points intended for the trucks, so that DeNolf could appreciate the need for roadworthy long-distance delivery vehicles. (CR 198)

DeNolf recommended the Navistar CF600 chassis. The CF600 is designed and manufactured by Navistar and actually is designed and manufactured for short-distance urban deliveries, not Appellant's intended long-distance deliveries. Nevertheless, DeNolf expressly warranted and

13

represented that the CF600 was of a quality and characteristic to perform as reliable, long-distance transportation for Appellant's goods. (CR 199)

DeNolf also recommended specific vendors of choice for both the bodies and the refrigeration units. DeNolf directed the initial design of all components to Appellant's specifications, providing drawings for changes, approval and mating to the truck chassis. (CR 199)

Appellant decided to follow DeNolf's recommendations. (CR 199) Appellant signed a handwritten purchase order for the CF600 trucks. (CR 89, Deposition of Albert Lujan, Vol. 3, page. 9, lines 12-13) He purchased five (5) CF600 chassis, five (5) custom designed Morgan bodies and five (5) Thermo King refrigeration units. Santex mated the bodies with the chassis. (CR 199) On October 7, 2005, Appellant paid $5,000 to Appellees. (CR 467)

On October 10, 2005, Appellees produced the Retail Buyer's Order. (CR 85-86) Appellant read the front of the Retail Buyer's Order only. He did not read the back. (CR 90, Deposition of Albert Lujan, Vol. 3, page 11, lines 11-25, page 12, line 1) He "read the numbers" and confirmed that "everything coincided with what the original handwritten proposal was". (CR 89, Deposition of Albert Lujan, Vol. 3, page 9, lines 11-13)

14

On October 11, 2005, Santex ordered the five truck chassis from Navistar. (CR 476, "Order Date")

On October 26, 2005, Appellant paid an additional $8,201.15 to Appellees. (CR 468)

On November 16, 2005, Navistar built the chassis. (CR 476, "Build Date")

On or before December 14, 2005, Appellant paid an additional $9,783.85 to Appellees. (CR 469) The receipt is dated December 19, 2005, however, the truck delivery receipt dated December 14, 2005 plainly credits Appellant's account with the total of the three payments, $22,985. (CR 470, CR 526)

On December 17, 2005, Appellant picked up the trucks at the dealership. (CR 199 and CR 470) Sometime during the week of December 19, 2005, DeNolf personally delivered to Appellant the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series. (CR 199 and CR 417, 418, Deposition of Albert Lujan, Vol. 3, page 17, line 12, - page 19, line 2) The Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series contains the disclaimer on which Appellees rely. It is undated; and the

15

signature line denoted "Customer Signature" is blank. (CR 517-538, Exhibit D to Appellee's Disclaimer Motion)

Thereafter the trucks frequently broke down while in service. (CR 199 and CR 203-CR 260, CR 26-CR 336, Navistar warranty service summaries, CR 475-CR 525, Santex service tickets, Appendix 20, Appellees' Warranty Summary)

On or about February 2, 2007, DeNolf proposed that Appellant replace the CF600 fleet with a different model truck (International 4300M) at a higher price and financial cost. Appellant and DeNolf discussed the proposal on several occasions. Each time Appellant shared his reservations and concerns. (CR 200)

Finally DeNolf said to Appellant, bottom line, they were done. Appellees would no longer provide warranty support for Appellant's CF600 fleet. Appellees would cease to honor warranty obligations and other commitments to Appellant's CF600 fleet, although the warranties otherwise would be in effect through December 2008. DeNolf said that Appellant would have full responsibility for breakdowns, including towing, repair and substitute delivery trucks during the repair period. (CR 200)

Subject to the threat, Appellant purchased the new 4300M trucks and incurred additional debt to do so. (CR 200, 352) But for the threat, Appellant had no desire or intent to purchase the new 4300M trucks. (CR 201)

Appellant has lost $2,572,568, representing lost profit for years 2006 and 2007 while the business was operational and $5,453,917, representing future lost profit for years 2008, 2009 and 2010. Appellant has lost $9,552,464, representing the value of the business. Appellant has lost $211,276.00, representing the difference between the price paid for the CF600 trucks and the actual value of the CF600 trucks. Appellant has lost $354,233.70, representing the difference between the cost of the 4300M fleet and the value of the CF 600 fleet at the time of the purchase of the 4300M fleet. (CR 201, CR 337–CR 351, CR 352)

17

## SUMMARY OF ARGUMENT

## ISSUE 1

The Trial Court erred in granting *Defendants' Motion for Summary Judgment Pursuant to Rule 166a(b)* and in denying *Plaintiff's Motion for Summary Judgment* pursuant to Tex. R. Civ. P. 166a(a), because (1) the disclaimer is inoperative as a matter of law; (2) Paragraph 10 of the Retail Buyer's Order on which Appellees rely is not conspicuous; (3) the disclaimer in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series was not communicated to Appellant *before* the Retail Buyer's Order; (4) the disclaimer in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series was not communicated to Appellant *before* the trucks were delivered. (CR 858-859)

Appellant first signed a handwritten purchase order for five CF600 trucks. Thereafter Appellees produced the Retail Buyer's Order. The Retail Buyer's Order is a contract. Language on the front reads as follows.

> Purchaser agrees that this order includes all of the terms and conditions on both the face and reverse side hereof, that this order cancels and supersedes any prior agreement and as of the date hereof comprises the complete and exclusive statement of the terms of the agreement relating to the subject...

The Retail Buyer's Order is dated October 10, 2005. It identifies the goods (Blue 2006 CF600 trucks with options); states quantity (5), price per unit ($60,521.10) and delivery date (October 15, 2005). It confirms that Appellant has paid $5,000 consideration and provides that Appellant is committing "to fulfilling the remaining terms of this agreement".

18

It provides for only two specific instances in which Appellant may cancel the Retail Buyer's Order, 1) in the event that Navistar changes the price of the trucks to Santex and 2) in the event that the original trade-in allowance is reduced. Otherwise, if Appellant should fail or refuse to accept delivery of the trucks and to comply with the terms of the Retail Buyer's Order, then Santex has the right to retain any cash payments and any trade-ins as liquidated damages.

Appellees concede that the Retail Buyer's Order *does not* contain a disclaimer of express or implied warranties. on which they rely. Appellees concede that the disclaimer on which they rely was communicated to Appellant in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series, two months later, during the week of December 19, 2005.

To be operative, a disclaimer must be delivered before the buyer signs the purchase order. As a matter of law, the disclaimer on which Appellees rely is inoperative to bar Appellant's express and implied warranty claims. In this regard, the date of the Retail Buyer's Order predates the delivery date of the instrument containing the disclaimer.

19

**ISSUE 2**

The Trial Court erred in granting *Defendants' Motion for Summary Judgment Pursuant to Rule 166a(i),* because there are genuine issues of material fact as to Appellees' breach of express warranty, implied warranty of merchantability and implied warranty of fitness. (CR 858-859)

DeNolf expressly warranted and represented that the CF600 was of a quality and characteristic to perform as reliable, long-distance transportation for Appellant's goods. Appellant took delivery of the CF600 trucks on December 17, 2005. Thereafter the trucks continually broke down while in service. The following are excerpts from Appellees' Warranty Summary.

**All five engines required repair within sixty (60) days of delivery.**

VIN 3HAJFAVK56L331537
Fail Date: 02/18/2006     Completed Date: 02/21/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  **Repair truck not to die when wet.** Heat cover has moisture. Cut hole in heat shield to remove water.

VIN 3HAJFAVK76L331538
Fail Date: 02/07/2006     Completed Date: 02/10/2006
Noun Desc:  Harness, Engine (Wires/Connectors/Term)
Comments:  **Engine dies. Would not restart.** Oil pressure only at 25. Put hole in cover over wire to let water.

VIN 3HAJFAVK96L331539
Fail Date: 02/10/2006     Completed Date: 02/14/2006
Noun Desc:  Harness, Engine (Wires/Connectors/Term)
Comments:  **Engine won't stay running.** Cut hole in rubber tubing for IPR wiring.

Fail Date: 02/18/2006     Completed Date: 02/21/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  **Repair truck not to die when wet.** Heat Cover filling with moisture. Drained and resealed rear IPR plug.

VIN 3HAJFAVK56L331540
Fail Date: 02/16/2006     Completed Date: 02/20/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  E**ngine no start.** Found water in IPR plug & harness. Dried plug & harness. Used silicone to seal.

VIN 3HAJFAVK76L331541
Fail Date: 02/18/2006     Completed Date: 02/21/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  **Repair engine not to die when wet.** Heat cover filled with water. Drained moisture and resealed rear cover at IPR.

**Three engines began disintegrating internally
within one hundred forty five (145) days of delivery.**

VIN 3HAJFAVK76L331538
Fail Date: 05/03/2006     Completed Date: 05/09/2006
Noun Desc:  Filter/Base/Gasket/Mounting Bracket/Oil
Comments:  No power & knocking. **Found metal in oil.**

VIN 3HAJFAVK96L331539
Fail Date: 04/21/2006     Completed Date: 05/22/2006
Noun Desc:  Crankcase
Comments:  Low power & engine miss. R/R oil pan. **Found metal debris.** Oil pump was scored. **Replaced engine.**

VIN 3HAJFAVK56L331540
Fail Date: 03/23/2006     Completed Date: 04/13/2006
Noun Desc:  Sender, Camshaft Position
Comments:  Eng. died. Won't start. Low fuel pressure. Replaced CMP sensor but **found metal shavings on tip.**

Fail Date: 03/23/2006     Completed Date: 04/13/2006
Noun Desc:  Injector Unit (Electrical)
Comments:  **Found metal on tip of CMP sensor.** Replace all 6 inj. (found 3 not torqued properly)

## Three engines required replacement.

VIN 3HAJFAVK96L331539
Fail Date:    04/07/2006   Completed Date: 06/19/2006
Noun Desc:  Crankcase
Comments:  Repair for no power. **REPLACE ENGINE**.

VIN 3HAJFAVK56L331540
Fail Date: 03/16/2007     Completed Date: 05/30/2007
Noun Desc:  Crankshaft
Comments:  Idler belt broken. Locked up engine. Rod broken. **REPLACED ENGINE** and transferred parts.

VIN 3HAJFAVK76L331541
Fail Date: 01/05/2007     Completed Date: 02/05/2007
Noun Desc:  Piston, Pin, Lock, Bushing
Comments:  Repair for lost all eng. oil. Cracked piston. **REPLACE ENTIRE ENGINE**.

## Additional Notes Regarding The Engines

As late as October 18, 2006, VIN 3HAJFAVK56L331537 was taken in for service, with the comment, "no power". Appellees kept the truck for a month before returning it to Appellant on November 16, 2006.

VIN 3HAJFAVK56L331538 suffered a myriad of troubles while in limited use. As late as January 29, 2007 it was taken in for service with the comment, "Burning too much fuel. Bad engine miss. Replace all inj(ectors)"

22

[parenthetical added for clarity]. Appellees kept the truck for over a month before returning it to Appellant on March 2, 2007, at or about the time that Appellant purchased the 4300M trucks.

The engine in VIN 3HAJFAVK96L331539 was replaced one hundred seven (107) days after delivery. Nevertheless the replacement engine suffered the same maladies, requiring continuing repairs for "low power", "metal debris" and "no power". The last warranty entry is dated April 25, 2007, *after* Appellant traded it in, with the comment "Engine miss & no power". Plainly Appellees failed to correct the engine failures, although given the opportunity to do so with two engines.

Appellees waited to replace the engine in VIN 3HAJFAVK56L331540 until March 16, 2007, *after* Appellant had purchased the 4300M trucks. The replacement work was not completed until May 30, 2007, a month *after* Appellant traded it in.

Appellees waited to replace the engine in VIN 3HAJFAVK76L331541 until January 5, 2007, a month before DeNolf threatened to discontinue warranty support for the CF600 trucks. The replacement work was not completed until February 5, 2007, a month before Appellant purchased the 4300M trucks.

Appellees' express warranties and representations became core bases of the bargain and the CF600 trucks did not comply with the express and implied warranties and representations.

Appellees also breached the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series. On or about February 2, 2007, Appellees' representative, DeNolf, proposed that Appellant replace the CF600 fleet with a different model truck (International 4300M) Appellant shared his reservations and concerns. DeNolf said to Appellant, bottom line, they were done. Appellees would no longer provide warranty support for Appellant's CF600 fleet. Appellees breached the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series, by withdrawing warranty support in February 2007, although the warranty was valid through December 2008.

**ISSUE 3**

The Trial Court erred in adjudging Appellant's claims of failure of essential purpose, economic coercion and duress, because Appellees did not expressly present the claims to the Trial Court. (CR 858-859)

Tex. R. Civ. P. 166a.(c) provides that "The motion for summary judgment shall state the specific grounds therefor." The Court erred in adjudging Appellant's claims of failure of essential purpose, economic

24

coercion and duress, because the claims were not specified in Appellees' motions for summary judgment. As a matter of procedural law, the Trial Court cannot adjudge Appellant's failure of essential purpose, economic coercion and duress claims.

## ISSUE 4

The Trial Court erred in granting *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)*, because (1) Appellee's summary judgment evidence is legally insufficient to prove a transfer of assets; (2) there is a genuine issue of material fact whether or not Appellant transferred his assets. (CR 856-857)

Appellant conducted business as a sole proprietorship, Texas Wholesale Flower Company. Appellees alleged that Appellant transferred ownership of his trucks and his entire business to the corporation, Texas Wholesale Flower Company, Inc. To prove the alleged transfer, Appellees relied on a page entitled *Section 351 Election*, pulled from Appellant's 2006 tax return. Appellees filed no other evidence to prove actual transfer. By sworn affidavit Appellant denied that any transfer occurred.

On its face, Appellees' proof of the alleged transfer is legally insufficient. A section 351 election is not recognized in Texas as an instrument to transfer legal title to assets and liabilities. Alternatively, Appellant raised a fact issue as to whether a transfer occurred.

# ISSUE 5

The Trial Court erred in striking Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* as a "sham", as a Tex. R. Civ. P. 13 sanction and as a Tex. Civ. Prac. & Rem. Code § 10.001 sanction, because  (1) Appellant's material sworn deposition testimony is not inconsistent with Appellant's affidavit testimony;  (2) Appellant's counsel's unsworn hearing statements are not inconsistent with Appellant's affidavit testimony;  (3) Appellant's counsel's unsworn hearing statements do not trigger application of the "sham" affidavit notion;  (4)  if counsel's unsworn statements may form a basis for application of the notion, then counsel satisfactorily explained any perceived inconsistency at the subsequent hearing on January 27, 2014; (5) Appellant's affidavit is neither groundless nor brought in bad faith; (6) Appellant's affidavit is warranted by the evidence. (CR 856-857)

The Trial Court struck Appellant's affidavit, finding that Appellant's affidavit was a "sham" and that Appellant's affidavit was filed in bad faith. The Trial Court then granted Appellees' motion for summary judgment.

To satisfy the notion of' "sham" affidavit, Appellees could not direct the Trial Court's attention to any contradictory testimony between Appellant's affidavit and his three depositions. Instead, Appellees complained that there is contradiction between the affidavit and counsel's unsworn statements during a hearing to strike an intervention. Assuming arguendo that counsel's unsworn statements are fair game, there are no contradictions. Alternatively, any perceived contradictions were explained at a subsequent hearing.

26

Tex. R. Civ. P. 13 requires that the court find good cause, "the particulars of which must be stated in the sanction order." The Court's order is defective, because the particulars are not stated. The Trial Court abused its discretion by failing to state the particulars.

In addition Tex. Civ. Prac. & Rem. Code § 10.005 provides, "A court shall describe in an order imposing a sanction under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed." The Court's order is defective, because it neither describes the violative conduct nor explains the basis for the sanction. The Trial Court abused its discretion by failing to describe the violative conduct and the basis for the sanction imposed.

Appellees' complaints of "sham" and bad faith are objections to the form of Appellant's affidavit. Tex R. Civ. P. 166a(f) mandates that in the event of defects in the form of an affidavit, the affiant must be given an opportunity to amend. The Trial Court abused its discretion in denying Appellant the opportunity to amend Appellant's affidavit.

**ISSUE 6**

The Trial Court erred in ruling that the statements contained in Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* are conclusory, because Appellant's affidavit contains clear, positive and direct statements of fact. (CR 856-857)

The Trial Court erred in striking as conclusory the statements from Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*, "At no time have I transferred my assets and liabilities of Texas Wholesale Flower Company. I did not transfer ownership of my trucks nor my business to a corporation."

Appellant's statements are not conclusory. His statements are clear, positive and direct statements of fact concerning what Appellant himself did not do. Appellant did not transfer his business assets and liabilities nor the trucks made the basis of his claims.

**ISSUE 7**

The Trial Court erred in overruling Appellant's objection to Appellee's *Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment*; the Trial Court erred in denying Appellant's motion to strike Appellees' *Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment*; the Trial Court erred in denying Appellant's alternative request for resetting of the hearing for *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)*, because Appellees introduced additional summary judgment evidence less than twenty one days before the hearing in violation of Tex. R. Civ. P. 166a. (RR Vol. 5, Page 11, Lines 21-25, Page 12, Lines 1-3)

28

Appellees' Motion was set for hearing January 27, 2014. Appellees' *reply* to

Appellant's response was filed January 24, 2014. Appellees' reply contains

the following statement.

STATEMENT OF INTENT TO USE UNFILED DISCOVERY<br>AS SUMMARY JUDGMENT PROOF

Per Tex. R. Civ. P. 166a(d), Defendants intend now to use the following unfilled discovery items as summary judgment proof to discredit Plaintiff's affidavit.

1. E-mail producing Appellant's 2006 Income Tax Return (Exh. 2).
2. Letter dated October 3, 2013, from Appellees to Appellant (Exh. 3)
3. Transcript of oral argument on Appellees' Motion to Strike
dated Oct. 21, 2013 (Exh. 4)
4. Promissory Notes to TexStar Bank (Exh. 5).
5. Texas Wholesale Flower Co. Inc.'s 2007-2009 tax returns (Exh. 6).
(CR 598)

Appellant objected to Appellees' reply to Appellant's response because

it was not timely filed, and moved the court to strike it. Alternatively,

Appellant requested that the Trial Court reset the hearing for Appellees'

Standing Motion at least twenty-one days.

Appellees' additional proof and reply were not properly before the

Trial Court; Appellees did not seek leave to file the additional evidence; the

Trial Court did not grant leave to file the additional evidence.

# ARGUMENT

## ISSUE 1

The Trial Court erred in granting *Defendants' Motion for Summary Judgment Pursuant to Rule 166a(b)* and in denying *Plaintiff's Motion for Summary Judgment* pursuant to Tex. R. Civ. P. 166a(a), because (1) the disclaimer is inoperative as a matter of law; (2) Paragraph 10 of the Retail Buyer's Order on which Appellees rely is not conspicuous; (3) the disclaimer in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series was not communicated to Appellant *before* the Retail Buyer's Order; (4) the disclaimer in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series was not communicated to Appellant *before* the trucks were delivered. (CR 858-859, CR 862, paragraph 5, 1st Supp. CR 44)

Appellees filed a motion for summary judgment entitled *Defendants' Motion for Summary Judgment Pursuant to Rules 166a(b) and 166a(i)*. (CR 47) By their traditional motion Appellees assert that Appellant's breach of warranty claims against Appellees should be dismissed, because Appellant's warranty rights were disclaimed. ("Appellees' Disclaimer Motion") No other issues are set out nor presented in Appellees' Disclaimer Motion.

Appellant filed a motion for summary judgment pursuant to Tex. R. Civ. P. 166a(a) entitled *Plaintiff's Motion for Summary Judgment* ("Appellant's Motion"), demonstrating that the disclaimers and limitations of remedies on which Appellees rely are inoperative to bar Appellant's express and implied warranty claims. (1st Supp. CR 3)

## Standard of Review

The Court of Appeals reviews a summary judgment *de novo*. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). It reviews the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).

The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists, and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see also Knott*, 128 S.W.3d at 216. When both sides move for traditional summary judgment and the Trial Court grants one motion and denies the other, the Court of Appeals reviews the summary judgment evidence presented by both sides and determines all questions presented. *Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). In such a situation, it renders the judgment as theTrial Court should have rendered. *Mann, Frankfort, Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

<h1 style="text-align:center"><u>Retail Buyer's Order</u></h1>

**The Retail Buyer's Order is a contract.**

In *Parker Drilling Co.v. Romfor Supply Co.*, 316 S.W.3d 68, 74 (Tex. App.

—Houston [14th Dist.] 2010, pet. denied), Justice Yates wrote,

Contracts should be examined on a case-by-case basis to determine which terms are material or essential. [additional citation omitted. *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 20 (Tex. App.-Houston [1st Dist.] 2000, pet. denied) (listing the essential elements for a contract for sale as (1) the object of the contract or thing sold, (2) the consideration to be paid, and (3) the parties' consent to the exchange); cf. Black's Law Dictionary 1510 (8th ed. 2004) (defining "material terms" as "contractual provision[s] dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done").

In this case, Appellant first signed a handwritten purchase order. (CR 89, Deposition of Albert Lujan, Vol. 3, page. 9, lines 12-13) Thereafter Appellees produced the printed Retail Buyer's Order. (CR 85-86, Appendix 18) Language at the bottom of the front side of the Retail Buyer's Order reads as follows.

Purchaser agrees that this order includes all of the terms and conditions on both the face and reverse side hereof, that this order cancels and supersedes any prior agreement and as of the date hereof comprises the complete and exclusive statement of the terms of the agreement relating to the subject... (CR 85)

32

The Retail Buyer's Order is dated October 10, 2005. It identifies the goods (Blue 2006 CF600 trucks with options). It states quantity (5), price per unit ($60,521.10) and delivery date (October 15, 2005). It confirms that Appellant has paid $5,000 consideration to secure the order and provides that Appellant is committing "to fulfilling the remaining terms of this agreement". (Introductory paragraph front page) (CR 85)

It provides for only two specific instances in which Appellant may cancel the Retail Buyer's Order; 1) in the event that Navistar changes the price of the trucks to Santex (Paragraph 2) and 2) in the event that the original trade-in allowance is reduced. (Paragraph 3) (CR 86)

Otherwise, if Appellant should fail or refuse to accept delivery of the trucks and to comply with the terms of the Retail Buyer's Order, then Santex has the right to retain any cash payments and any trade-ins as liquidated damages. (Paragraph 5) (CR 86)

The Retail Buyer's Order satisfies the requirements necessary to become a legally enforceable contract.

**There is no new vehicle disclaimer in the Retail Buyer's Order.**

Paragraph 10 of the Retail Buyer's Order reads in part as follows:

The printed new vehicle warranty delivered to purchaser with such vehicle or chassis and made a part hereof as though fully set forth herein is the only warranty applicable to such new vehicle or chassis and is expressly in lieu of all other warranties, expressed or implied including any implied warranty of merchantability or fitness for a particular purpose.
(CR 86)

Appellees concede that the Retail Buyer's Order *does not* contain a disclaimer of express or implied warranties. Appellees write,

However, it is not the Retail Buyer's Order that contains the disclaimer. The Retail Buyer's Order put Plaintiff on notice of the disclaimer. The operative disclaimer was contained in the Trucks' limited warranty. CR 410, Section IV)

The "limited warranty" to which Appellees refer is the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series, actually delivered to Appellant during the week of December 19, 2005. (CR 517-518, 525-526, 529-530, 536-537, 539-538, Appendix 19)

**Paragraph 10 is not conspicuous.**

Tex. Bus. & Com. Code Sec. 2.316(b) requires that exculpatory "language" be conspicuous. Tex. Bus. & Com. Code Sec. 2.316(b) reads:

(b) Subject to Subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Tex. Bus. & Com. Code Sec. 1.201(10) reads:

(10) "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Characterizing the language of Paragraph 10 as "notice" rather than "disclaimer" does not except the language from the Tex. Bus. & Com. Code Sec. 2.316(b) requirements. To the extent that Appellees may rely upon Paragraph 10 to exclude or modify the warranties, the language must be conspicuous or it is inoperative.

As a matter of law, Paragraph 10 is not conspicuous, and is not operative even to give Appellant "notice" of a disclaimer written in an instrument delivered in the course of a future event. The Trial Court erred in granting Appellees' Disclaimer Motion, because the language on which Appellees rely does not satisfy Tex. Bus. & Com. Code Sec. 2.316(b) requirements.

**<u>Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series</u>**

**Appellees communicated a disclaimer *after* the Retail Buyer's Order.**

Appellees concede that the disclaimer on which they rely was communicated to Appellant in the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series. (CR 410, Section IV) It is undated, but refers to the delivery date of the trucks (December 17, 2005) with the notation "Date Delivered to User (DTU)". (CR 518, 526, 530, 537, 538)

**Disclaimer must be communicated before the Retail Buyer's Order.**

The court in *Mercedes-Benz of N. Am., Inc. and Ryan Oldsmobile v. Dickenson,* 720 S.W.2d 844, 851 & 852 (Tex.App.-Fort Worth 1986, no writ) addressed the disclaimer of express warranties. The disclaimer must be communicated before the contract is signed.

Dickenson ordered a new Mercedes from Ryan. The order contained the following language (page 851):

> There are NO WARRANTIES, express or implied, made by the Selling Dealer or the manufacturer on the new vehicle or chassis described in this order, except the most recent printed Mercedes-Benz warranty or warranties applicable to such new vehicle or chassis which are made a part of this order as of here set forth in full. A copy of such Mercedes-Benz warranty or warranties will be furnished to the purchaser upon delivery of the vehicle or chassis, and they shall be expressly IN LIEU OF any other express or implied warranty, condition or guarantee on the new vehicle, chassis or any part thereof, including any implied WARRANTY OF MERCHANTABILITY or FITNESS and of any other obligation on the part of Mercedes-Benz, or the Selling Dealer. Purchaser acknowledges that this vehicle is not suitable for Trailer Towing unless specified in this order.

The Court concluded (page 852):

> Under a disclaimer such as this, the buyer is not given the opportunity to read the warranty or warranties made until after the contract is signed. The consumer does not know, at the time he signs the contract, whether the warranty he will find in his glove box does or does not correspond with the express warranties that have been made to him.
> ***
> The disclaimer language is, therefore, inoperative.

The court in *Womco Inc. v. Navistar Internat'l Corp.*, 84 S.W.3d 272, 275, 279 & 280 (Tex. App.-Tyler 2002) extended the communication requirement to implied warranties and held that the disclaimer must be communicated before the contract of sale is completed.

Womco purchased thirty 1993 International model 9300 tractor trucks manufactured by Navistar through Price, a dealer (page 275). Womco received the paperwork containing the disclaimer with delivery of the trucks (page 280). The court concluded (page 280):

> We adopt the rationale espoused in *Dickenson* and the holding set forth in *Klo-Zik Co.,* and likewise hold that in order to be effective, a disclaimer of either an express or an implied warranty is required to be communicated, in the manner described in section 2.316(b), to the buyer before the contract of sale has been completed.

The Womco court also noted, "Whether a particular disclaimer is conspicuous is a question of law to be determined by the court." (page 279)

The court in *Fieldtech Avionics & Instruments v. Component Control.com*, 262 S.W.3d 813, 829 (Tex.App.-Fort Worth 2008) read *Dickenson* and *Womco* to mean that the disclaimer must be communicated "to a buyer before the sale is consummated; otherwise the disclaimer language is inoperative". Consummation occurred when the parties "entered into a binding agreement".

The court in *Dewayne Rogers Logging, Inc. v. Propac Industries, Ltd.*, 299 S.W.3d 374, 390 (Tex.App.-Tyler 2009) read "completed" to mean when the purchase order is signed. The *Propac* Court wrote:

In *Womco,* the issue was whether the disclaimer had been communicated to the buyers prior to the completion of the contract for sale. *See id.* at 280. In this case, the contract of sale was not completed until Rogers Logging and East Texas Machinery signed the customer purchase customer order [sic] on December 1, 1998.

### Disclaimer is inoperative to bar Appellant's claims.

Appellees concede that Appellant purchased the CF600 trucks on October 10, 2005; that the Retail Buyer's Order accompanied the purchase and detailed its terms. (CR 83, paragraph 3) The date of the Retail Buyer's Order (October 10, 2005) (CR 85) predates the delivery date of the trucks (December 17, 2005). (CR 518, 526, 530, 537, 538) The Trial Court should have denied Appellees' Disclaimer Motion and granted Appellant's Motion, because the disclaimer on which Appellees rely was communicated over two months *after* the purchase of the trucks.

## ISSUE 2

The Trial Court erred in granting *Defendants' Motion for Summary Judgment Pursuant to Rule 166a(i)*, because there are genuine issues of material fact as to Appellees' breach of express warranty, implied warranty of merchantability and implied warranty of fitness. (CR 858-859)

By their no-evidence motion, Appellees assert that there is no evidence of breach of express warranty, implied warranty of merchantability and implied warranty of fitness. ("Appellees' No-Evidence Motion").

Appellees' No-Evidence Motion states no other element as to which there is no evidence. (CR 47, 56)

## Standard of Review

The Court of Appeals reviews a no-evidence summary judgment *de novo*. *Duerr v. Brown*, 262 S.W.3d 63, 68 (Tex. App.-Houston [14th Dist.] 2008, no pet.) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). To defeat a no-evidence motion for summary judgment, the responding party must present evidence raising a genuine issue of material fact supporting each element contested in the motion. Tex. R. Civ. P. 166a(i), *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). When reviewing a Trial Court's grant of such motion, we consider the evidence presented in the light most favorable to the party against whom summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).

## Appellees' Warranty Summary

Attached to the *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment* "(Appellant's Warranty Affidavit") is a warranty summary produced by Appellees. (CR 199, CR 203-CR 260, CR 261-CR 336, Navistar warranty service summaries, CR 475-CR 525 Santex service tickets) The record purports to document the warranty work performed by Appellees on Appellant's trucks. Compiled under Appendix 20 are pertinent entries sorted chronologically by vehicle identification number (VIN). Each entry indicates two references to the Clerk's Record, because Appellees produced the original record in halves. The lower Clerk's Record reference is the left half; the higher Clerk's Record reference is the right half. With few exceptions, all of the warranty repairs to the CF600 trucks related to the truck engines.

## Relevant Timeframe

Appellant took delivery of the CF600 trucks on or about December 17, 2005. On or after February 2, 2007 DeNolf threatened Appellant that Appellees would no longer provide warranty support for Appellant's CF600 fleet. (CR 200)

On or before March 9, 2007, subject to the threat, Appellant purchased new 4300M trucks. (CR 200 and CR 333, warranty summary for Appellant's 4300M trucks, column six entitled "Build Date", Lines 1, 3, 6, 8, 15-Note: CR 335 is the correlated right half of the original record.)

On or about March 23 2007, Appellant traded-in the CF600 trucks and took delivery of the 4300M truck chassis. (CR 352) Over the next nineteen days, Appellees removed the custom boxes from the CF600 trucks and installed the boxes onto the 4300M trucks. Appellees delivered each of the completed 4300M trucks as they were completed. (CR 335, warranty summary for Appellant's 4300M trucks, column four entitled "VIN", column seven entitled "DTU [Delivered to User] Date", Lines 1, 3, 6, 8, 15. Note: CR 333 is the correlated left half of the original record.)

## Correlation of Warranty Data

**All five engines required repair within sixty (60) days of delivery.**

VIN 3HAJFAVK56L331537
Fail Date: 02/18/2006     Completed Date: 02/21/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  **Repair truck not to die when wet.** Heat cover has moisture. Cut hole in heat shield to remove water.
(CR 283 & 314, Ln 6)

VIN 3HAJFAVK76L331538
Fail Date: 02/07/2006    Completed Date: 02/10/2006
Noun Desc:  Harness, Engine (Wires/Connectors/Term)
Comments:  **Engine dies. Would not restart.** Oil pressure only at 25. Put hole in cover over wire to let water.
(CR 275 & 306, Ln 4)

VIN 3HAJFAVK96L331539
Fail Date: 02/10/2006    Completed Date: 02/14/2006
Noun Desc:  Harness, Engine (Wires/Connectors/Term)
Comments:  **Engine won't stay running.** Cut hole in rubber tubing for IPR wiring.
(CR 287 & 318, Ln 1)

Fail Date: 02/18/2006    Completed Date: 02/21/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  **Repair truck not to die when wet.** Heat Cover filling with moisture. Drained and resealed rear IPR plug.
(CR 265 & 296, Ln 2)

VIN 3HAJFAVK56L331540
Fail Date: 02/16/2006    Completed Date: 02/20/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  E**ngine no start.** Found water in IPR plug & harness. Dried plug & harness. Used silicone to seal.
(CR 285 & 316, Ln 2)

VIN 3HAJFAVK76L331541
Fail Date: 02/18/2006    Completed Date: 02/21/2006
Noun Desc:  Regulator, Injection Pressure (IPR)
Comments:  **Repair engine not to die when wet.** Heat cover filled with water. Drained moisture and resealed rear cover at IPR.
(CR 276 & 307, Ln 7)

**Three engines began disintegrating internally
within one hundred forty five (145) days of delivery.**

VIN 3HAJFAVK76L331538
Fail Date: 05/03/2006     Completed Date: 05/09/2006
Noun Desc:  Filter/Base/Gasket/Mounting Bracket/Oil
Comments:  No power & knocking. **Found metal in oil.**
(CR 271 & 302, Ln 5)

VIN 3HAJFAVK96L331539
Fail Date: 04/21/2006     Completed Date: 05/22/2006
Noun Desc:  Crankcase
Comments:  Low power & engine miss. R/R oil pan. **Found metal debris.**
Oil pump was scored. **Replaced engine.**
(CR 279 & 310, Ln 6)

VIN 3HAJFAVK56L331540
Fail Date: 03/23/2006     Completed Date: 04/13/2006
Noun Desc:  Sender, Camshaft Position
Comments:  Eng. died. Won't start. Low fuel pressure. Replaced CMP sensor
but **found metal shavings on tip.**
(CR 289 & 320, Ln 1)

Fail Date: 03/23/2006     Completed Date: 04/13/2006
Noun Desc:  Injector Unit (Electrical)
Comments:  **Found metal on tip of CMP sensor.** Replace all 6 inj. (found 3
not torqued properly)
(CR 289 & 320, Ln 2)

**Three engines required replacement.**

VIN 3HAJFAVK96L331539
Fail Date:    04/07/2006  Completed Date: 06/19/2006
Noun Desc:  Crankcase
Comments:  Repair for no power. **REPLACE ENGINE**.
(CR 265 & 296, Ln 3)

VIN 3HAJFAVK56L331540
Fail Date: 03/16/2007     Completed Date: 05/30/2007
Noun Desc:  Crankshaft
Comments:  Idler belt broken. Locked up engine. Rod broken. **REPLACED ENGINE** and transferred parts.
(CR 266 & 297, Ln 4)

VIN 3HAJFAVK76L331541
Fail Date: 01/05/2007     Completed Date: 02/05/2007
Noun Desc:  Piston, Pin, Lock, Bushing
Comments:  Repair for lost all eng. oil. Cracked piston. **REPLACE ENTIRE ENGINE**.
(CR 267 & 298, Ln 6)

## Additional Notes Regarding The Engines

As late as October 18, 2006, VIN 3HAJFAVK56L331537 was taken in for service, with the comment, "no power". Appellees kept the truck for a month before returning it to Appellant on November 16, 2006. (CR 271 & 302, Line 5)

VIN 3HAJFAVK56L331538 suffered a myriad of troubles while in limited use. As late as January 29, 2007, it was taken in for service with the comment, "Burning too much fuel. Bad engine miss. Replace all inj(ectors)" [parenthetical added for clarity]. Appellees kept the truck for over a month before returning it to Appellant on March 2, 2007, at or about the time that Appellant purchased the 4300M trucks. (CR 275 & 306, Line 3)

The engine in VIN 3HAJFAVK96L331539 was replaced one hundred seven (107) days after delivery. Nevertheless the replacement engine suffered the same maladies, requiring continuing repairs for "low power" (CR 279 & 310, Line 6, CR 277 & 308, Line 2), "metal debris" (CR 279 & 310, Line 6) and "no power" (CR 268 & 299, Line 2, CR 265 & 296, Line 4, CR 282 & 313, Line 5, CR 265 & 296, Line 1). The last warranty entry is dated April 25, 2007, *after* Appellant traded it in, with the comment "Engine miss & no power". Plainly Appellees failed to correct the engine failures, although given the opportunity to do so with two engines.

Appellees waited to replace the engine in VIN 3HAJFAVK56L331540 until March 16, 2007, *after* Appellant had purchased the 4300M trucks. The replacement work was not completed until May 30, 2007, a month *after* Appellant traded it in.

Appellees waited to replace the engine in VIN 3HAJFAVK76L331541 until January 5, 2007, a month before DeNolf threatened to discontinue warranty support for the CF600 trucks. The replacement work was not completed until February 5, 2007, a month before Appellant purchased the 4300M trucks.

## **Appellees' Breach of Express and Implied Warranties**

Appellees' express warranties and representations became core bases of the bargain and the trucks did not comply with the express warranties and representations. The facts demonstrate the elements necessary to prove Appellant's claims for breach of the implied warranties of merchantability and fitness for intended purpose.

### **Express Warranty**

Tex. Bus. & Com. Code Sec. 2.313 reads, in part,

> (a) Express warranties by the seller are created as follows:
> (
> 1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Appellant's need for reliable, long-distance transportation for his goods was part of the basis of the bargain. Appellant sold and delivered perishable floral products and floral hard goods primarily in underserved markets throughout central and south Texas from Appellant's distribution facility and headquarters located in San Antonio, Texas. Appellant required

47

delivery vehicles that were fit and suitable for regular, long-distance service, while fit and suitable to refrigerate, preserve and market perishable floral products. (CR 199)

DeNolf and Appellant met a number of times after Appellant bought the companies. At each meeting they discussed Appellant's business plan and the importance of reliable long-distance transportation. During one meeting Appellant presented a map of Texas and showed the exact routes and delivery points intended for the trucks, so that DeNolf could appreciate the need for roadworthy long-distance delivery vehicles. (CR 198)

DeNolf expressly warranted and represented that the CF600 was of a quality and characteristic to perform as reliable, long-distance transportation for Appellant's goods. The CF600 was designed and manufactured by Navistar and actually was designed and manufactured for short-distance urban deliveries, not Appellant's intended long-distance deliveries. (CR 199)

DeNolf also recommended specific vendors of choice for both the bodies and the refrigeration units. DeNolf directed the initial design of all components to Appellant's specifications, providing drawings for changes, approval and mating to the truck chassis. (CR 199)

In his affidavit, DeNolf concedes that prior to Appellant's order of the CF600 trucks, Appellant and he discussed the specifications and features of the CF600 trucks; he does not controvert Appellant's testimony. (CR 434)

Appellees' Warranty Summary demonstrates that the trucks did not conform to the warranty. The engine is the beating heart of any truck. The warranty records would indicate that because of repeated engine failure, the trucks were not reliable as transportation and certainly not as long-distance transportation. There is more than a scintilla of evidence that Appellees breached their express warranty.

**Implied Warranty: Merchantability**

Tex. Bus. & Com. Code Sec. 2.314 reads,

> IMPLIED WARRANTY: MERCHANTABILITY; USAGE OF TRADE. (a) Unless excluded or modified (Section 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

> (b) Goods to be merchantable must be at least such as

> (1) pass without objection in the trade under the contract description; and

> (2) in the case of fungible goods, are of fair average quality within the description; and

(3) are fit for the ordinary purposes for which such goods are used; and

(4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(5) are adequately contained, packaged, and labeled as the agreement may require; and

(6) conform to the promises or affirmations of fact made on the container or label if any.

## (1) pass without objection in the trade under the contract description

The trucks did not pass without objection in the trade under the contract description, because the warranty record would indicate an unacceptably high incidence of disabling engine failure. (CR 199, CR 203-CR 260, CR 261-CR 336, Navistar warranty service summaries, CR 475-CR 525, Santex service tickets, Appendix 20, Appellees' Warranty Summary)

## (2) in the case of fungible goods, are of fair average quality within the description

Likewise the trucks are not of fair average quality within the description, because the warranty record would indicate an unacceptably high incidence of disabling engine failure. (CR 199, CR 203-CR 260, CR 261-CR 336, Navistar warranty service summaries, CR 475-CR 525 Santex service tickets, Appendix 20, Appellees' Warranty Summary)

**(3) are fit for the ordinary purposes for which such goods are used**

Again the trucks are not fit for the ordinary purposes for which they are used, because the warranty record would indicate an unacceptably high incidence of disabling engine failure. (CR 199, CR 203-CR 260, CR 261-CR 336, Navistar warranty service summaries, CR 475-CR 525 Santex service tickets, Appendix 20, Appellees' Warranty Summary)

**(4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved**

This Code description assumes that, among the units bought, there are units of acceptable quality. Such is not the instant case. None of the CF600 trucks were reliable as transportation, much less as long-distance transportation. The warranty record would indicate that all of the trucks suffered an unacceptably high incidence of disabling engine failure. (CR 199, CR 203-CR 260, CR 261-CR 336, Navistar warranty service summaries, CR 475-CR 525 Santex service tickets, Appendix 20, Appellees' Warranty Summary)

Appellees' Warranty Summary demonstrates that the trucks were not merchantable (Items 5 & 6 are not applicable.). The warranty record would indicate that all of the trucks suffered an unacceptably high incidence of

51

disabling engine failure. There is more than a scintilla of evidence that Appellees breached the implied warranty of merchantability.

## Implied Warranty: Fitness for Particular Purpose

Tex. Bus. & Com. Code Sec. 2.315 reads,

> IMPLIED WARRANTY: FITNESS FOR PARTICULAR PURPOSE. Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

### Appellees knew particular purpose.

As mentioned above, Appellant and DeNolf met a number of times after Appellant bought the companies. At each of the meetings they discussed Appellant's business plan and the importance of reliable long-distance transportation. During one meeting Appellant presented a map of Texas and showed the exact routes and delivery points intended for the trucks, so that DeNolf could appreciate the need for roadworthy long-distance delivery vehicles. (CR 198)

### Appellant relied on Appellees' skill and judgment.

During the purchasing process, Appellant dealt with DeNolf only. DeNolf said that he would handle everything necessary for the purchase.

DeNolf recommended the Navistar CF600. DeNolf expressly warranted and represented that the CF600 was of a quality and characteristic to perform as reliable, long-distance transportation for Appellant's goods. DeNolf also recommended specific vendors of choice for both the bodies and the refrigeration units. DeNolf directed the initial design of all components to Appellant's specifications, providing drawings for changes, approval and mating to the truck chassis. Appellant decided to follow DeNolf's recommendations. (CR 199)

The trucks were not fit as reliable transportation, much less long-distance transportation. Appellees breached the implied warranty of fitness for particular purpose, because all of the trucks suffered an unacceptably high incidence of disabling engine failure.

**Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series**

Appellees breached the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series. On or about February 2, 2007, DeNolf proposed that Appellant replace the CF600 fleet with a different model truck (International 4300M) at a higher price and financial cost. Appellant and DeNolf discussed the proposal on several occasions. Each time Appellant shared his reservations and concerns. (CR 200)

Finally, DeNolf said to Appellant, bottom line, they were done. Appellees would no longer provide warranty support for Appellant's CF600 fleet. Appellees would cease to honor warranty obligations and other commitments to Appellant's CF600 fleet, although the warranties otherwise would be in effect through December 2008. DeNolf said that Appellant would have full responsibility for breakdowns, including towing, repair and substitute delivery trucks during the repair period. (CR 200)

Appellees breached the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series, by withdrawing warranty support in February 2007, although the warranty was valid through December 2008.

## ISSUE 3

The Trial Court erred in adjudging Appellant's claims of failure of essential purpose, economic coercion and duress, because Appellees did not expressly present the claims to the Trial Court. (CR 858-859)

Tex. R. Civ. P. 166a(c) provides that "The motion for summary judgment shall state the specific grounds therefor." The Court erred in adjudging Appellant's claims of failure of essential purpose, economic coercion and duress, because Appellees did not expressly present the claims in either of their motions for summary judgment. *Chessher v. Southwestern Bell Telephone Company*, 658 S.W.2d 563 (Tex. 1983).

54

In his response and surreply to Appellees' Disclaimer Motion and in his motion for new trial, Appellant pointed out to the Trial Court that neither Appellees' Disclaimer Motion nor Appellees' No-Evidence Motion addressed Appellant's claims for failure of essential purpose, economic coercion and duress. (CR 47, 184, 448, 545, 860) As a precaution, Appellant proffered evidence in support of the claims as well as legal argument. (CR 192-196, 199-201, 203-260, 261-336, 475-525, 448-449) Although Appellees filed replies, they still did not address the economic coercion and duress claims or failure of essential purpose. (CR 406, 437)

Appellees must establish their entitlement to summary judgment on the issues expressly presented to the Trial Court. *Chessher*, Id at 564; *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993); *Alder v. Laurel*, 82 S.W.3d 372 (Tex.App.-Austin 2002, no pet.). Disregarding Tex. R. Civ. P. 166a.(c), the Trial Court abused its discretion in adjudging failure of essential purpose, economic coercion and duress claims.

### **Failure of Essential Purpose is properly before the Trial Court.**

In response to Appellant's Motion for New Trial, Appellees concede that Appellant raised duress and business coercion in his Third Amended Original Petition, but Appellees suggest that Appellant "never validly raised

55

a claim for failure of essential purpose". (CR 2013) Appellant's Third

Amended Original Petition recites facts sufficient to give Appellees fair and

accurate notice of the failure of essential purpose. *Dickenson*, supra at 853-

854. Appellees did not make a special exception.

In *Dickenson* Dickenson did not formally plead failure of essential

purpose. The *Dickenson* Court wrote at 853:

> The Texas Business and Commerce Code provides that a
> plaintiff may assert a claim for money damages "[w]here
> circumstances cause an exclusive or limited remedy to fail of its
> essential purpose...." [citation omitted] The failure of a limiting
> clause's essential purpose is a matter properly pled and
> submitted to the jury when contested. [citation omitted] The
> failure to so plead or submit this issue is not fatal, however,
> where no special exception is made to the plaintiff's pleadings.
> See *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982).
>
> ***
>
> The pleadings in Roark, a medical malpractice case, did not use
> the word "negligent" or otherwise indicate that the defendants
> failed to use ordinary care.
>
> ***
>
> The [*Roark*] Court explained:
>
> When there are no special exceptions, a petition will be
> construed liberally in favor of the pleader. *Stone v. Lawyers
> Title Insurance Corp.*, 554 S.W.2d 183, 186 (Tex.1977). Also,
> "[t]he court will look to the pleader's intendment and the
> pleading will be upheld even if some element of a cause of

56

action has not been specifically alleged. Every fact will be supplied that can reasonably be inferred from what is specifically stated." *Gulf, Colorado & Santa Fe Railway Co. v. Bliss*, 368 S.W.2d 594, 599 (Tex.1963). A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim.

In his Third Amended Original Petition, Appellant writes,

A reliable mode of transportation was essential to Plaintiff's business. After purchasing the business, Plaintiff contacted Santex to replace Plaintiff's fleet of aging delivery trucks. Plaintiff explained to Santex Plaintiff's business requirements and purposes, and asked that Santex recommend a suitable truck. (CR 24-25, Paragraph 3)

***

After multiple briefings, Santex recommended the CF600, a vehicle actually designed and manufactured for short-distance urban deliveries, not the intended long-distance deliveries. In addition, after Plaintiff experienced repeated mechanical problems, Plaintiff learned that engine of the CF600 had manufacturing troubles, resulting in an increased risk of breakdown while in service. Santex and Navistar knew about the increased risk of breakdown, and the associated loss of revenue and product that Plaintiff would suffer; but neither Santex nor Navistar advised Plaintiff. (CR 25, Paragraph 4)

***

Plaintiff purchased five (5) trucks. The trucks continually broke down while in service. (CR 25, Paragraph 5)

***

Plaintiff has lost $310,000, representing the value of products placed on trucks for delivery; but rendered unsaleable because of breakdowns. Plaintiff has lost $450,000, representing revenue from products placed on trucks; but rendered undeliverable because of breakdowns. (CR 25-26, Paragraph 6)

Appellant did not use the exact words "failure of essential purpose", but the facts recited in the Third Amended Original Petition are sufficient, using such words as "A reliable mode of transportation was essential to Plaintiff's business."; "after Plaintiff experienced repeated mechanical problems, Plaintiff learned that engine of the CF600 had manufacturing troubles, resulting in an increased risk of breakdown while in service."; "The trucks continually broke down while in service."; "unsaleable because of breakdowns"; "undeliverable because of breakdowns". The expressions accurately describe a failure of essential purpose.

Alternatively, failure of essential purpose was tried by consent. In *Plaintiff's Surreply to Defendants' Motion for Summary Judgment*, Appellant dedicated an entire section to failure of essential purpose, citing applicable statutory and case law and evidence in the summary judgment record. (CR 199-201, 203-260, 261-336, 475-525, 448-449) Although Appellees filed a response to Appellant's surreply, they neither contested nor objected to Appellant's briefing of failure of essential purpose. (CR 541-543)

In addition, the Trial Court's final order expressly recites, "The Court has reviewed the motion to [sic] summary judgment, any response to the motion and all matters of record" demonstrating that the Trial Court deliberately considered failure of essential purpose. (CR 858) Significantly, the Court then granted judgment as to Appellant's claims of breach of express warranties, implied warranties of fitness for purpose and implied warranties of merchantability only. (CR 858-859)

Appellant "validly raised" his claim for failure of essential purpose.

### Failure of Essential Purpose

Tex. Bus. & Com. Code Sec. 2.719(b) provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." Remedies to "be had" would include incidental and consequential damages. Tex. Bus. & Com. Code Sec. 2.715. In the present case, the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series failed of its essential purpose.

The *Dickenson* court addressed the issue at 854:

The parties to a contract are free to reasonably limit their remedies under section 2.719 but, where an apparently fair and reasonable limitation because of circumstances fails in its purpose or operates to deprive a party of the substantial value of the bargain, the limited remedy must give way to the general

59

remedy provisions of the code. See TEX.BUS. & COM.CODE ANN. sec. 2.719 comment 1 (Tex.UCC). From the buyer's standpoint, the purpose of the limited remedy is to give the buyer goods that conform to the contract within a reasonable time after the defect is discovered. [citation omitted] Good faith attempts to repair may be relevant to the issue of what constitutes a reasonable time. See id. at 427 n. 2. However, the limited remedy fails of its essential purpose and deprives the buyer of the substantial value of the bargain when the warrantor does not correct the defect within a reasonable time.

The court noted that "Dickenson returned the car for repairs at least seven times over an eight month period." The court held that "These facts constitute at least some evidence that the limited warranty failed of its essential purpose since the warrantor was unable to correct the car's defects within a reasonable time." *Dickenson*, Id at 854.

Appellees' Warrant Summary demonstrates that the Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series failed of its essential purpose since Appellees were unable to correct the engine defects within a reasonable time.

## Duress & Business Coercion

Economic coercion and duress are torts, and Appellant may sue Appellees for resulting damages. *State National Bank of El Paso v. Farah*

*Manufacturing Company, Inc.*, 678 S.W.2d 661, 684 (Tex.App. - El Paso

1984). The *Farah* court wrote:

> In the only Texas case found to address the point, it was held that duress is a tort. *Housing Authority of City of Dallas v. Hubbell*, 325 S.W.2d 880, 902 (Tex.Civ.App.--Dallas 1959, writ ref'd n.r.e.). There, the court stated: [Duress] often arises in connection with breach of contract, but it is nevertheless a tort, .... One who sustains damage as a result of being subjected to duress may sue as plaintiff against the wrongdoers. "Economic coercion", the basis of Lewis' cause of action, is generally considered a form of duress.

Under Texas law, when one coerces another to execute a contact by

taking undue or unjust advantage of the person's economic necessity or

distress, the contract may be invalid or unenforceable. *Brown v. Cain Chem.,*

*Inc.,* 837 S.W.2d 239, 244 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

This legal theory is called economic duress. It requires both the acts or

conduct of the opposing party and the necessities of the alleged victim or his

fear of what a third person might do. *Id.* The victim's plight alone will not

suffice; it must be coupled with the bad acts of the transgressor. *Id.* What

constitutes duress is a question of law for the court. *Windham v. Alexander,*

*Weston & Poehner, P.C.,* 887 S.W.2d 182, 185 (Tex.App.-Texarkana 1994,

writ denied); *Matthews v. Matthews,* 725 S.W.2d 275, 278 (Tex.App.-

Houston [1st Dist.] 1986, writ ref'd n.r.e.). However, whether duress exists in

a particular situation is generally a fact question dependent upon all the circumstances surrounding the situation, including the mental effect on the party claiming duress. *Windham,* supra at 185; *Matthews,* Id at 278.

Economic duress consists of (1) a threat to do something a party has no legal right to do, (2) an illegal exaction or some fraud or deception, and (3) an imminent restraint that destroys the victim's free agency and leaves him without a present means of protection. *Dale v. Simon,* 267 S.W. 467, 470 (Tex. Comm'n App.1924); *King v. Bishop,* 879 S.W.2d 222, 223 (Tex.App.-Houston [14th Dist.] 1994, no writ); *Brown,* supra at 244.

On or about February 2, 2007, DeNolf proposed that Appellant replace the CF600 fleet with a different model truck (International 4300M) at a higher price and financial cost. Appellant and DeNolf discussed the proposal on several occasions. Each time Appellant shared his reservations and concerns. (CR 200)

Finally, DeNolf said to Appellant, bottom line, they were done. Appellees would no longer provide warranty support for Appellant's CF600 fleet. Appellees would cease to honor warranty obligations and other commitments to Appellant's CF600 fleet, although the warranties otherwise would be in effect through December 2008. DeNolf said that Appellant

would have full responsibility for breakdowns, including towing, repair and substitute delivery trucks during the repair period. (CR 200)

Subject to the threat, Appellant purchased the new 4300M trucks and incurred additional debt to do so. (CR 200) The threat exacted duress and business coercion, compelling Appellant to purchase the 4300M trucks involuntarily and against his will. But for the threat, he had no desire or intent to purchase the new 4300M trucks. (CR 201)

The threat to discontinue warranty support, almost two years before the warranties actually would expire, was intended to coerce Appellant to purchase new trucks. Appellant did purchase the 4300M trucks while under the threat. The threat destroyed Appellant's free agency and left him without a present means of protection. But for the threat to discontinue warranty support, Appellant would not have purchased the 4300M trucks. (CR 201)

## Damages:
### In Support of Issues 2 & 3

Appellant suffered damages as a result of Appellees' misconduct. Attached as Exhibits B and C to the Appellant's Warranty Affidavit is proof of damages related to Appellant's claims. (CR 337-352) Exhibit B indicates that Appellant has lost $2,572,568, representing lost profit for years 2006

63

and 2007 while the business was operational and $5,453,917, representing future lost profit for years 2008, 2009 and 2010. Appellant has lost $9,552,464, representing the value of the business. Appellant also has lost $211,276.00, representing the difference between the price paid for the CF600 trucks and the actual value of the CF600 trucks. (CR 201, 337-351)

In connection with his claim for business coercion and duress, Appellant is entitled to recover the difference in cost of the new 4300M fleet and the value of the CF 600 fleet at the time of the purchase of the 4300M fleet. The difference is $354,233.70. (CR 201, 352)

## ISSUE 4

The Trial Court erred in granting *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)*, because (1) Appellee's summary judgment evidence is legally insufficient to prove a transfer of assets; (2) there is a genuine issue of material fact whether or not Appellant transferred his assets. (CR 856-857)

Appellees filed a second traditional motion for summary judgment entitled *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)* ("Appellees' Standing Motion") asserting that Appellant lacks standing. Appellees alleged that Appellant transferred title to his trucks and business on June 12, 2006 and therefore Appellant should be

barred from recovering damages occurring after June 12, 2006. No other issues are set out in Appellees' Standing Motion. (CR 545-553)

Appellant responded that he did not transferred title to his trucks and business. (CR 566-567, *Plaintiff's Response to Defendants' Second Motion for Summary Judgment*, CR 568, *Affidavit of Albert Lujan in Support of Response to Appellees' Second Motion for Summary Judgment* ("Appellant's Standing Affidavit"))

The Trial Court concluded that Appellant raised a fact issue that would preclude summary judgment. At the hearing, the Trial Court remarked,

> And so if the Court has the authority, which I'm not convinced I do, to strike the affidavit, then I will. If I don't have the authority, then I think you've created a fact issue.
> (RR Vol. 5, Page 43, Lines 4-7)

> ***

> I'll see if there's any authority for the Court to strike the affidavit. Otherwise, if I can't strike it, then I anticipate that the Court will be --will say that there's a fact issue and that point will be argued to the jury. (RR Vol. 5 Page 43, Lines 14-18)

The Trial Court did strike Appellant's Standing Affidavit, finding that it was a "sham" and that Appellant's Standing Affidavit was filed in bad faith. Tex. R. Civ. P. 13 and Tex. Civ. Prac. & Rem. Code § 10.001. (CR

65

856-857) The Trial Court also sustained Appellees' objection to the following testimony as conclusory and excluded it from the summary judgment proof:

> At no time have I transferred my assets and liabilities of Texas Wholesale Flower Company. I did not transfer ownership of my trucks nor my business to a corporation. (CR 857)

Then the Trial Court granted Appellees' Standing Motion. (CR 856-857)

## Standard of Review

The Court of Appeals reviews a summary judgment *de novo*. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). It reviews the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).

The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see also Knott*, 128 S.W.3d at 216.

66

**Appellant conducted business as a sole proprietorship.**

Appellant conducted business as a sole proprietorship, Texas Wholesale Flower Company. (CR 568, Appellant's Standing Affidavit) Appellees alleged that Appellant transferred ownership of his trucks and his entire business to the corporation, Texas Wholesale Flower Company, Inc. To prove the alleged transfer, Appellees rely on a page entitled *Section 351 Election*, pulled from Appellant's 2006 tax return. Appellees filed no other evidence to prove actual transfer. (CR 547, 561)

**A Section 351 Election is not an instrument to transfer assets.**

On its face, Appellees' proof of the alleged transfer is legally insufficient. A section 351 election is not recognized in Texas as an instrument to transfer legal title to assets and liabilities. (cf. Tex. Transp. Code Sec. 501.071, *Sale of Vehicle. Transfer of Title.* "a motor vehicle may not be the subject of a subsequent sale unless the owner designated on the title submits a transfer of ownership of the title."; Tex. Transp. Code Sec. 502.042, *Title Required for Registration.* "The department may not register or renew the registration of a motor vehicle for which a title is required under Chapter 501 unless the owner: (1) obtains a title for the vehicle.")

**Section 351 addresses the federal tax treatment of gains and losses.**

26 U.S.C. § 351 addresses the recognition of gains or losses for federal income tax purposes, *in the event of* a transfer of assets. Nothing more. If no transfer occurs, then section 351 is not implicated. Section 351 reads, in pertinent part, as follows.

> No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Section 351 does not provide the framework to transfer assets. It regulates the tax treatment of the gains and losses associated with a transfer that has occurred. In this case, no transfer occurred.

Appellees' proof is legally insufficient to demonstrate transfer of Appellant's assets. In addition, Appellant raised an issue of material fact, and the Trial Court agreed, regarding the title to the trucks and assets, The Trial Court should have denied Appellees' Standing Motion. (CR 856-857)

**ISSUE 5**

The Trial Court erred in striking Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* as a "sham", as a Tex. R. Civ. P. 13 sanction and as a Tex. Civ. Prac. & Rem. Code § 10.001 sanction, because (1) Appellant's material sworn deposition testimony is not inconsistent with Appellant's affidavit testimony; (2) Appellant's counsel's unsworn hearing statements are not inconsistent with Appellant's affidavit testimony; (3) Appellant's counsel's unsworn hearing statements do not trigger application of the "sham" affidavit notion; (4) if counsel's unsworn statements may form a basis for application of the notion, then counsel satisfactorily explained any perceived inconsistency at the subsequent hearing on January 27, 2014; (5) Appellant's affidavit is neither groundless nor brought in bad faith; (6) Appellant's affidavit is warranted by the evidence. (CR 856-857, CR 862, paragraph 5, 1st Supp. CR 44)

The Trial Court struck Appellant's Standing Affidavit, finding that it was a "sham" and that Appellant's Standing Affidavit was filed in bad faith. Tex. R. Civ. P. 13 and Tex. Civ. Prac. & Rem. Code § 10.001. (CR 856-857)

**Standard of Review**

The Court of Appeals reviews the Trial Court's sanction order for abuse of discretion. *Zarsky v. Zurich Management, Inc.*, 829 S.W.2d 398 (Tex.App. -Houston [14 Dist.] 1992).

69

**"Sham"**

In *Farroux v. Denny's Rests., Inc.*, 962 S.W.2d 108, 111 (Tex. App.—Houston [1st Dist.] 1997, no pet.) the First Court of Appeals gave life to the notion of a "sham" affidavit, writing,

> A party cannot file an affidavit to contradict his own deposition testimony without any explanation for the change in the testimony, for the purpose of creating a fact issue to avoid summary judgment.

In *Thompson v. City of Corsicana Housing Authority,* 57 S.W.3d 547, 557 (Tex.App. —Waco 2001) the Tenth Court of Appeals writes a simple but compelling analysis against the notion,

> It appears that the First Court of Appeals relied solely on federal summary judgment authorities to reach this conclusion. However, the Supreme Court has expressly disavowed the application of federal procedural standards to summary judgment motions filed under Rule 166a. [citations omitted] *** For these reasons, we adhere to our statement in *Sosebee*. If a party provides inconsistent or conflicting summary judgment proof, that party has created a fact issue for the trier of fact to resolve. [citations omitted]

The Texas Supreme Court does not recognize the "sham" affidavit notion. *Randall v. Dallas Power & Light Co.*, 752 S.W.2d 4, 5 (Tex. 1988) (per curiam).

The court of appeals completely ignores the well-established rule that a deposition does not have controlling effect over an affidavit in determining whether a motion for summary judgment should be granted. [citation omitted] Thus, if conflicting inferences may be drawn from a deposition and from an affidavit filed by the same party in opposition to a motion for summary judgment, a fact issue is presented. [citation omitted] *** Thus, summary judgment was improperly granted.

**Appellant's testimony is not contradictory.**

Assuming arguendo that the notion is sound, Appellees bear the burden to prove that there *are* material contradictions in Appellant's affidavit and his deposition testimony. Tex. R. Civ. P 166a(c) Out of one thousand pages of deposition testimony, Appellees' could cite no more than the following.

Q: I thought you filed corporate tax returns in '06 and '07.
A: Yeah. Then it must have been changed. At some point in there, it was changed.
Q: Let me back up, though. But you did incorporate the business --
A: At some point.
Q: -- in '06?
A: At some point, yes.

(CR 846, *Second Supplementary Brief in Support of Defendants' Motion for Partial Summary Judgment and Striking Plaintiff's Affidavit*, filed eight days after the hearing)

71

The affidavit testimony does not contradict the deposition testimony. Appellant's Standing Affidavit contains no testimony (1) that corporate tax returns were *not* filed nor (2) that a corporation was *not* formed. CR 568-569) Appellant's Standing Affidavit cannot be stricken as a "sham".

**The Affidavit testimony does not contradict counsel's statements.**

Failing to find conflicting deposition testimony, Appellees attempted to extend the "sham" notion to include unsworn statements of counsel. (CR 591, 594, *Defendants' Reply to Plaintiff's Response to Defendants' Motion for Partial Summary Judgment*) No Court of Appeals has ventured to make this leap from sworn deposition testimony of a party to unsworn statements of counsel.

Assuming arguendo that unsworn statements of counsel are fair game, Appellant's Standing Affidavit does not contradict counsel's unsworn statements. Moreover, counsel satisfactorily explained any perceived change at the subsequent hearing on January 27, 2014. (RR Vol. 5, Page 12, Line 4 through Page 21, Line 11) The following excerpts are taken from the hearing for Appellees' motion to strike the intervention of the corporation, Texas Wholesale Flower Company, Inc.

72

I produced our damage model in March of 2012. And then they also requested tax returns. When my client wired the tax returns to me or e-mailed the tax returns to me, I saw, I saw that there was an 1120 Sub Chapter S return in there. This is May 2012. When I asked him about it, he said his accountant made him do it, or advised that he'd do it, but he never did anything with it. I asked him what about the trucks? Did you ever convey the title to the trucks? And he said, no, I have title to the trucks. In fact, in 2007, he had purchased another fleet, also in his name, so he never actually transferred legal title.
(RR Vol. 4, Page 8, Lines 12-23)

Last month, anticipating we were going to trial, I read through the records and I read through the 2006 return. And that's when I found the 351 transfer...(RR Vol. 4, Page 9, Lines 18-20)

...it's something that we had to address before the Court before we went to trial so we didn't have this in front of the jury. (RR Vol. 4, Page 10, Lines 1-3)

In June of 2006, based upon advice of his accountant, Texas Wholesale Flower Company, the same business, executed [sic] [elected] this 351 transfer, making Appellant a hundred percent shareholder, but nothing else changed. Texas Wholesale Flower Company -- everything was identical. Employees, telephone number, business contacts, everything, absolutely everything was the same. (RR Vol. 4, Page 10, Lines 10-16)

Appellant's Standing Affidavit does not contradict counsel's statements. Appellant's Standing Affidavit contains no testimony (1) that Appellant does *not* acknowledge the 351 election (2) that corporate tax returns were *not* filed. Appellant's Standing Affidavit *does* contain clear, positive and direct statements of fact that Appellant did *not* take the steps

73

necessary to effect an actual transfer of the items listed in the 351 election.

Appellant's Standing Affidavit specifically supports counsel's statement that "absolutely everything was the same". (CR 568-569)

The Trial Court abused its discretion in striking Appellant's Standing Affidavit as a "sham". (CR 856-857)

**Appellees are not entitled to sanctions.**

The Court erred in striking Appellant's Standing Affidavit as a Rule 13 sanction. (CR 856-857) Tex. R Civ. P. 13 provides in part as follows:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith...

> ***

> Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law.

Procedurally Rule 13 requires preliminary findings that a pleading is groundless and brought in bad faith. "Groundless" means "no basis in law or fact". Rule 13 mandates that the Court presume that Appellant's pleadings, in

74

this instance Appellant's Standing Affidavit, are filed in good faith. Rule 13 requires that the Court find good cause, "the particulars of which must be stated in the sanction order." The Court's order is defective, because the particulars are not stated. (CR 856-857) Appellant pointed out the defect in his motion for new trial. The Trial Court abused its discretion by failing to state the particulars.

Similarly, Tex. Civ. Prac. & Rem. Code § 10.001 provides that by signing a pleading, a party represents that "each denial in the pleading or motion of a factual contention is warranted on the evidence..."

In addition Tex. Civ. Prac. & Rem. Code § 10.005 provides, "A court shall describe in an order imposing a sanction under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed." The Court's order is defective, because it neither describes the violative conduct nor explains the basis for the sanction. (CR 856-857) Appellant pointed out the defect in his motion for new trial. (CR 860, 862) The Trial Court abused its discretion by failing to describe the violative conduct and the basis for the sanction imposed.

As demonstrated, Appellant's Standing Affidavit is neither groundless nor brought in bad faith. Appellant has remained steadfast in his testimony

75

and pleadings throughout this proceeding, and his testimony and pleadings are warranted by evidence. The Trial Court abused its discretion in striking Appellant's Standing Affidavit.

**Appellant was denied the opportunity to amend.**

Appellees' complaints of "sham" and bad faith are objections to the form of Appellant's Standing Affidavit. *Broadnax v. Kroger Texas*, No. 05-04-01306-CV (Tex. App.-Dallas 2005) ("Kroger's general objection that Broadnax's affidavit is a sham affidavit because it contradicts his deposition testimony is an objection complaining of a defect in the form of his affidavit."). Tex R. Civ. P. 166a(f) mandates that in the event of defects in the form of an affidavit, the affiant must be given an opportunity to amend.

The summary judgment hearing was set for Monday, January 27, 2014. (CR 564) Appellees first raised their complaints on Friday afternoon, January 24, 2014. (CR 591-599) Appellant filed his objection and motion to strike on Sunday, January 26, 2014. (CR 782-784) Appellant requested that Appellees' reply be stricken or alternatively that the Trial Court reset the hearing twenty-one days. The resetting would have given Appellant an opportunity to amend Appellant's Standing Affidavit in accordance with Tex.

R. Civ. P. 166a(f). The Trial Court denied Appellant's requests. (RR Vol. 5, Page 11, Lines 21-25, Page 12, Lines 1-3)

The Trial Court abused its discretion in denying Appellant the opportunity to amend Appellant's Standing Affidavit.

## ISSUE 6

The Trial Court erred in ruling that the statements contained in Appellant's *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* are conclusory, because Appellant's affidavit contains clear, positive and direct statements of fact. (CR 856-857)

The Court erred in striking as conclusory the statements from Appellant's Standing Affidavit, "At no time have I transferred my assets and liabilities of Texas Wholesale Flower Company. I did not transfer ownership of my trucks nor my business to a corporation." (CR 856-857) There is no way to prove these negatives except by direct testimony of the actor. The statements are not conclusory.

Appellant's affidavit is divided into two paragraphs. Paragraph 1 addresses the sole proprietorship, Albert Lujan d/b/a Texas Wholesale Flower Co. Appellant is the sole proprietor. He is Texas Wholesale Flower Co. The paragraph contains clear, positive and direct statements of what Appellant did and did not do. Tex. R Civ. P. 166a(c). There can be no more

77

clear, positive and direct a statement of fact than an affiant's testimony of what he did and did not do, of action he did and did not take. Tex. R. Civ. P 166a(c). Specifically concerning the stricken statements, they are clear, positive and direct statements of fact concerning what Appellant himself did not do. Tex. R Civ. P. 166a(c). Appellant did not transfer his business assets and liabilities nor the trucks made the basis of his claims. (CR 568-569)

## ISSUE 7

The Trial Court erred in overruling Appellant's objection to Appellee's *Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment*; the Trial Court erred in denying Appellant's motion to strike Appellees' *Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment*; the Trial Court erred in denying Appellant's alternative request for resetting of the hearing for *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) and 166a(e)*, because Appellees introduced additional summary judgment evidence less than twenty one days before the hearing in violation of Tex. R. Civ. P. 166a. (RR Vol. 5, Page 11, Lines 21-25, Page 12, Lines 1-3)

Appellees' Standing Motion was set for hearing January 27, 2014. (CR 564) Appellees' *reply* to Appellant's response was filed January 24, 2014. (CR 591-599)  Appellees' reply contains the following statement.

78

## STATEMENT OF INTENT TO USE UNFILED DISCOVERY
## AS SUMMARY JUDGMENT PROOF

Per Tex. R. Civ. P. 166a(d), Defendants intend now to use the following unfiled discovery items as summary judgment proof to discredit Plaintiff's affidavit;

1. E-mail producing Appellant's 2006 Income Tax Return (Exh. 2).
2. Letter dated October 3, 2013, from Appellees to Appellant (Exh. 3)
3. Transcript of oral argument on Appellees' Motion to Strike, dated Oct. 21, 2013 (Exh. 4)
4. Promissory Notes to TexStar Bank (Exh. 5).
5. Texas Wholesale Flower Co. Inc.'s 2007-2009 tax returns (Exh. 6).
(CR 598)

Appellant objected to Appellees' reply because it was not timely filed, and moved the court to strike it. Alternatively, Appellant requested that the Trial Court reset the hearing at least twenty-one days. (CR 782-784)

The Tex. R. Civ. P. 166a(d) reads as follows.

(d) **Appendices, References and Other Use of Discovery Not Otherwise on File.** Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

Appellant specifically objected to the items 1, 4 and 5 of the additional summary judgment proof, because the documents were not used in compliance with Tex. R. Civ. P. 166a(d). (CR 783) Appellees did not file and serve the proof with a statement of intent to use the specific discovery as summary judgment proofs at least twenty-one days before the hearing.

Tex. R. Civ. P. 166a(c) reads in part, "Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing". Notably there is no provision permitting a reply to a response; but logically, a reply should comply with the time constraint of the motion.

Appellant specifically objected to items 1, 2, 3, 4 and 5 of the additional summary judgment proof, because the documents are not used in compliance with Tex. R. Civ. P. 166a(c). (CR 783) Appellees did not file and serve the proof or the reply at least twenty-one days before the hearing and Appellees did not seek leave to file the new evidence. Instead, Appellees took the position that leave was not required, because the evidence was not filed in support of the motion.

In *Mansfield v. Ohio Casualty Insurance Company,* 40 S.W.3d 528, 530 (Tex. App.–Houston [14th Dist.] 2000), the Court of Appeals writes,

> Where a movant files summary judgment proof outside the twenty-one day period and without leave of the court, such proof is not properly before the trial court on the motion for summary judgment.

Appellees' additional proof and reply were not properly before the Trial Court; Appellees did not seek leave to file the additional evidence; the Trial Court did not grant leave to file the additional evidence. Tex. R. Civ. P. 166a(c) & (d). The Trial Court abused its discretion in overruling Appellant's objection and in denying Appellant's motion to strike or alternative request for resetting.

## PRAYER

Appellant prays that the Court of Appeals reverse the judgment of the Trial Court and render judgment that Appellees' disclaimer of warranties is inoperative to bar Appellant's express and implied warranty claims. Alternatively, Appellant prays that Court of Appeals reverse the judgment of the Trial Court and remand Appellees' disclaimer defense for trial.

In addition, Appellant prays that the Court of Appeals reverse the judgment of the Trial Court and remand Appellant's claims of breach of implied and express warranties, failure of essential purpose, duress and business coercion for trial.

In addition, Appellant prays that Court of Appeals reverse the judgment of the Trial Court and remand Appellees' standing defense for trial.

CODDOU & CODDOU
A Professional Corporation

/S/ Wesley S. Coddou
Wesley S. Coddou
04468300
1206 Neck Road
Ponte Vedra Beach, Florida 32082
Telephone: 713.993.0208
Facsimile: 713.993.0209
wsc@coddouandcoddou.com
ATTORNEYS FOR APPELLANT

# CERTIFICATE OF COMPLIANCE

In reliance on the word count of the computer program used to prepare this document, I certify that the number of words in this document is **14,222**.

/S/ Wesley S. Coddou

## CERTIFICATE OF SERVICE

I certify that on March 27, 2015, I e-served and e-mailed this instrument upon counsel for Appellees Navistar, Inc., Navistar International Corporation, Navistar International Transportation Corp., International Truck and Engine Corporation and Santex Truck Centers, Ltd.

/S/ Wesley S. Coddou


Richard A. Sheehy
rsheehy@sheehyware.com
William J. Collins, III
wcollins@sheehyware.com
Sheehy, Serpe & Ware, P.C.
2500 Two Houston Center
909 Fannin
Houston, Texas 77010-1008
By e-service and e-mail
ATTORNEYS FOR APPELLEES

APPENDIX CONTENTS

1.    The Trial Court's *Amended Order* granting *Defendants' Motion for Summary Partial Judgment Pursuant to Rules 166a(b) & 166a(e)*

2.    The Trial Court's *Order* granting *Defendants' Motion for Summary Judgment Pursuant to Rules 166a(b) and 166a(i)*

3.    Denial of Motion to Strike or Request for Resetting

4.    Tex. Bus. & Com. Code Sec. 1.201(10) "Conspicuous"

5.    Tex. Bus. & Com. Code Sec. 2.313 Express Warranty

6.    Tex. Bus. & Com. Code Sec. 2.314 Implied Warranty: Merchantability

7.    Tex. Bus. & Com. Code Sec. 2.315 Implied Warranty: Fitness

8.    Tex. Bus. & Com. Code Sec. 2.316(b) Exclusion of Warranties

9.    Tex. Bus. & Com. Code Sec. 2.715 Buyer's Damages

10.   Tex. Bus. & Com. Code Sec. 2.719(b) Failure Essential Purpose

11.   Tex. Civ. Prac. & Rem. Code § 10.001 Signing Pleadings

12.   Tex. Civ. Prac. & Rem. Code § 10.005 Sanction Order

13.   Tex. Transp. Code Sec. 501.021

14.   Tex. Transp. Code Sec. 501.071

15.   26 U.S.C. § 351 Transfer Gain or Loss

16.   Tex. R. Civ. P. 13 Signing Pleadings

17.   Tex. R. Civ. P. 166a Summary Judgment

18.   Retail Buyer's Order

19.   Limited Standard Warranty(s) for Medium Duty CF500/CF600 Series

20. Appellees' Warranty Summary

21. *Affidavit of Albert Lujan in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*

22. Case Law

   Claims Not Presented.*Chessher v. Southwestern Bell Telephone*

   Claims Not Presented.*McConnell v. Southside ISD*

   Claims Not Presented.*Alder v. Laurel*

   Contract Elements.*Parker Drilling C. v. Romfor Supply Co.*

   Disclaimer.*Mercedes-Benz et al v. Dickenson*

   Disclaimer.*Womco v. Navistar*

   Disclaimer.*Fieldtech v. Component Control*

   Disclaimer.*Dewayne Rogers Logging v. Propac Industries*

   Duress.*State National Bank of El Paso v. Farah Manufacturing*

   Opportunity to Amend.*Broadnax v. Kroger Texas*

   Sanction Order.*Zarsky v. Zurich Management*

   Sham.*Randall v. Dallas Power & Light Company*

   Sufficiency of Pleadings.*Roark v. Allen*

   Untimely Evidence.*Mansfield v. Ohio Casualty Insurance Company*

2/4/2014 2:25:25 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 380714
By: FRAZIER, WILLIE J

CAUSE NO. 2009-77458

| | | |
|---|---|---|
| ALBERT LUJAN d/b/a<br>TEXAS WHOLESALE FLOWER CO. | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| *Plaintiff* | §<br>§<br>§ | |
| V. | §<br>§ | |
| NAVISTAR, INC., NAVISTAR<br>INTERNATIONAL CORPORATION,<br>NAVISTAR INTERNATIONAL<br>TRANSPORTATION CORP.,<br>INTERNATIONAL TRUCK AND<br>ENGINE CORPORATION, and<br>SANTEX TRUCK CENTERS, LTD. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | HARRIS COUNTY, TEXAS |
| *Defendants* | §<br>§ | 129TH JUDICIAL DISTRICT |

## AMENDED ORDER

BE IT REMEMBERED that on this the __5th__ day of __February__, 2014, came before me Defendants Navistar, Inc. and Santex Truck Centers, Ltd.'s Motion for Partial Summary Judgment and Striking Plaintiff's Affidavit, and the Court having considered all of Defendants' briefs and pleadings in support of the same and all of Plaintiff's briefs and pleadings in opposition to the same, as well as all exhibits and the oral arguments of all counsel, finds that said motion is meritorious; it is, therefore,

It is ORDERED that Defendants' Partial Motion for Summary Judgment be in all things GRANTED; it is further ORDERED that as a matter of law, Plaintiff Albert Lujan d/b/a Texas Wholesale Flower Co lacks standing and is prohibited from recovering damages incurred after June 12, 2006.

In addition to its finding on the merits of Defendants' Motion for Partial Summary Judgment, this Court finds:

2133112

9

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

856

Plaintiff's statements in his affidavit that "[a]t no time have I transferred my assets and liabilities of Texas Wholesale Flower Company" and "I did not transfer ownership of my trucks nor my business to a corporation," are conclusory and therefore excluded as inadmissible summary judgment proof:

_____X_____ Granted _____ Denied; and

Plaintiff's Affidavit is stricken as it was made in bad faith and therefore is excluded as inadmissible summary judgment proof; and *as a sanction under TRCP and CPRC.*

_____X_____ Granted _____ Denied; and

██████████ Plaintiff's Affidavit should be stricken as it is inadmissible summary judgment proof under the "Sham Affidavit Doctrine."

_____X_____ Granted _____ Denied; and

████████████████████████████████████████████████
████████████████████████████████████████████ .00.
████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
ground████████████████████████████████████████████
the ██████████████████████████████████████████████
including ████████ under TEX. CIV. PRAC. & REM. CODE ANN. § 10.004 (C)(3)
██████████

████████████████████████

SIGNED this __5__ day of ___February___, 2014.

FEB 0 5 2014

_____
JUDGE PRESIDING

2133112                                  10

CAUSE NO. 2009-77458

| | | |
|---|---|---|
| ALBERT LUJAN d/b/a<br>TEXAS WHOLESALE FLOWER CO. | § § § | IN THE DISTRICT COURT |
| *Plaintiff* | § § § | |
| vs. | § § | |
| NAVISTAR, INC., NAVISTAR<br>INTERNATIONAL CORPORATION,<br>NAVISTAR INTERNATIONAL<br>TRANSPORTATION CORP.,<br>INTERNATIONAL TRUCK AND<br>ENGINE CORPORATION, and<br>SANTEX TRUCK CENTERS, LTD. | § § § § § § § § | 129TH JUDICIAL DISTRICT |
| *Defendants* | § § | HARRIS COUNTY, TEXAS |

Filed 13 September 30 P4:50
Chris Daniel - District Clerk
Harris County
ED101J017744136
By: Marcella Hill

## ORDER

On this date, the Court considered the Motion of Defendants, Navistar, Inc. ("Navistar") and Santex Truck Centers, Ltd. ("Santex") (collectively "Defendants") for Summary Judgment pursuant to Rules 166a(b) and 166a(i), Texas Rules of Civil Procedure. The Court finds that all parties received notice of the hearing pursuant to the Texas Rules of Civil Procedure. The Court has reviewed the motion to summary judgment, any response to the motion, and all matters of record. The Court is of the opinion that the Motion should be granted. Therefore, it is

ORDERED that the Motion of Defendants for Summary Judgment pursuant to Rules 166a(b) and 166a(i) is granted. Further it is;

ORDERED that Plaintiff, Albert Lujan d/b/a Texas Wholesale Flower Co. ("Plaintiff") take nothing from Defendants for his claims of breach of express warranty;

ORDERED that Plaintiff take nothing from Defendants for his claim of breach of implied warranty of fitness; *and*

ORDERED that Plaintiff take nothing from Defendants for his claim of breach of implied

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

858

warranty of merchantability.

~~[redacted]~~

~~[redacted]~~

~~[redacted]~~

SIGNED on this 5 day of February 2014.

FEB 0 5 2014                                    PRESIDING JUDGE

This is the final judgment, it disposes of all claims and parties, and it is appealable.

-17-

indebtedness, they were doing business as Inc. for the years that Mr. Lujan's attorney said, and on top of that, his own admissions to this Court, so we've created an affidavit of disingenuous facts. Take out the affidavit, there is no argument to be made on the summary judgment. He's conceded the point.

The whole thing here, I think, is just a sham on this court to come in, not two months ago and say, "I need an intervention because this is what I found out, and we transferred all the assets," and then to turn around and say, "That's not really true."

We didn't have to attach the court's record, the property tax returns, the corporate income tax returns or any other documents to support our summary judgment, other than the 351, because we really didn't have any idea that this would happen. And that -- I'm not asking the Court for mercy or anything. I don't anticipate that someone is going to say something to the Court and turn around and less than two months later come back and say that that's not what happened.

THE COURT: Let's talk about that. Counselor?

MR. CODDOU: Okay, Your Honor. And again, since it's my turn, I would urge my objection to the reply and the evidence attached to it. I don't think we can slice and dice the way Mr. Collins has suggested to the Court. I move to strike it.

Alternatively, I ask that this be reset 21 days so that the evidence is compliant with the rule.

THE COURT: It's denied. Anything else?

MR. CODDOU: Okay. Your Honor, as far as the record that they refer to, that's -- that related to an intervention by a corporation. It was the corporation that was -- whose pleading was stricken. In fact, if you read through the proceedings of the day, that was -- the principle issue was, isn't the corporation a separate and complete and totally different entity. The Court referred to it throughout the proceeding as another plaintiff.

And so to come in here now, two months later, and say that was -- that that is a pleading filed by Mr. Lujan, or that that was an argument made by Mr. Lujan, it's a flip-flop, because the argument at the time and the reason that the intervention was stricken was because the corporation was considered a third party.

THE COURT: Mr. Coddou, you represent both, right?

MR. CODDOU: I represent both, Your Honor. But you can't -- you can't today say "I represent both and, therefore, they're the same," and yet two months ago say, "Mr. Coddou, aren't these different," and then strike the intervention on that basis. Now --

THE COURT: I mean, that's -- counselor, if the

Sec. 1.201 General Definitions

(a)Unless the context otherwise requires, words or phrases defined in this section, or in the additional definitions contained in other chapters of this title that apply to particular chapters or parts thereof, have the meanings stated.

(b)Subject to definitions contained in other chapters of this title that apply to particular chapters or parts thereof:

(1)"Action," in the sense of a judicial proceeding, includes recoupment, counterclaim, set-off, suit in equity, and any other proceeding in which rights are determined.

(2)"Aggrieved party" means a party entitled to pursue a remedy.

(3)"Agreement," as distinguished from "contract," means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade as provided in Section 1.303.

(4)"Bank" means a person engaged in the business of banking and includes a savings bank, savings and loan association, credit union, and trust company.

(5)"Bearer" means a person in control of a negotiable electronic document of title or a person in possession of a negotiable instrument, a negotiable tangible document of title, or a certificated security that is payable to bearer or indorsed in blank.

(6)"Bill of lading" means a document of title evidencing the receipt of goods for shipment issued by a person engaged in the business of directly or indirectly transporting or forwarding goods.The term does not include a warehouse receipt.

(7)"Branch" includes a separately incorporated foreign branch of a bank.

(8)"Burden of establishing" a fact means the burden of persuading the trier of fact that the existence of the fact is more probable than its nonexistence.

(9)"Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Chapter 2 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

(10)"Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:



(A)a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(B)language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

(11)"Consumer" means an individual who enters into a transaction primarily for personal, family, or household purposes.

(12)"Contract," as distinguished from "agreement," means the total legal obligation that results from the parties' agreement as determined by this title as supplemented by any other applicable laws.

(13)"Creditor" includes a general creditor, a secured creditor, a lien creditor and any representative of creditors, including an assignee for the benefit of creditors, a trustee in bankruptcy, a receiver in equity and an executor or administrator of an insolvent debtor's or assignor's estate.

(14)"Defendant" includes a person in the position of defendant in a counterclaim, cross-claim, or third-party claim.

(15)"Delivery," with respect to an electronic document of title, means voluntary transfer of control, and with respect to an instrument, a tangible document of title, or chattel paper, means voluntary transfer of possession.

(16)"Document of title" means a record that in the regular course of business or financing is treated as adequately evidencing that the person in possession or control of the record is entitled to receive, control, hold, and dispose of the record and the goods the record covers, and purports to be issued by or addressed to a bailee and to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.The term includes a bill of lading, transport document, dock warrant, dock receipt, warehouse receipt, and order for delivery of goods.An electronic document of title is evidenced by a record consisting of information stored in an electronic medium.A tangible document of title is evidenced by a record consisting of information that is inscribed on a tangible medium.

(17)"Fault" means a default, breach, or wrongful act or omission.

(18)"Fungible goods" means:

(A)goods of which any unit, by nature or usage of trade, is the equivalent of any other like unit; or

(B)goods that by agreement are treated as equivalent.

(19)"Genuine" means free of forgery or counterfeiting.

(20)"Good faith," except as otherwise provided in Chapter 5, means honesty in fact and the observance of reasonable commercial standards of fair dealing.

(21)"Holder" means:

(A)the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession;



(B)the person in possession of a negotiable tangible document of title if the goods are deliverable either to bearer or to the order of the person in possession; or

(C)a person in control of a negotiable electronic document of title.

(22)"Insolvency proceeding " includes an assignment for the benefit of creditors or other proceeding intended to liquidate or rehabilitate the estate of the person involved.

(23)"Insolvent" means:

(A)having generally ceased to pay debts in the ordinary course of business other than as a result of a bona fide dispute;

(B)being unable to pay debts as they become due; or

(C)being insolvent within the meaning of the federal bankruptcy law.

(24)"Money" means a medium of exchange currently authorized or adopted by a domestic or foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more countries.

(25)"Organization" means a person other than an individual.

(26)"Party," as distinguished from "third party," means a person that has engaged in a transaction or made an agreement subject to this title.

(27)"Person" means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity.

(28)"Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain by use of either an interest rate specified by the parties if that rate is not manifestly unreasonable at the time the transaction is entered into or, if an interest rate is not so specified, a commercially reasonable rate that takes into account the facts and circumstances at the time the transaction is entered into.

(29)"Purchase" means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property.

(30)"Purchaser" means a person that takes by purchase.

(31)"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

(32)"Remedy" means any remedial right to which an aggrieved party is entitled with or without resort to a tribunal.

(33)"Representative" means a person empowered to act for another, including an agent, an officer of a corporation or association, and a trustee, executor, or administrator of an estate.

(34)"Right" includes remedy.



(35)"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. "Security interest" includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Chapter 9. "Security interest" does not include the special property interest of a buyer of goods on identification of those goods to a contract for sale under Section 2.401, but a buyer may also acquire a "security interest" by complying with Chapter 9. Except as otherwise provided in Section 2.505, the right of a seller or lessor of goods under Chapter 2 or 2A to retain or acquire possession of the goods is not a "security interest," but a seller or lessor may also acquire a "security interest" by complying with Chapter 9. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer under Section 2.401 is limited in effect to a reservation of a "security interest." Whether a transaction in the form of a lease creates a security interest is determined pursuant to Section 1.203.

(36)"Send" in connection with a writing, record, or notice means:

(A)to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and, in the case of an instrument, to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances; or

(B)in any other way cause to be received any record or notice within the time at which it would have arrived if properly sent.

(37)"Signed" includes using any symbol executed or adopted with present intention to adopt or accept a writing.

(38)"State" means a State of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

(39)"Surety" includes a guarantor or other secondary obligor.

(40)"Term" means a portion of an agreement that relates to a particular matter.

(41)"Unauthorized signature" means a signature made without actual, implied, or apparent authority. The term includes a forgery.

(42)"Warehouse receipt" means a document of title issued by a person engaged in the business of storing goods for hire.

(43)"Writing" includes printing, typewriting, or any other intentional reduction to tangible form. "Written" has a corresponding meaning.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967. Amended by Acts 1973, 63rd Leg., p. 997, ch. 400, Sec. 2, Jan. 1, 1974; Acts 1983, 68th Leg., p. 1535, ch. 290, Sec. 12, eff. Aug. 29, 1983; Acts 1983, 68th Leg., p. 2575, ch. 442, Sec. 12, eff. Sept. 1, 1983; Acts 1989, 71st Leg., ch. 846, Sec. 1, eff. Sept. 1, 1989; Acts 1995, 74th Leg., ch. 921, Sec. 2, eff. Jan. 1, 1996; Acts 1999, 76th Leg., ch. 414, Sec. 2.12, 2.13, eff. July 1, 2001; Acts 2003, 78th Leg., ch. 542, Sec. 1, eff. Sept. 1, 2003.

Amended by:

Acts 2005, 79th Leg., Ch. 122, Sec. 2, eff. September 1, 2005.





Sec. 2.313 Express Warranties By Affirmation, Promise, Description, Sample

(a)Express warranties by the seller are created as follows:

(1)Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2)Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3)Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(b)It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967.



Sec. 2.314 Implied Warranty: Merchantability; Usage of Trade

(a)Unless excluded or modified (Section 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(b)Goods to be merchantable must be at least such as

(1)pass without objection in the trade under the contract description; and

(2)in the case of fungible goods, are of fair average quality within the description; and

(3)are fit for the ordinary purposes for which such goods are used; and

(4)run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(5)are adequately contained, packaged, and labeled as the agreement may require; and

(6)conform to the promises or affirmations of fact made on the container or label if any.

(c)Unless excluded or modified (Section 2.316) other implied warranties may arise from course of dealing or usage of trade.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967.



Sec. 2.315 Implied Warranty: Fitness For Particular Purpose

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967.



Sec. 2.316 Exclusion or Modification of Warranties

(a)Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(b)Subject to Subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(c)Notwithstanding Subsection (b)

(1)unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(2)when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(3)an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(d)Remedies for breach of warranty can be limited in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (Sections 2.718 and 2.719).

(e)The implied warranties of merchantability and fitness shall not be applicable to the furnishing of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir of such other tissues or organs. Such blood, blood plasma or tissue or organs shall not for the purpose of this Title be considered commodities subject to sale or barter, but shall be considered as medical services.

(f)The implied warranties of merchantability and fitness do not apply to the sale or barter of livestock or its unborn young.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967. Amended by Acts 1979, 66th Leg., p. 190, ch. 99, Sec. 1, eff. May 2, 1979.



Sec. 2.715 Buyer's Incidental and Consequential Damages

(a)Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(b)Consequential damages resulting from the seller's breach include

(1)any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2)injury to person or property proximately resulting from any breach of warranty.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967.



Sec. 2.719 Contractual Modification or Limitation of Remedy

(a)Subject to the provisions of Subsections (b) and (c) of this section and of the preceding section on liquidation and limitation of damages,

(1)the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(2)resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(b)Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

(c)Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Acts 1967, 60th Leg., p. 2343, ch. 785, Sec. 1, eff. Sept. 1, 1967.



Sec. 10.001 Signing of Pleadings and Motions

The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:

(1)the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4)each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.



Sec. 10.005 Order

A court shall describe in an order imposing a sanction under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.



Sec. 502.042 Title Required For Registration.

The department may not register or renew the registration of a motor vehicle for which a title is required under Chapter 501 unless the owner:

(1) obtains a title for the vehicle; or

(2) presents satisfactory evidence that a title was previously issued to the owner by the department or another jurisdiction.

Transferred, redesignated and amended from Transportation Code, Section 502.152 by Acts 2011, 82nd Leg., R.S., Ch. 1296 (H.B. 2357), Sec. 80, eff. January 1, 2012.



Sec. 501.071 Sale of Vehicle; Transfer of Title.

SALE OF VEHICLE; TRANSFER OF TITLE. (a) Except as provided in Section 503.039, a motor vehicle may not be the subject of a subsequent sale unless the owner designated on the title submits a transfer of ownership of the title.

(b) The transfer of the title must be in a manner prescribed by the department that:

(1) certifies the purchaser is the owner of the vehicle; and

(2) certifies there are no liens on the vehicle or provides a release of each lien on the vehicle.

Acts 1995, 74th Leg., ch. 165, Sec. 1, eff. Sept. 1, 1995.

Amended by:

Acts 2005, 79th Leg., Ch. 1127 (H.B. 2495), Sec. 1, eff. September 1, 2005.

Acts 2011, 82nd Leg., R.S., Ch. 1296 (H.B. 2357), Sec. 32, eff. January 1, 2012.



Sec. 351 Transfer to corporation controlled by transferor

# §351. Transfer to corporation controlled by transferor

## (a) General rule

No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

## (b) Receipt of property

If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

## (c) Special rules where distribution to shareholders

## (1) In general

In determining control for purposes of this section, the fact that any corporate transferor distributes part or all of the stock in the corporation which it receives in the exchange to its shareholders shall not be taken into account.

## (2) Special rule for section 355

If the requirements of section 355 (or so much of section 356 as relates to section 355) are met with respect to a distribution described in paragraph (1), then, solely for purposes of determining the tax treatment of the transfers of property to the controlled corporation by the distributing corporation, the fact that the shareholders of the distributing corporation dispose of part or all of the distributed stock, or the fact that the corporation whose stock was distributed issues additional stock, shall not be taken into account in determining control for purposes of this section.

## (d) Services, certain indebtedness, and accrued interest not treated as property

For purposes of this section, stock issued for—

(1) services,



(2) indebtedness of the transferee corporation which is not evidenced by a security, or

(3) interest on indebtedness of the transferee corporation which accrued on or after the beginning of the transferor's holding period for the debt,

shall not be considered as issued in return for property.

## (e) Exceptions

This section shall not apply to—

## (1) Transfer of property to an investment company

A transfer of property to an investment company. For purposes of the preceding sentence, the determination of whether a company is an investment company shall be made—

(A) by taking into account all stock and securities held by the company, and

(B) by treating as stock and securities—

(i) money,

(ii) stocks and other equity interests in a corporation, evidences of indebtedness, options, forward or futures contracts, notional principal contracts and derivatives,

(iii) any foreign currency,

(iv) any interest in a real estate investment trust, a common trust fund, a regulated investment company, a publicly-traded partnership (as defined in section 7704(b)) or any other equity interest (other than in a corporation) which pursuant to its terms or any other arrangement is readily convertible into, or exchangeable for, any asset described in any preceding clause, this clause or clause (v) or (viii),

(v) except to the extent provided in regulations prescribed by the Secretary, any interest in a precious metal, unless such metal is used or held in the active conduct of a trade or business after the contribution,

(vi) except as otherwise provided in regulations prescribed by the Secretary, interests in any entity if substantially all of the assets of such entity consist (directly or indirectly) of any assets described in any preceding clause or clause (viii),

(vii) to the extent provided in regulations prescribed by the Secretary, any interest in any entity not described in clause (vi), but only to the extent of the value of such interest that is attributable to assets listed in clauses (i) through (v) or clause (viii), or

(viii) any other asset specified in regulations prescribed by the Secretary.

The Secretary may prescribe regulations that, under appropriate circumstances, treat any asset described in clauses (i) through (v) as not so listed.



**(2) Title 11 or similar case**

A transfer of property of a debtor pursuant to a plan while the debtor is under the jurisdiction of a court in a title 11 or similar case (within the meaning of section 368(a)(3)(A)), to the extent that the stock received in the exchange is used to satisfy the indebtedness of such debtor.

**(f) Treatment of controlled corporation**

If—

(1) property is transferred to a corporation (hereinafter in this subsection referred to as the "controlled corporation") in an exchange with respect to which gain or loss is not recognized (in whole or in part) to the transferor under this section, and

(2) such exchange is not in pursuance of a plan of reorganization,

section 311 shall apply to any transfer in such exchange by the controlled corporation in the same manner as if such transfer were a distribution to which subpart A of part I applies.

**(g) Nonqualified preferred stock not treated as stock**

**(1) In general**

In the case of a person who transfers property to a corporation and receives nonqualified preferred stock—

(A) subsection (a) shall not apply to such transferor, and

(B) if (and only if) the transferor receives stock other than nonqualified preferred stock—

(i) subsection (b) shall apply to such transferor; and

(ii) such nonqualified preferred stock shall be treated as other property for purposes of applying subsection (b).

**(2) Nonqualified preferred stock**

For purposes of paragraph (1)—

**(A) In general**

The term "nonqualified preferred stock" means preferred stock if—

(i) the holder of such stock has the right to require the issuer or a related person to redeem or purchase the stock,

(ii) the issuer or a related person is required to redeem or purchase such stock,



(iii) the issuer or a related person has the right to redeem or purchase the stock and, as of the issue date, it is more likely than not that such right will be exercised, or

(iv) the dividend rate on such stock varies in whole or in part (directly or indirectly) with reference to interest rates, commodity prices, or other similar indices.

## (B) Limitations

Clauses (i), (ii), and (iii) of subparagraph (A) shall apply only if the right or obligation referred to therein may be exercised within the 20-year period beginning on the issue date of such stock and such right or obligation is not subject to a contingency which, as of the issue date, makes remote the likelihood of the redemption or purchase.

## (C) Exceptions for certain rights or obligations

### (i) In general

A right or obligation shall not be treated as described in clause (i), (ii), or (iii) of subparagraph (A) if—

(I) it may be exercised only upon the death, disability, or mental incompetency of the holder, or

(II) in the case of a right or obligation to redeem or purchase stock transferred in connection with the performance of services for the issuer or a related person (and which represents reasonable compensation), it may be exercised only upon the holder's separation from service from the issuer or a related person.

### (ii) Exception

Clause (i)(I) shall not apply if the stock relinquished in the exchange, or the stock acquired in the exchange is in—

(I) a corporation if any class of stock in such corporation or a related party is readily tradable on an established securities market or otherwise, or

(II) any other corporation if such exchange is part of a transaction or series of transactions in which such corporation is to become a corporation described in subclause (I).

## (3) Definitions

For purposes of this subsection—

## (A) Preferred stock

The term "preferred stock" means stock which is limited and preferred as to dividends and does not participate in corporate growth to any significant extent. Stock shall not be treated as participating in corporate growth to any significant extent unless there is a real and meaningful likelihood of the shareholder actually participating in the earnings and growth of the corporation. If there is not a real and meaningful likelihood that dividends beyond any limitation or preference will actually be paid, the



possibility of such payments will be disregarded in determining whether stock is limited and preferred as to dividends.

### (B) Related person

A person shall be treated as related to another person if they bear a relationship to such other person described in section 267(b) or 707(b).

### (4) Regulations

The Secretary may prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection and sections 354(a)(2)(C), 355(a)(3)(D), and 356(e). The Secretary may also prescribe regulations, consistent with the treatment under this subsection and such sections, for the treatment of nonqualified preferred stock under other provisions of this title.

### (h) Cross references

**(1) For special rule where another party to the exchange assumes a liability, see section 357.**

**(2) For the basis of stock or property received in an exchange to which this section applies, see sections 358 and 362.**

**(3) For special rule in the case of an exchange described in this section but which results in a gift, see section 2501 and following.**

**(4) For special rule in the case of an exchange described in this section but which has the effect of the payment of compensation by the corporation or by a transferor, see section 61(a)(1).**

**(5) For coordination of this section with section 304, see section 304(b)(3).**

(Aug. 16, 1954, ch. 736, 68A Stat. 111; Pub. L. 89–809, title II, §203(a), (b), Nov. 13, 1966, 80 Stat. 1577; Pub. L. 94–455, title XIX, §1901(a)(48)(A), (B), Oct. 4, 1976, 90 Stat. 1772; Pub. L. 96–589, §5(e), Dec. 24, 1980, 94 Stat. 3406; Pub. L. 97–248, title II, §226(a)(1)(B), Sept. 3, 1982, 96 Stat. 491; Pub. L. 100–647, title I, §1018(d)(5)(G), Nov. 10, 1988, 102 Stat. 3580; Pub. L. 101–239, title VII, §7203(a), (b), Dec. 19, 1989, 103 Stat. 2333; Pub. L. 101–508, title XI, §11704(a)(3), Nov. 5, 1990, 104 Stat. 1388–518; Pub. L. 105–34, title X, §§1002(a), 1012(c)(1), 1014(a), Aug. 5, 1997, 111 Stat. 909, 916, 919; Pub. L. 105–206, title VI, §6010(c)(3)(A), (e)(1), July 22, 1998, 112 Stat. 813, 814; Pub. L. 105–277, div. J, title IV, §4003(f)(1), Oct. 21, 1998, 112 Stat. 2681–910; Pub. L. 106–36, title III, §3001(d)(1), June 25, 1999, 113 Stat. 183; Pub. L. 107–147, title IV, §417(9), Mar. 9, 2002, 116 Stat. 56; Pub. L. 108–357, title VIII, §899(a), Oct. 22, 2004, 118 Stat. 1649; Pub. L. 109–135, title IV, §403(kk), Dec. 21, 2005, 119 Stat. 2632.)

## Amendments

**2005**—Subsec. (g)(3)(A). Pub. L. 109–135 inserted at end "If there is not a real and meaningful likelihood that dividends beyond any limitation or preference will actually be paid, the possibility of such payments will be disregarded in determining whether stock is limited and preferred as to dividends."

**2004**—Subsec. (g)(3)(A). Pub. L. 108–357 inserted at end "Stock shall not be treated as participating in corporate growth to any significant extent unless there is a real and meaningful likelihood of the shareholder actually participating in the earnings and growth of the corporation."

**2002**—Subsec. (h)(1). Pub. L. 107–147 inserted comma after "liability".

**1999**—Subsec. (h)(1). Pub. L. 106–36 struck out ", or acquires property subject to a liability," after "liability".



**1998**—Subsec. (c). Pub. L. 105–206, §6010(c)(3)(A), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: "In determining control for purposes of this section—

"(1) the fact that any corporate transferor distributes part or all of the stock in the corporation which it receives in the exchange to its shareholders shall not be taken into account, and

"(2) if the requirements of section 355 are met with respect to such distribution, the shareholders shall be treated as in control of such corporation immediately after the exchange if the shareholders own (immediately after the distribution) stock possessing—

"(A) more than 50 percent of the total combined voting power of all classes of stock of such corporation entitled to vote, and

"(B) more than 50 percent of the total value of shares of all classes of stock of such corporation."

Subsec. (c)(2). Pub. L. 105–277 inserted ", or the fact that the corporation whose stock was distributed issues additional stock," after "dispose of part or all of the distributed stock".

Subsec. (g)(1)(A) to (C). Pub. L. 105–206, §6010(e)(1), inserted "and" at end of subpar. (A), added subpar. (B), and struck out former subpars. (B) and (C) which read as follows:

"(B) subsection (b) shall apply to such transferor, and

"(C) such nonqualified preferred stock shall be treated as other property for purposes of applying subsection (b)."

**1997**—Subsec. (c). Pub. L. 105–34, §1012(c)(1), amended heading and text of subsec. (c) generally. Prior to amendment, text read as follows: "In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account."

Subsec. (e)(1). Pub. L. 105–34, §1002(a), inserted last two sentences.

Subsecs. (g), (h). Pub. L. 105–34, §1014(a), added subsec. (g) and redesignated former subsec. (g) as (h).

**1990**—Subsec. (e)(2). Pub. L. 101–508 substituted "is used" for "are used".

**1989**—Subsec. (a). Pub. L. 101–239, §7203(a), struck out "or securities" after "stock".

Subsecs. (b), (d), (e)(2). Pub. L. 101–239, §7203(b)(1), struck out "or securities" after "stock".

Subsec. (g)(2). Pub. L. 101–239, §7203(b)(2), substituted "stock or property" for "stock, securities, or property".

**1988**—Subsecs. (f), (g). Pub. L. 100–647 added subsec. (f) and redesignated former subsec. (f) as (g).

**1982**—Subsec. (f)(5). Pub. L. 97–248 added par. (5).

**1980**—Subsec. (a). Pub. L. 96–589, §5(e)(2), struck out provision that stock or securities issued for services shall not be considered as issued in return for property for purposes of this section.

Subsec. (d). Pub. L. 96–589, §5(e)(1), added subsec. (d). Former subsec. (d) redesignated (e)(1).



Subsec. (e). Pub. L. 96–589, §5(e)(2), redesignated former subsec. (d) as par. (1) and added par. (2). Former subsec. (e) redesignated (f).

Subsec. (f). Pub. L. 96–589, §5(e)(1), redesignated former subsec. (e) as (f).

**1976**—Subsec. (a). Pub. L. 94–455, §1901(a)(48)(A), struck out "(including, in the case of transfers made on or before June 30, 1967, an investment company)" after "property is transferred to a corporation".

Subsec. (d). Pub. L. 94–455, §1901(a)(48)(B), among other changes, substituted "Exception" for "Application of June 30, 1967, date" in heading and in text provision that this section does not apply to a transfer of property to an investment company for provisions relating to treatment of a transfer of property to an investment company as made on or before June 30, 1967.

**1966**—Subsec. (a). Pub. L. 89–809, §203(a), inserted "(including, in the case of transfers made on or before June 30, 1967, an investment company)" after "if property is transferred to a corporation".

Subsecs. (d), (e). Pub. L. 89–809, §203(b), added subsec. (d) and redesignated former subsec. (d) as (e).

## Effective Date of 2005 Amendment

Amendment by Pub. L. 109–135 effective as if included in the provision of the American Jobs Creation Act of 2004, Pub. L. 108–357, to which such amendment relates, see section 403(nn) of Pub. L. 109–135, set out as a note under section 26 of this title.

## Effective Date of 2004 Amendment

Pub. L. 108–357, title VIII, §899(b), Oct. 22, 2004, 118 Stat. 1649, provided that: "The amendment made by this section [amending this section] shall apply to transactions after May 14, 2003."

## Effective Date of 1999 Amendment

Pub. L. 106–36, title III, §3001(e), June 25, 1999, 113 Stat. 184, provided that: "The amendments made by this section [amending this section and sections 357, 358, 362, 368, 584, and 1031 of this title] shall apply to transfers after October 18, 1998."

## Effective Date of 1998 Amendments

Amendment by Pub. L. 105–277 effective as if included in the provision of the Taxpayer Relief Act of 1997, Pub. L. 105–34, to which such amendment relates, see section 4003(l) of Pub. L. 105–277, set out as a note under section 86 of this title.

Amendment by Pub. L. 105–206 effective, except as otherwise provided, as if included in the provisions of the Taxpayer Relief Act of 1997, Pub. L. 105–34, to which such amendment relates, see section 6024 of Pub. L. 105–206, set out as a note under section 1 of this title.

## Effective Date of 1997 Amendment

Pub. L. 105–34, title X, §1002(b), Aug. 5, 1997, 111 Stat. 909, provided that:



"(1) In general.—The amendment made by subsection (a) [amending this section] shall apply to transfers after June 8, 1997, in taxable years ending after such date.

"(2) Binding contracts.—The amendment made by subsection (a) shall not apply to any transfer pursuant to a written binding contract in effect on June 8, 1997, and at all times thereafter before such transfer if such contract provides for the transfer of a fixed amount of property."

Pub. L. 105–34, title X, §1012(d), Aug. 5, 1997, 111 Stat. 917, as amended by Pub. L. 105–206, title VI, §6010(c)(1), July 22, 1998, 112 Stat. 813, provided that:

"(1) Section 355 rules.—The amendments made by subsections (a) and (b) [amending sections 355 and 358 of this title] shall apply to distributions after April 16, 1997; except that the amendment made by subsection (a) [amending section 355 of this title] shall apply to such distributions only if pursuant to a plan (or series of related transactions) which involves an acquisition described in section 355(e)(2)(A)(ii) of the Internal Revenue Code of 1986 occurring after such date.

"(2) Divisive transactions.—The amendments made by subsection (c) [amending this section and section 368 of this title] shall apply to transfers after the date of the enactment of this Act [Aug. 5, 1997].

"(3) Transition rule.—The amendments made by this section [amending this section and sections 355, 358, and 368 of this title] shall not apply to any distribution pursuant to a plan (or series of related transactions) which involves an acquisition described in section 355(e)(2)(A)(ii) of the Internal Revenue Code of 1986 (or, in the case of the amendments made by subsection (c), any transfer) occurring after April 16, 1997, if such acquisition or transfer is—

"(A) made pursuant to an agreement which was binding on such date and at all times thereafter,

"(B) described in a ruling request submitted to the Internal Revenue Service on or before such date, or

"(C) described on or before such date in a public announcement or in a filing with the Securities and Exchange Commission required solely by reason of the acquisition or transfer.

This paragraph shall not apply to any agreement, ruling request, or public announcement or filing unless it identifies the acquirer of the distributing corporation or any controlled corporation, or the transferee, whichever is applicable."

Pub. L. 105–34, title X, §1014(f), Aug. 5, 1997, 111 Stat. 921, provided that:

"(1) In general.—The amendments made by this section [amending this section and sections 354 to 356 and 1036 of this title] shall apply to transactions after June 8, 1997.

"(2) Transition rule.—The amendments made by this section shall not apply to any transaction after June 8, 1997, if such transaction is—

"(A) made pursuant to a written agreement which was binding on such date and at all times thereafter,

"(B) described in a ruling request submitted to the Internal Revenue Service on or before such date, or

"(C) described on or before such date in a public announcement or in a filing with the Securities and Exchange Commission required solely by reason of the transaction."

### Effective Date of 1989 Amendment



Pub. L. 101–239, title VII, §7203(c), Dec. 19, 1989, 103 Stat. 2334, provided that:

"(1) In general.—Except as provided in this subsection, the amendments made by this section [amending this section] shall apply to transfers after October 2, 1989, in taxable years ending after such date.

"(2) Binding contract.—The amendments made by this section shall not apply to any transfer pursuant to a written binding contract in effect on October 2, 1989, and at all times thereafter before such transfer.

"(3) Corporate transfers.—In the case of property transferred (directly or indirectly through a partnership or otherwise) by a C corporation, paragraphs (1) and (2) shall be applied by substituting &apos;July 11, 1989&apos; for &apos;October 2, 1989&apos;. The preceding sentence shall not apply where the corporation meets the requirements of section 1504(a)(2) of the Internal Revenue Code of 1986 with respect to the transferee corporation (and where the transfer is not part of a plan pursuant to which the transferor subsequently fails to meet such requirements)."

## Effective Date of 1988 Amendment

Pub. L. 100–647, title I, §1018(d)(5)(G), Nov. 10, 1988, 102 Stat. 3580, provided that the amendment made by that section is effective with respect to transfers on or after June 21, 1988.

## Effective Date of 1982 Amendment

Amendment by Pub. L. 97–248 applicable to transfers occurring after Aug. 31, 1982, except for certain transfers pursuant to an application to form a BHC filed with the Federal Reserve Board before Aug. 16, 1982, see section 226(c) of Pub. L. 97–248, set out as a note under section 304 of this title.

## Effective Date of 1980 Amendment

Amendment by Pub. L. 96–589 applicable to transactions which occur after Dec. 31, 1980, other than transactions which occur in proceedings in bankruptcy cases or similar judicial proceedings or in proceedings under Title 11, Bankruptcy, commencing on or before Dec. 31, 1980, except as otherwise provided, see section 7 of Pub. L. 96–589, set out as a note under section 108 of this title.

## Effective Date of 1976 Amendment

Pub. L. 94–455, title XIX, §1901(a)(48)(C), Oct. 4, 1976, 90 Stat. 1772, provided that: "The amendments made by this paragraph [amending this section] shall take effect with respect to transfers of property occurring after the date of the enactment of this Act [Oct. 4, 1976]."

## Effective Date of 1966 Amendment

Pub. L. 89–809, title II, §203(c), Nov. 13, 1966, 80 Stat. 1577, provided that: "The amendments made by subsections (a) and (b) [amending this section] shall apply with respect to transfers of property to investment companies whether made before, on, or after the date of the enactment of this Act [Nov. 13, 1966]."



Rule 13 Effect of Signing Pleadings, Motions and Other Papers; Sanctions

## RULE 13. EFFECT OF SIGNING PLEADINGS, MOTIONS AND OTHER PAPERS; SANCTIONS

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. A general denial does not constitute a violation of this rule. The amount requested for damages does not constitute a violation of this rule.

**Notes and Comments**

Comment to 1990 change: To require notice and hearing before a court determines to impose sanctions, to specify that any sanction imposed be appropriate, and to eliminate the 90-day "grace" period provided in the former version of the rule.



Rule 166a Summary Judgment

**RULE 166a. SUMMARY JUDGMENT**

(a) **For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

(b) **For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

(c) **Motion and Proceedings Thereon.** The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

(d) **Appendices, References and Other Use of Discovery Not Otherwise on File.** Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

(e) **Case Not Fully Adjudicated on Motion.** If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

(f) **Form of Affidavits; Further Testimony.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The



court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. <mark>Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.</mark>

(g) **When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(h) **Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

(i) **No-Evidence Motion.** After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. <mark>The motion must state the elements as to which there is no evidence.</mark> The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.



CAUSE NO. 2009-77458

| | | |
|---|---|---|
| ALBERT LUJAN d/b/a TEXAS WHOLESALE FLOWER CO. | § § § § § § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| vs. | § § | |
| NAVISTAR, INC., NAVISTAR INTERNATIONAL CORPORATION, NAVISTAR INTERNATIONAL TRANSPORTATION CORP., INTERNATIONAL TRUCK AND ENGINE CORPORATION, and SANTEX TRUCK CENTERS, LTD. | § § § § § § § § | 129TH JUDICIAL DISTRICT |
| *Defendants* | § § | HARRIS COUNTY, TEXAS |

**AFFIDAVIT OF WAYNE KYRISH**

| | |
|---|---|
| COUNTY OF BEXAR | § § |
| STATE OF TEXAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared WAYNE KYRISH in the above entitled and numbered cause, who, being by me first duly sworn, deposed and stated under oath the following:

1. "My name is Wayne Kyrish. I am of sound mind, capable to make this affidavit, and am personally acquainted with the facts stated in it. The facts contained in this Affidavit are true and correct and are based upon my personal knowledge.

2. I serve as Chief Executive Officer of Santex Truck Centers, Ltd. ("Santex") and I am authorized in that capacity to make this affidavit. Attached hereto as **Exhibit B-1** are two pages of records comprising a true and correct copy of the front and back of a document titled Retail Buyer Order. These records were made or received in the normal course of Santex's business and are routinely maintained by Santex. I have made a reasonable inquiry into the contents of these records and have determined that their time and place of making or their time and place of receipt and storage are accurate and complete. The records are exact duplicates of the originals.

3. On October 10, 2005, Albert Lujan d/b/a Texas Wholesale Flower CO. purchased five (5) International CF600 trucks from Santex. The Retail Buyer Order accompanied the purchase of these trucks and detailed the terms of the purchase.



83

Further Affiant sayeth not.

Wayne Kyrish

SWORN TO AND SUBSCRIBED before me, the undersigned Notary Public in and for the State of Texas, on September 30 , 2013.

(signature)
Notary Public
State of Texas

Notary's printed name or stamp:
Gloria P. Lopez

GLORIA P. LOPEZ
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
9-5-2015

84




RETAIL BUYERS ORDER

# SANTEX TRUCK CENTER

1380 ACKERMAN RD.
SAN ANTONIO, TX 78219
Phone (210) 661-8371    FAX (210) 6661-0226

PURCHASER'S NAME: **Albert Lujan dba Texas Wholesale Flower Co.**   DATE   **10-Oct-2005**
PHYSICAL ADDRESS: 915 E. Elmira Street                               PHONE #   210-226-9238
CITY, ST ZIP: San Antonio, TX 78212                                 FAX #   210-226-9732

PLEASE ENTER MY ORDER FOR THE FOLLOWING MOTOR VEHICLE & SCHEDULE DELIVERY TO OCCUR ON OR ABOUT ___15-Oct-2005___ TO SECURE THIS ORDER AND TO PLACE A HOLD ON THIS VEHICLE FOR A NORMAL AND REASONABLE PERIOD OF TIME, I AM PRESENTING A DEPOSIT THAT WILL BE APPLIED TO FINAL TRANSACTION. BY DOING SO, I UNDERSTAND THAT I AM COMMITTING MYSELF TO FULFILLING THE REMAINING TERMS OF THIS AGREEMENT.

| QUANTITY | YEAR | MAKE | MODEL | COLOR | STOCK # | VEHICLE I.D. NUMBER |
|---|---|---|---|---|---|---|
| 5 | 2006 | INTERNATIONAL | CF600 | Blue | Ordered | To Be Determined |

Options: Radio, Blue Paint, 167" wheelbase, 19,500 GVWR dual 35 gal. fuel tanks.

18'x96"x96" Supreme Kold King Insulated Body with Inverted "T" Floor, Aluminum Shelving, Chicago Step Bumper, Refrig. Service Platform, Swing Doors. Includes Installation. Thermoking MD200-50 Stand-Alone Refrigeration Unit with Electric Standby. Includes Installation.

### Pricing is for a 5 truck order.

Tag lbs:   19,500      Truck      12      months

| | Sales Price | $ | 60,521.10 | | |
|---|---|---|---|---|---|
| | Extended Warranty | $ | - | | |
| | F.E.T Exempt Body | $ | - | | |
| | F.E.T. | $ | - | | |
| | ~ Pre-Paid Tire Credit | $ | ~ | | |
| | Sub-Total | $ | 60,521.10 | $ | 60,521.10 |
| | | | | | |
| | Sales Tax | $ | 3,782.57 | | |
| | Emissions Surcharge | $ | 605.21 | | |
| | License Fee | $ | 177.45 | | |
| | Road & Bridge Fee | $ | 11.50 | | |
| | Title Transfer Fee | $ | 33.00 | | |
| | State Inspection Fee | $ | - | | |
| | Documentary Fee** | $ | 25.00 | | |
| | Sub-Total | $ | 4,634.73 | $ | 4,634.73 |

| | | | |
|---|---|---|---|
| Net Sales Price Each | | $ | 65,155.83 |
| Total Order Sales Price | | $ | 325,779.15 |
| Deposit with Order | $ | 5,000.00 | |
| Cash on Delivery | $ | - | |
| Net Trade Allowance | $ | - | |
| Total Credits | $ | 5,000.00 | $ 5,000.00 |
| Balance due | | $ | 320,779.15 |

## TRADE IN INFORMATION

| YEAR | MAKE | MODEL | BODY |
|---|---|---|---|
| | | | |

VEHICLE I.D. NUMBER _____
TRADE ALLOWANCE   $   -
PAYOFF            $   -
NET ALLOWANCE     $   -
BALANCE OWED TO: _____
ADDRESS _____
CITY, ST ZIP _____
ACCT. # _____

THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY THE GENERAL MANAGER OR SALES MANAGER FOR

ACCEPTED & APPROVED BY _____

SALES REPRESENTATIVE   Rick DeNoff

DATE _____   F & I APPROVAL _____

IF SALE IS OF A USED VEHICLE, IT IS (BOUGHT) "AS-IS"

ACCEPTED BY _____
                        SIGNATURE
PRINTED NAME _____

TITLE _____   DATE _____

**DOCUMENTARY FEE – A DOCUMENTARY FEE IS NOT OFFICIAL FEE. A DOCUMENTARY FEE IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO BUYERS FOR HANDLING DOCUMENTS AND PERFORMING SERVICES RELATING TO THE CLOSING OF A SALE. A DOCUMENTARY FEE MAY NOT EXCEED $50 FOR A MOTOR VEHICLE CONTRACT OR A REASONABLE AMOUNT AGREED TO BY THE PARTIES FOR A HEAVY COMMERCIAL VEHICLE CONTRACT. THIS NOTICE IS REQUIRED BY LAW.

PURCHASER AGREES THAT THIS ORDER INCLUDES ALL OF THE TERMS AND CONDITIONS ON BOTH THE FACE AND REVERSE SIDE HEREOF, THAT THIS ORDER CANCELS AND SUPERSEDES ANY PRIOR AGREEMENT AND AS OF THE DATE HEREOF COMPRISES THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT RELATING TO THE SUBJECT BINDING UNTIL ACCEPTED BY THE GENERAL MANAGER OR SALES MANAGER. PURCHASER BY HIS EXECUTION OF THIS ORDER ACKNOWLEDGES THAT HE HAS READ ITS TERMS AND CONDITIONS AND HAS RECEIVED A TRUE COPY OF THIS ORDER



EXHIBIT
3-1

SANTEX 698

85

1. As used in this Order the terms (a) "Dealer" shall mean the authorized Dealer to whom this Order is addressed and who shall become a party hereto by its acceptance hereof, (b) "Purchaser" shall mean the party executing this Order as such on the face hereof, and (c) "Manufacture" shall mean the Corporation that manufactured the vehicle or chassis, it being understood by Purchaser and Dealer that Dealer is in no respect the agent of Manufacturer, that Dealer and Purchaser are the sole parties to this Order and that reference to Manufacturer herein is for the purpose of explaining generally certain contractual relationships existing between Dealer and Manufacturer with respect to new motor vehicles.

2. Manufacturer has reserved the right to change the price to Dealer of new motor vehicle without notice. In the event the price to Dealer of new motor vehicles of the series and body type ordered hereunder is changed by Manufacturer prior to delivery of the new motor vehicle ordered hereunder to Purchaser, Dealer reserves the right to change the cash delivered price of such motor vehicle to Purchaser accordingly. If such cash delivered price is increased by Dealer, Purchaser may, if dissatisfied therewith, cancel this Order, in which event if a used motor vehicle has been traded in as a part of the consideration for such new motor vehicle, such used motor vehicle shall be returned to Purchaser upon payment of a reasonable charge for storage and repairs (if any) or, if such used motor vehicle has been previously sold by Dealer, the amount received thereof, less a selling commission of 15% and any expense incurred in storing, insuring, conditioning or advertising said used motor vehicle for sale, shall be returned to Purchaser.

3. If the used motor vehicle which has been traded in as a part of the consideration for the motor vehicle ordered hereunder, is not to be delivered to Dealer until to Purchaser of such motor vehicle, the used motor vehicle shall be reappraised at that time and such reappraised value shall determine the allowance made for such used motor vehicle. If such reappraised value is lower than the original allowance therefore shown on the front of the Order, Purchaser may, if dissatisfied therewith, cancel this Order, provided, however, that such right to cancel is exercised prior to the delivery of the motor vehicle ordered hereunder to the Purchaser and surrender of the motor vehicle to Dealer.

4. Purchaser agrees to deliver to Dealer satisfactory evidence of title to any used motor vehicle traded in as a part of the consideration for the motor vehicle ordered hereunder at the time of delivery of such used motor vehicle to Dealer. Purchaser warrants any such used motor vehicle to be his property free and clear of all liens and encumbrances except as otherwise noted herein.

5. Unless this Order shall have been canceled by Purchaser under and in accordance with the provisions of paragraph 2 or 3 above, Dealer shall have the right, upon failure or refusal of Purchaser to accept delivery of the motor vehicle order hereunder and to comply with the terms of this Order to retain as liquidated damages any cash deposit made by Purchaser, and, in the event a used motor vehicle has been traded in as a failure or refusal by Purchaser.

6. Manufacturer has reserved the right to change the design of any new motor vehicle, chassis, accessories or parts thereof at any time without notice and without obligation to make the same or any similar change upon any motor vehicle, chassis, accessories or parts thereof previously purchased by or shipped to Dealer or being manufactured or sold in accordance with Dealers orders. Correspondingly, in the event of any such change by Manufacture, Dealer shall have no obligation to Purchaser to make the same or any similar change in any motor vehicle, chassis, accessories or parts thereof covered by this Order either before or subsequent to deliver thereof to Purchaser.

7. Dealer shall not be liable for failure to deliver or delay in delivering the motor vehicle cover by this Order where such failure or delay is due, in whole or in part, to any cause beyond the control or without the fault or negligence of Dealer.

8. The price for the motor vehicle specified on the face of this Order includes reimbursement for Federal Excise taxes for tires as collected by the manufacture. The Price for the motor vehicle specified on the face of this Order does not include Federal Excise taxes for certain types of vehicle as defined by the Internal Revenue Service, sales taxes or use taxes unless expressly so stated. Purchaser assumes and agrees to pay, unless prohibited by law, any such Federal Excise, sales or use taxes imposed on or applicable to the transaction covered by this Order, regardless of which party may have primary tax liability thereof.

9. If a charge for Creditor Life Insurance is include in this Order the provision on Creditor Life Insurance in any retail installment contract form subsequently executed between the parties hereto in conjunction with this Order shall be fully effective. If such insurance is unavailable or partly unavailable under the designated policy, the applicable portion of the charge for Creditor Life Insurance specified herein, and the finance charge thereon, may be deducted from the Total Time Balance and credited to the Purchaser. If such insurance does not become effective, notice thereof will be sent to the Purchaser by the Dealer and this Order and any retail installment contract executed in conjunction therewith shall otherwise remain fully effective.

10. There are no warranties, express or implied, made by the seller herein, or the manufacturer, on the vehicle or chassis described on the face hereof except in the case of a new vehicle or chassis. The printed new vehicle warranty delivered to purchaser with such vehicle or chassis and hereby made a part hereof as though fully set forth herein is the only warranty applicable to such new vehicle or chassis and is expressly in lieu of all other warranties , expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose. In the case of a used vehicle or chassis, the applicability of an existing manufacturer's warranty thereon, if any, shall be determined solely by the terms of such warranty.

11. Any used motor vehicle sold to Purchaser by Dealer under this Order is sold at the time of delivery by Dealer without any guarantee or warranty, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose, as to its condition or the condition of any part thereof except as may be otherwise specifically provided in writing on the face of this Order or in a separate writing furnished to Purchaser by Dealer.

12. The Purchaser, before or at the time of delivery of the motor vehicle covered by this Order will execute such other forms of agreement or documents as may be required by the terms and conditions of payment indicated on the front of this Order.

SANTEX 699

# LIMITED STANDARD WARRANTY FOR MEDIUM DUTY CF500/CF600 SERIES

## VEHICLE LIMITED COVERAGE

International Truck & Engine Corp., at its option, will repair or replace any part of this vehicle which proves defective in material or workmanship, in normal use and service, with new or ReNEWed® parts, for the first 24 months from new vehicle delivery date, regardless of distance traveled. Exceptions are listed herein under What is Not Included Under Limited Vehicle Coverage.

This limited warranty is automatically transferred to subsequent owners at no charge.

## ADDITIONAL COMPONENT COVERAGE

The components described below are given additional warranty coverage of variable time periods and distance traveled limitations, as shown in the Warranty Coverage Schedule.

1. Frame Side Rails.
2. Cab/Cowl Structure (on-highway applications).
3. The Cab/Cowl is warranted against perforation due to corrosion, except for perforation caused by industrial chemicals and/or corrosion caused by use in a corrosive industrial environment.
4. International Diesel Engines including: block, cylinder heads, fuel pump, high pressure pump, turbocharger, internally lubricated components, and water pump, injectors/nozzles; electronic modules, relays, sensors and regulators required for electronic engine operation. **Note:** Thermostats, attaching accessories (e.g., fan clutch, alternator, starter, etc.), or externally mounted electrical and filtration systems, glow plugs, glow plug relay, and harness are warranted per the Limited Warranty Coverage Schedule.

## LIMITED WARRANTY COVERAGE SCHEDULE

| Items Covered | Months | Miles/Km (000) |
|---|---|---|
| **VEHICLE LIMITED COVERAGE** | | |
| Vehicle Limited Warranty (Feature Code 40024) | 24 | Unlimited |
| Towing - International warrantable failure and mission disabling International failure resulting in a non drivable or unsafe operating condition | 36 | 150/240 |
| **COMPONENTS** | | |
| Automatic Transmission | 36 | 150/240 |
| Axles, Propshaft, Crossmembers | 24 | Unlimited |
| Batteries | 12 | Unlimited |
| Brightwork, Chassis Paint and Corrosion (other than Cab) | 6 | Unlimited |
| Cab/Cowl Perforation corrosion | 48 | Unlimited |
| Cab/cowl structure | 48 | Unlimited |
| Frame side rails | 48 | Unlimited |
| **INTERNATIONAL® ENGINE** | | |
| VT 275 | 36 | 150/240 |
| VT 275 Glow Plug,Relay & Harness/Connectors | 12 | Unlimited |

## OBTAINING SERVICE

Return this vehicle to any International Truck Dealer authorized to service this model vehicle and engine.

IMPORTANT: The information contained in this Warranty Policy explains the coverage provided on your new International vehicle. This policy should be kept in the vehicle for presentation to the Dealer when you request warranty services.



EXHIBIT D

91

# INTERNATIONAL

**Note:** The customer has 180 days from DTU (delivery to end user) to purchase any extended warranty on the unit. See your local International dealer for details.

## *WHAT IS NOT INCLUDED UNDER LIMITED COVERAGE*

**AFTER THE FIRST 90 DAYS FROM DELIVERY TO USER (DTU):**

- Correction of loose fasteners, squeaks, rattles and unusual noises.
- Adjustments and maintenance (e.g., aim headlights, adjust brake/clutch, adjust steering system, check and fill coolant levels).

### COMPONENTS / ITEMS:

- Warranted by their respective manufacturers (e.g., non-International brand engines, tires & tubes, Allison Transmissions, radios, lubricants, etc.)
- Bodies, equipment, and accessories installed by other than authorized International Truck employees at International Truck manufacturing plants.
- Front and rear axle alignment.

### REPAIRS & MAINTENANCE:

- Maintenance-related items/repairs, or those as a result of normal wear and tear, including tune-ups, brake/clutch linings, windshield wiper blades, tire balancing, lubrication and other similar procedures/parts required to keep vehicle in good working condition.
- Vehicle misuse, negligent care, improper maintenance, improper operation, or the result of accident or collision.
- Fade, runs, mismatch or damage to paint, trim items, upholstery, chrome, polished surfaces, etc., resulting from environmental causes, improper polishes, cleaners or washing solutions, or chemical and industrial fallout.
- Failure to observe published capacity or load specifications for engine, transmission, propshaft, axles (power train) and suspension.

### OTHER:

- Vehicles sold and/or operated outside the United States and Canada.
- Vehicles/components which have had unauthorized alterations or modifications.
- Vehicles on which the odometer reading has been altered.
- Loss of time or use of the vehicle, loss of profits, inconvenience, or other consequential or incidental damages or expenses.
- Replacement of defective parts with parts other than those provided by International Trucks.

## *DISCLAIMER*

NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on the Company's behalf unless made or assumed in writing by the Company; and no other person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

**Remedies Under State or Provincial Law:** Some States and Provinces do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to the owner. This warranty gives the owner specific legal rights, and he may also have other legal rights which may vary by state or province.

## *RECORD OF OWNERSHIP*

Upon receipt of new vehicle by original owner, complete the following:
I have read this Warranty Brochure and fully understand the warranty coverage.
I acknowledge that I have received a copy of the Owner's Limited Warranty and
I accept the terms described herein.

Albert Lujan dba Texas Wholesale Flower Co.

| Customer Signature | | Date |
|---|---|---|

| Owner's Address | | |
|---|---|---|
| 915 E. Elmira Street | | |

| City | State/Prov | Postal Code |
|---|---|---|
| San Antonio | Texas | 78212 |

Vehicle Identification Number
3HAJFAVK56L331540

Engine Serial Number
282889

Truck Model
CF600 4x2

Odometer Reading at Delivery
53

Date Delivered to User (DTU)
12-17-05

07/2005

000518

# LIMITED STANDARD WARRANTY
## FOR MEDIUM DUTY
## CF500/CF600 SERIES

### VEHICLE LIMITED COVERAGE

International Truck & Engine Corp., at its option, will repair or replace any part of this vehicle which proves defective in material or workmanship, in normal use and service, with new or ReNEWed® parts, for the first 24 months from new vehicle delivery date, regardless of distance traveled. Exceptions are listed herein under *What Is Not Included Under Limited Vehicle Coverage*.

*This limited warranty is automatically transferred to subsequent owners at no charge.*

### ADDITIONAL COMPONENT COVERAGE

The components described below are given **additional** warranty coverage of variable time periods and distance traveled limitations, as shown in the *Warranty Coverage Schedule.*

1. Frame Side Rails.

2. Cab/Cowl Structure (on-highway applications).

3. The Cab/Cowl is warranted against perforation due to corrosion, except for perforation caused by industrial chemicals and/or corrosion caused by use in a corrosive industrial environment.

4. International Diesel Engines including: block, cylinder heads, fuel pump, high pressure pump, turbocharger, internally lubricated components, and water pump, injectors/nozzles; electronic modules, relays, sensors and regulators required for electronic engine operation. **Note:** Thermostats, attaching accessories (e.g., fan clutch, alternator, starter, etc.), or externally mounted electrical and filtration systems, glow plugs, glow plug relay, and harness are warranted per the Limited Warranty Coverage Schedule.

### LIMITED WARRANTY COVERAGE SCHEDULE

#### VEHICLE LIMITED COVERAGE

| Items Covered | Months | Miles/Km (000) |
|---|---|---|
| Vehicle Limited Warranty (Feature Code 40024) | 24 | Unlimited |
| Towing | | |
| International warrantable failure and mission disabling International failure resulting in a non drivable or unsafe operating condition | 36 | 150/240 |

#### COMPONENTS

| | Months | Miles/Km (000) |
|---|---|---|
| Automatic Transmission | 36 | 150/240 |
| Axles, Propshaft, Crossmembers | 24 | Unlimited |
| Batteries | 12 | Unlimited |
| Brightwork, Chassis Paint and Corrosion | 6 | Unlimited |
| (other than Cab) | | |
| Cab/Cowl Perforation corrosion | 48 | Unlimited |
| Cab/cowl structure | 48 | Unlimited |
| Frame side rails | 48 | Unlimited |

#### INTERNATIONAL® ENGINE

| | Months | Miles/Km (000) |
|---|---|---|
| VT 275 | 36 | 150/240 |
| VT 275 Glow Plug,Relay & Harness/Connectors | 12 | Unlimited |

### OBTAINING SERVICE

Return this vehicle to any International Truck Dealer authorized to service this model vehicle and engine.

**IMPORTANT:** The information contained in this Warranty Policy explains the coverage provided on your new International vehicle. This policy should be kept in the vehicle for presentation to the Dealer when you request warranty services.

# INTERNATIONAL

**Note:** The customer has 180 days from DTU (delivery to end user) to purchase any extended warranty on the unit. See your local International dealer for details.

## WHAT IS NOT INCLUDED UNDER LIMITED COVERAGE

### AFTER THE FIRST 90 DAYS FROM DELIVERY TO USER (DTU):

- Correction of loose fasteners, squeaks, rattles and unusual noises.
- Adjustments and maintenance (e.g., aim headlights, adjust brake/clutch, adjust steering system, check and fill coolant levels).

### COMPONENTS / ITEMS:

- Warranted by their respective manufacturers (e.g., non-international brand engines, tires & tubes, Allison Transmissions, radios, lubricants, etc.)
- Bodies, equipment, and accessories installed by other than authorized International Truck employees at International Truck manufacturing plants.
- Front and rear axle alignment.

### REPAIRS & MAINTENANCE:

- Maintenance-related items/repairs, or those as a result of normal wear and tear, including tune-ups, brake/clutch linings, windshield wiper blades, tire balancing, lubrication and other similar procedures/parts required to keep vehicle in good working condition.
- Vehicle misuse, negligent care, improper maintenance, improper operation, or the result of accident or collision.
- Fade, runs, mismatch or damage to paint, trim items, upholstery, chrome, polished surfaces, etc., resulting from environmental causes, improper polishes, cleaners or washing solutions, or chemical and industrial fallout.
- Failure to observe published capacity or load specifications for engine, transmission, propshaft, axles (power train) and suspension.

### OTHER:

- Vehicles sold and/or operated outside the United States and Canada.
- Vehicles/components which have had unauthorized alterations or modifications.
- Vehicles on which the odometer reading has been altered.
- Loss of time or use of the vehicle; loss of profits, inconvenience, or other consequential or incidental damages or expenses.
- Replacement of defective parts with parts other than those provided by International Trucks.

## DISCLAIMER

NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on the Company's behalf unless made or assumed in writing by the Company; and no other person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

**Remedies Under State or Provincial Law:** Some States and Provinces do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to the owner. This warranty gives the owner specific legal rights, and he may also have other legal rights which may vary by state or province.

## RECORD OF OWNERSHIP

Upon receipt of new vehicle by original owner, complete the following:

I have read this Warranty Brochure and fully understand the warranty coverage.
I acknowledge that I have received a copy of the Owner's Limited Warranty and I accept the terms described herein.

Albert Lujan dba Texas Wholesale Flower CO.

| Customer Signature | | Date |
|---|---|---|

| 915 E. Elmira Street | | | |
|---|---|---|---|
| Owner's Address | | | |
| | San Antonio | Texas | 78212 |
| | City | State/Prov | Postal Code |

| 3HAJFAVK56L331537 |
|---|
| Vehicle Identification Number |

| CF600 4x2 | 282891 |
|---|---|
| Truck Model | Engine Serial Number |

| 12-17-05 | 38 |
|---|---|
| Date Delivered to User (DTU) | Odometer Reading at Delivery |

000526

# LIMITED STANDARD WARRANTY
## FOR MEDIUM DUTY
## CF500/CF600 SERIES

### VEHICLE LIMITED COVERAGE

International Truck & Engine Corp., at its option, will repair or replace any part of this vehicle which proves defective in material or workmanship, in normal use and service, with new or ReNEWed® parts, for the first 24 months from new vehicle delivery date, regardless of distance traveled. Exceptions are listed herein under *What Is Not Included Under Limited Vehicle Coverage.*

*This limited warranty is automatically transferred to subsequent owners at no charge.*

### ADDITIONAL COMPONENT COVERAGE

The components described below are given **additional** warranty coverage of variable time periods and distance traveled limitations, as shown in the *Warranty Coverage Schedule.*

1. Frame Side Rails.

2. Cab/Cowl Structure (on-highway applications).

3. The Cab/Cowl is warranted against perforation due to corrosion, except for perforation caused by industrial chemicals and/or corrosion caused by use in a corrosive industrial environment.

4. International Diesel Engines including: block, cylinder heads, fuel pump, high pressure pump, turbocharger, internally lubricated components, and water pump, injectors/nozzles; electronic modules, relays, sensors and regulators required for electronic engine operation. **Note:** Thermostats, attaching accessories (e.g., fan clutch, alternator, starter, etc.), or externally mounted electrical and filtration systems, glow plugs, glow plug relay, and harness are warranted per the Limited Warranty Coverage Schedule.

### LIMITED WARRANTY COVERAGE SCHEDULE

| Items Covered | Months | Miles/Km (000) |
|---|---|---|
| **VEHICLE LIMITED COVERAGE** | | |
| Vehicle Limited Warranty (**Feature Code 40024**) | 24 | Unlimited |
| Towing | | |
| International warrantable failure and mission disabling International failure resulting in a non drivable or unsafe operating condition | 36 | 150/240 |
| **COMPONENTS** | | |
| Automatic Transmission | 36 | 150/240 |
| Axles, Propshaft, Crossmembers | 24 | Unlimited |
| Batteries | 12 | Unlimited |
| Brightwork, Chassis Paint and Corrosion | 6 | Unlimited |
| Cab/Cowl Perforation corrosion (other than Cab) | 48 | Unlimited |
| Cab/cowl structure | 48 | Unlimited |
| Frame side rails | 48 | Unlimited |
| **INTERNATIONAL® ENGINE** | | |
| VT 275 | 36 | 150/240 |
| VT 275 Glow Plug,Relay & Harness/Connectors | 12 | Unlimited |

### OBTAINING SERVICE

Return this vehicle to any International Truck Dealer authorized to service this model vehicle and engine.

**IMPORTANT:** The information contained in this Warranty Policy explains the coverage provided on your new International vehicle. This policy should be kept in the vehicle for presentation to the Dealer when you request warranty services.

# INTERNATIONAL

**Note:** The customer has 180 days from DTU (delivery to end user) to purchase any extended warranty on the unit. See your local International dealer for details.

## WHAT IS NOT INCLUDED UNDER LIMITED COVERAGE

### AFTER THE FIRST 90 DAYS FROM DELIVERY TO USER (DTU):

- Correction of loose fasteners, squeaks, rattles and unusual noises.
- Adjustments and maintenance (e.g., aim headlights, adjust brake/clutch, adjust steering system, check and fill coolant levels).

### COMPONENTS / ITEMS:

- Warranted by their respective manufacturers (e.g., non-International brand engines, tires & tubes, Allison Transmissions, radios, lubricants, etc.)
- Bodies, equipment, and accessories installed by other than authorized International Truck employees at International Truck manufacturing plants.
- Front and rear axle alignment.

### REPAIRS & MAINTENANCE:

- Maintenance-related items/repairs, or those as a result of normal wear and tear, including tune-ups, brake/clutch linings, windshield wiper blades, tire balancing, lubrication and other similar procedures/parts required to keep vehicle in good working condition.
- Vehicle misuse, negligent care, improper maintenance, improper operation, or the result of accident or collision.
- Fade, runs, mismatch or damage to paint, trim items, upholstery, chrome, polished surfaces, etc., resulting from environmental causes, improper polishes, cleaners or washing solutions, or chemical and industrial fallout.
- Failure to observe published capacity or load specifications for engine, transmission, propshaft, axles (power train) and suspension.

### OTHER:

- Vehicles sold and/or operated outside the United States and Canada.
- Vehicles/components which have had unauthorized alterations or modifications.
- Vehicles on which the odometer reading has been altered.
- Loss of time or use of the vehicle, loss of profits, inconvenience, or other consequential or incidental damages or expenses.
- Replacement of defective parts with parts other than those provided by International Trucks.

## DISCLAIMER

NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on the Company's behalf unless made or assumed in writing by the Company, and no other person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

**Remedies Under State or Provincial Law:** Some States and Provinces do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to the owner. This warranty gives the owner specific legal rights, and he may also have other legal rights which may vary by state or province.

## RECORD OF OWNERSHIP

Upon receipt of new vehicle by original owner, complete the following:
I have read this Warranty Brochure and fully understand the warranty coverage. I acknowledge that I have received a copy of the Owner's Limited Warranty and I accept the terms described herein.

Albert Lujan dba Texas Wholesale Flower CO.

| Customer Signature | | Date |
|---|---|---|
| 915 E. Elmira Street | | |
| Owner's Address | | |

| City | State/Prov | Postal Code |
|---|---|---|
| San Antonio | Texas | 78212 |

| Vehicle Identification Number |
|---|
| 3HAJFAVK76L331541 |

| Truck Model | Engine Serial Number |
|---|---|
| CF600 4x2 | 282467 | 42 |

| Date Delivered to User (DTU) | Odometer Reading at Delivery |
|---|---|
| 12-17-05 | |

07/2005

000530

# LIMITED STANDARD WARRANTY
## FOR MEDIUM DUTY
## CF500/CF600 SERIES

### VEHICLE LIMITED COVERAGE

International Truck & Engine Corp., at its option, will repair or replace any part of this vehicle which proves defective in material or workmanship, in normal use and service, with new or ReNEWed® parts, for the first 24 months from new vehicle delivery date, regardless of distance traveled. Exceptions are listed herein under *What Is Not Included Under Limited Vehicle Coverage.*

*This limited warranty is automatically transferred to subsequent owners at no charge.*

### ADDITIONAL COMPONENT COVERAGE

The components described below are given **additional** warranty coverage of variable time periods and distance traveled limitations, as shown in the *Warranty Coverage Schedule.*

1. Frame Side Rails.

2. Cab/Cowl Structure (on-highway applications).

3. The Cab/Cowl is warranted against perforation due to corrosion, except for perforation caused by industrial chemicals and/or corrosion caused by use in a corrosive industrial environment.

4. International Diesel Engines including: block, cylinder heads, fuel pump, high pressure pump, turbocharger, internally lubricated components, and water pump, injectors/nozzles; electronic modules, relays, sensors and regulators required for electronic engine operation. **Note:** Thermostats, attaching accessories (e.g., fan clutch, alternator, starter, etc.), or externally mounted electrical and filtration systems, glow plugs, glow plug relay, and harness are warranted per the Limited Warranty Coverage Schedule.

### LIMITED WARRANTY COVERAGE SCHEDULE

| Items Covered | Months | Miles/Km (000) |
|---|---|---|
| **VEHICLE LIMITED COVERAGE** | | |
| Vehicle Limited Warranty (Feature Code 40024) | 24 | Unlimited |
| Towing | 36 | 150/240 |
| International warrantable failure and mission disabling International failure resulting in a non drivable or unsafe operating condition | | |
| **COMPONENTS** | | |
| Automatic Transmission | 36 | 150/240 |
| Axles, Propshaft, Crossmembers | 24 | Unlimited |
| Batteries | 12 | Unlimited |
| Brightwork, Chassis Paint and Corrosion (other than Cab) | 6 | Unlimited |
| Cab/Cowl Perforation corrosion | 48 | Unlimited |
| Cab/cowl structure | 48 | Unlimited |
| Frame side rails | 48 | Unlimited |
| **INTERNATIONAL® ENGINE** | | |
| VT 275 | 36 | 150/240 |
| VT 275 Glow Plug,Relay & Harness/Connectors | 12 | Unlimited |

### OBTAINING SERVICE

Return this vehicle to any International Truck Dealer authorized to service this model vehicle and engine.

**IMPORTANT:** The information contained in this Warranty Policy explains the coverage provided on your new International vehicle. This policy should be kept in the vehicle for presentation to the Dealer when you request warranty services.

# INTERNATIONAL

**Note:** The customer has 180 days from DTU (delivery to end user) to purchase any extended warranty on the unit. See your local International dealer for details.

## WHAT IS NOT INCLUDED UNDER LIMITED COVERAGE

### AFTER THE FIRST 90 DAYS FROM DELIVERY TO USER (DTU):

- Correction of loose fasteners, squeaks, rattles and unusual noises.
- Adjustments and maintenance (e.g., aim headlights, adjust brake/clutch, adjust steering system, check and fill coolant levels).

### COMPONENTS / ITEMS:

- Warranted by their respective manufacturers (e.g., non-International brand engines, tires & tubes, Allison Transmissions, radios, lubricants, etc.)
- Bodies, equipment, and accessories installed by other than authorized International Truck employees at International Truck manufacturing plants.
- Front and rear axle alignment.

### REPAIRS & MAINTENANCE:

- Maintenance-related items/repairs, or those as a result of normal wear and tear, including tune-ups, brake/clutch linings, windshield wiper blades, tire balancing, lubrication and other similar procedures/parts required to keep vehicle in good working condition.
- Vehicle misuse, negligent care, improper maintenance, improper operation, or the result of accident or collision.
- Fade, runs, mismatch or damage to paint, trim items, upholstery, chrome, polished surfaces, etc., resulting from environmental causes, improper polishes, cleaners or washing solutions, or chemical and industrial fallout.
- Failure to observe published capacity or load specifications for engine, transmission, propshaft, axles (power train) and suspension.

### OTHER:

- Vehicles sold and/or operated outside the United States and Canada.
- Vehicles/components which have had unauthorized alterations or modifications.
- Vehicles on which the odometer reading has been altered.
- Loss of time or use of the vehicle, loss of profits, inconvenience, or other consequential or incidental damages or expenses.
- Replacement of defective parts with parts other than those provided by International Trucks.

---

## DISCLAIMER

NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on the Company's behalf unless made or assumed in writing by the Company; and no other person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

**Remedies Under State or Provincial Law:** Some States and Provinces do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to the owner. This warranty gives the owner specific legal rights, and he may also have other legal rights which may vary by state or province.

## RECORD OF OWNERSHIP

Upon receipt of new vehicle by original owner, complete the following:
I have read this Warranty Brochure and fully understand the warranty coverage.
I acknowledge that I have received a copy of the Owner's Limited Warranty and I accept the terms described herein.

Albert Lujan dba Texas Wholesale Flower CO.

| Customer Signature | | Date |
|---|---|---|
| 915 E. Elmira Street | | |
| Owner's Address | | |

| San Antonio | Texas | 78212 |
|---|---|---|
| City | State/Prov | Postal Code |

3HAJFAVK96L331539
Vehicle Identification Number

CF600 4x2
Truck Model

282525
Engine Serial Number

12-17-05
Date Delivered to User (DTU)

41
Odometer Reading at Delivery

07/2005

98

000537

# INTERNATIONAL

# LIMITED STANDARD WARRANTY
## FOR MEDIUM DUTY
## CF500/CF600 SERIES

### VEHICLE LIMITED COVERAGE

International Truck & Engine Corp., at its option, will repair or replace any part of this vehicle which proves defective in material or workmanship, in normal use and service, with new or ReNEWed® parts, for the first 24 months from new vehicle delivery date, regardless of distance traveled. Exceptions are listed herein under *What Is Not Included Under Limited Vehicle Coverage*.

*This limited warranty is automatically transferred to subsequent owners at no charge.*

### ADDITIONAL COMPONENT COVERAGE

The components described below are given **additional** warranty coverage of variable time periods and distance traveled limitations, as shown in the *Warranty Coverage Schedule*.

1. Frame Side Rails.

2. Cab/Cowl Structure (on-highway applications).

3. The Cab/Cowl is warranted against perforation due to corrosion, except for perforation caused by industrial chemicals and/or corrosion caused by use in a corrosive industrial environment.

4. International Diesel Engines including: block, cylinder heads, fuel, pump, high pressure pump, turbocharger, internally lubricated components, and water pump, injectors/nozzles; electronic modules, relays, sensors and regulators required for electronic engine operation. **Note:** Thermostats, attaching accessories (e.g., fan clutch, alternator, starter, etc.), or externally mounted electrical and filtration systems, glow plugs, glow plug relay, and harness are warranted per the Limited Warranty Coverage Schedule.

### LIMITED WARRANTY COVERAGE SCHEDULE

| Items Covered | Months | Miles/Km (000) |
|---|---|---|
| **VEHICLE LIMITED COVERAGE** | | |
| Vehicle Limited Warranty **(Feature Code 40024)** | 24 | Unlimited |
| Towing | | |
| International warrantable failure and mission disabling International failure resulting in a non drivable or unsafe operating condition | 36 | 150/240 |
| **COMPONENTS** | | |
| Automatic Transmission | 36 | 150/240 |
| Axles, Propshaft, Crossmembers | 24 | Unlimited |
| Batteries | 12 | Unlimited |
| Brightwork, Chassis Paint and Corrosion | 6 | Unlimited |
| (other than Cab) | | |
| Cab/Cowl Perforation corrosion | 48 | Unlimited |
| Cab/cowl structure | 48 | Unlimited |
| Frame side rails | 48 | Unlimited |
| **INTERNATIONAL® ENGINE** | | |
| VT 275 | 36 | 150/240 |
| VT 275 Glow Plug,Relay & Harness/Connectors | 12 | Unlimited |

### OBTAINING SERVICE

Return this vehicle to any International Truck Dealer authorized to service this model vehicle and engine.

**IMPORTANT:** The information contained in this Warranty Policy explains the coverage provided on your new International vehicle. This policy should be kept in the vehicle for presentation to the Dealer when you request warranty services.

99

**Note:** The customer has 180 days from DTU (delivery to end user) to purchase any extended warranty on the unit. See your local International dealer for details.

## WHAT IS NOT INCLUDED UNDER LIMITED COVERAGE

### AFTER THE FIRST 90 DAYS FROM DELIVERY TO USER (DTU):

- Correction of loose fasteners, squeaks, rattles and unusual noises.
- Adjustments and maintenance (e.g., aim headlights, adjust brake/clutch, adjust steering system, check and fill coolant levels).

### COMPONENTS / ITEMS:

- Warranted by their respective manufacturers (e.g., non-International brand engines, tires & tubes, Allison Transmissions, radios, lubricants, etc.)
- Bodies, equipment, and accessories installed by other than authorized International Truck employees at International Truck manufacturing plants.
- Front and rear axle alignment.

### REPAIRS & MAINTENANCE:

- Maintenance-related items/repairs, or those as a result of normal wear and tear, including tune-ups, brake/clutch linings, windshield wiper blades, tire balancing, lubrication and other similar procedures/parts required to keep vehicle in good working condition.
- Vehicle misuse, negligent care, improper maintenance, improper operation, or the result of accident or collision.
- Fade, runs, mismatch or damage to paint, trim items, upholstery, chrome, polished surfaces, etc., resulting from environmental causes, improper polishes, cleaners or washing solutions, or chemical and industrial fallout.
- Failure to observe published capacity or load specifications for engine, transmission, propshaft, axles (power train) and suspension.

### OTHER:

- Vehicles sold and/or operated outside the United States and Canada.
- Vehicles/components which have had unauthorized alterations or modifications.
- Vehicles on which the odometer reading has been altered.
- Loss of time or use of the vehicle, loss of profits, inconvenience, or other consequential or incidental damages or expenses.
- Replacement of defective parts with parts other than those provided by International Trucks.

## DISCLAIMER

NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on the Company's behalf unless made or assumed in writing by the Company; and no other person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

**Remedies Under State or Provincial Law:** Some States and Provinces do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to the owner. This warranty gives the owner specific legal rights, and he may also have other legal rights which may vary by state or province.

## RECORD OF OWNERSHIP

Upon receipt of new vehicle by original owner, complete the following:
I have read this Warranty Brochure and fully understand the warranty coverage.
I acknowledge that I have received a copy of the Owner's Limited Warranty and I accept the terms described herein.
Albert Lujan dba Texas Wholesale Flower CO.

| Customer Signature | | Date | |
|---|---|---|---|

| 915 E. Elmira Street | San Antonio | Texas | 78212 |
|---|---|---|---|
| Owner's Address | City | State/Prov | Postal Code |

| 3HAJFAVK76L331538 | |
|---|---|
| Vehicle Identification Number | |

| 282584 | |
|---|---|
| Engine Serial Number | |

| CF600 4x2 | |
|---|---|
| Truck Model | |

| 12-17-05 | 27 |
|---|---|
| Date Delivered to User (DTU) | Odometer Reading at Delivery |

07/2005

000538

**APPELLEES' WARRANTY SUMMARY**

VIN 3HAJFAVK56L331537

Fail Date: 12/21/2005    Completed Date: 12/23/2005
Noun Desc: Sender, Manifold Absolute Pressure (MAP)
Comments: Faulty MAP sensor. Replaced MAP
(CR 261 & 292, Ln 3)

Fail Date: 07/25/2006    Completed Date: 08/02/2006
Noun Desc: Oil/Fuel Line High Pressure Injection
Comments: Repair for no start and found Branch Tube Fitting leaking.
Replace with latest version of fitting.
(CR 265 & 296, Ln 5)

Fail Date: 08/01/2006    Completed Date: 08/11/2006
Noun Desc: Injector Unit (Electrical)
Comments: Replace all six injectors.
(CR 266 & 297, Ln 1)

Fail Date: 08/24/2006    Completed Date: 08/24/2006
Noun Desc: Module, Electronic Control (ECM)
(CR 261 & 292, Ln 4)

Fail Date: 07/20/2007    Completed Date: 07/21/2007
Noun Desc: Oil
(CR 261 & 292, Ln 5)

VIN 3HAJFAVK76L331538

Fail Date: 05/17/2006    Completed Date: 05/22/2006
Noun Desc: Lines, Oil
Comments: Replace turbo oil supply line.
(CR 263 & 294, Ln 4)

Fail Date: 06/21/2006    Completed Date: 06/26/2006
Noun Desc: Module, Electronic Control (ECM)
Comments: Check fuel pressure as per Intl.
(CR 263 & 294, Ln 4)

VIN 3HAJFAVK96L331539

Fail Date: 02/18/2006     Completed Date: 02/21/2006
Noun Desc: Regulator, Injection Pressure (IPR)
Comments: Repair truck not to die when wet heat cover filling with
          moisture. Drained and resealed rear.
(CR 265 & 296, Ln 2)


Fail Date:   03/24/2006  Completed Date: 04/13/2006
Noun Desc: Injector Unit (Electrical)
Comments: Engine died and won't start. Checked and found airated fuel.
          Replace all inj due to cannot pin down which one is faulty.
(CR 264 & 295, Ln 4)


Fail Date:   04/07/2006  Completed Date: 06/19/2006
Noun Desc: Crankcase
Comments: Repair for no power. Replace engine.
(CR 265 & 296, Ln 3)


Fail Date: 07/28/2006     Completed Date: 08/10/2006
Noun Desc: Pipe & Flange Exhaust
Comments: Repair for no power. R/R several components for access.
          Found exhaust pipe broken at ECR cooler. Replaced pipe.
(CR 265 & 296, Ln 4)


Fail Date: 11/22/2006     Completed Date: 11/27/2006
Noun Desc: Oil
Comments: Pull oil sample.
(CR 264 & 295, Ln 5)


Fail Date: 11/29/2006     Completed Date: 01/05/2007
Noun Desc: High Pressure Rail System
Comments: Extra time to take parts from new truck and reinstall on truck
          when we receive them.
(CR 264 & 295, Ln 6)


Fail Date: 04/25/2007     Completed Date: 05/09/2007
Noun Desc: Injector Unit (Electrical)
Comments: Engine miss & no power T/S. Found amp reading for glow plug
          wires at 39 amps.Advised by engine group to replace all.
(CR 265 & 296, Ln 1)

VIN 3HAJFAVK56L331540

Fail Date: 03/23/2006     Completed Date: 04/13/2006
Noun Desc: Injector Unit (Electrical)
(CR 262 & 293, Ln 5)

Fail Date: 06/20/2006     Completed Date: 06/26/2006
Noun Desc: Module, Electronic Control (ECM)
Comments:  Check fuel pressure as per Intl. Took fuel sample.
                    Took snapshot of performance.
(CR 263 & 294, Ln 1)

Fail Date: 11/22/2006     Completed Date: 11/27/2006
Noun Desc: Oil
Comments:  Pulled oil sample from truck.
(CR 266 & 297, Ln 6)

Fail Date: 03/16/2007     Completed Date: 05/30/2007
Noun Desc: Crankshaft
Comments:  Idler belt broken. Locked up engine. Rod broken.
                    Replaced engine and transferred parts.
(CR 263 & 294, Ln 2)

VIN 3HAJFAVK76L331541

Fail Date: 05/17/2006     Completed Date: 05/18/2006
Noun Desc: Oil
Comments:  Replace engine oil and filter and fuel filter. Save both filters.
(CR 264 & 295, Ln 1)

Fail Date: 08/03/2006     Completed Date: 10/06/2006
Noun Desc: Pump, Oil/Fuel (High PSI Injector System)
Comments:  Branch Tube Fitting. R/R all NECC components to replace
                    Branch Tube
(CR 264 & 295, Ln 2)

Fail Date: 07/20/2007     Completed Date: 07/21/2007
Noun Desc: Oil
(CR 264 & 295, Ln 3)

2009-77458

| | | |
|---|---|---|
| ALBERT LUJAN d/b/a | § | IN THE DISTRICT COURT |
| TEXAS WHOLESALE FLOWER CO. | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| vs. | § | |
| | § | |
| NAVISTAR, INC., NAVISTAR | § | 129th JUDICIAL DISTRICT |
| INTERNATIONAL CORPORATION, | § | |
| NAVISTAR INTERNATIONAL | § | |
| TRANSPORTATION CORP., | § | |
| INTERNATIONAL TRUCK AND | § | |
| ENGINE CORPORATION, and | § | |
| SANTEX TRUCK CENTERS, LTD. | § | |
| | § | |
| *Defendants* | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF ALBERT LUJAN IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

My name is Albert Lujan. I am the Plaintiff in this case. I am over the age of 21 years and fully competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit, and the facts herein stated are true and correct.

1.      At all times I did business as Texas Wholesale Flower Company. At no time have I transferred my assets and liabilities of Texas Wholesale Flower Company. I did not transfer ownership of my trucks nor my business to a corporation. I never closed the books of my sole proprietorship, and conducted business as a sole proprietorship throughout the business life of Texas Wholesale Flower Company. At no time did a corporation conduct business as Texas Wholesale Flower Company.

2.      Texas Wholesale Flower Co., Inc.

        never had a company agreement,

        never held a board meeting nor a stockholder meeting,

568

never adopted resolutions,

never elected officers,

never issued stock of any class whatsoever,

never opened, held nor maintained bank accounts, petty cash accounts, accounts receivable, accounts payable, merchant accounts, capital accounts, utility accounts, payroll tax accounts or property tax accounts,

never carried debt obligations to American Express, Navistar Financial Corporation, Texstar Bank, National Plant & Floral, Ford Credit or any other creditor,

never held nor was a beneficiary of an insurance policy,

never acquired, owned nor held title to real estate,

never acquired, owned, held title to nor operated motor vehicles, including the trucks made the basis of my lawsuit against Defendants,

never owned furniture or fixtures,

never bought nor sold merchandise or services of any kind whatsoever, and

never conducted business.

VERIFICATION

_____
Albert Lujan

Before me the undersigned authority, personally appeared Albert Lujan, known to me to be the person who executes this verification. He stated that he has read the forgoing instrument, he has personal knowledge of the facts therein contained, and he avers that the facts therein stated are true and correct.

Sworn and subscribed before me on this date, __Jan. 15th 2014__:

_____

CHETNA V SHAH
My Commission Expires
June 30, 2015

569

**Page 563**
**658 S.W.2d 563**
**Paul G. CHESSHER, Petitioner,**
**v.**
**SOUTHWESTERN BELL TELEPHONE COMPANY, Respondent.**
**No. C-2367.**
**Supreme Court of Texas.**
**Oct. 5, 1983.**
**Rehearing Denied Nov. 9, 1983.**

**Page 564**

Wheat & Rickard, Robert W. Rickard, Houston, for petitioner.

Fulbright & Jaworski, Roger Townsend, Houston, for respondent.

PER CURIAM.

Paul G. Chessher instituted this suit against Southwestern Bell Telephone Company seeking damages for breach of employment contract, wrongful discharge, fraud, and misrepresentation. Summary judgment was rendered in favor of Southwestern Bell on the basis of the Statute of Frauds, Tex.Bus. & Comm.Code Ann. art. 26.01(b)(6) (1977), and the court of appeals affirmed in an unpublished opinion. Tex.R.Civ.P. 452. We reverse the judgments of the courts below and remand the cause to the trial court.

The record discloses that the sole ground upon which Southwestern Bell sought summary judgment was the Statute of Frauds; no defense was raised as to the tort allegations set forth in Chessher's petition. The trial court's judgment, however, disposed of all four of Chessher's causes of action. The court of appeals concluded that Chessher had waived his tort claims by failing to raise them in his response to the motion for summary judgment. In so holding, the court committed reversible error.

It is axiomatic that one may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding. In City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979), we wrote, "The movant ... must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law." (emphasis added).

Because Southwestern Bell moved for summary judgment on only one of Chessher's four causes of action, the court of appeals' affirmation of this judgment was improper as to the other causes of action alleged by Chessher. Griffin v. Rowden, 654 S.W.2d 435 (Tex.1983); Puga v. Donna Fruit Co., Inc., 634 S.W.2d 677 (Tex.1982); Missouri-Kan.-Tex. R.R. Co. v. City of Dallas, 623 S.W.2d 296 (Tex.1981).

Pursuant to Tex.R.Civ.P. 483, the application for writ of error is granted, and without hearing oral argument, the judgments of the courts below are reversed and the cause is remanded to the trial court.



**Page 337**
**858 S.W.2d 337**
**84 Ed. Law Rep. 1182**
**John S. McCONNELL, Petitioner,**
**v.**
**SOUTHSIDE INDEPENDENT SCHOOL DISTRICT, Dr. David S. Smith,**
**Miguel M. Fernandez, Sammie Kerby, Joe L. Weiss,**
**Mack C. Stallcup, Gilbert P. Arredondo,**
**and Julian Gonzales, Respondents.**
**No. D-1659.**
**Supreme Court of Texas.**
**April 21, 1993.**
**Rehearing Overruled Sept. 10, 1993.**


**Page 338**


James M. Heidelberg, Stacy C. Ferguson, San Antonio, for petitioner.

John T. Fleming, Austin, for respondents.

OPINION

HIGHTOWER, Justice.

This case presents the question whether grounds for summary judgment must be expressly presented in the motion for summary judgment itself or whether such grounds may be presented in either a brief filed contemporaneously with the motion or in the summary judgment evidence. We conclude that grounds for summary judgment must be expressly presented in the summary judgment motion itself. Consequently, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

John S. McConnell (McConnell) sued Southside Independent School District (Southside) after Southside failed to renew his contract of employment. Southside moved for summary judgment, stating in its motion only that there were "no genuine issues as to any material facts". [1] Southside

Page 339

also filed a twelve page brief in support of the motion in which it expressly presented the grounds allegedly establishing its entitlement to summary judgment. McConnell filed a written exception to the motion, arguing that the motion was defective in that it failed to present any grounds. The trial court overruled McConnell's exception and rendered summary judgment for Southside. The court of appeals affirmed, holding that "Rule 166a allows a summary judgment movant to set out the specific grounds for summary judgment in a brief served on all parties contemporaneously with the motion itself." 814 S.W.2d 247.

I.



McConnell argues that the specific grounds for summary judgment must be expressly presented in the motion for summary judgment itself and not in a brief filed contemporaneously with the motion or in the summary judgment evidence. We agree.

Motion For Summary Judgment

The first sentence of Rule 166a(c), added in 1971, plainly provides: "The motion for summary judgment shall state the specific grounds therefor." Tex.R.Civ.P. 166a(c). [2] Several cases have paraphrased this requirement as follows:

The motion for summary judgment must itself state specific grounds on which judgment is sought.... The motion for summary judgment must stand or fall on the grounds it specifically and expressly sets forth.... There is authority to the effect that a summary judgment cannot be sustained on a ground not specifically set forth in the motion.

Westbrook Const. Co. v. Fidelity Bank of Dallas, 813 S.W.2d 752, 754-55 (Tex.App.--Fort Worth 1991, writ denied) (emphasis added). See, e.g., Roark v. Stallworth Oil and Gas, Inc., 813 S.W.2d 492, 494-95 (Tex.1991) ("[A]n unpleaded affirmative defense may also serve as the basis for a summary judgment when it is raised in the summary judgment motion...."); 410/West Ave. Ltd. v. Texas Trust Savings Bank, F.S.B., 810 S.W.2d 422, 424 (Tex.App.--San Antonio 1991, no writ) ("Motions for summary judgment 'stand or fall on the grounds specifically set forth in the motions.' "); Hall v. Harris County Water Control & Improvement Dist., 683 S.W.2d 863, 867 (Tex.App.--Houston [14th Dist.] 1984, no writ). Consequently, a literal reading of Rule 166a(c) and these authorities indicate that the motion itself must state the grounds.

Other cases have considered the same language of Rule 166a(c) when the motion for summary judgment presented no grounds. In Boney v. Harris, 557 S.W.2d 376 (Tex.Civ.App.--Houston [1st Dist.] 1977, no writ), the motion for summary judgment stated only that the defendant's answer was "insufficient in law to constitute a defense...." Id. at 378. The court held that such a motion failed to satisfy the requirements of Rule 166a(c). Id. In another case in which the motion presented absolutely no grounds, the court held:

The motion, however, does not state any grounds, specific or otherwise, upon which it is based, and, as a result, it is not in compliance with Rule 166-A(c) as amended.

Moody v. Temple National Bank, 545 S.W.2d 289, 290 (Tex.Civ.App.--Austin 1977, no writ). See also Mallory v. Dorothy Prinzhorn Real Estate, Inc., 535 S.W.2d 371, 372 (Tex.Civ.App.--Eastland

Page 340

1976, no writ) (motion stating that "original answer is insufficient to raise a controverted fact issue" insufficient under rule 166a(c)). [3]

Finally, there are cases, such as the one before the court today, in which summary judgment grounds were expressly presented, but only in a brief in support of the motion. In Shade v. City of Dallas, 819 S.W.2d 578 (Tex.App.--Dallas 1991, no writ), the court held:

Although it raised these other grounds in a brief in support of the motion, we hold that this is not sufficient. A brief in support is not a motion, answer, or response as contemplated by rule 166a. The City's motion does not incorporate the brief, and the trial court's judgment does not state that the brief was



considered. The right to summary judgment exists only where there is compliance with the rule.... Because those grounds were not contained in the City's motion, we hold that summary judgment was improper if granted on those grounds.

Id. at 583 (emphasis added). Additionally, in Watkins v. Hammerman & Gainer, 814 S.W.2d 867 (Tex.App.--Austin 1991, no writ), the court held:

H & G argued in its trial and appellate briefs that additional grounds entitled it to summary judgment, but failed to raise the other grounds in its motion for summary judgment. The judgment must stand or fall on the grounds expressly alleged in the motion.

Id. at 869 n. 1 (emphasis added). The same result was reached in Roberts v. Southwest Texas Methodist Hospital, 811 S.W.2d 141 (Tex.App.--San Antonio 1991, writ denied). In Roberts, the movant identified two grounds in his motion and discussed two additional grounds in his brief. The court of appeals, holding that the grounds discussed in the brief could not provide the basis for summary judgment, stated:

It did make these arguments later in a brief, but its motion said only that limitations barred the suit and that hospitals have no duty to give informed consent. Apart from limitations, the motion simply did not address the cause of action for battery. The trial court could not have granted summary judgment on grounds that were not included in the motion, and likewise, we cannot uphold it on unstated grounds.

Id. at 145. On motion for rehearing, the court added:

There is nothing onerous or unreasonable about requiring the movant to state the grounds upon which he seeks to win a lawsuit without a trial. If the grounds are so obvious from the summary judgment proof, what is burdensome about requiring the movant to state them in the motion? Grounds may be stated concisely, without detail and argument. But they must at least be listed in the motion.

Id. at 146. If this court intended Rule 166a(c) to permit a summary judgment movant to place, or possibly hide, grounds

Page 341

for summary judgment in a brief filed in support of the motion or in accompanying summary judgment evidence, the Rule could have easily provided: "The motion for summary judgment or the brief in support thereof or the summary judgment evidence shall state the specific grounds therefor." Rule 166a(c), however, does not so provide. "[W]e are not free to disregard ... [the rule's] plain language. Nor should we revise the rule by opinion." Alvarado v. Farah Mfg. Co., Inc., 830 S.W.2d 911, 915 (Tex.1992). [4] Although Rule 166a(c) is an admittedly rigorous rule, it must be applied as written.

Consistent with the precise language of Rule 166a(c), we hold that a motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion. In determining whether grounds are expressly presented, reliance may not be placed on briefs or summary judgment evidence.

Non-Movant's Answer or Response

Likewise, issues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are



not expressly presented by mere reference to summary judgment evidence. See City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 678 (Tex.1979) ("the non-movant must expressly present to the trial court any reasons seeking to avoid movant's entitlement ...").

The summary judgment pleading rules we announce today are consistent with the express language of Rule 166a(c) requiring that the motion for summary judgment state the specific grounds therefor and further the purpose of Rule 166a(c) to provide adequate information for opposing the motion, and to define the issues. See Weaver v. Stewart, 825 S.W.2d 183, 184-85 (Tex.App.--Houston [14th Dist.] 1992, writ denied) ("[Rule 166a(c) ] is important because it provides the opposing party with notice of all matters expected to be asserted in arguing the motion."). Carving exceptions to this simple requirement that the motion for summary judgment state the specific grounds frustrates the purpose of Rule 166a(c). Eventually the exceptions would consume the rule, and inject uncertainty into summary judgment proceedings concerning what issues were presented for consideration. Furthermore, it is certainly not unduly burdensome to require the movant to state the specific grounds in the motion for summary judgment. These rules also permit the trial court to consider a brief in support of a motion for summary judgment as guidance in making its determination whether the summary judgment evidence demonstrates that the moving party is "entitled to judgment", see Tex.R.Civ.P. 166a(c), but not in determining whether summary judgment grounds and issues are expressly presented. Finally, these rules further the policy of seeking clarity and simplicity in summary judgment practice. See, e.g., Black v. Victoria

Page 342

Lloyds Ins. Co., 797 S.W.2d 20, 27 (Tex.1990) ("[T]he motion [for summary judgment] must identify or address the cause of action or defense and its elements." (emphasis added)).

II.

A corollary question concerns whether a burden exists to except or object to a defective motion for summary judgment or response. In certain situations, we conclude that such a burden exists.

Motion Presenting No Grounds

When the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, any confusion may and should be resolved by exception in the trial court. However, summary judgments must stand or fall on their own merits, and the non-movant's failure to except or respond cannot supply by default the grounds for summary judgment or the summary judgment proof necessary to establish the movant's right--the movant's right is not established and the movant must still assert grounds in the motion for summary judgment itself and establish its entitlement to summary judgment. See Clear Creek, 589 S.W.2d at 678.

While it would be prudent and helpful to the trial court for the non-movant always to file an [exception,] answer or response, the non-movant needs no [exception,] answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient as a matter of law to support the summary judgment.

Id. (emphasis in original). Even if the non-movant fails to except or respond, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as a matter of law. Consequently, we conclude that Rule 166a(c) does not require a non-movant to except in this situation. [5]



Motion Presenting Only Certain Grounds

When the motion for summary judgment clearly presents certain grounds but not others, a non-movant is not required to except. This distinction was recognized and correctly resolved in Roberts v. Southwest Texas Methodist Hospital, when the court held:

When a motion for summary judgment asserts grounds A and B, it cannot be upheld on grounds C and D, which were not asserted, even if the summary judgment proof supports them and the responding party did not except to the motion.

811 S.W.2d at 146. Why should a non-movant be required to except to a motion expressly presenting certain grounds and not others? The only effect of such a rule would be to alert the movant to additional unasserted grounds for summary judgment. Consequently, we conclude that Rule 166a(c) does not require a non-movant to except in this situation.

Grounds Unclear from Motion

An exception is required should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous. See Lochabay v. Southwestern Bell Media, Inc., 828 S.W.2d 167, 170 n. 2 (Tex.App.--Austin 1992, no writ) ("Lochabay did not except to the motion for summary judgment, as he was required to do if he wished to claim lack of specificity."). Prudent trial practice dictates that such an exception should be lodged to ensure that the parties, as well as

Page 343

the trial court, are focused on the same grounds. [6] This prevents the non-movant from having to argue on appeal each and every ground vaguely referred to in the motion. The practical effect of failure to except is that the non-movant loses his right to have the grounds for summary judgment narrowly focused, thereby running the risk of having an appellate court determine the grounds it believes were expressly presented in the summary judgment. Even in this situation, however, "[a]n appellate court cannot 'read between the lines, infer or glean from the pleadings or the proof' any grounds for granting the summary judgment other than those grounds expressly set forth before the trial court [in the motion for summary judgment]." Clark v. First National Bank of Highlands, 794 S.W.2d 953, 956 (Tex.App.--Houston [1st Dist.] 1990, no writ) (quoting Great-Ness Professional Serv., Inc. v. First Nat'l Bank of Louisville, 704 S.W.2d 916, 918 (Tex.App.--Houston [14th Dist.] 1986, no writ)).

Non-Movant's Answer or Response

With one exception, the above rules apply equally to a non-movant's response. The non-movant must expressly present to the trial court, by written answer or response, any issues defeating the movant's entitlement. Clear Creek, 589 S.W.2d at 678 ("The written answer or response to the motion must fairly apprise the movant and the court of the issues the non-movant contends should defeat the motion."). If it is clear what issues the non-movant contends should defeat the movant's entitlement, the movant should be able to reply only to these issues. See Tex.R.Civ.P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). Any confusion regarding what issues are expressly presented by the non-movant can also be resolved by exception. [7] However, summary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right. Clear Creek, 589 S.W.2d at 678. If a non-movant fails to present



any issues in its response or answer, the movant's right is not established and the movant must still establish its entitlement to summary judgment. The effect of such a failure is that the non-movant is limited on appeal to arguing the legal sufficiency of the grounds presented by the movant. Id. at 678.

III.

The summary judgment pleading rules we announce today are simple, equitable, and prevent the confusion that results when parties fail to expressly present grounds and issues entitling or defeating entitlement to summary judgment. [8] They

Page 344

also prevent parties from arguing that grounds and issues were presented in lengthy briefs or voluminous summary judgment evidence. Finally, these rules ultimately prevent the controversies that result when appellate courts are forced to ascertain whether grounds and issues were expressly presented to the trial court.

Because Southside's motion for summary judgment stated no grounds and because McConnell properly excepted to this defect, the court of appeals erred in affirming the trial court's rendition of summary judgment for Southside. For these reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

GONZALEZ, J., concurring.

HECHT, J., joined by CORNYN, J., dissenting.

ENOCH, J., joined by PHILLIPS, C.J., dissenting.

GONZALEZ, Justice, concurring.

I agree with the Court that Rule 166a(c) of the Texas Rules of Civil Procedure mandates that the grounds for a motion for summary judgment must be set out in the motion itself and cannot be furnished by an accompanying brief. If the Rule does not mean what it says, we ought to change it. Because I would not reach the other issues addressed by the Court, I join only in the judgment and not the majority opinion.

HECHT, Justice, dissenting.

Despite the discursive plurality opinion, the actual holding in this case is a narrow one. It is that the grounds for a motion for summary judgment must be set out in the motion itself and cannot be supplied by an accompanying brief on which the motion is expressly based. Because the motion in this case does not comport with this rule, the Court reverses the judgment for the movant, even though any error in granting the motion is made entirely harmless by the non-movant's concession that he was fully apprised of the grounds on which it was based. I disagree with the Court's rule; it is a rigid formality incongruent with the more basic principle it is meant to effectuate, which is, that the grounds for a summary judgment motion should be clear to the non-movant and the trial court. The Court's rule is concerned only with where the grounds for summary judgment are stated, and not with whether they are stated clearly. I also disagree that a violation of the rule requires reversal even when it has caused no prejudice. Finally, I do not join in the plurality opinion's extensive discussions of various other subjects, all obiter dicta, which



are in some respects wrong and in all respects completely unnecessary to a decision of the dispute before us.

Defendants filed a motion for summary judgment stating as its only grounds "that there are no genuine issues as to any material facts and that these Defendants are entitled to judgment dismissing Plaintiff's amended complaint as a matter of law." The motion also recited, however, that it was based on a supporting brief. That brief accompanied the motion (plaintiff does not contradict defendants' assertion that the two instruments were actually attached to each other), was 12 pages long, and clearly set out the grounds for granting summary judgment. Plaintiff concedes that he understood the basis for defendants' motion but made a tactical choice not to respond to it on the merits. Instead, plaintiff excepted to the motion because it did not itself, apart from the accompanying brief, state the grounds for summary judgment.

Page 345

Plaintiff's sole contention in this Court is that it was reversible error for the trial court to grant defendants' motion in the face of his exception.

Plaintiff's exception to defendants' motion for summary judgment is based upon the first sentence of Rule 166a(c), TEX.R.CIV.P., which provides simply: "The motion for summary judgment shall state the specific grounds therefor." In Westchester Fire Ins. Co. v. Alvarez, 576 S.W.2d 771, 772 (Tex.1978), we stated: "The purpose of this requirement is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment." There is no question that the purpose of Rule 166a(c) was fully served in this case by the brief accompanying defendants' motion. Plaintiff concedes as much. Nevertheless, the Court holds that the summary judgment must be reversed because defendants did not comply with the rule.

The plurality opinion reasons that Rule 166a(c) "plainly" requires that the grounds for a motion for summary judgment must actually be set out in the motion itself. The alternative, according to the plurality opinion, would be to permit the grounds to be stated anywhere in the summary judgment record. This procedure would fail to provide a cogent statement of the issues in a particular place and thus would defeat the purpose of the rule. Since this procedure is unacceptable, the plurality opinion concludes that its reading of the rule must be correct.

The fallacy in the plurality opinion's reasoning lies in its misapplication of the law of the excluded middle. It is just not true that the only alternatives are either to require that the grounds for summary judgment be recited in the motion, or to permit them to be raised anywhere in the record. There is a middle position more flexible than the Court's rule and still fully consistent with the underlying purpose: the motion may state the grounds for summary judgment by reference to other documents as long as the opposing party is provided with adequate information to oppose the motion, and the summary judgment issues are defined. That is precisely what happened in this case. Defendants' motion expressly stated that it was based upon a supporting brief, which accompanied the motion. From the motion and brief, plaintiff knew exactly what defendants' contentions were. Both the rule and its purpose were thus fully satisfied. The motion stated "the specific grounds therefor" by reference to the accompanying brief, giving plaintiff full notice of defendants' contentions and defining the issues for resolution.

This is not a less than literal reading of the rule. As long as the purpose of the rule is met, its precise language does not preclude specification of the grounds for summary judgment in documents accompanying or referenced in the motion. We have never suggested that the rule is as restrictive as the



Court views it. In Chessher v. Southwestern Bell Telephone Co., 658 S.W.2d 563, 564 (Tex.1983) (per curiam), we wrote: "It is axiomatic that one may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding." (Emphasis added.) In Black v. Victoria Lloyds Ins. Co., 797 S.W.2d 20, 27 (Tex.1990), we reiterated: "A summary judgment movant may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding." (Emphasis added.) In both instances we insisted that the issues determined by summary judgment must actually be raised, but only in the proceeding. In neither case did we suggest that those issues must always be recited in the motion.

No reported Texas case addresses the specific issue before us. Most of the cases cited by the plurality opinion stand only for the general proposition that the grounds for summary judgment must be stated and do not specify where or how. One court of appeals has held that issues in opposition to a motion for summary judgment may be raised in a brief incorporated in the non-movant's response. In Resolution Trust Corp. v. Ammons, 836 S.W.2d 705, 708-709 (Tex.App.--Houston [1st Dist.1992, no writ), the court explained:

Page 346

The RTC filed a response to Ammons' motion for summary judgment and incorporated a memorandum of law in support of its response that was served on all parties and the trial court contemporaneously with its response. It is undisputed that the RTC's motion in response and memorandum of law in support of the response were in 'writing' and 'before' the trial court at the summary judgment hearing. Moreover, the motion itself, by its language, expressly incorporated the memorandum of law. We find the RTC's motion in response and supporting memorandum of law constitutes the type of 'written motion, answer or other response' contemplated by rule 166a(c). See S. McConnell v. Southside Indep. School Dist., 814 S.W.2d 247, 248 (Tex.App.--Austin 1991, writ granted) (Rule 166a allows a summary judgment movant to set out the specific grounds for summary judgment in a brief served on all parties contemporaneously with the motion itself); see also TEX.R.CIV.P. 1 (rules are to be given liberal construction).

Other courts have uniformly refused to consider grounds for summary judgment raised only in a brief not accompanying the motion. Shade v. City of Dallas, 819 S.W.2d 578, 583 (Tex.App.--Dallas 1991, no writ) (the "motion does not incorporate the brief, and the trial court's judgment does not state that the brief was considered"); Roberts v. Southwest Texas Methodist Hosp., 811 S.W.2d 141, 144-146 (Tex.App.--San Antonio 1991, writ denied) (arguments not raised in motion were made "later in a brief"); Avinger v. Campbell, 499 S.W.2d 698, 702 (Tex.Civ.App.--Dallas 1973) (grounds cannot be raised for the first time in appellate briefs), writ ref'd n.r.e., 505 S.W.2d 788 (Tex.1974) (per curiam). The holding in each of these cases, as distinct from desultory language in some of the opinions, is correct. Raising issues in a brief which is filed separately and not referenced in the summary judgment motion or response may not comply with Rule 166a(c). Still, no Texas court has ever held that the grounds for or against a summary judgment cannot be stated in a brief accompanying the motion or response.

The plurality opinion argues that its rule promotes clarity and simplicity in summary judgment practice. Actually, however, a rigid rule requiring recitation of the grounds for summary judgment in the motion itself does not make for clearer, simpler motions; to the contrary, such a rule simply encourages prudent counsel to incorporate any supporting briefing and affidavits in the body of the motion when it is possible to do so. As defendants' counsel in this case observed in oral argument: "Had I served this motion and left off the title of the third page which begins, "Brief in Support", the entire document would have been deemed a motion, and I wouldn't be here today." Under the Court's rule, counsel is correct. But



merely deleting the caption on defendants' brief so that its text is inside the motion itself instead of attached to it does not make the issues in this case clearer or simpler. No such purely formal requirement can serve the purpose of clarifying the issues. In this case, the Court's clearer, simpler rule requires a remand so that the parties and lower courts can all reconsider the very same issues they have already considered. The needless delay and expense in this case will be multiplied in others.

The Court's objectives of clarity and simplicity are not achieved by its rule. A 1-page motion which does not state the grounds for summary judgment, attached to a 99-page brief which does, is not made clearer or simpler merely by combining the two documents into a single 100-page motion which states the grounds for summary judgment amid supporting arguments. Yet the 100-page motion in this example complies with the Court's rule while the 1-page motion does not. This sort of nonsense results when the application of a rule becomes divorced from its purpose. What is essential for summary judgment, as we explained in Westchester, is that the issues be set out with sufficient specificity to assure that they are fairly addressed by the parties and trial court. How that is achieved, while not totally immaterial, should certainly be of far less importance

Page 347

than whether it is achieved. A motion which does not serve the purpose of the rule should not be preferred to a motion and brief which, together, do.

Rules of procedure are not written to define a perverse game of legal hopscotch to test the adroitness of lawyers; they are devised to provide a logical, predictable, simple, sensible structure for achieving justice. When rules are divorced from the basic principles they effectuate, the resulting structure is deformed and arbitrary, and its purpose--achieving justice--is thwarted. A rule that does not simply restate the basic principle on which it is based, but instead prescribes a guideline which tends to further that principle, must be applied consistent with its principle. Rule 166a, for example, does not restate its purpose (fair notice and definition of issues), but prescribes a guideline (motion shall state grounds). The words of the rule are defined by its purpose. A motion which does not provide fair notice of the issues raised is not proper simply because somewhere in its ramblings the grounds are stated; a motion which does define the issues is not improper simply because the grounds are stated in an attachment. The plain language of the rule itself cannot be disregarded, but it does not supplant the purpose and cannot properly be construed to reach a result incongruent with that purpose.

There are many other examples of such rules. The "in anticipation of litigation" standard of Rule 166b is not a basic legal principle but an abbreviation to describe the balance struck among the conflicting purposes of privilege and discovery. The standard is intended to achieve in application the balance desired in the abstract. If the standard is applied without regard to its purpose, it may mean anything from the remotest speculation that litigation may be an eventuality to service of summons. Application of the standard is defined not by the dictionary meaning of its words but by its underlying purposes. See National Tank Co. v. Brotherton, 851 S.W.2d 193 (Tex.1993). Likewise, the rules governing preservation of error in the jury charge are meant to assure that a party's position is fully communicated to the trial court and ruled upon. Application of those rules apart from their purpose leads to an endless development of arcane distinctions. See State v. Payne, 838 S.W.2d 235 (Tex.1992). There are many other similar examples. All such rules can be applied under the rubric of literal construction to defeat their own purposes unless those purposes govern and define the rules. The underlying principles must control.



I do not doubt that the Court's decision today is motivated by the very legitimate desire to clarify summary judgment procedure with a bright-line rule. I do not believe, however, that that desire is fulfilled. Rule 166a should be applied to serve its purpose; it should not be an end in itself.

At least as troubling as the rule the Court adopts is its conclusion that the judgment in this case must be reversed. Rule 184(b), TEX.R.APP.P., states:

No judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that an error of law has been committed by the trial court in the course of the trial, unless the Supreme Court shall be of the opinion that the error complained of amounted to such a denial of the rights of the petitioner as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case, or was such as probably prevented the petitioner from making a proper presentation of his case to the appellate courts....

The plurality opinion does not apply or mention this rule. Even if it be conceded that the trial court erred, reversal is not proper except under Rule 184. Petitioner does not argue that the trial court's alleged error "amounted to such a denial of the rights of the petitioner as was reasonably calculated to cause and probably did cause the rendition of an improper judgment". Nor does petitioner argue that the trial court's action "probably prevented the petitioner from making a proper presentation of his case to the appellate courts". The Court does not explain why reversal is necessary in these circumstances. The only logical alternatives are that the trial court

Page 348

committed fundamental error, or that Rule 184 does not apply to this case. Both alternatives are clearly wrong.

In very similar circumstances, the court in McCloud v. Knapp, 507 S.W.2d 644 (Tex.Civ.App.--Dallas 1974, no writ), refused to reverse the judgment. In that case, as in this one, the trial court granted a motion for summary judgment which did not state specific grounds, although the grounds were stated in a supporting brief. The court reasoned:

Appellee cannot say that she was misled or misinformed concerning appellee's position; her only complaint is that there was technical noncompliance with the Rule.

We do not wish to be understood as holding that strict compliance with Rule 166-A is unnecessary, but it is our holding that in this particular factual situation it appears that no harm or prejudice was suffered by appellant and that she presents no proper ground for reversal. Rule 434. [Tex.R.Civ.P. 434, now TEX.R.APP.P. 81(b)(1), counterpart to TEX.R.APP.P. 184.]

Id. at 645. The Court should adopt the same reasoning in this case.

Finally, most of the plurality opinion is a discourse on summary judgment procedure unnecessary to a decision in this case. There has not been one word of argument in this Court or in the court of appeals concerning whether the grounds for summary judgment may be stated in the evidence, yet the plurality opinion undertakes not only to resolve this issue but to disapprove the three other cases which mention it. Two of those cases did hold that the grounds for summary judgment may be found in the evidence in at least some circumstances. City of Asherton v. Trigo, 714 S.W.2d 90, 92 (Tex.App.--San Antonio 1986, no writ) (grounds for motion may be found in affidavit even though not stated in the motion); Sparks v.



Cameron Employees Credit Union, 678 S.W.2d 600, 602 (Tex.App.--Houston [14th Dist.] 1984, no writ) (grounds readily apparent from the evidence in suit on a note). In the other case, however, the issue appears, as in this case, only in dicta. Albritton v. Henry S. Miller Co., 608 S.W.2d 693, 695 (Tex.Civ.App.--Dallas 1980, writ ref'd n.r.e.) (non-movant's complaint was not that motion failed to state grounds, but that it should have stated each element of the movant's cause of action). The plurality opinion also addresses when issues may be raised by the summary judgment evidence offered in response to a motion, another matter not involved in this case.

The plurality opinion indicates the level of specificity required of motions for summary judgment by disapproving Bado Equip. Co. v. Ryder Truck Lines, Inc., 612 S.W.2d 81 (Tex.Civ.App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.). There the court held that summary judgment was properly granted in a sworn account suit on a motion which stated only that defendant's answer was "insufficient in law to constitute a defense" and did not refer specifically to TEX.R.CIV.P. 185. Id. at 82. Whether Bado was correctly decided has nothing to do with the issues in the case before us.

The plurality opinion also decides what it euphemistically refers to as a "corollary question": in what circumstances must a non-movant except to a summary judgment motion which does not state grounds in order to preserve error. The plurality opinion suggests, among other things, that if the motion states no grounds at all, no exception is required. That is directly contrary to our decision in Westchester. There we wrote:

The question in this case is whether the specificity requirement in Texas Rules of Civil Procedure 166-A(c) is waived by failure to except to the motion for summary judgment prior to rendition of judgment....

Rule 166-A(c) states that "the motion for summary judgment shall state the specific grounds therefor." The purpose of this requirement is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment. In this respect, the specificity requirement in Rule 166-A(c) parallels the

Page 349

pleading requirements of Rule 45(b) and Rule 47(a) [TEX.R.CIV.P.]. Although Rule 90 [TEX.R.CIV.P.] does not specifically refer to summary judgment pleadings, the same considerations apply. Just as defects in pleadings are waived unless specifically pointed out by motion or exception in writing before the charge to the jury or rendition of judgment, we hold that the failure of a motion for summary judgment to specify grounds is a defect of form that is waived unless excepted to prior to rendition of judgment.

576 S.W.2d at 772-773. The plurality opinion states that this holding in Westchester was "effectively" overruled in City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979). By use of the word "effectively", the plurality opinion avoids pointing out that Clear Creek did not actually say it was overruling Westchester. In fact, Clear Creek does not even cite Westchester. The plurality opinion's reliance on a part of a sentence from Clear Creek is very misleading. What Clear Creek says is a non-movant may assert that a motion for summary judgment lacks legal substance without filing a response. Clear Creek does not suggest that a procedural deficiency, such as the failure to state grounds in the motion itself, can be asserted without some objection in the trial court. The relevant passage from Clear Creek makes this clear:

We are not to be understood, however, as shifting the burden of proof that exists in summary judgment proceedings. The trial court may not grant a summary judgment by default for lack of an answer



or response to the motion by the non-movant when the movant's summary judgment proof is legally insufficient. The movant still must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law. See Swilley v. Hughes, 488 S.W.2d 64, 67 (Tex.1972). Summary judgments must stand on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right.

While it would be prudent and helpful to the trial court for the non-movant always to file an answer or response, the non-movant needs no answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient as a matter of law to support summary judgment. The non-movant, however, may not raise any other issues as grounds for reversal. Under the new rule, the non-movant may not urge on appeal as reason for reversal of the summary judgment any and every new ground that he can think of, nor can he resurrect grounds that he abandoned at the hearing.

Id. at 678 (footnote omitted) (emphasis added). A fair reading of this passage does not support the plurality opinion's position that Westchester was silently overruled and its rule abandoned. Nor should Westchester be overruled. A rule requiring the non-movant to object to procedural deficiencies in the trial court operates to assure a decision on the merits in the trial court, thereby minimizing unnecessary appeals.

However, the propriety of the Westchester rule is outside the proper scope of the issues in this case. The plurality opinion's discussion of these and other "corollary" questions comprises the bulk of its opinion. Some of it is wrong--such as the treatment of Westchester--most of it is ill-advised, and all of it is dicta entitled to no regard.

\* \* \* \* \* \*

For the reasons I have explained, I would affirm the judgment of the court of appeals. I therefore respectfully dissent.

CORNYN, J., joins in this dissenting opinion.

ENOCH, Justice, dissenting.

I agree with the Court that the plain words of Rule 166a(c) of the Texas Rules of Civil Procedure establish a bright line rule. The grounds for the granting of a motion for summary judgment must be

Page 350

stated in the motion. [1] However, I would not address any of the other issues, nor can I agree that in this case the failure to include the grounds in the motion itself is harmful. The evidence in the record establishes that neither the court nor the non-movant was unaware, confused or mislead as to the specific grounds being relied upon by the movant. Therefore, I would affirm the judgment of the court of appeals.

PHILLIPS, C.J., joins in this dissenting opinion.

---------------

1 Southside's motion for summary judgment, in its entirety, stated:



Defendants, SOUTHSIDE ..., in accordance with Rule 166a of the Texas Rules of Civil Procedure, move this Court for summary judgment in the above entitled action on the grounds that there are no genuine issues as to any material facts and that these Defendants are entitled to a judgment dismissing Plaintiff's amended complaint as a matter of law. The Defendants respectfully request this Court to enter a summary judgment based on the pleadings in file, this Brief in Support [sic], containing the undisputed facts and conclusions of law as required by the Local Rules, and transcripts, together with affidavits submitted along with this motion, or in the alternative to specify what, if any, facts remain to be determined.

2 Consistent with Rule 166a, we use the term "grounds" to refer to the reasons entitling the movant to summary judgment. Likewise, we use the term "issues" to refer to the reasons the non-movant contends defeat the movant's entitlement to summary judgment.

3 Ignoring the plain language of Rule 166a(c), some courts of appeals have reached the opposite result. In City of Asherton v. Trigo, 714 S.W.2d 90 (Tex.App.--San Antonio 1986, no writ), the motion stated only that "[t]he pleadings and affidavits on file in this cause show that there is no genuine issue of material fact and that Counter-Defendant is entitled to judgment on the Counterclaim as a matter of law." Id. at 92. Holding that the movant sufficiently presented the grounds to the trial court, the court stated that "[i]ssues may be expressly presented by considering all of the summary judgment evidence presented in the case." Id. Furthermore, in Bado Equipment Co. v. Ryder Truck Lines Inc., 612 S.W.2d 81 (Tex.Civ.App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.), the court held that a motion stating only that the answer filed was "insufficient in law to constitute a defense ..." "was sufficiently specific under rule 166a(c)." Id. at 82. See also Sparks v. Cameron Emp. Credit Union, 678 S.W.2d 600, 602 (Tex.App.--Houston [14th Dist.] 1984, no writ) (construing summary judgment motion stating no grounds, court holds that "the specific issues were readily apparent from this [summary judgment] evidence...."); Albritton v. Henry S. Miller Co., 608 S.W.2d 693, 695 (Tex.Civ.App.--Dallas 1980, writ ref'd n.r.e.) ("It is clear, therefore, that issues are 'expressly presented' by all of the summary judgment evidence presented to and considered by the court."). To the extent that they conflict with our opinion today, we disapprove City of Asherton v. Trigo, Bado Equipment Co. v. Ryder Truck Lines Inc., Sparks v. Cameron Emp. Credit Union and Albritton v. Henry S. Miller Co..

4 In arguing that the grounds for summary judgment may be specified "in documents accompanying or referenced in the motion ...," the dissent consistently relies upon the "basic principle it [Rule 166a(c) ] is meant to effectuate" and its "underlying purpose." 858 S.W.2d 344, 347 (Hecht, J., dissenting). The dissent further states:

A rule [of procedure] that does not simply restate the basic principle on which it is based, but instead prescribes a guideline which tends to further that principle, must be applied consistent with its principle. * * * The words of the rule [Rule 166a] are defined by its purpose.

All such rules [of procedure] can be applied under the rubric of literal construction to defeat their own purposes unless those purposes govern and define the rules. The underlying principles must control.

858 S.W.2d 344, 347 (Hecht, J., dissenting). The Texas Rules of Civil Procedure including Rule 166a(c) should be clearly understandable and be applied in a predictable and consistent manner. In an attempt to avoid the effect of Rule 166a(c), the dissent would do a great disservice to the litigants whom we serve by rewriting the unambiguous text of Rule 166a(c) in light of the dissent's perceptions concerning Rule 166a(c)'s "underlying purpose and principles." This approach would inject an element of uncertainty into every rule, no matter how clearly stated.

5 The dissent suggests that we have overruled Westchester Fire Ins. Co. v. Alvarez, 576 S.W.2d 771 (Tex.1978) when we allegedly state "that if the motion states no grounds at all, no exception is required." 858 S.W.2d 344, 348 (Hecht, J., dissenting). The statement in Westchester, 576 S.W.2d at 773, "that the failure of a motion for summary judgment to specify grounds is a defect of form that is waived unless excepted to prior to rendition of judgment," was effectively overruled fourteen years ago by Clear Creek, 589 S.W.2d at 678 ("the non-movant needs no answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient as a matter of law to support the summary judgment.").



6 When the non-movant files a proper exception to the motion stating that the movant's grounds are uncertain or ambiguous, and such an exception is overruled, the non-movant may have a valid complaint on appeal. See Jones v. McSpedden, 560 S.W.2d 177, 179 (Tex.Civ.App.--Dallas 1977, no writ).

7 Concerning the form and time of exceptions, Clear Creek held that both the grounds for summary judgment and the issues defeating entitlement thereto must be in writing and before the trial court at the hearing. Id. at 677. We stated that to permit grounds and issues to be presented orally would encourage parties to request that a court reporter record summary judgment hearings, a practice neither necessary nor appropriate to the purposes of such a hearing. Id. This rationale compels the conclusion that exceptions to a motion or response must also be in writing. Furthermore, the requirement that a written response must be filed and served not later than seven days prior to the hearing applies equally to the non-movant's exceptions. See Tex.R.Civ.P. 166a(c). Similarly, any exceptions filed by the movant to the non-movant's response must be filed and served not less than three days prior to the hearing. See Tex.R.Civ.P. 21. Finally, a party asserting exceptions must obtain a ruling at or prior to the hearing of the motion for summary judgment. Tex.R.App.P. 52(a).

8 We do not believe that our holding presents a trap for the unwary practitioner. For example, the Texas Litigation Guide provides a standard motion for summary judgment form consistent with our holding today. See W. Dorsaneo, 4 Texas Litigation Guide § 101.101 (1992). Additionally, in an effort to avoid any resulting confusion, we point out that the oft-cited commentators on Texas summary judgment practice have recently changed positions on this issue in response to the incorrect opinion of the court of appeals in this case. Compare L. Liberato & D. Hittner, Summary Judgments in State and Federal Courts, in 1 State Bar of Texas, Fourth Annual Advanced Appellate Practice Course G-2 (1990) ("Rule 166a(c) unequivocally requires that the motion shall state with specificity the grounds upon which the movant is relying.") with D. Hittner, L. Liberato, B. Ramage, Summary Judgments and Defaults in the State Courts of Texas, 1:13.1 (1992) ("The movant may set out the specific grounds for a summary judgment in a brief served on all parties contemporaneously with the motion itself."). As our opinion indicates, the rule expressed in 1990 is correct.

1 Responding to Justice Hecht's criticism that requiring the grounds for summary judgment to be stated in the motion is a technicality without a purpose, at least one court of appeals has stated "... the trial brief is neither in the record before us nor would it properly be part of the appellate record." Concrete Constr. Supply v. M.F.C., Inc., 636 S.W.2d 475, 483-84 (Tex.App.--Dallas 1982, no writ) (citing TEX.R.CIV.P. 376a, now found in TEX.R.APP.P. 51 and 52 (emphasis added).



82 S.W.3d 372

Edwin E. ALDER, Appellant,

v.

Sandra LAUREL and Albertson, Snow & Laurel, L.L.P., Appellees.

No. 03-01-00377-CV.

Court of Appeals of Texas, Austin.

February 22, 2002.

Page 373

Gary F. Deshazo, Gary F. Deshazo & Associates, Austin, for appellant.

Corbin L. Snow III, San Antonio, for appellees.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and PURYEAR.

MARILYN ABOUSSIE, Chief Justice.

Appellant Edwin Alder appeals the district court's order granting appellees' summary judgment and the court's denial of his motion for new trial. Alder contends the trial court erred by (1) improperly disposing of his claims, as they were not addressed in appellees' motion for summary judgment, (2) granting appellees' no evidence motion for summary judgment despite Alder's summary judgment evidence in the form of seven interrogatory answers, and (3) granting summary judgment on claims not challenged in the summary judgment motion. We will reverse the trial court's judgment and remand the cause for further proceedings.

## BACKGROUND

In May 1997, Alder was involved in a car accident. In September, Alder hired appellee Sandra Laurel, a lawyer in the firm of Albertson, Snow & Laurel, L.L.P., to represent him in his personal injury action against the driver. Alder alleges the parties signed a contingency fee agreement (the "agreement") in return for Laurel's oral promise to loan Alder $9000. A dispute arose when Laurel refused to loan Alder the money, and they terminated the agreement.

Page 374

Alder filed suit against Laurel seeking a declaratory judgment that the contingent fee arrangement was unenforceable. Alder claimed that Laurel breached the fee agreement by (1) refusing to fund the loan; (2) failing to disclose her conflicts of interest, thereby invalidating the agreement; (3) terminating the agreement voluntarily and for cause; and (4) performing inferior work on his case. Alder also sought a declaratory judgment to prevent Laurel from collecting a fee from the proceeds of his personal injury suit. Finally, Alder alleged that Laurel violated the Deceptive Trade Practices Act ("DTPA") through her misrepresentations and unconscionable actions regarding the loan agreement, as well as her subsequent refusal to withdraw from representation. Alder did not assert any cause of action against Laurel based upon negligence.

In March 1999, the trial court signed an agreed order severing Alder's claims against Laurel from those against the defendant driver in the personal injury suit. In February 2001, Laurel filed a no evidence motion for summary judgment as to Alder's claims against her and the firm arising out of *negligence,* which the trial court granted.

## STANDARD OF REVIEW

Rule 166a(i) allows the party without the burden of proof to move for summary judgment on the ground that the nonmovant lacks evidence to support an essential element of the nonmovant's claim.



TEX.R. CIV. P. 166a(i). Under a no evidence motion, the movant can file for summary judgment without tendering any proof. *Id.* The nonmovant then has the burden to present enough evidence to take the case to the jury. *Id.* If the nonmovant fails to present more than a scintilla of evidence, the court must grant the motion for summary judgment. *Jackson v. Fiesta Mart,* 979 S.W.2d 68, 70-71 (Tex.App.-Austin 1998, no pet.). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See id.; Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450; *Mansfield v. C.F. Bent Tree Apartment Ltd. P'ship,* 37 S.W.3d 145, 149 (Tex.App.-Austin 2001, no pet.).

A no evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no evidence summary judgment as we apply in reviewing a directed verdict. *Jackson,* 979 S.W.2d at 70. Like a directed verdict, then, the task of the appellate court is to determine whether the plaintiff has produced any evidence of probative force to raise fact issues on the material questions presented. *Id.* The appellate court must consider all of the evidence in the light most favorable to the party against whom the no evidence summary judgment was rendered; every reasonable inference must be indulged in favor of the nonmovant, and any doubts resolved in its favor. *Id.*

A motion for summary judgment must stand or fall on the grounds expressly presented in the motion. TEX.R. CIV. P. 166a(i); *see also McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). Granting a motion for summary judgment on a cause of action not addressed in the motion constitutes reversible error. *See Mafrige v. Ross,* 866 S.W.2d 590, 591 (Tex.1993).

## DISCUSSION

In his first issue, appellant contends that the trial court erred in granting Laurel's motion for summary judgment and in denying his motion for new trial because Laurel's motion for summary

Page 375

judgment was based on claims not alleged in appellant's original pleadings. Alder's petition requests declaratory relief and alleges a violation of the DTPA. However, Laurel's motion for summary judgment does not challenge the claims alleged in his pleadings but instead addresses only a negligence claim, a theory of recovery not alleged in Alder's petition. The substance of the motion states, "An essential element of plaintiff's cause of action is that he must prove that he sustained an injury and damages proximately caused by defendant's *negligence.* In the instant case, plaintiff has no evidence that plaintiff sustained an injury and/or damages on the occasion in question." (Emphasis added.) Alder asserts that as Laurel's motion for summary judgment is limited to negligence, it does not address his DTPA and declaratory judgment claims. Thus, Alder contends the trial court erred in granting Laurel's motion for summary judgment based only on a cause of action not pleaded in his petition.

In response, Laurel argues she "inadvertently use[d] the word negligence" in the motion, but that she also stated in the motion that she was relying on all pleadings as summary judgment evidence. Laurel maintains that Alder had notice of the grounds for summary judgment and that Alder produced no evidence raising a genuine issue of material fact as to the elements of his causes of action in order to defeat her no evidence motion for summary judgment.

The Texas Supreme Court has held that judgment cannot be granted on grounds not alleged in the motion for summary judgment. *McConnell,* 858 S.W.2d at 341; *Mafrige,* 866 S.W.2d at 591. Some courts of appeals have strictly interpreted this holding to mean that, even though a cause of action may not be viable, a party may obtain summary judgment only on those causes of action expressly addressed in the summary judgment motion. *See, e.g., Smith v. Atlantic Richfield Co.,* 927 S.W.2d 85, 88-89 (Tex.App.-



Houston [1st Dist.] 1996, writ denied); *Southwestern Clinic of Bone & Joint Diseases v. Farmers Ins. Group,* 850 S.W.2d 750, 754 (Tex. App.-Corpus Christi 1993, no writ); *Weaver v. Stewart,* 825 S.W.2d 183, 184-85 (Tex. App.-Houston [14th Dist.] 1992, writ denied); *see also Watkins v. Hammerman & Gainer,* 814 S.W.2d 867, 869 (Tex.App.-Austin 1991, no writ) (judgment must stand or fall on grounds expressly alleged in the motion).

This Court adheres to a strict interpretation of Rule 166a(i) which specifically requires that a no evidence motion for summary judgment state the elements on which there is no evidence. "[A] party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence." TEX.R. CIV. P. 166a(i). Even though a movant may file a brief in support of the motion, the movant must be careful to include all grounds for summary judgment *in the motion itself* (Emphasis added.) *McConnell,* 858 S.W.2d at 339-42. The supreme court has expressly held that a motion for summary judgment must itself present the grounds upon which it is made, and the movant may not rely on briefs or summary judgment evidence in lieu of that requirement. *Id.* at 341.[1] Thus, a trial court considering

Page 376

a motion for summary judgment is restricted to the issues raised in the motion, response, and subsequent replies. *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993).

In her motion for summary judgment, Laurel stated that she would rely on the pleadings as summary judgment evidence. Laurel contends that statement was sufficient to address the elements of appellant's DTPA and declaratory judgment claims. When filing a no evidence motion for summary judgment, the moving party relies on the pleadings and alleges that the opposing party cannot possibly establish one of the elements of its pleaded cause of action. *See* TEX.R. CIV. P. 166a(i). However, a party cannot substitute the nonmovant's pleading for the movant's obligation to allege in her motion the specific basis on which she is entitled to judgment. *See McConnell,* 858 S.W.2d at 341. Laurel cannot substitute her challenge to one cause of action for another merely by referring to the original pleadings. *See id.*

While the parties do not raise the issue, we note that where the grounds for summary judgment are not sufficiently specific or are unclear, the nonmovant must specially except to the form of the motion and give the movant an opportunity to amend before the nonmovant can raise the complaint on appeal. *Id.* However, when a motion for summary judgment clearly presents certain grounds but not others, a non-movant is *not* required to specially except. *Id.* at 342; *see also Roberts v. Southwest Tex. Methodist Hosp.,* 811 S.W.2d 141, 146 (Tex.App.-San Antonio 1991, no writ) ("When a motion for summary judgment asserts grounds A and B, it cannot be upheld on grounds C and D, which were not asserted, even if the summary judgment proof supports them and the responding party did not except to the motion."). Alder did not file a special exception to the form of Laurel's motion. However, Alder's response to the motion for summary judgment clearly stated that Laurel's motion was based on a negligence claim, and was therefore inconsistent with Alder's DTPA action and request for declaratory relief. Upon notice of this deficiency in the motion, Laurel had an opportunity to amend her summary judgment motion to correct the mistake, but failed to do so. Because the motion relied on a cause of action not brought by the plaintiff in his original pleadings, it should not have been granted.

Laurel argues for the first time on appeal that Alder had insufficient proof of DTPA damages and that his claims violate the Statute of Frauds. Laurel failed to amend her motion for summary judgment to include these contentions when she was given the opportunity. Laurel cannot raise for the first time on



appeal alleged deficiencies in Alder's DTPA and declaratory judgment claims. TEX.R.APP. P. 33.1. Laurel's motion for summary judgment failed to address Alder's claims for relief pursuant to the DTPA and his action for declaratory judgment, and thus summary judgment should not have been granted. *See Mansfield v. Ohio Cas. Ins. Co.,* 40 S.W.3d 528, 532 (Tex.App.-Houston [14th Dist.] 2000, pet. dism'd by agr.) (because motion failed to address claims in plaintiffs pleadings summary judgment was improper). Accordingly, we sustain appellant's first issue and do not reach his second and third issues.[2]

Page 377

**CONCLUSION**

Because the trial court erred in granting summary judgment on causes of action not addressed in the motion, we sustain appellant's first issue and reverse and remand the cause to the trial court for further proceedings.

---------------

Notes:

1. We note that the Fourteenth Court of Appeals has further excluded from consideration any grounds set out in a document that is incorporated by reference into the motion for summary judgment. *See Coastal Cement Sand v. First Interstate Credit,* 956 S.W.2d 562, 566 (Tex.App.-Houston [14th Dist.] 1997, writ denied).

2. In appellant's second and third issues, he contends that he provided sufficient evidence to avoid a no evidence summary judgment and that the trial court, in granting summary judgment relief, exceeded the scope of Laurel's motion. We need not address either of these issues.

---------------



**316 S.W.3d 68**
**Court of Appeals of Texas,**
**Houston (14th Dist.).**
**PARKER DRILLING COMPANY & Parker Drilling Company (Bolivia) S.A., Appellants**
**v.**
**ROMFOR SUPPLY COMPANY & Romfor West Africa Ltd., Appellees.**

**No. 14-08-00875-CV.**
**June 8, 2010.**
**Rehearing Overruled Aug. 12, 2010.**

[316 S.W.3d 69]

COPYRIGHT MATERIAL OMITTED

[316 S.W.3d 70]

Jeffrey L. Oldham, Andrew F. Spalding, Nell Frances Connally, Houston, for appellants.

Larry D. Harvey, Houston, for appellees.

Panel consists of Justices YATES, FROST, and BROWN.**OPINION**LESLIE YATES, Justice.

Appellants Parker Drilling Company and Parker Drilling Company (Bolivia) S.A. (collectively "Parker") appeal from a judgment entered in favor of appellees Romfor Supply Company and Romfor West Africa Ltd. (collectively "Romfor") in a breach of contract case. In three issues, Parker argues the evidence is legally insufficient to support the jury's finding of a contract between Parker and Romfor, the trial court erred as a matter of law in awarding damages against Parker, and the trial court's award of attorney's fees in favor of Romfor is erroneous. Because we find the evidence is legally insufficient to support the jury's finding of a contract between Parker and Romfor, we reverse the trial court's judgment and render judgment that Romfor take nothing.

## I. Background

Parker and Romfor are companies engaged in drilling for oil in various locations throughout the world. In early 2003, Romfor learned that Parker was selling equipment out of its worldwide fleet. Romfor expressed interest in purchasing one of Parker's oil rigs located in Nigeria ("Rig 220") because it was planning to begin drilling operations in the Congo along with Caroil S.A., Romfor's French venture partner. Romfor and Parker signed a letter of intent for Romfor to purchase Rig 220 for $800,000. Before a contract was finalized, Parker informed

[316 S.W.3d 71]

Romfor that it was withdrawing its offer to sell Rig 220 because it had accepted a third party's offer. Parker subsequently provided Romfor with a list of other rigs available for sale, and Romfor decided to pursue an agreement to purchase a rig located in Bolivia ("Rig 118") for $1,745,000. Romfor's president, Stuart Breckon, travelled to Bolivia in May 2003 to inspect Rig 118 and determined the rig needed certain repairs before being transported to the Congo. Following Breckon's visit to Bolivia, Parker and Romfor entered into an agreement (the "Service Agreement") under which Parker would repair Rig 118 and Romfor would pay Parker for the repairs. A contract for the sale of Rig 118 was finalized in June 2003,



and Parker shipped Rig 118 to the Congo during the last week of June 2003 after completing the repairs requested by Romfor.

While in Bolivia, Breckon learned that Parker was winding down drilling operations in that country and was looking to sell much of its equipment located there. Breckon signed a document offering to purchase eleven pieces of equipment from Parker for $84,000 ("Romfor's Offer"). Included in these eleven pieces of equipment were three Gardner Denver PZ-9 mud pumps (the "Mud Pumps"), [1] which Romfor offered to purchase for $6,000 each. Parker did not officially respond to Romfor's Offer; however, Parker shipped the eight items other than the Mud Pumps to Africa along with Rig 118, and Romfor later paid Parker for these eight items. After Rig 118 left Bolivia, Patricia Carreras, Parker's financial administrator, informed Breckon that Parker intended to sell the Mud Pumps to SOCO Bolivia S.R.L. ("SOCO") [2] for $21,429, and that SOCO would be responsible for refurbishing and exporting the pumps.

Parker subsequently invoiced the pumps to SOCO (the "Parker/SOCO Invoice") and SOCO finished repairing the pumps. Over the next several months, SOCO repeatedly asked Romfor to pay the pumps' purchase price and repair costs, and continually informed Parker that it could not pay for the pumps because Romfor had not yet paid SOCO for them. In January 2004, Parker notified SOCO that it was cancelling the sale of the Mud Pumps because SOCO had not paid the purchase price. SOCO cancelled the Parker/SOCO Invoice in February 2004 and Parker regained possession of the pumps. In April 2004, Parker invoiced the Mud Pumps to SOCO again after SOCO informed Parker that it had received an offer from a third party to purchase the pumps for $90,000. Parker re-sold the pumps to SOCO for $21,429. SOCO kept all of the profit from the subsequent sale to the third party.

After being notified that Parker had regained possession of the pumps, Romfor demanded that Parker refund Romfor $68,680, the total amount SOCO had invoiced Romfor for repairing and storing the Mud Pumps. Parker refused to refund any amount, claiming there was no contract for the sale of the Mud Pumps between itself and Romfor. Romfor filed suit against Parker in March 2006, alleging that Parker and Romfor contracted for the sale of the Mud Pumps and that Parker breached this contract. The jury found that Parker agreed to sell the Mud Pumps to Romfor and that Parker failed to comply with the agreement. The jury then

[316 S.W.3d 72]

awarded Romfor $68,571 in damages. The trial court entered final judgment in Romfor's favor, awarding Romfor $90,000 in damages [3] and $100,000 in attorney's fees, along with additional contingent attorney's fees for appeal.

Parker raises three issues on appeal. In its first issue, Parker argues the evidence is legally insufficient to show the formation of a contract between Parker and Romfor for the sale of the Mud Pumps. Next, Parker asserts there is legally insufficient evidence to support the jury's damage award of $68,571 and the trial court's final damage award of $90,000. Finally, Parker contends the trial court's award of $100,000 in attorney's fees should be reversed because it is legally unsupportable.

## II. Analysis A. Standard of Review

In its first issue, Parker alleges there is no evidence of a contract between Parker and Romfor for the sale of the Mud Pumps. In a legal sufficiency or no-evidence review, we determine whether the evidence would enable reasonable and fair-minded individuals to reach the verdict under review. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). While conducting this review, we credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.*



Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony, and we cannot impose our own opinions to the contrary. *Id.* at 819. We must consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *See id.* at 822. We must, and may only, sustain no-evidence points when either (1) the record reveals a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810.

### B. Elements of Contract Formation

To recover for breach of contract, a plaintiff must show (1) the existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result of defendant's breach. *Aguiar v. Segal,* 167 S.W.3d 443, 450 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). A legally enforceable contract consists of (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Wal-Mart Stores, Inc. v. Lopez,* 93 S.W.3d 548, 555-56 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *see also AKIB Constr., Inc. v. Neff Rental, Inc.,* No. 14-07-00063-CV, 2008 WL 878935, at *3 (Tex.App.-Houston [14th Dist.] Apr. 3, 2008, no pet.) (mem. op.). Whether the parties reached an agreement is a question of fact. *Advantage Physical Therapy, Inc. v. Cruse,* 165 S.W.3d 21, 24 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Whether an agreement is legally enforceable, however, is a question of law. *See id.; Gaede v. SK Invs., Inc.,* 38 S.W.3d 753, 757 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

[316 S.W.3d 73]

In this case, there is no writing signed by Parker acknowledging its acceptance of Romfor's Offer.[4] However, the jury could properly imply the formation of a contract between Parker and Romfor from any conduct by both parties recognizing the existence of a contract. *See* Tex. Bus. & Com.Code Ann. § 2.204(a) (Vernon 2009); *Adams v. H & H Meat Prods., Inc.,* 41 S.W.3d 762, 771 (Tex.App.-Corpus Christi 2001, no pet.); *see also Wal-Mart,* 93 S.W.3d at 557 (describing implied contracts as those inferred from the acts and conduct of the parties when the facts and circumstances show a mutual intent to contract). The existence of an implied contract involves inferences drawn from circumstantial evidence and is therefore a question of fact. *See Domingo v. Mitchell,* 257 S.W.3d 34, 40 (Tex.App.-Amarillo 2008, pet. denied); *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 348 (Tex.App.-Fort Worth 1996, no writ). Questions of contract formation must be resolved on objective standards, based upon the meaning reasonably conveyed by the parties' actions and words rather than their uncommunicated subjective intentions. *Harrison v. Williams Dental Group, P.C.,* 140 S.W.3d 912, 916 (Tex.App.-Dallas 2004, no pet.); *Angelou v. African Overseas Union,* 33 S.W.3d 269, 278 (Tex.App.-Houston [14th Dist.] 2000, no pet.). We view the conduct and circumstances surrounding the transaction from a reasonable person's interpretation at that particular point in time. *Wal-Mart,* 93 S.W.3d at 557-58.

According to Parker, the only contract for the sale of the Mud Pumps shown by the evidence is between Parker and SOCO. Romfor argues a contract between itself and Parker is clearly shown by the Sales and Service Agreements, Romfor's Offer,[5] and the parties' actions. After reviewing the record, we conclude there was no contract between Parker and Romfor for the sale of the Mud Pumps. There was no meeting of the minds between Parker and Romfor regarding the pumps, and the parties' conduct shows that Parker contracted to sell the pumps to SOCO.



**1. No Evidence of Acceptance of Romfor's Offer**

Parker contends the evidence shows it did not accept Romfor's Offer in accordance with its terms and that "a different plan for the [Mud Pumps] was understood and followed by both Parker and Romfor." To create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms. *See*

[316 S.W.3d 74]

*Levin Law Group, P.C. v. Sigmon,* No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex.App.-Houston [14th Dist.] Jan. 21, 2010, pet. denied) (mem. op.); *Angelou,* 33 S.W.3d at 278. A purported acceptance that changes or qualifies an offer's material terms constitutes a rejection and counteroffer rather than an acceptance. *See Lewis v. Adams,* 979 S.W.2d 831, 834 (Tex.App.-Houston [14th Dist.] 1998, no pet.); *see also Knowles v. Wright,* 288 S.W.3d 136, 143 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (recognizing the material terms of a contract must be agreed upon before a contract may be enforced).

The question of whether a contract contains all the essential terms for it to be enforceable is a question of law. *See Beal Bank, S.S.B. v. Schleider,* 124 S.W.3d 640, 653 n. 8 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Contracts should be examined on a case-by-case basis to determine which terms are material or essential. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992); *see also John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 20 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (listing the essential elements for a contract for sale as (1) the object of the contract or thing sold, (2) the consideration to be paid, and (3) the parties' consent to the exchange); *cf.* Black's Law Dictionary 1510 (8th ed. 2004) (defining "material terms" as "contractual provision[s] dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done"). Here, Romfor's Offer contains the following material terms: (1) Romfor will purchase eleven items of equipment from Parker, including the Mud Pumps, (2) Romfor will pay Parker $84,000 for all eleven items, and (3) the Mud Pumps will be exported out of Bolivia while the remaining eight items are to be shipped along with Rig 118 to the Congo.

The record does not reflect a written response by Parker to Romfor's Offer until July 10, 2003, when Carreras sent an e-mail changing several of the offer's terms to Breckon. The e-mail states, in relevant part:

> As you will see [the Mud Pumps] are still in [Bolivia] for repairs. Due to local regulations, we will need to bill these with a local invoice, subject to VAT and Transaction Tax. The plan is for SOCO to be the buyer so they can finish the repairs and take care of the exportation whenever that happens. By doing this we can release Parker from the operations related to this sale, and hopefully wrap up everything in July.

Carreras's e-mail also includes a document that further modifies Romfor's Offer by separating the Mud Pumps from the other eight items Romfor wanted to purchase and breaking the $84,000 Romfor was willing to pay for all eleven items into two groups: $21,429 for the pumps [6] and $66,000 for the remaining eight items.

It is clear that Carreras's e-mail changed several of the material terms of Romfor's Offer, including (1) the total number of items Romfor would purchase from Parker, (2) the total price Romfor would pay Parker for these items, (3) the price for the Mud Pumps, and (4) the party who would ultimately purchase the Mud Pumps from Parker. *See John Wood Group USA,* 26 S.W.3d at 20.[7] By changing



[316 S.W.3d 75]

the material terms of the offer, Carreras's e-mail constitutes a rejection of Romfor's Offer and a counteroffer. *See Knowles,* 288 S.W.3d at 143; *Lewis,* 979 S.W.2d at 834. Breckon acknowledged receiving this notification and stated he did not object because the sale of Mud Pumps was a relatively small portion of the Rig 118 project. This shows that Romfor was aware Parker planned to sell the pumps to SOCO and the parties acted according to this understanding. Romfor had ample notice that Parker did not accept its offer to purchase all eleven pieces of equipment in strict compliance with the offer's terms, thus negating an essential element of contract formation. *See, e.g., Wal-Mart,* 93 S.W.3d at 555-56.

## 2. No Evidence of a Meeting of the Minds or Mutual Assent

Romfor argues Carreras's e-mail does not show a rejection of Parker's Offer because it was not sent until after Parker transported Rig 118 and the other eight items included in Romfor's Offer to Africa. According to Romfor, Parker's shipment of the eight additional items shows that Parker accepted Romfor's Offer, thereby creating a contract for the sale of the Mud Pumps. In response, Parker argues the actions and communications of the parties show no meeting of the minds or mutual intent to contract for the sale of the Mud Pumps. We conclude that the acts of the parties related to the Mud Pumps do not show the existence of a contract between Parker and Romfor.

Regardless of whether a contract is based on express or implied promises, mutual assent must be present. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 850 (Tex.2009). In cases involving implied contracts, mutual intent is inferred from the circumstances. *Id.* In determining whether mutual assent is present, courts consider the communications between the parties, the acts and circumstances surrounding the communications, and any course of dealing between the parties. *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972); *Angelou,* 33 S.W.3d at 278. The minds of the parties must also meet with respect to the agreement's subject matter and essential terms. *See Wal-Mart,* 93 S.W.3d at 556. The determination of a meeting of the minds is based on the objective standard of what the parties said and did, not on their subjective states of mind. *Angelou,* 33 S.W.3d at 278. This determination is a question of fact, and the factfinder's decision that one party reasonably drew the inference of a promise from the other party's conduct will be given legal effect. *Id.; see also Fraud-Tech, Inc. v. Choicepoint, Inc.,* 102 S.W.3d 366, 386 (Tex.App.-Fort Worth 2003, pet. denied). The parties' conduct determines the terms of the contract on which the parties' minds met. *See Wal-Mart,* 93 S.W.3d at 557.

According to Breckon, Parker indicated it would provide Romfor additional equipment related to Rig 118 at a discount

[316 S.W.3d 76]

because Parker withdrew its offer to sell Rig 220 to Romfor. Breckon testified he "offered very low prices" in Romfor's Offer to "make back some of this bait and switch that [Parker] had done" with the price difference between Rig 220 and Rig 118. Romfor argues that these facts, considered with the parties' actions and communications surrounding the Sales Agreement and the Service Agreement, show a meeting of the minds between Parker and Romfor. The evidence, however, proves the contrary.

Neither the Sales Agreement nor the Service Agreement mentions any of the items included in Romfor's Offer. The Service Agreement simply states that Parker will be responsible for "perform[ing] certain services in connection with Rig 118." Romfor argues these "certain services" included refurbishing and exporting the Mud Pumps according to the terms of Romfor's Offer. There is, however, no evidence that Parker was involved in repairing the Mud Pumps. Instead, Parker released the pumps to

SOCO, who then informed Romfor that it was repairing the pumps. Carreras subsequently notified Romfor that Parker would sell the pumps to SOCO. Breckon acknowledged receiving this notification, and Romfor voiced no objection. All of the communications regarding repairs performed on the Mud Pumps were between Romfor and SOCO. This course of dealing is different than Parker's involvement in the repairing of Rig 118. The Rig 118 repairs were overseen by Mike Alborta, Parker's operations manager, and performed by ex-Parker employees selected by Romfor and hired by SOCO. Alborta, along with many of the individuals hired by SOCO, obtained employment with Romfor and went to the Congo with Rig 118 at the end of June 2003. This left Parker with no representatives involved in repairing the Mud Pumps. Breckon acknowledged at trial that SOCO was involved in repairing the Mud Pumps in exactly the same way as Parker was involved in the Rig 118 project, thus differentiating Parker's obligations under the Service Agreement and its activities related to the pumps.

Additionally, none of the documentary evidence in the record points to a contract for the Mud Pumps between Parker and Romfor. Parker's communications to Romfor plainly state that SOCO would purchase the pumps from Parker, and the Parker/SOCO Invoice does not mention Romfor.[8] Carreras testified the Parker/SOCO Invoice constituted a transfer of ownership and that Parker removed the pumps from its asset records after issuing the invoice. Carreras and Breckon both testified that Parker, Romfor, and SOCO understood that Parker would not be paid the pumps' $21,429 purchase price until Romfor first paid SOCO. Parker continuously looked to SOCO for payment of the purchase price and only SOCO attempted to recover funds related to the Mud Pumps directly from Romfor.[9] Additionally,

[316 S.W.3d 77]

none of Parker's documentation related to the Service Agreement reference the Mud Pumps. In September 2003, Parker invoiced Romfor $230,537.61 for Service Agreement obligations. This amount included $66,000 for the eight items from Romfor's Offer shipped with Rig 118 but does not include any amount for the Mud Pumps. Romfor paid the $230,537.61 directly to Parker, and Breckon acknowledged the $66,000 charge for additional assets sent with Rig 118 did not include the Mud Pumps.

This evidence clearly shows that each of the parties acted as though Parker sold the Mud Pumps to SOCO, not to Romfor. Parker invoiced the Mud Pumps to SOCO, only SOCO was involved in repairing and seeking payment for the pumps, and the pumps were not included in any of Parker's requests for payment under the Sales or Service Agreements. After objectively reviewing the parties' communications, acts, and circumstances surrounding the communications, we find there was no meeting of the minds or mutual intent to contract for the sale of the Mud Pumps between Parker and Romfor. *See Haws & Garrett,* 480 S.W.2d at 609; *Angelou,* 33 S.W.3d at 278. Also, based on the evidence showing that Romfor did not object to Parker's proposal to sell the pumps to SOCO, we conclude the jury could not determine that Romfor could reasonably infer a promise by Parker to sell the Mud Pumps to Romfor. *See Fraud-Tech,* 102 S.W.3d at 386; *Angelou,* 33 S.W.3d at 278. Therefore, the evidence shows there was no meeting of the minds or mutual assent to contract between Parker and Romfor. *See Levin Law Group,* 2010 WL 183525, at *4-5 (concluding no contract to mediate existed where the "communications between the parties and the acts and circumstances surrounding those communications" did not indicate a meeting of the minds regarding the essential terms of an alleged contract to mediate); *see also Wal-Mart,* 93 S.W.3d at 557 (stating a meeting of the minds regarding contract terms is determined by the parties' conduct).

Although Texas law favors validating transactions rather than voiding them, a reviewing court may not create a contract where none exists. *See Knowles,* 288 S.W.3d at 143. After reviewing the evidence in the light most favorable to the verdict, we find that Romfor failed to prove each of the elements necessary to establish the existence of a legally enforceable contract. *See Advantage Physical Therapy,* 165 S.W.3d



at 24 (recognizing the existence of a legally enforceable agreement is a question of law); *Wal-Mart,* 93 S.W.3d at 555-56 (stating there must be a meeting of the minds and acceptance in strict compliance with an offer's terms to form a valid contract). This renders the evidence legally insufficient to support the jury's verdict. *See City of Keller,* 168 S.W.3d at 810 (stating evidence is legally insufficient when record reveals a complete absence of a vital fact). Accordingly, we sustain Parker's first issue.

## C. Parker's Remaining Issues

Because there is legally insufficient evidence of a contract between Parker and Romfor, Romfor is not entitled to recover breach-of-contract damages. *See Peterson v. Jansen,* No. 14-07-00535-CV, 2009 WL 334915, at *6 (Tex.App.-Houston [14th Dist.] Feb. 12, 2009, no pet.) (mem. op.) (listing the existence of a valid contract as a prerequisite to recovery for

[316 S.W.3d 78]

breach of contract); *Aguiar,* 167 S.W.3d at 450 (same). Additionally, an award of attorney's fees in a breach of contract claim is appropriate only if a party prevails and recovers damages. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (Vernon 2008) (allowing recovery of attorney's fees in valid claims involving oral or written contracts); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995); *Peterson,* 2009 WL 334915, at *6. Thus, there is no legal basis for the recovery of either damages or attorney's fees and the awards in the judgment for damages and attorney's fees fail on this basis. Thus, we do not reach Parker's second issue challenging the sufficiency of the evidence to support the damages award or Parker's third issue challenging the reasonableness of the attorney's fees awarded.

## III. Conclusion

After reviewing the evidence in the light most favorable to the verdict, we find the evidence is legally insufficient to show the existence of a contract for the sale of the Mud Pumps between Parker and Romfor. Because no legally enforceable contract was formed in this case, Romfor is not entitled to recover breach-of-contract damages or attorney's fees. Accordingly, we reverse the trial court's judgment and render judgment that Romfor take nothing.

--------

Notes:

1. Mud pumps act as the "circulatory system" for the drilling rig by circulating drilling fluid down drilling holes.

2. SOCO is a Bolivian company that assisted in Rig 118's repairs by coordinating catering and transportation services and by hiring ex-Parker employees selected by Romfor to repair the rig.

3. The trial court added $21,429-the amount SOCO ultimately paid Parker for the Mud Pumps-to the jury's damage award.

4. Romfor contends Parker raises a statute of frauds defense on appeal and that Parker waived this argument by failing to raise the issue before the trial court. *See* Tex.R. Civ. P. 94 (listing statute of frauds as an affirmative defense); *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.,* 48 S.W.3d 865, 875 (Tex.App.-



Houston [14th Dist.] 2001, pet. denied) (stating statute of frauds defense is waived if it is not pleaded). We agree with Parker that this contention lacks merit, as Parker is simply challenging the legal sufficiency of the evidence to prove the existence of any contract, written or otherwise, to sell the Mud Pumps between itself and Romfor.

5. We note that each of these documents were executed at different times and do not expressly refer to one another. However, we may consider them together to ascertain the parties' intent. *See City of Keller,* 168 S.W.3d at 811; *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex.2000). Additionally, although Parker and Caroil are the Service Agreement's only signatories, Romfor was heavily involved in negotiating the Sales Agreement, the Sales Agreement provides for written notices to be copied to Romfor and names Romfor as Rig 118's purchaser, and Caroil's payment of the rig's purchase price was coordinated by Romfor.

6. This total includes $6,000 for each individual Mud Pump plus an additional $3,428.57 in taxes.

7. *See also Potcinske v. McDonald Prop. Invs., Ltd.,* 245 S.W.3d 526, 530-31 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (upholding trial court's determination that no contract was formed between parties where offeree changed offer's financing option, a material term, and offeror failed to accept the requested change); *Gasmark, Ltd. v. Kimball Energy Corp.,* 868 S.W.2d 925, 928 (Tex.App.-Fort Worth 1994, no writ) (determining offeree significantly altered terms of natural gas purchase and sales contract offer by sending an amended purchase agreement changing billing and payment provisions); *cf. Adams,* 41 S.W.3d at 768-73 (finding buyer liable for breach of contract damages where seller was not paid for three shipments of meat products delivered by seller to intermediary, despite non-existence of signed writing by buyer guaranteeing payment for delivery to intermediary, where buyer instructed seller to send product to intermediary for permit purposes and unpaid shipments directly matched buyer's orders).

8. In one internal e-mail discussing SOCO's interest in purchasing equipment from Parker, Carreras states "as a reference[,] we sold RomFor [sic] PZ-9's at USD 6,000 each." Romfor argues this evidence shows the pumps were, in fact, sold by Parker to Romfor. This statement is conclusively negated by the undisputed documentary and testimonial evidence showing the only party ever invoiced or billed for the pumps by Parker was SOCO. This e-mail does not constitute legally sufficient evidence to show the formation of a contract between Parker and Romfor. *See City of Keller,* 168 S.W.3d at 820 (stating jury may not credit evidence that is conclusively negated by undisputed facts).

9. Romfor points to a September 19, 2003 e-mail from Carreras to Breckon referencing several "SocoRomfor" invoices-including the Parker/SOCO Invoice-as evidence that Parker sought payment for the pumps directly from Romfor. However, the e-mail clearly asks Breckon to "coordinate with SOCO to make the payment so [Parker] can collect the money that is pending." This message does not show that Parker sought payment of the purchase price from Romfor.

--------



**Page 844**
**720 S.W.2d 844**
**MERCEDES-BENZ OF NORTH AMERICA, INC., and Ryan Oldsmobile,**
**Inc., Appellants,**
**v.**
**David Vincent DICKENSON, Appellee.**
**No. 2-86-022-CV.**
**Court of Appeals of Texas,**
**Fort Worth.**
**Nov. 6, 1986.**

**Page 846**

Jackson, Walker, Winstead, Cantwell & Miller, Jack Pew, Jr., Dallas, for Mercedes-Benz.

Gandy, Michener, Swindle, Whitaker & Pratt, J. Shelby Sharpe, Fort Worth, for Ryan Olds.

Shannon, Gracey, Ratliff & Miller, Tim G. Sralla, Fort Worth, for appellee.

Before FENDER, C.J., and BURDOCK and HILL, JJ.

OPINION

FENDER, Chief Justice.

Defendants, Ryan Oldsmobile, Inc. (hereinafter "Ryan") and Mercedes-Benz of North America, Inc. (hereinafter "Mercedes") appeal from a judgment against them and in favor of plaintiff, David Vincent Dickenson, in an action brought for breach of warranty, negligence, and deceptive trade practices in the sale and repair of a 1982 Mercedes-Benz 300D. Dickenson originally only sued Ryan, the dealer, who impleaded Mercedes, the manufacturer, in a cross-claim for indemnity. The jury found Ryan and Mercedes jointly and severally liable for $8,679.30 in actual damages, plus attorney's fees. The jury awarded Dickenson additional damages of $3,000 from Ryan and $7,000 from Mercedes based on their finding that the defendants' actions were committed knowingly. The judgment further ordered Mercedes

Page 847

to fully indemnify Ryan. Mercedes also appeals from the judgment on the question of Ryan's right to indemnity.

We affirm.

In April, 1982, Dickenson bought a 1982 Mercedes automobile from Ryan, an authorized Mercedes dealer, in Fort Worth. Ryan's salesman made a number of representations as to the quality and characteristics of the car in question. Dickenson signed a contract which included a disclaimer purporting to exclude all warranties except those found in the Mercedes warranty booklet to be delivered with the car. Dickenson did not receive a copy of the warranty booklet until the car was delivered. The warranty, running from the manufacturer only, limited Dickenson's remedies to repairs or replacements necessary to correct defects in material or workmanship. The repairs were to be performed by any authorized



Mercedes-Benz dealer. This warranty and any warranties implied by law were limited to the first 36 months or 36,000 miles.

Within three weeks, Dickenson began experiencing trouble with the car, including a defect in the transmission. Numerous other defects appeared over the next eight months. Dickenson returned the car for repairs at least seven times during that period. The transmission was replaced at least two times and still did not operate properly. Several other defects were never corrected despite repeated attempts by the appellants to do so.

In December 1982, Dickenson offered to return the car to Ryan for a full refund or replacement with a car which was not defective. Both appellants refused this offer. Dickenson then solicited four bids on the car and sold it, in April 1983, to the highest bidder.

The jury's answers to the special issues can be summarized as follows:

1) Ryan knowingly represented that the car was of a particular standard, quality, or grade with respect to its transmissions when it was of another, which was a producing cause of damage to the plaintiff, see TEX.BUS. & COM.CODE ANN. secs. 17.50(a)(1), 17.46(b)(7) (Vernon Pamph.Supp.1986);

2) Ryan knowingly represented that its repair services were of a particular standard, quality, or grade when they were of another, which was a producing cause of damage to the plaintiff, see id.;

3) Mercedes knowingly engaged in an unconscionable act or course of action in failing to provide proper replacement parts in connection with repair made to the car, which was a producing cause of damage to the plaintiff, see TEX.BUS. & COM.CODE ANN. sec. 17.50(a)(3) (Vernon Pamph.Supp.1986);

4) Ryan knowingly made untrue express warranties to the effect that:

a) the car was of the highest quality and the best car Mercedes had yet produced;

b) the car would get 33 miles to the gallon on the highway and 27 miles to the gallon in town; and

c) Ryan could or would and had properly repaired the car,

each of which were a producing cause of damage to the plaintiff, see TEX.BUS. & COM.CODE ANN. sec. 17.50(a)(2) (Vernon Pamph.Supp.1986);

5) Ryan and Mercedes were negligent in failing to properly repair the car and in failing to provide or install proper replacement parts for the car, each of which was a proximate cause of damage to the plaintiff; and

6) the car was not reasonably fit for its ordinary intended purposes when purchased, see TEX.BUS. & COM.CODE ANN. sec. 2.314 (Tex.UCC) (Vernon 1968); TEX.BUS. & COM.CODE ANN. sec. 17.50(a)(2).

The award of damages was based on these findings. Further findings were the basis for the award of indemnity. Those findings were:

1) Ryan followed Mercedes' factory guidelines in regard to the repair work it did on the car;

Page 848

2) there was a defect or defects in the car when it left Mercedes' possession; and

3) such defects were the reason Ryan was unable to repair the car so as to make it reasonably fit for its ordinary intended purposes.

Finally, the jury found that 30% of the negligence which caused the plaintiff's damages was attributable to Ryan while 70% was attributable to Mercedes.

On appeal Ryan brings three points of error contesting the judgment in favor of Dickenson. Mercedes brings nineteen points of error also contesting that judgment. In addition, Mercedes brings five points of error contesting the judgment for indemnity of Ryan.

In its first point of error, Ryan claims that the judgment cannot stand because no evidence of damages was offered at trial. Ryan contends that the only offer of such evidence, Dickenson's opinion as to the market value of the car when purchased, was legally insufficient to establish the car's market value when purchased. Ryan asserts that Dickenson's testimony was "no evidence" of market value because, even though Dickenson was the owner of the car, he failed to show two things: 1) that he was familiar with the market value at the time of purchase of a car with defects such as his had, and 2) that his opinion referred to market value as opposed to personal value. See Vista Chevrolet, Inc. v. Lewis, 704 S.W.2d 363, 371 (Tex.App.--Corpus Christi 1985), rev'd on other grounds, 709 S.W.2d 176 (Tex.1986); see also, Porras v. Craig, 675 S.W.2d 503, 505 (Tex.1984).

The actual damages to which a plaintiff is entitled in a DTPA case are the same as damages recoverable at common law. See Brown v. American Transfer & Storage Co., 601 S.W.2d 931, 939 (Tex.), cert. denied, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). The common law measure of damage for a case such as this one is the difference between the market value of the property as warranted and the market value of the property as delivered. See Johnson v. Willis, 596 S.W.2d 256, 262 (Tex.Civ.App.--Waco), writ ref'd n.r.e. per curiam, 603 S.W.2d 828 (Tex.1980). It is uncontested that the owner of property can testify as to its market value even though he cannot qualify to testify about the value of like property belonging to someone else. See Porras, 675 S.W.2d at 504. The Court in Porras explained further:

Even an owner's testimony, however, is subject to some restrictions. In order for a property owner to qualify as a witness to the damages to his property, his testimony must show that it refers to market, rather than intrinsic or some other value of the property. This requirement is usually met by asking the witness if he is familiar with the market value of his property. [Cites omitted.]

Id. at 504-05.

Appellant Ryan interprets the above language as a modification of the general rule that an owner may testify as to the market value of his property. Ryan contends that unless the owner at some point declares he is "familiar with" or "knows" the market value of his property, he is not qualified to give an opinion of the property's market value. Without such a declaration, Ryan urges an owner's testimony is "no evidence" even where he states that his opinion refers to market rather than intrinsic value. We do not interpret Porras to make such a requirement.

The facts in Porras clearly show that the property owner's testimony of his property's value in no way referred to market value. The owner was asked, "Mr. Craig, what in your opinion was the value of the property...." Id. at 505. The owner was not asked if he had an opinion of his property's market value. Mr. Craig replied, "[a]bout fifteen [thousand dollars]." Id. When asked the basis for this opinion Mr. Craig answered:



Well I bought this land to build a retirement home on and I am fifty-seven and my wife is fifty-six and she's not--she's crippled so she wants to get out in the country, too. And we bought that

Page 849

for that reason and now we are afraid to build out there. And the reason we're afraid is because of the exotic animals that will be put next to us. Also they patrol the fence with guns. A sign on their fence [sic] they'll shoot if you go across that fence. And about a month ago there was a fire started on the grass on my property and burned in under my trees and if my wife had been there by herself she couldn't have got away.

Id.

Although the Court found such testimony constituted no evidence, the language immediately following that determination shows that Ryan's interpretation of Porras is incorrect. The Court continued:

We should not be understood as retreating from the general rule that an owner is qualified to testify about the market value of his property. Moreover, this is not just a case in which the lawyer failed to ask his client if he was familiar with the market value of the property. Instead, in this case the owner's testimony affirmatively showed that he referred to personal rather than market value. See Stinson v. Cravens, Dargan & Co., 579 S.W.2d 298 (Tex.Civ.App.--Dallas 1979, no writ). Mr. Craig was qualified to give an opinion of the market value of his land; he simply failed to do so.

Id. (emphasis added).

The Court stated that Mr. Craig, as owner, was qualified to give his opinion of his property's market value even without a declaration that he "knew" or was "familiar with" the market value. Mr. Craig's testimony was no evidence because he did not even attempt to refer to market value. According to Porras, a property owner is qualified to give his opinion of his property's market value as long as his testimony refers to market rather than intrinsic value. See id.

Moreover, even though an owner states that the values are only his opinion and fails to give the basis for such opinion, his testimony is admissible as evidence as long as he declares it refers to market value. See Bower v. Processor and Chemical Service, Inc., 672 S.W.2d 30, 32 (Tex.App.--Houston [14th Dist.] 1984, no writ). The court found that, "[d]espite the fact that on cross-examination Mr. Bartley answered affirmatively to questions which asked if he had guessed the values, the evidence was sufficient to support the judgment." Id.

Ryan's reliance on Vista Chevrolet is also misplaced. In that case, the court summarized the car owner's testimony as follows:

"[T]he value of it hindsight knowing that it's defective" was "nothing." She also testified that the automobile was worth "nothing" or was "really worthless" or was "really worth zero" because she couldn't depend on it and she couldn't sell it.

Vista Chevrolet, 704 S.W.2d at 371.

It is clear from this testimony that the owner did not qualify to give her opinion of her car's market value since her opinion referred only to the car's value to her. As the appellant in that case pointed out, the car would have some market value even if it was for simple salvage. Id. In light of the owner's testimony



referring only to intrinsic value and the fact that no expert testimony regarding the actual market value was offered, the court held:

(1) that it was never shown that Mrs. Lewis was qualified to testify regarding the value of her automobile and (2) that there was no evidence regarding the actual market value of the automobile as received in its defective condition to support the submission of and the jury's finding in response to the DTPA damages issue. [Cites omitted.]

Id. at 372.

After reviewing the cases, we reject Ryan's interpretations of Porras and Vista Chevrolet. We will apply the law governing an owner's qualification to give his opinion on the market value of his property as set out in Porras; i.e., in order for a property owner to qualify as a witness to the damages to his property, his testimony must only show that it refers to market,

Page 850

rather than intrinsic or some other value of the property.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. See Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568 (Tex.1985); International Armament Corp. v. King, 686 S.W.2d 595, 597 (Tex.1985); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. See In re King's Estate, 244 S.W.2d at 661-62.

On the question of damages Dickenson, as owner, was asked by his attorney:

Q. [MR. MILLER:] If you had known the problems that the car had on April of 1982 when you bought it, do you have an opinion as to what its reasonable market value would have been that date with those defects?

....

THE WITNESS: Yes, I have an opinion.

Q. (By Mr. Miller) What, in your opinion, would have been the reasonable market value in Tarrant County, Texas of that vehicle with those defects?

....

A. (By the Witness) Approximately $8,500 less than what I paid for it.

Q. And you paid what for it?

A. $30,429 on the street.

Q. So that amount, less $8,500 would be your opinion of its market value in a defective condition?

A. Yes, sir.



Q. And the defects being those that you have testified to in this case?

A. Yes, sir. [Emphasis added.]

It is clear from the form of the questions asked that Dickenson's opinion refers to market value. In addition, Dickenson testified his opinion was based "on the fact that it had this enormous amount of problems." We hold that this testimony from the car's owner is at least some evidence of the car's market value at the time of purchase. Ryan's first point of error is overruled.

In its point of error number twelve, appellant Mercedes voices the same no evidence complaint as to damages. For the reasons stated above, this point is overruled. Mercedes then contends that the evidence of damages is factually insufficient to support the jury's award of $8,679.30 as actual damages.

Where the challenge to a jury finding is that there was "insufficient evidence" to support the finding, we are to consider all the evidence in the case, both that in support of and that contrary to the finding, to determine if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. See Dyson v. Olin Corp., 692 S.W.2d 456, 457 (Tex.1985); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). If the court so determines, the finding should be set aside and a new trial ordered. See Garza, 395 S.W.2d at 823.

The only evidence as to damages was given by Dickenson. He stated that he paid $30,429.00 for the car in April of 1982. He also gave his opinion that the April 1982 market value of the car he received was "[a]pproximately $8,500 less than what I paid for it." We have already held that Dickenson's testimony was some evidence of the car's market value when purchased. Neither Mercedes nor Ryan offered expert testimony to contradict Dickenson's opinion of the car's market value even though it is clear that, as the manufacturer and dealer of the car, expert witnesses would have been available to them. As Dickenson's testimony is the only evidence of the car's market value when purchased, we hold that it is factually sufficient to support the jury's award of $8,679.30 in actual damages. Mercedes' thirteenth point of error is overruled.

In its second point of error, Ryan argues, in effect, that there is no evidence to support the jury's findings that it made certain express warranties or that the implied warranty

Page 851

of merchantability arose in Ryan's dealings with Dickenson. Ryan points to disclaimer language in the contract signed by Dickenson which says:

STATEMENT OF NEW CAR WARRANTY

There are NO WARRANTIES, express or implied, made by the Selling Dealer or the manufacturer on the new vehicle or chassis described in this order, except the most recent printed Mercedes-Benz warranty or warranties applicable to such new vehicle or chassis which are made a part of this order as of here set forth in full. A copy of such Mercedes-Benz warranty or warranties will be furnished to the purchaser upon delivery of the vehicle or chassis, and they shall be expressly IN LIEU OF any other express or implied warranty, condition or guarantee on the new vehicle, chassis or any part thereof, including any implied WARRANTY OF MERCHANTABILITY or FITNESS and of any other obligation on the part of Mercedes-Benz, or the Selling Dealer. Purchaser acknowledges that this vehicle is not suitable for Trailer Towing unless specified in this order.



Ryan argues that, because of this disclaimer, the court should have granted its motion for judgment non obstante veredicto and entered judgment in favor of Ryan against Dickenson.

An argument to the effect that the trial court failed to grant a motion for judgment non obstante veredicto is a "no evidence" point of error. See Southwestern Bell Tel. Co. v. Sims, 615 S.W.2d 858, 861 (Tex.Civ.App.--Houston [1st Dist.] 1981, no writ). See also Chemical Cleaning, Inc. v. Chemical Cleaning & Equipment Service, Inc., 462 S.W.2d 276, 277 (Tex.1970). We must, therefore, uphold the jury's findings if there is any evidence of probative value to support it while ignoring all evidence and inferences to the contrary. See In re King's Estate, 244 S.W.2d at 661-62.

The jury found that Ryan knowingly made express warranties concerning the car sold to Dickenson to the effect that 1) the car was of the highest quality, 2) the car would get 33 miles to the gallon in town, 3) the car was the best car Mercedes had yet produced, 4) Ryan could or would properly repair the car, and 5) Ryan had properly repaired the car. The jury also found that Ryan knowingly represented the car's transmissions and Ryan's repair services were of a particular standard, quality or grade when they were of another. Finally, the jury found that the car was not reasonably fit for its ordinary, intended purposes when Dickenson bought it.

A review of the testimony from the owner of Ryan Oldsmobile and one of its salesmen, establishes that there was at least some evidence to support each of the jury's holdings as to the express warranties and representations given. The testimony also shows that within three weeks of its purchase, the car suffered from a substantial number of defects, not the least of which was a faulty transmission which was replaced at least two times and still found to have some problem. This evidence is sufficient to show the car was not fit for its ordinary, intended purpose when purchased.

Having found the evidence supports the jury's findings that certain express and implied warranties were made, we must consider the effect the disclaimer in Ryan's contract had on these warranties.

Section 2.316 of the Texas Business and Commerce Code deals with the exclusion or modification of warranties and provides in pertinent part:

(a) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(b) Subject to Subsection (c), to exclude or modify the implied warranty of

Page 852

merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(c) Notwithstanding Subsection (b)

(1) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and



(2) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(3) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

TEX.BUS. & COM.CODE ANN. sec. 2.316 (Tex. UCC) (Vernon 1968).

The disclaimer made in the present case seems sufficient to negate the implied warranty found by the jury. This finding is not controlling, however, since we do not believe the disclaimer effectively excluded the express warranties made by Ryan.

The disclaimer in the contract says, in part:

There are NO WARRANTIES, express or implied, made by the Selling Dealer ... except the most recent printed Mercedes-Benz warranty or warranties.... A copy of such Mercedes-Benz warranty or warranties will be furnished to the purchaser upon delivery of the vehicle.... [Emphasis added.]

Under a disclaimer such as this, the buyer is not given the opportunity to read the warranty or warranties made until after the contract is signed. The consumer does not know, at the time he signs the contract, whether the warranty he will find in his glove box does or does not correspond with the express warranties that have been made to him. The fact is in this case that the buyer opened his warranty booklet to find that Ryan was making no warranty at all. Ryan's brief points out that, "[t]he warranty booklet Dickenson received with the automobile stated unequivocally on page 12 that the warranties ran from Mercedes." The principal purpose of section 2.316 is to protect a buyer from unexpected and unbargained for language of disclaimer by denying effect to such language when inconsistent with express warranties made. See TEX.BUS. & COM.CODE ANN. sec. 2.316 comment 1 (Tex.UCC). We find that the language found in the Mercedes-Benz warranty booklet cannot reasonably be construed consistently with the express warranties made. The disclaimer language is, therefore, inoperative.

In addition, when a plaintiff sues both for breach of warranty under the DTPA and false representation under the DTPA, a proper disclaimer waives the breach of warranty action under the DTPA. See Metro Ford Truck Sales, Inc. v. Davis, 709 S.W.2d 785, 789 (Tex.App.--Fort Worth 1986, no writ); McCrea v. Cubilla Condominium Corp., 685 S.W.2d 755, 758 (Tex.App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.); TEX.BUS. & COM.CODE ANN. sec. 17.42 (Vernon Pamph.Supp.1986). It does not, however, waive the cause of action for misrepresentation under the DTPA. See Metro, 709 S.W.2d at 790.

In the present case, the jury found with respect to the transmissions in the car and Ryan's repair services, that Ryan had "[r]epresented that the car or repair services were of a particular standard, quality or grade when they were of another." The jury found that Ryan made these misrepresentations knowingly and that such statements were a producing cause of damage

Page 853

to Dickenson. We hold that these findings alone were sufficient to support the judgment against Ryan. Ryan's second point of error is overruled.



Ryan's final point of error is a claim that the jury's findings do not support the judgment. The jury found that the defects in the car sold to Dickenson were present when the car left the manufacturer. It further found that these defects prevented Ryan from repairing the vehicle even though Ryan followed factory guidelines in working on the vehicle. Ryan asserts that, because of these jury findings, the trial court erred in failing to enter judgment in favor of Ryan against Dickenson.

The jury findings mentioned by Ryan were made in answer to special issues submitted to determine Ryan's claim for indemnity against Mercedes. Prior to making these findings, the jury found that Ryan had made certain representations which were not true and certain express warranties which had not been met. There is ample evidence to support these findings.

Ryan also complains that the judgment is wrong because it stood ready at all times to try to repair the defective car. Ryan urges that judgment should be rendered in its favor against Dickenson because Dickenson failed to give Ryan the opportunity to correct the defects. See Import Motors, Inc. v. Matthews, 557 S.W.2d 807, 809 (Tex.Civ.App.--Austin 1977, writ ref'd n.r.e.).

It is undisputed in this case that Ryan replaced the transmission in Dickenson's car at least twice because it was defective. Testimony from Ryan's own employee shows that, even then, the car was not operating properly. There was also testimony that several other defects in the car had never been finally repaired. After attempting to repair the car for eight months, it was still not running properly. We find that this evidence is sufficient to support the jury's findings that Dickenson gave the appellants reasonable opportunity to repair the car. Ryan's third point of error is overruled.

Appellant Mercedes' first point of error asserts Dickenson failed to plead and request a jury finding on failure of the warranty's essential purpose. Mercedes also claims there is no evidence to show the warranty failed of its essential purpose. Without such pleading, evidence, and fact finding, Dickenson is limited to the exclusive remedy of repair or replacement given in the Mercedes-Benz warranty booklet. See Henderson v. Ford Motor Co., 547 S.W.2d 663, 669 (Tex.Civ.App.--Amarillo 1977, no writ).

The Texas Business and Commerce Code provides that a plaintiff may assert a claim for money damages "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose...." TEX.BUS. & COM.CODE ANN. sec. 2.719 (Tex.UCC) (Vernon 1968). The failure of a limiting clause's essential purpose is a matter properly pled and submitted to the jury when contested. See Henderson, 547 S.W.2d at 669. The failure to so plead or submit this issue is not fatal, however, where no special exception is made to the plaintiff's pleadings. See Roark v. Allen, 633 S.W.2d 804, 810 (Tex.1982).

The pleadings in Roark, a medical malpractice case, did not use the word "negligent" or otherwise indicate that the defendants failed to use ordinary care. See id. The pleadings said that the child was injured because of acts "jointly and severally" practiced by the defendants. The Court held that these allegations were sufficient to put the appellant on notice that plaintiffs sought to hold him liable for some acts connected with the child. If vague, the appellant should have specially excepted; otherwise, the defect was waived. See id. The Court explained:

When there are no special exceptions, a petition will be construed liberally in favor of the pleader. Stone v. Lawyers Title Insurance Corp., 554 S.W.2d 183, 186 (Tex.1977). Also, "[t]he court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every fact will be

Page 854



supplied that can reasonably be inferred from what is specifically stated." Gulf, Colorado & Santa Fe Railway Co. v. Bliss, 368 S.W.2d 594, 599 (Tex.1963). A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim.

Id. at 809-10.

In the present case, Dickenson alleged that after having returned the car for repairs at least seven times, Mercedes' authorized dealer was unable to repair the car's defective transmissions, squealing brakes, rattles in the dashboard, and low gas mileage. Dickenson also alleged that the replacement transmissions installed in the vehicle "were not as warranted, but were defective and were, in turn, in need of replacement." These allegations are sufficient to inform Mercedes that Dickenson claimed the limited warranty failed of its essential purpose. Since Mercedes did not specially except to the omission, it cannot complain of the lack on appeal. See id.; TEX.R.CIV.P. 90-91.

Likewise, if an issue necessary to sustain a ground of recovery is omitted without an objection or request, the trial court will be deemed to have found the issue in such manner as to support its judgment. See Roark, 633 S.W.2d at 808-09; TEX.R.CIV.P. 279. Neither appellant objected when the court failed to submit an issue based on failure of the limited warranty's essential purpose. It is deemed that the issue was resolved in Dickenson's favor so as to support the judgment.

We must next consider whether there is some evidence to support this deemed finding. See In re King's Estate, 244 S.W.2d at 661-62. The parties to a contract are free to reasonably limit their remedies under section 2.719 but, where an apparently fair and reasonable limitation because of circumstances fails in its purpose or operates to deprive a party of the substantial value of the bargain, the limited remedy must give way to the general remedy provisions of the code. See TEX.BUS. & COM.CODE ANN. sec. 2.719 comment 1 (Tex.UCC). From the buyer's standpoint, the purpose of the limited remedy is to give the buyer goods that conform to the contract within a reasonable time after the defect is discovered. See Beal v. General Motors Corporation, 354 F.Supp. 423, 426 (D.Del.1973). Good faith attempts to repair may be relevant to the issue of what constitutes a reasonable time. See id. at 427 n. 2. However, the limited remedy fails of its essential purpose and deprives the buyer of the substantial value of the bargain when the warrantor does not correct the defect within a reasonable time. See id. at 426; see also Riley v. Ford Motor Company, 442 F.2d 670, 673 (5th Cir.1971) (jury was not unjustified in its implicit finding that the warranty deprived the buyer of the substantial value of the bargain where buyer returned the defective car once and warrantor was unable to correct the defects).

In the present case, Dickenson returned the car for repairs at least seven times over an eight-month period. It is undisputed that the transmission was replaced at least two times and there is testimony from Mercedes' own employee that the last transmission was also defective. Dickenson also complained that other defects in the car were never corrected. We find from these facts that appellants had ample opportunity to try to correct the car's defects. These facts constitute at least some evidence that the limited warranty failed of its essential purpose since the warrantor was unable to correct the car's defects within a reasonable time. Mercedes' first point of error is overruled.

In point of error four, Mercedes complains that the jury's finding that Mercedes knowingly engaged in an unconscionable course of action because it failed to provide proper replacement parts, which was a producing cause of damage to the plaintiff, is not supported by the pleadings. In points of error two, three, five, six, nine, and ten, Mercedes challenges the legal and factual sufficiency of the evidence to support this finding and the finding that Mercedes negligently failed to properly repair and provide



Page 855

or install proper replacement parts, which was a proximate cause of injury to the plaintiff. Mercedes also contends there is no evidence that the car was not fit for its intended purpose when purchased.

These contentions are without merit. Dickenson's pleadings do allege that Mercedes' failure to provide proper replacement parts was unconscionable. See TEX.BUS. & COM.CODE ANN. sec. 17.50(a)(3). Also, the repeated appearance of numerous defects in the car, some of which remained uncorrected when Dickenson filed suit, are at least some evidence that Mercedes failed to properly repair and provide or install proper replacement parts. Appellant testified the car's problems appeared within three weeks of its purchase. It is undisputed that the transmission was replaced at least two times because it was defective. There is also testimony that the final transmission was not operating properly. These facts also constitute some evidence that the car was not fit for its intended purpose when purchased. See TEX.BUS. & COM.CODE ANN. sec. 2.314 (Tex.UCC); TEX.BUS. & COM.CODE ANN. sec. 17.50(a)(2). Furthermore, we do not find that this testimony was greatly outweighed by the testimony of the car's subsequent owner who could not verify what work had been done on the car by those who inspected it for defects. The evidence, therefore, is neither legally nor factually insufficient to support the findings as to these points.

The DTPA defines "unconscionable action or course of action" as follows:

(5) "Unconscionable action or course of action" means an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX.BUS. & COM.CODE ANN. sec. 17.45(5) (Vernon Pamph.Supp.1986). We hold that the jury was justified in finding that Mercedes' failure to provide proper repair parts was unconscionable in that it resulted in a gross disparity between the value Dickenson gave in consideration for the car and the value of the car he received. Mercedes' points of error two through six, nine and ten are overruled.

Mercedes also urges the evidence is legally and factually insufficient to support the jury's finding that it engaged in the unconscionable action knowingly. Mercedes contends, therefore, the award of $9,000 ($2,000 under the automatic doubling provision and $7,000 awarded by the jury) is not justified under TEX.BUS. & COM.CODE ANN. sec. 17.50(b)(1) (Vernon Pamph.Supp.1986).

Section 17.50(b)(1) of the DTPA provides:

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of actual damages found by the trier of fact. In addition the court shall award two times that portion of the actual damages that does not exceed $1,000. If the trier of fact finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages in excess of $1,000.

Id. (emphasis added). Clearly, the $2,000 award against Mercedes constitutes the automatic doubling award which does not depend on a finding that the conduct of the defendant was committed knowingly. See id. That portion of the damages awarded must stand.



The DTPA defines the word "knowingly" as follows:

(9) "Knowingly" means actual awareness of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act or practice constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

Page 856

TEX.BUS. & COM.CODE ANN. sec. 17.45(9) (Vernon Pamph.Supp.1986). The court's instruction defining "knowingly" closely tracks this provision's language. While only the first part of this definition is applicable when questioning whether an unconscionable action was committed knowingly, there was no objection to the submission of the complete definition. After considering all the evidence in the record, we hold the evidence is both legally and factually sufficient to support this finding. We cannot say the jury was unjustified in finding Mercedes was actually aware of the falsity, deception, or unfairness of its unconscionable action since Mercedes knew that its repeated attempts to provide proper replacement parts for the car had failed at least two times. The jury's award of $7,000 must, therefore, stand. Mercedes' fourteenth point of error is overruled.

In its seventh point of error, Mercedes contends that the court erred in submitting an issue on the implied warranty of merchantability to the jury. See TEX.BUS. & COM.CODE ANN. sec. 2.314 (Tex.UCC); TEX.BUS. & COM.CODE ANN. sec. 17.50(a)(2). Mercedes points to its disclaimer which purports to negate the implied warranty of merchantability. The disclaimer to which Mercedes refers negates all warranties, express and implied, "except the most recent printed Mercedes-Benz warranty or warranties ... [which] will be furnished to the purchaser upon delivery of the vehicle...." The warranty booklet delivered with Dickenson's car stated, "ANY WARRANTIES IMPLIED BY LAW ARE LIMITED TO 36 MONTHS OR 36,000 MILES FROM THE DATE OF INITIAL OPERATION, WHICHEVER EVENT SHALL FIRST OCCUR." Therefore, the implied warranty of merchantability, about which special issue number 7 inquires, was not completely negated. This implied warranty was only limited to 36 months or 36,000 miles from the date of initial operation. At the time Dickenson made his demand, he had driven the car some 12,000 miles in less than 12 months time, well within the limitation period. The special issue on the implied warranty of merchantability was proper. Mercedes' seventh point of error is overruled.

Mercedes next contends that the answer to special issue number 7 cannot be used to support a judgment in favor of Dickenson because it irreconcilably conflicts with the jury answer to special issue number 3(a). In answer to special issue number 7 the jury found the car was not reasonably fit for its ordinary, intended purposes. Mercedes alleges that in answer to special issue number 3(a) the jury found Mercedes was not guilty of distributing a defective car.

A court is under the duty to reconcile apparently conflicting jury findings if at all possible. See Huber v. Ryan, 627 S.W.2d 145, 145 (Tex.1981). The presumption is always that the jury did not intend to return conflicting answers. See Traywick v. Goodrich, 364 S.W.2d 190, 191 (Tex.1963). In reviewing the jury findings for conflict the threshold question is whether the findings are about the same material fact. See Bender v. Southern Pac. Transp. Co., 600 S.W.2d 257, 260 (Tex.1980).

The findings in question do not address the same material fact. Mercedes has misinterpreted the jury's answer to special issue 3(a). The question in pertinent part was set out as follows:



Did Defendant Mercedes-Benz of North America, Inc., engage in an unconscionable action or course of action in connection with the following matters, if any . . .

```
              COLUMN 1   COLUMN 2     COLUMN 3

              --------   ----------   ---------------

              Whether    Whether      Whether action

              actions    action was   was a producing

              occured    done         cause of damage

              --------   knowingly    to Plaintiff

                         ----------   ---------------

              YES NO     YES NO       YES NO

              ___ __     ___ __       ___ __

(a)Distributing a

defective car            X

              ___ __
```

The word "actions" in column 1 refers to the phrase "unconscionable action or course of action" in the main part of the question. The jury's negative answer did not, therefore, absolve Mercedes of guilt in

Page 857

distributing a defective car. Rather, it found that Mercedes did not engage in unconscionable action in distributing a defective car. This interpretation is consistent not only with the answer to special issue number 7 but also with the answer to special issue number 13 in which the jury found there was a defect or defects in the car when it left Mercedes' possession. Mercedes' eighth point of error is overruled.

In point of error number eleven, Mercedes complains that the court erred in admitting into evidence plaintiff's Exhibit Number 4. This exhibit is a letter from Ryan's attorney to the Zone Manager for Mercedes. Mercedes claims that the letter is an offer of settlement, and it is, therefore, inadmissible hearsay the admission of which is reversible error. See Verschoyle v. Holifield, 132 Tex. 516, 123 S.W.2d 878, 886 (1939).

An offer of compromise has been defined as an agreement in which a party concedes some right to which he believes he is entitled in order to bring about a mutual settlement. See Duval County Ranch Co. v. Alamo Lumber Co., 663 S.W.2d 627, 634 (Tex.App.--Amarillo 1983, writ ref'd n.r.e.). Ryan does not make any concessions to Mercedes in this letter. Rather, the letter demands that Mercedes agree to replace Dickenson's car or take notice that Ryan will seek indemnification from Mercedes in any action filed by Dickenson against Ryan. The trial court could have found, in its discretion, that the letter was more in the nature of an ultimatum than an offer to compromise. See id. We find no abuse of the trial court's discretion. Mercedes' eleventh point of error is overruled.



Mercedes' last five points of error deal with issues raised in Ryan's claim for indemnity from Mercedes. In four separate arguments, Mercedes claims the court erred in entering judgment on the verdict for indemnity of Ryan. Two of those arguments are that there is no evidence to support the jury's findings supporting this award, and the jury's answer to special issue number 13 fatally conflicts with its answer to special issue number 3(a).

A manufacturing defect may be established by circumstantial evidence. See Mahan Volkswagen, Inc. v. Hall, 648 S.W.2d 324, 328 (Tex.App.--Houston [1st Dist.] 1982, writ ref'd n.r.e.). Where the defect is latent, the plaintiff need not rebut by direct evidence all the conceivable possibilities which would account for the defect, other than its existence at the time of sale. See Darryl v. Ford Motor Company, 440 S.W.2d 630, 632 (Tex.1969).

In answer to special issues 13 and 14 the jury found that the car had a defect or defects in it when it left Mercedes' possession and these defects were the reason Ryan was unable to repair the car. There is uncontroverted testimony that the car's defects began to appear within three weeks of its sale to Dickenson. The testimony is also unchallenged that Ryan's factory trained service personnel used factory supplied parts in attempting to repair the car. The jury found that Ryan's service personnel followed factory guidelines in making the repairs. We hold that this evidence is legally sufficient to support the jury's inferences that the car had a defect or defects in it when it left Mercedes' possession and that these defects prevented Ryan from properly repairing the car. Mercedes' seventeenth and eighteenth points of error are overruled.

In point of error number nineteen, Mercedes claims that the jury's answer to special issue number 13 fatally conflicts with the answer to special issue number 3(a). We have already shown how Mercedes has misinterpreted the jury's finding in special issue number 3(a). For the same reason, we find no conflict in these two jury findings. Point of error nineteen is overruled.

In the remaining two points of error, Mercedes complains that Ryan is not entitled to indemnity under Texas law. Mercedes contends that Ryan's claim for indemnity is based on strict products liability law. Under this theory, Ryan could not recover unless it was an "innocent" retailer

Page 858

and then, only for liability based on physical harm to the consumer. See Bonniwell v. Beech Aircraft Corp., 663 S.W.2d 816, 819 (Tex.1984); Ling, Oliver, O'Dwyer Elec. v. Ladd Tool Co., 702 S.W.2d 658, 659-60 (Tex.App.--San Antonio 1985, writ ref'd n.r.e.). We do not agree, however, that Ryan's claim for indemnity is restricted to a products liability theory of law.

The DTPA allows anyone against whom a DTPA action has been brought to seek indemnity from one who, under the statute law or at common law, may have liability for the damaging event of which the consumer complains. See TEX.BUS. & COM.CODE ANN. sec. 17.55A (Vernon Pamph.Supp.1986). Although common law indemnity has been severely restricted, common law indemnity for liability of a vicarious nature survives. See Bonniwell, 663 S.W.2d at 819; B & B Auto Supply v. Central Freight Lines, Inc., 603 S.W.2d 814, 817 (Tex.1980).

Under the general rules of agency, an agent is entitled to indemnity when its liability arises from conduct performed for the benefit and under the direction of the principal as a good faith execution of the agency relationship. See Oats v. Dublin Nat. Bank, 127 Tex. 2, 90 S.W.2d 824, 829 (1936); Mortgageamerica v. Am. Nat. Bank of Austin, 651 S.W.2d 851, 857 (Tex.App.--Austin 1983, writ ref'd



n.r.e.); Mira-Pak, Inc. v. G.E. Posey Corp., 566 S.W.2d 86, 89-90 (Tex.Civ.App.--Waco 1978, writ ref'd n.r.e.). The existence of an agency relationship is a question of law determined by the agreement between and the words and conduct of the parties. See Polk Terrace, Inc. v. Harper, 386 S.W.2d 588, 592 (Tex.Civ.App.--Tyler 1965, writ ref'd n.r.e.). An authorized agent acts within the scope of actual and apparent authority when it makes representations which do not exceed the principal's own representations. See id.

In the present case it is clear that an agency relationship, in fact, did exist between Ryan and Mercedes. It is undisputed that Ryan is an authorized dealer for Mercedes.

It also cannot be said that Ryan was not acting for the benefit and under the direction of Mercedes. Under Mercedes' warranty, any authorized Mercedes dealer was required to make the repairs or replacements necessary to correct defects in material or workmanship. Testimony that Ryan's factory trained service personnel used factory supplied parts is uncontradicted. In addition, the jury found that Ryan's personnel followed factory guidelines at all times in attempting to repair the car, that the defects were in the car when it left Mercedes' possession, and that these defects made it impossible for Ryan to successfully repair the car.

Finally, we do not believe that the representations made by Ryan exceeded Mercedes' own representations as found, for example, in its warranty booklet, and those made by its own representative. Mercedes' representations include that any authorized dealer will make any repairs and replacements necessary to correct a car's defects, that the equipment on the car, as well as replacement parts, meet exacting quality control standards, and that it makes fine cars which hold up well and should last a long time. In light of these facts we hold that Ryan is entitled to full indemnity from Mercedes since its liability arises from conduct performed for the benefit and under the direction of Mercedes, in a good faith execution of the agency relationship. Mercedes' fifteenth and sixteenth points of error are overruled.

The judgment is affirmed.



**84 S.W.3d 272**
**WOMCO, INC., W.O. Marquess, C.L. Hall, Doris Hall, Lori Claxton, Douglas Wayne Hall, NE-TEX AG Transportation Company, Inc. and Miller Grove Farm Supply, Inc., Appellants,**
**v.**
**NAVISTAR INTERNATIONAL CORPORATION, Price International, Inc. and Mahaney International, Inc., Appellees.**
**No. 12-01-00045-CV.**
**Court of Appeals of Texas, Tyler.**
**June 20, 2002.**
**Page 273**
**COPYRIGHT MATERIAL OMITTED**
**Page 274**
**COPYRIGHT MATERIAL OMITTED**
**Page 275**
**William Cornelius, for appellants.**
**Mark M. Donheiser, Michele R. Sowers & Kurt C. Kern, Dallas, for appellees.**
**Panel consisted of WORTHEN, J., and GRIFFITH, J.**
*OPINION ON APPELLEES' MOTION TO CLARIFY*
**SAM GRIFFITH, Justice.**

On May 22, 2002, we delivered our opinion in this case in which we affirmed the trial court's order granting summary judgment as to some of Appellants' claims and reversing and remanding the trial court's order as to certain other claims. On June 10, 2002, Appellees requested that we clarify our original opinion to further delineate those claims remanded to the trial court for further proceedings. Appellees' motion is hereby granted, our opinion dated May 22, 2002 is withdrawn, and the following opinion is substituted.

Appellants, Womco, Inc.("Womco"), W.O. Marquess ("Marquess"), C.L. Hall, Doris Hall, Lori Claxton, Douglas Wayne Hall, NE-TEX AG Transportation Company, Inc. and Miller Grove Farm Supply, Inc., appeal the trial court's order granting summary judgment in favor of Appellees, Navistar International Corporation ("Navistar"), Price International, Inc. ("Price") and Mahaney International, Inc. ("Mahaney").[1] Appellants raise eight issues on appeal. We affirm in part, and reverse and remand in part.

*BACKGROUND*

In 1993, the Womco Appellants purchased thirty 1993 International model 9300 tractor trucks manufactured by Navistar through Price, a dealer. Also, in 1993, the Hall Appellants purchased sixteen 1994 International model 9300 tractor trucks also manufactured by Navistar through Mahaney, another dealer. Almost immediately after the trucks were put into service, Appellants each had problems with their respective trucks' engines overheating. As the problems occurred, Appellants took their trucks, which were still covered under warranty, to their respective dealerships for diagnoses and repairs related to the overheating problem. Although repeated attempts were made, the dealership's mechanics were unable to correct the problem.

In June 1995, Marquess, the president of Womco, had one of the trucks inspected by an independent source, Rodieck Welding & Radiator Service ("Rodieck"). Rodieck found nothing wrong with the truck's radiator, but replaced the core of the radiator to be certain. Rodieck also informed Marquess that the truck's radiator appeared to be unusually small. Despite Rodieck's efforts, the overheating problem in the Womco Appellants' trucks continued. Soon thereafter, Marquess contacted Price and spoke to Les Miller



("Miller"), informing him that he wanted to install larger radiators in his trucks. Miller responded that Price did not make a larger radiator for that particular truck and further, that

Page 276

the hood of the truck would not accommodate a larger radiator. Following this conversation, Marques had an audit conducted of the cooling system of one of the trucks in July 1995 by the Tyler Truck Center, which revealed that the trucks were overheating due to insufficient radiator capacity.

The Womco Appellants filed suit on April 23, 1997. The Hall Appellants joined the suit on or about May 22, 1997 after learning of the results of the audit. In January 2000, Appellees filed a motion for summary judgment based on their affirmative defenses of limitations, accord and satisfaction, disclaimer of warranty and the economic loss rule. Appellants responded. The motion was set for oral hearing. On the day of the hearing on Appellees' motion for summary judgment, Appellees filed and served Appellants with their motion to strike the affidavit of Marques. Appellees raised the motion to strike during the hearing. At the conclusion of the hearing, the trial judge stated that he would rule on the motions in 21 days. The trial court granted Appellees' motion to strike and motion for summary judgment in November 2000.

## STANDARD OF REVIEW

In reviewing a 166a(c) motion for summary judgment, we must apply the standards established in *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548-49 (Tex.1985), which are:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law;

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true;

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*See Nixon,* 690 S.W.2d at 548-49. For a party to prevail on a motion for summary judgment, he must conclusively establish the absence of any genuine question of material fact and that he is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). A movant must either negate at least one essential element of the nonmovant's cause of action, or prove all essential elements of an affirmative defense. *See Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *see also MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). Since the burden of proof is on the movant, and all doubts about the existence of a genuine issue of a material fact are resolved against the movant, we must view the evidence and its reasonable inferences in the light most favorable to the non-movant. *See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965). We are not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits and other summary judgment proof. *See Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 932 (1952). The only question is whether or not an issue of material fact is presented. *See* TEX.R. CIV. P. 166a(c).

Once the movant has established a right to summary judgment, the non-movant has the burden to respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *See, e.g., City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678-79 (Tex.1979). All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *See* TEX.R. CIV. P. 166a(c).



Page 277

*THE DISCOVERY RULE*

Twenty-seven of the thirty trucks purchased by the Womco Appellants and ten of the sixteen trucks purchased by the Hall Appellants were delivered more than four years prior to the filing of the instant lawsuit. Appellees contend that any cause of action concerning these thirty-seven trucks is barred by limitations. In their fifth issue, Appellants contend that the discovery rule operates to toll the running of limitations until they discovered that the radiator was the cause of overheating. Appellees contend that the discovery rule does not apply to Appellants' claims, but that even if it does, it runs from the time Appellants discovered that the trucks were overheating.

The primary purpose of statutes of limitations is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988); *see also Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734 (Tex.2001), *citing Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996); *S.V. v. R.V.,* 933 S.W.2d 1, 3 (Tex.1996). It is in society's best interest to grant repose by requiring that disputes be settled or barred within a reasonable time. *Horwood,* 58 S.W.3d at 734. Generally, a cause of action accrues when a wrongful act causes a legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *See S.V.,* 933 "S.W.2d at 3; *see also Li v. University of Tex. Health Sci. Center at Houston,* 984 S.W.2d 647, 651 (Tex.App.Houston [14th Dist.] 1998, pet. denied). The discovery rule is the legal principle which, when applicable, provides that limitations run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury. *See Childs v. Haussecker,* 974 S.W.2d 31, 40 (Tex.1998); *Willis,* 760 S.W.2d at 644. Discovering the "nature of the injury" requires knowledge of the wrongful act and the resulting injury. *See Childs,* 974 S.W.2d at 40.

Appellants argue that the discovery rule tolls limitations until they discovered the specific cause of the overheating-namely, as they allege, that the radiator was too small to properly cool the trucks. We disagree. In *Bayou Bend Towers Council of Co Owners v. Manhattan Constr. Co.,* the Fourteenth Court of Appeals held that the discovery of an injury and its general cause, as opposed to the exact cause, is sufficient to commence the running of the limitations period. 866 S.W.2d 740, 742 (Tex.App.-Houston [14th Dist.] 1993, writ denied). The court of appeals' holding comports with the Texas Supreme Court's opinion in *Childs,* in which the court stated, "when the discovery rule applies, accrual is tolled until a claimant discovers or in the exercise of reasonable diligence should have discovered the injury and that it was likely caused by the wrongful acts of another." *Id.* at 40; *see also KPMG Peat Marwick,* 988 S.W.2d at 749 (statute tolls until plaintiff knew or should have known of the wrongfully caused injury); *Rhone-Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 224 (Tex.1999) (issue characterized as whether plaintiff knew or should have known, through the exercise of reasonable diligence, that the injury was likely workrelated); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990) (discovery rule tolls the running of the limitations period until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the nature of the injury). Thus, if the discovery rule applies to a case such as this one, it would begin to run

Page 278

from the point where Appellants discovered, or in the exercise of reasonable care and diligence should have discovered, the "nature of the injury" as that term has been defined by the Texas Supreme Court. *See*



*La Gloria Oil and Gas Co. v. Garboline Co.,* 84 S.W.3d 228 (Tex.App.-Tyler 2001), *citing Childs,* 974 S.W.2d at 40.

Even assuming *arguendo* that the discovery rule does apply, Appellants' cause of action would still be barred by limitations. Appellants analogize their case to medical malpractice cases, in which a person could not have been expected to know that his symptoms were caused by the wrongful conduct of his treating physician. But as Appellees declare with deft simplicity in their brief, "a [truck] is not a person." That is to say, a truck is manufactured to function properly. Thus, when a truck, upon being put into use, malfunctions almost immediately, it follows that the problem is caused by the wrongful conduct, be it design, manufacture or otherwise, of another. On the other hand, when a person gets sick, it does not necessarily follow that the ailment is the cause of the wrongful conduct of another as the illness could be naturally occurring. In the instant case, it is undisputed that the trucks began overheating almost immediately after being put into service. Given the immediacy of the overheating and the noted distinction between a human being and a piece of machinery, we conclude that Appellants discovered, or, in the exercise of reasonable care and diligence, should have discovered that the overheating problem was caused by the wrongful conduct of another upon its first occurrence. Indeed, it is undisputed that Appellants sought to have their trucks repaired under the warranty, which necessarily implies that they knew that the problem was caused by the wrongful conduct of another. Thus, we conclude that, assuming *arguendo* that the discovery rule applies, Appellants claims as to thirty-seven trucks are barred by limitations because the undisputed facts indicate that Appellants either discovered, or in the exercise of reasonable care and diligence, should have discovered the "nature of their injury" more than four years prior to the date they filed suit. Appellants fifth issue is overruled.[2]

## *DISCLAIMER OF WARRANTY*

It is undisputed that Appellants' breach of implied warranty claims as to nine trucks are not barred by limitations.[3] However, in their sixth issue, Appellees contend that such implied warranties were disclaimed. The Texas Uniform Commercial Code allows sellers to disclaim both the implied warranty of merchantability as well as the implied warranty of fitness for particular purpose. *See* TEX. Bus. & Comm. CODE ANN. § 2.316(b) (Vernon 1994);

Page 279

*Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 577 (Tex.1991). In order to disclaim an implied warranty of merchantability in a sales transaction, the disclaimer must mention the word "merchantability." The disclaimer may be oral or written, but if in writing, the disclaimer must be conspicuous. *See La Bella v. Charlie Thomas, Inc.,* 942 S.W.2d 127, 131-32 (Tex.App.-Amarillo 1997, writ denied); TEX. Bus. & COMM.CODE § 2.316(b). To disclaim an implied warranty of fitness for a particular purpose, the disclaimer must be in writing and must be conspicuous. *See* TEX. Bus. & COMM.CODE § 2.316(b); *W.R. Weaver Co. v. Burroughs Corp.,* 580 S.W.2d 76, 81 (Tex.Civ.App.-E1 Paso 1979, writ ref `d n.r.e.). Whether a particular disclaimer is conspicuous is a question of law to be determined by the court. *See Cate v. Dover Corp.,* 790 S.W.2d 559, 560 (Tex.1990). A term or clause is conspicuous if it is written so that a reasonable person against whom it is to operate ought to have noticed it. *See* TEX. Bus. & COMM.CODE ANN. § 1.201(10) (Vernon Supp.2002); *W.R. Weaver Co.,* 580 S.W.2d at 81. Language is "conspicuous" if it is in larger type or other contrasting font or color. *Id.* Conspicuousness is not required if the buyer has actual knowledge of the disclaimer. *See Cate,* 790 S.W.2d at 561-62.[4]

Appellants, citing Texas Business and Commerce Code, section 2.316(a), argue that Appellees are also required to prove the reasonableness of the disclaimers at issue. However, section 2.316(a) concerns



the disclaimer of express warranties. In the instant case, Appellants have only pleaded that Appellees breached implied warranties. Thus, section 2.316(a) and its requirement of reasonableness are inapplicable.

Further, Appellants argue that Appellees were required to offer proof of the context of the purported disclaimers, contending that in order for a disclaimer of an implied warranty to be effective, the plaintiffs must have had an opportunity to examine it prior to consummation of the contract for sale. *See Klo-Zik Co. v. General Motors Corp.,* 677 F.Supp. 499, 508 (E.D.Tex.1987). In *Klo-Zik Co.,* the court, in reaching its conclusion, relied on *Mercedes-Benz of N. Am., Inc. v. Dickenson,* 720 S.W.2d 844, 852 (Tex.App.-Fort Worth 1986, no writ). In *Dickenson,* the court held that a disclaimer of an express warranty was ineffective where the buyer was not given the opportunity to read the warranty or warranties made until after the contract is signed. *Id.* Although the instant case concerns a converse situation to *Dickenson,* the rationale applied by the *Dickenson* court is helpful. One of the underlying purposes of Texas Business and Commerce Code section 2.316 is to protect a buyer from surprise by permitting the exclusion of implied warranties. *See* TEX. Bus. & COMM.CODE § 2.316, comment 1 (Vernon 1994). We fail to see how section 2.316 can fulfill such a purpose unless a disclaimer is required to be communicated to the buyer before the contract of sale has been completed, unless the buyer afterward agrees to the disclaimer as a modification of the contract. *See* Weintraub, "Disclaimer of Warranties and Limitation of Damages for Breach of Warranty Under the UCC," 53 TEX. L.REV. 60, 69 (1975), *citing Dessert Seed Co. v. Drew Farmers Supply, Inc.,* 248 Ark. 858, 454 S.W.2d 307 (1970); *Dougall v. Brown Bay Boat Works & Sales, Inc.,* 287 Minn. 290,

Page 280

178 N.W.2d 217 (1970). We adopt the rationale espoused in *Dickenson* and the holding set forth in *Klo-Zik Co.,* and likewise hold that in order to be effective, a disclaimer of either an express or an implied warranty is required to be communicated, in the manner described in section 2.316(b), to the buyer before the contract of sale has been completed.

In support of their motion for summary judgment, Appellees offered six disclaimers, all of which were deposition exhibits. None of these six disclaimers is probative as to the issue of whether the disclaimer was communicated prior to the completion of the contract of sale. Appellees also offered the deposition testimony of Marquess, C.L. Hall, Douglas Hall and Lori Parham. In each deposition transcript, the witness testified that he or she had received the paperwork containing the corresponding disclaimer with delivery of the trucks. However, no evidence concerning the disclaimer issue raised by Appellees in their motion for summary judgment demonstrates that the disclaimer was communicated to Appellants prior to their respective completions of the contract for sale. Therefore, we hold that since Appellant failed to conclusively prove that they were entitled to judgment as a matter of law on the disclaimer issue, summary judgment was not appropriate on that issue. Appellants' sixth issue is sustained.[5]

## *ACCORD AND SATISFACTION*

In their seventh issue, Appellants argue that the trial court erred in granting summary judgment based on Appellees' affirmative defense of accord and satisfaction. Accord and satisfaction is a defense to a breach of warranty claim. *See Jenkins v. Steakley Bros. Chevrolet Co.,* 712 S.W.2d 587, 590 (Tex.App.-Waco 1986, no writ). Accord and satisfaction, as a defense to a claim based upon a contract, exists when the parties have entered into a new contract, express or implied, which discharges the obligations under the original contract in a manner otherwise than as originally agreed. *See Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979). In other words, the person with the right of action accepts some performance in



satisfaction of the right of action. *See Priem v. Shires,* 697 S.W.2d 860, 863 n. 3 (Tex.App.-Austin 1985, no writ). The new agreement need not state that it is intended to be an accord and satisfaction. *See Jenkins,* 712 S.W.2d at 590. Rather, we may look to the circumstances surrounding the execution of the new agreement to determine if there has been an agreement to discharge the original obligation. *Id.,citing Harris,* 593 S.W.2d at 306.

In the case at hand, Appellees, in their motion for summary judgment, argue that a letter agreement dated September 12, 1995 between Price and the Womco Appellants operated as an accord and satisfaction. There are no allegations of an accord and satisfaction operating as to the Hall Appellants. Although the letter agreement does not specifically state that it is in satisfaction of the previous obligation, Appellees contend that the circumstances of the transaction are indicative of an accord and satisfaction. Specifically, Appellees argue that the following facts establish accord and satisfaction as a matter of law: (1) Womco returned all thirty trucks and received fifty new trucks; (2) Womco received $50,000.00, thirty days free interest on thirty of the

Page 281

new trucks, 100% financing on all fifty new trucks, a 9.4% interest rate, and waiver of $11,000.00 in late charges. However, Appellants point out that in Marquess's affidavit, which was part of Appellants' summary judgment evidence, Marquess expressly denies that he, on behalf of Womco, ever agreed to release any claim he had against Price or anyone else for the problems with Womco's trucks.[6] Thus, even assuming that these circumstances are indicative of an accord and satisfaction, taking the evidence favorable to Appellants as true, we conclude that there is a material issue of fact as to whether the letter agreement dated September 12, 1995 was an accord and satisfaction. Appellants' seventh issue is sustained. Furthermore, Appellant's third issue, as it relates to paragraph of Marquess's affidavit, is sustained.[7]

Accordingly, the trial court's order granting summary judgment is ***reversed*** as to Appellants' claims for breach of warranty filed less than four years after the delivery of the truck upon which the claim is based, and is ***remanded*** to the trial court for further proceedings. As to all other claims of Appellants, the trial court's order granting summary judgment is ***affirmed.***

---------------

Notes:

1. Womco and Marquess are referred to collectively as the "Womco Appellants." C.L. Hall, Doris Hall, Lori Claxton, Douglas Wayne Hall, NE-TEX AG Transportation Company, Inc. and Miller Grove Farm Supply, Inc. are referred to collectively as the "Hall Appellants." The Womco Appellants and the Hall Appellants are referred to collectively as "Appellants." Navistar and Price are referred to collectively as "Appellees."

2. In their fifth issue, Appellants also raise the issue of the deferred accrual exception based on fraudulent concealment. Although our analysis above refers to the "discovery rule" in the traditional sense, it is equally applicable to cases involving the deferred accrual exception. *See La Gloria Oil and Gas Co.,* 84 S.W.3d 228, 233, n. 4 (Tex.App.-Tyler 2001), *citing Rodessa Resources, Inc. v. Arcadia Exploration and Production Co.,* 5 S.W.3d 363, 366 (Tex.App.-Texarkana 1999, no pet.); *S.V.,* 933 S.W.2d at 6.

3. The record reflects that three trucks owned by the Womco Appellants were delivered within four years of their filing the instant lawsuit. The record further reflects that six trucks owned by the Hall Appellants were delivered within four years of their filing suit. The statute of limitations for breach of implied warranty is four years. *See* TEX. Bus. & COMM.CODE. ANN § 2.725(a) (Vernon 1994).



4. We recognize that there are certain exceptions to the aforementioned rules regarding disclaimers. However, these exceptions have not been raised on appeal and therefore, a review of these exceptions is not necessary for the purposes of this opinion.

5. As it was not raised as a ground for summary judgment, in reaching our holding on this issue, we did not consider whether the implied warranties at issue could have been properly excluded by prior course of dealing or course of performance between the parties. *See* TEX. Bus. & COMM.CODE ANN. § 2.316(c) (Vernon 1994).

6. We note that this paragraph of Marquess's affidavit, paragraph eleven, was one of the subjects of Appellees' motion to strike, which is contested by Appellants' in their third issue on appeal. In their motion to strike, Appellees state, "Defendants object to Paragraph 11 of W.O. Marquess' affidavit because it contains unsubstantiated legal conclusions." Defects in the form of affidavits or attachments must be specifically pointed out by objection by an opposing party. *See* TEX.R. CIV. P. 166a(f); *Knetsch v. G.V. Gaitonde, M.D.,* 898 S.W.2d 386, 389 (Tex.App.-San Antonio 1995, no writ). A specific objection is one that enables the trial court to understand the precise grounds so as to make an informed ruling and affords the offering party an opportunity to remedy the defect, if possible. *See In the Interest of N.C.M.,* 66 S.W.3d 417, 420 (Tex.App.-Tyler 2001, no pet.). In the instant case, Appellees objection that paragraph 11 contains unsubstantiated legal conclusions is itself conclusory. Appellees do not in their objection identify which statements in paragraph eleven are objectionable on such grounds, nor do they offer any explanation to the trial court as to the precise bases for their objection. We conclude that Appellees' objection to paragraph eleven of Marquess's affidavit in their motion to strike does not meet the criteria set forth by Texas Rule of Civil Procedure 166a(f).

7. As our consideration of issues five, six and seven is dispositive of all of Appellants' claims, we do not reach Appellants' issues one, two, three, four and eight, other than a portion of issue three as discussed above. Moreover, even if the issues one through four related to Appellants' motion to strike had been sustained, our determination of Appellants' issue five would not change as there was no dispute about the fact that the trucks began overheating almost immediately after being put into service.

---------------



262 S.W.3d 813

**FIELDTECH AVIONICS & INSTRUMENTS, INC., Kevin Nelms, and David Mills, Appellants**

**v.**

**COMPONENT CONTROL.COM, INC., d/b/a Component Control; CitiCapital Technology Finance, Inc., d/b/a Bankers Leasing; and CitiCorp USA, Inc., d/b/a CitiCapital, CitiCapital Technology Finance, Inc., Bankers Leasing, and Softech Financial, Appellees.**

**No. 2-07-329-CV.**

**Court of Appeals of Texas, Fort Worth.**

**August 7, 2008.**

**[262 S.W.3d 817]**

**Harris Finley & Bogle PC, Paul B. Westbrook, Fort Worth, for appellants.**

**Akin Gump Strauss Hauer & Feld LLP, Thomas E. Sanders, Monica J. Lerma, San Antonio, Law Snakard & Gambill PC, Larry Bracken, Ed Huddleston, Jennifer M. Covington, Fort Worth, for appellees.**

**PANEL: DAUPHINOT, HOLMAN, and GARDNER, JJ.**

**OPINION**

**ANNE GARDNER, Justice.**

Appellants Fieldtech Avionics & Instruments, Inc., Kevin Nelms, and David Mills appeal from the trial court's grant of summary judgment in favor of Appellees (1) Component Control.Com, Inc., d/b/a Component Control; and (2) CitiCapital Technology Finance, Inc., d/b/a Bankers Leasing and Softech Financial, and CitiCorp USA, Inc., d/b/a CitiCapital, CitiCaptial Finance, Inc., Bankers Leasing, and Softech Financial (collectively, CitiCapital). We reverse in part and affirm in part.

**Background**

Fieldtech is an avionics parts supplier. Component Control is a commercial software company. On August 24, 2001, Fieldtech signed a proposal generated by

[262 S.W.3d 818]

Component Control to acquire "Quantum Control Software 2K.4" ("the software") from Component Control. Fieldtech financed the transaction through a finance lease agreement with CitiCapital whereby CitiCapital acquired the software from Component Control and leased it to Fieldtech. Nelms and Mills—Fieldtech's president and secretary, respectively—personally guaranteed the lease. The transaction involved several documents: the proposal; a software maintenance agreement; the lease agreement and an associated property schedule and certificate of acceptance; and a "clickwrap agreement," an electronic agreement provided by Component Control that Fieldtech had to accept before it could download and install the software.[1] We will examine the relevant documents and testimony concerning their execution later in this opinion.

Fieldtech allegedly learned that the software was incompatible with its business operations when it sent two employees to Component Control for software training in January 2002. Fieldtech sued Component Control and CitiCapital in October 2003. Fieldtech sued Component Control for breach of contract, breach of warranty, and violations of the Deceptive Trade Practices Act, alleging that Component Control had represented that the software would meet Fieldtech's business needs. Fieldtech sued CitiCapital for breach of contract and for a declaratory judgment, seeking a declaration of its rights under its lease agreement with CitiCapital. CitiCapital filed a counterclaim against Fieldtech and third-party claims against Nelms and Mills, seeking to enforce the lease and Nelms's and Mills's guarantees.



After nineteen months of discovery, CitiCapital filed no-evidence and traditional motions for summary judgment, and Component Control filed a combined no-evidence and traditional motion for summary judgment. Fieldtech filed timely summary judgment responses. The trial court eventually granted summary judgment in favor of Component Control and CitiCapital and awarded CitiCapital $95,105.55 in damages and $28,205.83 in attorney's fees. Fieldtech, Nelms, and Mills filed this appeal.

**Summary Judgment Evidence**

The parties presented the following relevant summary judgment evidence to the trial court.

### 1. Component Control's proposal

Component Control's proposal is a one-page printed document listing the software, software modules, installation, training, and maintenance to be provided by Component Control and the price for each item, with a total quote of $86,224.94. The area labeled "[p]lease sign to confirm your order" was signed by David Mills on August 24, 2001, and a line labeled "check here for third-party leasing" was checked.

### 2. The clickwrap license agreement

Lisa Wortman, Component Control's director of contract administration, averred that when a user attempts to install the software on a computer, a clickwrap license

[262 S.W.3d 819]

agreement appears on the computer screen, and the software will not install unless the user signifies acceptance of the license agreement. Wortman attached two versions of the license agreement to her affidavit. The first version is printed on Component Control letterhead; the second version, said Wortman, is the actual clickwrap agreement that would have appeared on Fieldtech's computer screen. The two versions are identical except that the former contains headings in bold type and the latter does not. Both versions contain the following warranty provisions:

6.3 Limited Warranty Remedies: During a period of thirty (30) days after delivery of the Software to Licensee, if the Licensee claims that the software is defective, Licensor shall either (i) replace such Software, provided that upon inspection by Licensor, Licensor has found the Software to be defective, or (ii) refund the amount paid therefor, if the Licensee returns the defective software to the Licensor with a copy of proof that the warranty period has not expired, and Licensor has verified the defect. Licensee agrees that Licensee's sole and exclusive remedy hereunder shall be limited to this corrective action.

6.4 Warranty Disclaimer: The express warranties set forth in the Agreement are in lieu of all other warranties, express or implied, including, without limitation, any warranties of merchantability or fitness for a particular purpose.

6.5 Limitation of remedies: Licensee agrees that its exclusive remedies, and Licensor's entire liability with respect to the Software, shall be as set forth herein. Licensee further agrees that Licensor shall not be liable to Licensee for any damages, including any lost profits, lost savings, or other incidental or other consequential damages arising out of its use or inability to use the Software or the breach of any express or implied warranty, even if Licensor has been advised of the possibility of those damages.

### 3. Master Lease Agreement



CitiCapital and Fieldtech executed a Master Lease Agreement setting out the terms under which CitiCapital leased the software to Fieldtech. Fieldtech agreed to make monthly lease payments of $3,528.85 for thirty months. The lease agreement contains the following relevant language:

**1. LEASE.** LESSOR hereby leases and/or grants to LESSEE the right to use, and LESSEE hereby leases from and/or agrees to accept the right to use, subject to the terms and conditions herein set forth, the item(s) of personal property including but not limited to the hardware and/or software herein referred to as "Property".... Each Property Schedule entered into by the parties shall constitute a separate non-cancellable lease agreement....

....

**4. DISCLAIMER OF WARRANTIES.** (A) LESSEE ACKNOWLEDGES THAT LESSEE MADE THE SELECTION OF THE PROPERTY BASED ON ITS OWN JUDGMENT AND IS NOT RELYING ON LESSOR'S SKILL OR JUDGMENT TO SELECT OR FURNISH GOODS SUITABLE FOR ANY PARTICULAR PURPOSE. LESSEE ACKNOWLEDGES THAT LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, DIRECTLY OR INDIRECTLY, INCLUDING, WITHOUT LIMITATION, THE WARRANTY OF MERCHANTABILITY AND OF FITNESS, CAPACITY OR DURABILITY FOR ANY PARTICULAR PURPOSE, AND WARRANTIES AS TO THE DESIGN OR CONDITION OF THE

[262 S.W.3d 820]

PROPERTY AND THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE PROPERTY. LESSOR SHALL HAVE NO LIABILITY TO LESSEE FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER, INCLUDING ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, TO ANY EXTENT WHATSOEVER, RELATING TO OR ARISING OUT OF THE SELECTION, QUALITY, CONDITION, MERCHANTABILITY, SUITABILITY, FITNESS, OPERATION OR PERFORMANCE OF THE PROPERTY. NO DEFECT IN OR UNFITNESS OF THE PROPERTY SHALL RELIEVE LESSEE OF ITS OBLIGATIONS UNDER THE LEASE....

(B) For the term of the LEASE, or any extension thereof, LESSOR hereby assigns to LESSEE and LESSEE may have the benefit of any and all Vendor's warranties ... if any, with respect to the Property to the extent assignable by LESSOR, provided, however, that LESSEE'S sole remedy for the breach of any such warranty ... shall be against the Vendor and not against the LESSOR, nor shall any such breach have any effect whatsoever on the rights and obligations of either party with respect to the LEASE.

**5. STATUTORY FINANCE LEASE.** LESSEE agrees and acknowledges that it is the intent of both parties to the LEASE that it qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code. LESSEE acknowledges and agrees the LESSEE has selected both: (1) the Property; and (2) the Vendor from whom the property is to be acquired. LESSEE acknowledges that LESSOR has not participated in any way in LESSEE'S selection of the Property or of the Vendor, and LESSOR has not selected, manufactured, or supplied the Property.

LESSEE IS ADVISED THAT IT MAY HAVE RIGHTS UNDER THE CONTRACT EVIDENCING THE ACQUISITION OF THE PROPERTY FROM THE VENDOR CHOSEN BY THE LESSEE AND THAT LESSEE SHOULD CONTACT THE VENDOR OF THE PROPERTY FOR A DESCRIPTION OF ANY SUCH RIGHTS.

....



**18. DEFAULT.** ... If LESSEE fails to pay any rent or other amounts required ... LESSOR or its agents shall have the right ... to declare the entire amount of rent hereunder immediately due and payable....

To the extent permitted by applicable law, the LESSEE waives any and all rights and remedies conferred upon a LESSEE by UCC Sections 2A-508 through 2A-522, including (without limitation) the LESSEE'S rights to (a) cancel or repudiate the LEASE, (b) reject or revoke acceptance of the leased Property, (c) recover damages from LESSOR for breach of warranty or for any other reason....

....

**22. NET LEASE.** The LEASE is a net lease and LESSEE agrees that its obligation to pay all rent and other sums payable thereunder are absolute and unconditional and shall not be subject to any abatement, reduction, setoff, defense, counterclaim or recoupment for any reason whatsoever.

....

**27. ENTIRE AGREEMENT, WAIVER.** This Instrument constitutes the entire agreement between the parties.

[262 S.W.3d 821]

### 4. Certificate of Acceptance

Kevin Nelms, as Fieldtech's president, executed a document provided by CitiCapital and titled "Certificate of Acceptance" on October 19, 2001, which provides,

We certify that [the software] was delivered to and installed at [Fieldtech] in good order and condition and acceptable to us, is ready for its intended use as of the date hereof, and is acceptable for maintenance by the maintenance provider, and the quantity, description and serial numbers are correct.

### 5. Kevin Nelm's affidavit

Nelms averred that Component Control contacted Fieldtech beginning in 2001 to sell software to Fieldtech. Nelms stated that Fieldtech communicated the nature of its business to Component Control, including its need for software that would allow Fieldtech to quickly and easily provide quotes to customers and access customers' historical purchasing records for credit evaluations. According to Nelms, Component Control represented that its software would be useful to Fieldtech and would work in Fieldtech's business environment. Nelms averred that the only reason Fieldtech agreed to lease the software was because Component Control represented that it would work for Fieldtech.[2]

Nelms stated that when Fieldtech signed the proposal and software maintenance agreement on August 24, 2001, it did not intend that the proposal be a complete and exclusive expression of the agreement between the parties but "merely a business confirmation from Component Control created for its internal purposes and to confirm that an agreement had been reached." Shortly after Fieldtech signed the proposal, Component Control delivered the software, but Nelms said that Fieldtech did not begin "any real use" of the software until it completed CitiCapital's financing documents six weeks later. Nelms signed a Master Lease Agreement with CitiCapital on September 24, 2001.

Nelms acknowledged that he signed a "Certificate of Acceptance" sent to Fieldtech by CitiCapital and that the certificate indicated that the "software was considered placed in service on October 19, 2001," but he averred that Fieldtech did not "use the software in any sense through the remainder of



2001" because Fieldtech was arranging software training with Component Control. Nelms said that he signed the certificate merely to acknowledge receipt of the software and that he did not intend to acknowledge that the software fully satisfied Component Control's agreements and representations. Nelms stated that he "felt assured" that CitiCapital's intent was to finance software that Fieldtech actually needed. Nelms said that CitiCapital and Component Control both assured him that Fieldtech would not be obligated for the whole proposal amount unless and until the software was working for Fieldtech and Component Control had provided the necessary services.

Nelms averred that two Fieldtech employees attended a software training class at Component Control in January 2002. He stated that after two days of the five-day class, the employees realized that the software would not work for Fieldtech because it would not allow Fieldtech to quickly quote prices to potential customers. Nelms said that he communicated to Component Control the fact that the software would not work for Fieldtech and that he considered such communication to

[262 S.W.3d 822]

be notice revoking any acceptance of the software that Fieldtech had given.

Nelms stated that he did not remember whether the clickwrap agreement appeared when Fieldtech installed the software but that he had no specific reason to believe that it did not appear.

### 6. Affidavit of Carol Beckham

Carol Beckham, Fieldtech's accounts manager, averred that she was one of the two Fieldtech employees who attended Component Control's software training class in January 2002. She stated that after two days of training, it was apparent to her that the software would not work for Fieldtech. Beckham said that she communicated to Component Control and CitiCapital that the software would not work for Fieldtech and was not what Fieldtech needed. Her affidavit lists by date and amount the nine payments Fieldtech made to CitiCapital under the lease.

## Standards of Review

When a party moves for both a traditional summary judgment under rule 166a(c) and a no-evidence summary judgment under rule 166a(i), we first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). If the nonmovant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.*

### 1. No-evidence summary judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex.2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX.R. CIV. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a



scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied).

### 2. Traditional summary judgment

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *see* TEX.R. CIV. P. 166a(b), (c). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr.,* 143 S.W.3d at 798.

A plaintiff or counterplaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* TEX.R. CIV. P. 166a(a), (c); *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). When reviewing a summary judgment, we take as true all

[262 S.W.3d 823]

evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr.,* 143 S.W.3d at 798.

**Discussion**

### 1. Finance Lease Agreement

Fieldtech and CitiCapital agree that the lease between them is a statutory finance lease. A finance lease is a three-party transaction governed by article 2A of the Uniform Commercial Code, TEX. BUS. & COM.CODE ANN. Ch. 2A (Vernon 1994 & Supp.2008). The UCC defines a finance lease as "a lease with respect to which ... the lessor does not select, manufacture, or supply the goods"; "the lessor acquires the goods or the right to possession and use of the goods in connection with the lease"; and one of four other conditions is met, i.e., (i) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to their use and possession; (ii) the lessee's approval of the contract by which the lessor acquired the goods or the right to their use and possession is a condition to the effectiveness of the lease; (iii) the lessee, before signing the lease contract, receives a statement designating the promises and warranties and disclaimers provided to the lessor by the third-party supplier; or (iv) if the lease is not a consumer lease, the lessor informs the lessee in writing of (a) the identity of the supplier unless the lessee has selected the supplier and directed the lessor to acquire the goods or the right to use and possession, (b) the lessee's entitlement to promises and warranties provided to the lessor by the supplier, and (c) the lessee's right to communicate with the supplier and receive the warranties and disclaimers from it. *Id.* § 2A.103(7) (Vernon Supp. 2008). The lease in this case meets the statutory requirements for a finance lease, including the last of the enumerated conditions.

In a finance lease, the UCC does not imply warranties of merchantability and fitness running from the lessor to the lessee. *Id.* §§ 2A.212, 2A.213 (Vernon 1994) (creating implied warranties of merchantability and fitness in lease agreements "[e]xcept in a finance lease"). Instead, "[t]he benefit of a supplier's promises to the lessor under the supply contract and all warranties, whether express or implied ... extends to the lessee ... but is subject to the terms of the warranty and of the supply contract and all defenses or claims arising therefrom." *Id.* § 2A.209(a) (Vernon Supp.2007). Thus, a finance lessee's remedies for defective or nonconforming goods or for breach of warranty run against the supplier of the goods, not the lessor, and are governed by UCC article 2. *See id.* & cmt.



### 2. Component Control's motion

In its first issue, Fieldtech argues that the trial court erred by granting summary judgment in favor of Component Control because Component Control's no-evidence motion was procedurally inadequate and because the summary judgment evidence raises fact issues with regard to all of Fieldtech's causes of action.

### a. Adequacy of no-evidence motion

Fieldtech contends that the no-evidence portion of Component Control's summary judgment motion is procedurally inadequate because it fails to distinguish between no-evidence and traditional summary judgment grounds and because it fails to specifically identify the elements of Fieldtech's causes of action for which Component Control claims there is no evidence. Fieldtech raised these alleged procedural

[262 S.W.3d 824]

defects in special exceptions filed in the trial court.[3]

A no-evidence motion must state the elements as to which there is no evidence and must be specific in challenging the evidentiary support for a claim or defense; rule 166a(i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case.[4] TEX.R. CIV. P. 166a(i) & cmt. A no-evidence challenge that only generally challenges the sufficiency of the nonmovant's case and fails to state specific elements is fundamentally defective and insufficient to support summary judgment as a matter of law. *Mott,* 249 S.W.3d at 98. But a specific attack on the evidentiary components that might prove a certain element is unnecessary, as long as the element itself is specifically challenged. *See* TIMOTHY PATTON, SUMMARY JUDGMENT IN TEXAS, PRACTICE, PROCEDURE AND REVIEW § 5.03[2][b] (3d ed.2006). A summary judgment movant may combine no-evidence and traditional grounds in the same motion. *Binur v. Jacobo,* 135 S.W.3d 646, 650-51 (Tex.2004). A motion that combines both bases for summary judgment is sufficient if it sets forth its grounds clearly and otherwise complies with rule 166a. *See id.* at 651.

With regard to Fieldtech's breach of contract claim, Component Control argued that "there is no evidence that Fieldtech did not receive the Software it leased or that the Software did not perform." With regard to alleged DTPA violations, Component Control argued that "there is simply no evidence of any misrepresentation or unconscionable act by Component Control." We hold that these no-evidence challenges are sufficiently specific to pass rule 166a(i) muster. *See* TEX.R. CIV. P. 166a(i) & cmt.

But with regard to breach of warranty, after lengthy arguments analyzing the language of the relevant agreements, Component Control stated conclusorily, "As a matter of law, therefore, Component Control did not breach an express warranty and Fieldtech has no evidence to show that it did," and "As a matter of law, therefore, Component Control did not breach an implied warranty and Fieldtech has no evidence to show that it did." These two statements do not challenge specific elements of Fieldtech's breach of warranty claim as required by rule 166a(i); rather, they are vague and general statements tacked on to the end of the traditional summary judgment arguments. We therefore hold that the no-evidence portion of Component Control's summary judgment motion dealing with breach of warranty did not comply with rule 166a(i)'s

[262 S.W.3d 825]

requirement for specificity, and we will review the summary judgment relating to breach of warranty under the traditional summary judgment rules. *See* TEX.R. CIV. P. 166a(c), (i).



### b. Breach of contract

Component Control argues that there is no evidence that it breached its agreement with Fieldtech because Component Control agreed only to provide and did provide the Quantum Control software to Fieldtech but did not agree to provide software that would be "useful" to Fieldtech or perform the functions Fieldtech allegedly requires, namely, the ability to look up customers' order histories and quickly generate quotes. Fieldtech contends that the proposal was not a complete agreement and that Fieldtech may therefore rely on parol evidence to explain the parties' true agreement.

The elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff. *Harris v. Am. Prot. Ins. Co.,* 158 S.W.3d 614, 622-23 (Tex.App.-Fort Worth 2005, no pet.). Because Component Control's no-evidence motion challenged the third element, our analysis will focus primarily on whether Fieldtech produced any evidence that Component Control breached its agreement. But before we can determine whether Fieldtech presented any evidence of a breach of the agreement, we must first examine the agreement itself and determine whether Component Control promised that the software would provide the functionality required by Fieldtech, namely, the ability to look up a customer's order history and quickly generate quotes.

Because Fieldtech's rights against Component Control are governed by UCC article 2, we look to article 2 to guide our analysis. Under article 2, parol evidence of a contemporaneous oral agreement may explain or supplement, but not contradict, the terms of a written agreement between the contracting parties unless the court finds that the parties intended the writing to be a complete and exclusive statement of the terms of the agreement:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) by course of performance, course of dealing, or usage of trade (Section 1.303) and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

TEX. BUS. & COM.CODE ANN. § 2.202 (Vernon Supp.2008).[5]

[262 S.W.3d 826]

We turn now to the writings at issue with regard to Component Control, the proposal and the clickwrap agreement. The first question is whether the writings were intended as a "complete and exclusive statement of the terms of the agreement." TEX. BUS. & COM.CODE ANN. § 2.202. Neither writing contains an express merger or integration clause or any language to show that the parties intended either document to be a complete and exclusive statement of the terms of the agreement. Indeed, the fact that Component Control included the clickwrap agreement in the software indicates that it did not intend the proposal to be a complete and exclusive statement of the agreement, and the clickwrap agreement itself is not complete or exclusive because it omits crucial terms, such as price. Nor do the writings suggest that the parties intended them to be final expressions of their agreement. Therefore, Fieldtech may present parol evidence of contemporaneous oral agreements that explain or supplement the terms of the proposal and the clickwrap agreement. *See id.*



The second question is whether Fieldtech presented summary judgment evidence explaining or supplementing the terms of the writings. *See id.* We look first to the terms of the writings. Component Control's proposal identifies the software and included software modules by name and price, but it does not identify or recite any particular features or functionality of the software. The clickwrap agreement likewise identifies the software and included modules but does not specify any functionality, uses, or benefits of the software.

Next, we look to the parol evidence presented by Fieldtech to determine whether it supplements or explains the terms of the writings. In his affidavit, Nelms averred that

In response [to Nelms's discussions with Component Control personnel about the nature of Fieldtech's business], these Component Control personnel represented that the software it was trying to sell Fieldtech would be useful to Fieldtech and would [fulfill the needs Fieldtech expressed to Component Control].

... The only reason the agreement was for "Quantum Control" software is that such software was what Component Control represented would work for Fieldtech. Fieldtech was not interested [in leasing], and did not agree to lease, the Quantum Control software no matter whether or not it was useful to Fieldtech. Rather, Fieldtech's agreement with Component Control was simply to purchase software that was useful to Fieldtech and effectively met Fieldtech's needs.

Nelms's affidavit supplements, but does not contradict, the terms of the proposal and the licensing agreement. The proposal states that Component Control would provide the software; Nelms's affidavit supplements the proposal by explaining what the parties allegedly agreed the software would actually do. Thus, Nelms's affidavit creates a fact issue as to a contemporaneous oral agreement that supplements the terms of the written agreements between Fieldtech and Component Control. *See id.*

Finally, we look to Fieldtech's summary judgment evidence to determine whether it raised a fact issue as to whether Component Control breached the agreement as supplemented by Nelms's

[262 S.W.3d 827]

affidavit. Nelms averred that the software "simply would not work for Fieldtech" because—among other things—it requires a user to input "a myriad of information" regarding a potential customer before the user can generate a quote and does not allow a user to access a customer's historical information. He stated that "the software did not satisfy what Component Control agreed and represented it would provide to Fieldtech, and it was not useable for the purposes for which Fieldtech communicated to Component Control it needed the software."

Component Control argues that Nelms's affidavit does not raise a fact issue because he testified in his deposition that he merely had the "impression" that the software would do everything Fieldtech wanted it to, Fieldtech could present no documents containing the software specifications alleged by Nelms, and Nelms's affidavit is the self-serving testimony of an interested witness. We will consider each of these three alleged defects in turn. First, it is well established that a deposition does not have controlling effect over an affidavit when determining whether a motion for summary judgment should be granted. *Davis v. City of Grapevine,* 188 S.W.3d 748, 755 (Tex.App.-Fort Worth 2006, pet. denied). When a deposition and an affidavit filed by the same party in opposition to a motion for summary judgment conflict, a fact issue is presented that will preclude summary judgment. *Id.* Thus, to the extent that Component Control argues that Nelms's affidavit conflicts with his earlier deposition testimony, that conflict itself creates a fact issue. Second, UCC section 2.201 specifically contemplates parol evidence of contemporaneous *oral* agreements to supplement or explain written agreements; thus, no documents are



required to create a fact issue. *See* TEX. BUS. & COM.CODE ANN. § 2.201 (Vernon 1994). Third, while testimony from an interested witness cannot serve as a basis for *granting* summary judgment in some instances, it is enough to create a fact issue that justifies *denying* summary judgment. "Uncontroverted evidence ... from an interested witness does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible, and free from contradictions and inconsistencies, and could have been readily controverted." *Reynolds v. Murphy,* 188 S.W.3d 252, 262 (Tex.App.-Fort Worth 2006, pet. denied), *cert. denied,* ___ U.S. ___, 127 S.Ct. 1839, 167 L.Ed.2d 323. Because Fieldtech sought to create a fact issue and defeat summary judgment rather than negate a fact issue and obtain summary judgment, Nelms's interested affidavit is competent summary judgment evidence.

Component Control argues that this case is like *Bubbajunk.com, Inc. v. Momentum Software, Inc.,* in which the Austin court held that a written but unsigned "software requirements specification" did not impose additional contractual obligations on a software developer. No. 03-03-00590-CV, 2004 WL 904081, at *4 (Tex. App.-Austin Apr. 29, 2004, pet. denied). In that case, BubbaJunk and Momentum entered into a written consulting contract in which Momentum promised to perform software- and Internet-development services described in two work authorizations attached to and incorporated into the contract. *Id.* The contract required that changes to the scope of the services be in writing and executed by both parties. *Id.* When BubbaJunk failed to make payments under the contract, Momentum sued for breach of contract and eventually moved for summary judgment on its claim. *Id.* at *3. BubbaJunk asserted promissory estoppel as an affirmative defense, alleging that Momentum made additional promises regarding the scope of its services in an

[262 S.W.3d 828]

unsigned software requirements specification. *Id.* at *3, 4. The court held that because the software requirements specification was not executed by both parties, it was not a part of the contract and would not support BubbaJunk's promissory estoppel defense. *Id.* at *4.

This case is distinguishable from *Bubbajunk.* The contract in *Bubbajunk* was the complete, integrated agreement between the parties. Neither of the writings in this case—the proposal and the clickwrap agreement—is a complete expression of the parties' agreement, and neither contains a merger or integration clause. The clickwrap agreement includes a provision stating that "[t]his Agreement shall be modified only by a written agreement duly executed by Licensor and Licensee," but "this Agreement"—the clickwrap agreement—says nothing about the software's functionality; thus, Component Control's alleged oral promises about the software's functionality do not modify the clickwrap agreement. For these reasons, *Bubbajunk* does not guide our analysis.

Nelms testified that Component Control promised that the software would meet Fieldtech's needs, and he testified that the software failed to meet Fieldtech's needs. We therefore hold that Fieldtech created a fact issue as to whether Component Control breached its agreement with Fieldtech; thus, the trial court erred by granting Component Control's no-evidence summary judgment motion on Fieldtech's breach of contract claim. *See* TEX.R. CIV. P. 166a(i). For the same reasons, the trial court erred by granting Component Control's traditional motion for summary judgment, in which Component Control sought to conclusively negate the "breach" element of Fieldtech's breach of contract claim. *See* TEX.R. CIV. P. 166a(c).

Component Control also moved for summary judgment because Fieldtech suffered no injury from Component Control's purported breach of contract, arguing cursorily that "[o]nce again, there is no performance issue.... There is no injury because Fieldtech's change of heart is not a breach by Component Control." Because we have already held that the summary judgment evidence raises a fact question as to



whether Component Control breached its agreement with Fieldtech, we likewise hold that the trial court erred by granting summary judgment on Component Control's "no injury" argument. *See id.*

### c. Breach of warranty[6]

In its motion for summary judgment, Component Control argued that it conclusively negated the existence of any express or implied warranties because Component Control disclaimed all such warranties in the clickwrap agreement.

### i. Implied warranties

Contracts for the sale of goods imply warranties of merchantability and fitness for a particular purpose. TEX. BUS. & COM.CODE ANN. §§ 2.314, 2.315 (Vernon Supp.1994). To exclude the implied warranty of merchantability, the exclusionary language must mention "merchantability," be in writing, and be conspicuous. *Id.* § 2.316(b) (Vernon 1994). Likewise, to exclude an implied warranty of fitness, the exclusionary language must be in writing and be conspicuous. *Id.* Language is "conspicuous" in a disclaimer of an implied warranty if it is in larger type or other contrasting font or color. *Womco, Inc. v. Navistar Int'l Corp.,* 84 S.W.3d 272, 279 (Tex.App.-Tyler 2002, no pet.); TEX. BUS. &

[262 S.W.3d 829]

COM.CODE ANN. § 1.201(10) (Vernon 1994) (defining "conspicuous" as "so written ... that a reasonable person against [whom] it is to operate ought to have noticed it" and providing that language in the body of a form is "conspicuous" if it is in larger or other contrasting type, font, or color). Whether language is conspicuous is a question of law for the court to resolve. *Womco, Inc.,* 84 S.W.3d at 279.

The warranty disclaimer Component Control relies on appears in the clickwrap agreement and states that "Licensor shall not be liable to Licensee for any damages ... arising out of ... the breach of any express or implied warranty." This language, which appears on the third page of the five-page clickwrap agreement, is not in larger type or other contrasting font or color. We therefore hold that it is not "conspicuous" as a matter of law and was ineffective to disclaim the implied warranties of merchantability and fitness. *See* TEX. BUS. & COM.CODE ANN. § 2.316(b). Because the disclaimer was the sole basis of Component Control's motion for summary judgment with regard to Fieldtech's claim for breach of implied warranties, the trial court erred by granting summary judgment on this claim.[7]

### ii. Express warranties

Any affirmation of fact or promise made by the seller to the buyer that relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation or promise. TEX. BUS. & COM.CODE ANN. § 2.313(a)(1) (Vernon 1994). Likewise, any description of the goods that is made part of the basis of the bargain creates an express warranty that the goods will conform to the description. *Id.* § 2.313(a)(2). It is not necessary to the creation of an express warranty that the lessor use formula words, such as "warrant" or "guarantee," or that the lessor have a specific intent to make a warranty. *Id.* § 2.313(b).

Unlike disclaimers of implied warranties, the UCC does not require conspicuous language for the disclaimer of express warranties. *See id.* § 2.316(b). But a disclaimer of an express warranty must be communicated to a buyer before the sale is consummated; otherwise, the disclaimer language is inoperative. *Mercedes-Benz of N. Am., Inc. v. Dickenson,* 720 S.W.2d 844, 852 (Tex.App.-Fort Worth 1986, no writ) (holding automobile dealer's disclaimer of express warranties ineffective when buyer was



uninformed of disclaimer until he found it in the car's glove box after consummating the sale); *see also Womco, Inc.,* 84 S.W.3d at 279.

In this case, Fieldtech signed Component Control's proposal on August 24, 2001. Nothing in the record suggests—and Component Control does not argue—that Fieldtech was made aware of the clickwrap agreement and its warranty disclaimer until Fieldtech installed the software in October 2001, two months after the parties had entered into a binding agreement for the lease of the software. We therefore hold that the clickwrap agreement's disclaimer of express warranties was ineffective as a matter of law and that the trial court erred by granting summary

[262 S.W.3d 830]

judgment with regard to Fieldtech's claim for breach of express warranty.

#### d. DTPA claims

Component Control asserted that it was entitled to a no-evidence summary judgment because there is no evidence of any misrepresentation or unconscionable act by Component Control, and it asserted that it was entitled to a traditional summary judgment because Fieldtech's claim was barred by limitations[8] and because Component Control had disclaimed all warranties.

#### i. Evidence of misrepresentations

The DTPA creates a cause of action for false, misleading, or deceptive acts or practices, including misrepresentations that goods have characteristics, uses, or benefits that they do not have. TEX. BUS. & COM.CODE ANN. §§ 17.46(b)(7), 17.50(a) (Vernon 2008). We have already recounted the evidence presented by Nelms's affidavit regarding representations he alleges Component Control made to Fieldtech about the suitability of the software to Fieldtech's needs and his averment that the software failed to meet those needs. Nelms's affidavit is some evidence that Component Control made misrepresentations about the characteristics, uses, or benefits of the software. Thus, Component Control was not entitled to no-evidence summary judgment on Fieldtech's DTPA claims.

#### ii. Limitations

A consumer must commence a DTPA action within two years of the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. *Id.* § 17.565 (Vernon 2002).

Component Control argues that Fieldtech's DTPA claims are barred by limitations because Component Control would have made any alleged misrepresentations before Fieldtech signed the proposal in August 2001, but Fieldtech did not file suit until October 16, 2003—more than two years later. Fieldtech replies that it did not discover that the software was not as Component Control represented until it sent two employees for software training in January 2002.

Nelms avers in his affidavit that Fieldtech installed the software on October 19, 2001, but did not use it for the remainder of the year. He further stated that it was not until Fieldtech employees attended training in January 2002 that Fieldtech discovered that the software would not suit Fieldtech's needs, contrary to Component Control's alleged representations. We hold that Nelms's affidavit is some evidence that Fieldtech could not have discovered Component Control's alleged misrepresentations until January 2002, less than two years before Fieldtech filed suit. Thus, Component Control did not conclusively



establish the affirmative defense of limitations and was not entitled to a traditional summary judgment on this basis.

### iii. DTPA warranty claims

The DTPA does not create any warranties, but it does create a cause of action

[262 S.W.3d 831]

for breach of an express or implied warranty. *Id.* § 17.50(a)(2). Component Control argues that it is entitled to summary judgment because the summary judgment evidence conclusively proves that it effectively disclaimed all express and implied warranties as a matter of law. We have already analyzed Component Control's warranty-disclaimer argument in connection with Fieldtech's breach of warranty claims and determined that the disclaimer was ineffective. For the same reasons, we hold that Component Control is not entitled to summary judgment on Fieldtech's DTPA warranty claims.

### e. Conclusion

Having determined that Component Control is not entitled to summary judgment on Fieldtech's breach of contract, breach of warranty, and DTPA claims, we hold that the trial court erred by granting summary judgment in Component Control's favor, and we sustain Fieldtech's first issue.

### 3. CitiCapital's motions

Fieldtech sued CitiCapital for (1) breach of contract, alleging that CitiCapital made improper and unauthorized charges and payments under the lease; and (2) a declaratory judgment that the lease was unenforceable, alleging a complete lack of consideration. CitiCapital filed a motion for no-evidence summary judgment, asserting that there was no evidence that CitiCapital made improper or unauthorized charges or payments under the lease and no evidence that CitiCapital had breached the lease.[9] CitiCapital also filed a traditional motion for summary judgment, arguing that as a matter of law, failure of consideration is not a defense to Fieldtech's obligations under the lease, that Fieldtech was in default, and that Nelms and Mills were liable on their guarantees for all sums owing under the lease. CitiCapital filed a further traditional motion for partial summary judgment on the issue of attorney's fees. The trial court granted all three motions and awarded CitiCapital damages of $95,105.55 and attorney's fees of $28,205.83.

### a. Enforceability of lease

Fieldtech argues that the trial court erred by granting summary judgment in favor of CitiCapital on Fieldtech's causes of action because there is at least a fact issue as to whether Fieldtech revoked its acceptance of the software, thereby rendering the lease unenforceable. CitiCapital responds that Fieldtech specifically waived its right to revoke acceptance of the software.

### i. Hell or high water clause

The finance lease between Fieldtech and CitiCapital contains what is commonly referred to as a "hell or high water" clause. A hell or high water clause requires that the lessee, once it accepts the leased item, must pay its rent in all events (i.e., come hell or high water) without regard for the proper function of the item or the conduct of the lessor with respect to the subject or any other transaction. *Excel Auto & Truck Leasing, L.L.P. v. Alief ISD,* 249 S.W.3d 46, 51 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). The UCC provides that hell or high water clauses are enforceable in finance leases:



(a) In the case of a finance lease that is not a consumer lease, a term in the lease

[262 S.W.3d 832]

agreement that provides that the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods is enforceable.

(b) A promise that has become irrevocable and independent under Subsection (a):

(1) is effective and enforceable between the parties, and by or against third parties including assignees of the parties; and

(2) is not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs.

TEX. BUS. & COM.CODE ANN. § 2A.407 (Vernon Supp.2008).

The lease agreement between Fieldtech and CitiCapital states that it is "non-cancellable," that "no defect in or unfitness of the property shall relieve [Fieldtech] of its obligations under the lease," that the breach of any warranty by Component Control will not "have any effect whatsoever on the rights and obligations of either party with respect to the lease," and that Fieldtech's "obligation to pay all rent and other sums payable [under the lease is] absolute and unconditional." Thus, Fieldtech agreed to make payments under the lease come "hell or high water," that is, even if the software proved to be defective or useless.

### ii. Waiver of right to revoke acceptance

Fieldtech points to the comment to section 2A.407, which states that a hell or high water clause "remain[s] subject to ... the lessee's revocation of acceptance (section 2A-517)." *Id.* cmt 1. Section 2A.517 provides that a lessee in a finance lease may revoke acceptance of goods the nonconformity of which substantially impairs their value to the lessee if the lessee has accepted them without discovery of the nonconformity if the lessee's acceptance was reasonably induced by the lessor's assurances. *Id.* § 2A.517(a)(2) (Vernon 2002). Fieldtech argues that Nelms's affidavit creates a fact issue as to whether CitiCapital's assurances reasonably induced Fieldtech to accept the software and whether Fieldtech effectively revoked its acceptance.

CitiCapital replies that Fieldtech specifically waived its right to revoke acceptance in paragraph 18 of the lease agreement, which provides that

[t]o the extent permitted by applicable law, the LESSEE waives any rights and remedies conferred upon a LESSEE by UCC Sections 2A-508 through 2A-522, including (without limitation) the LESSEE'S rights to ... revoke acceptance of the leased Property....

UCC section 1.302(a) states that "[e]xcept as otherwise provided in Subsection (b) or elsewhere in this title, the effect of provisions of this title may be varied by agreement." *Id.* § 1.302(a) (Vernon Supp. 2008). Thus, an agreement can change the legal consequences that flow from the provisions of the UCC. *Id.* § 1.302(a) cmt. 1. Subsection (b) provides that the obligations of good faith, diligence, reasonableness, and care may not be disclaimed by agreement. *Id.* § 1.302(b).

Nothing in the UCC precludes an agreement between a finance-lease lessor and lessee to restrict or waive a lessee's right to revoke acceptance under section 2A.517(a)(2). In this case, the waiver of Fieldtech's right to revoke acceptance is clear and unambiguous. Therefore, even if we assume that



Fieldtech attempted to revoke acceptance of the software when it learned the software did not suit its needs, such revocation did not render the lease unenforceable as a matter of law because Fieldtech had already waived its right to

[262 S.W.3d 833]

revoke acceptance. We therefore hold that the trial court did not err by granting summary judgment in favor of CitiCapital on its counterclaim to enforce the lease and on Fieldtech's cause of action for a declaration that the lease was unenforceable.

### b. Unauthorized and improper charges

Fieldtech argues that Carol Beckham's affidavit created a fact issue as to improper and unauthorized charges allegedly made by CitiCapital and, therefore, created a fact issue as to whether CitiCapital breached the lease agreement. In her affidavit, Beckham listed the nine payments Fieldtech had made to CitiCapital by date, as follows:[10]

```
July 2002        $ 3,500.00

August 2002      $ 3,500.00

October 2002     $ 5,000.00

December 2002    $ 5,000.00

January 2003     $ 5,000.00

February 2003    $ 5,000.00

March 2003       $ 5,000.00

April 2003       $ 1,199.80

July 2003        $ 5,000.00

                 _____

Total            $38,199.80
```

Beckham averred that "it has been difficult to determine the amount Fieldtech should actually owe under the lease" and that "CitiCapital could never explain the calculation or the reason for the tax and insurance charges they were making to Fieldtech." Based on Beckham's affidavit, Fieldtech argues that "there is at least a genuine fact issue regarding the issue of whether CitiCapital correctly applied the payments made by Fieldtech and whether CitiCapital's charges under the lease are correct."

The lease agreement called for Fieldtech to make monthly payments of $3,528.85 beginning 180 days after the first day of the calendar quarter after Fieldtech installed the software, or June 30, 2002. The lease was a "net" lease—that is, the basic lease payments were "net" of any other sums due—and specifically required Fieldtech to pay for insurance and taxes in addition to the monthly lease payments; the lease also gave CitiCapital the right to obtain insurance and charge Fieldtech for the premiums if Fieldtech failed to obtain the required coverage. CitiCaptial attached to its motion for partial summary judgment the affidavit of its employee Wendy Henderson, who averred that as of April 5, 2005, Fieldtech



owed CitiCapital $71,399.60 in past due payments, $11,459.91 in late charges, and $12,264.04 in insurance premiums and fees.

Beckham's affidavit is no evidence of unauthorized or improper charges. Beckham merely testified that "it has been difficult to determine the amount Fieldtech should actually owe under the lease," not that the amounts paid by Fieldtech actually went to pay unauthorized or improper charges; at the very most, Beckham only speculates that the payments *might* have gone towards improper charges. Speculation is not evidence. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 164 (Tex.2004). Moreover, Beckham's affidavit shows that Fieldtech did not even make the explicitly authorized and agreed-to net lease payments of $3,528.85 per month. Over the twelve months that Fieldtech made lease payments, it should have paid $42,346.20; the payments listed in Beckham's affidavit total $38,199.80. Because the money Fieldtech paid to CitiCapital did not cover the monthly lease payment, no money was left over for CitiCapital to apply to allegedly improper or unauthorized charges.

We therefore hold that Fieldtech failed to raise a fact issue on its allegation of improper and unauthorized charges and

[262 S.W.3d 834]

that CitiCapital conclusively proved that Fieldtech was in default under the lease agreement and owed CitiCapital the amounts recited in Henderson's affidavit. Thus, the trial court did not err by granting CitiCapital's no-evidence motion for summary judgment on Fieldtech's breach of contract claim and its traditional motion on CitiCapital's counterclaim to enforce the lease.

### c. Liability of guarantors

Nelms and Mills argue that because there are fact issues regarding the enforceability of the lease, CitiCapital is not entitled to summary judgment on Nelms's and Mills's guarantees because if an underlying debt is unenforceable and the principal debtor has no liability, the guarantor likewise has no liability. *See Hercules Exploration, Inc. v. Halliburton Co.,* 658 S.W.2d 716, 724 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.) ("The guarantor's liability is measured by the principal's liability."). Fieldtech offers no other argument regarding the summary judgment against Nelms and Mills on their guarantees. Because we have held that the lease was enforceable as a matter of law and that the trial court did not err by granting summary judgment in favor of CitiCapital against Fieldtech, we also hold that the trial court did not err by granting summary judgment against Nelms and Mills on their guarantees.

### d. Conclusion

Having determined that the trial court did not err by granting CitiCapital's no-evidence and traditional motions for summary judgment, we overrule Appellants' second issue.

### Conclusion

Having sustained Appellants' first issue and overruled their second issue, we affirm the trial court's summary judgments in favor of CitiCapital, reverse its summary judgments in favor of Component Control, and remand Fieldtech's claims against Component Control for further proceedings.

---------------

Notes:



1. A clickwrap agreement derives its name from the similarities between such agreements and the licenses shrinkwrapped with many software packages. *RealPage, Inc. v. EPS, Inc.,* 560 F.Supp.2d 539, 545 (E.D.Tex. 2007). Clickwrap agreements allow users to manifest assent to contractual terms presented to the user before installation of computer software programs. *Id.* Generally, the user must indicate acceptance of the clickwrap agreement to proceed with the installation. *Id.* Texas courts recognize the validity of clickwrap agreements. *Id.; see also Barnett v. Network Solutions, Inc.,* 38 S.W.3d 200, 203-04 (Tex.App.-Eastland 2001, pet. denied).

2. In deposition testimony, Nelms testified that Component Control had demonstrated the software's operation to Fieldtech telephonically and through a webcast.

3. The record does not show that the trial court ruled on Fieldtech's special exceptions, but a trial court implicitly overrules special exceptions when it grants summary judgment on the motion to which the special exceptions pertain. *Clement v. City of Plano,* 26 S.W.3d 544, 550 n. 5 (Tex.App.-Dallas 2000, no pet.), *overruled on other grounds by Telthorster v. Tennell,* 92 S.W.3d 457, 464 (Tex.2002); *Dagley v. Haag Eng'g Co.,* 18 S.W.3d 787, 795 n. 9 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

4. Component Control argues that the no-evidence portion of its motion obviously gave Fieldtech adequate notice as to what specific elements lacked evidentiary support because Fieldtech filed two summary judgment responses attempting to show evidentiary support for the challenged elements. Because rule 166a(i) uses the unconditional term "must" in expressly directing no-evidence summary judgment movants to state the elements as to which there is no evidence, we decline to extend a "fair notice" exception to rule 166a(i)'s specific-elements requirement. *See Mott v. Red's Safe & Lock Servs., Inc.,* 249 S.W.3d 90, 98 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Callaghan Ranch, Ltd. v. Killam,* 53 S.W.3d 1, 4 (Tex.App.-San Antonio 2000, pet. denied) (both rejecting similar "fair-notice" arguments).

5. Component Control argues that absent pleading and proof of ambiguity, fraud, accident, or mistake, a written agreement presumes that all prior agreements have merged into the agreement and its provisions cannot be added to, varied, or contradicted by parol evidence. But one of the cases cited by Component Control is a real property case, to which the UCC does not apply. *See Thompson v. Chrysler First Bus. Corp.,* 840 S.W.2d 25, 33 (Tex.App.-Dallas 1992, no writ); TEX. BUS. & COM.CODE ANN. § 2.102 (Vernon 1994). And while the other case cited by Component Control was apparently within the scope of the UCC, it did not reference or discuss the UCC, and the written agreement in that case-unlike the writings in this case-contained a clear and unambiguous merger and integration clause. *See i2 Techs., Inc. v. DARC Corp.,* No. Civ. 3:02-CV-0327-H, 2003 WL 22205091, at *6 (N.D.Tex. Sep.23, 2003).

6. As we noted above, we will analyze Component Control's summary judgment motion on Fieldtech's breach of warranty claim under the rules governing traditional motions for summary judgment.

7. On appeal, Component Control argues that even if the disclaimer was ineffective, the only evidence before the trial court "confirms" that Component Control did not breach any warranties. But Component Control did not assert this argument as a ground for summary judgment in the trial court, and summary judgment cannot be granted except on the grounds expressly presented in the motion. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 204 (Tex.2002); *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex. 1997). Therefore, we cannot affirm the summary judgment on this basis.

8. Component Control also moved for no-evidence summary judgment on limitations but, as Fieldtech observes, it was not entitled to a no-evidence summary judgment on limitations because limitations is an affirmative defense on which Component Control would have the burden of proof at trial. *See* TEX.R. CIV. P. 166a(i) (providing that a party may move for no-evidence summary judgment on a claim or defense on which an adverse party would have the burden of proof at trial).

9. As it did with Component Control's no-evidence motion, Fieldtech challenges the sufficiency of CitiCapital's no-evidence motion. But unlike Component Control's motion, CitiCapital's specifically identifies elements of Fieldtech's causes of action for which there is no evidence. Therefore, we reject Fieldtech's insufficiency argument with regard to CitiCapital's no-evidence motion. *See* TEX.R. CIV. P. 166a(i).



10. Beckham averred that these payments added up to $43,199.80.

---------------



**299 S.W.3d 374**
**DEWAYNE ROGERS LOGGING, INC., Appellant,**
**v.**
**PROPAC INDUSTRIES, LTD., East Texas Machinery Rental, Inc. and Deere & Company, d/b/a**
**John Deere Company, Appellees.**
**No. 12-08-00048-CV.**
**Court of Appeals of Texas, Tyler.**
**August 31, 2009.**
**Rehearing Overruled December 16, 2009.**
**[299 S.W.3d 380]**
**Glenn J. Fahl, Houston, for Appellant.**
**Stephen P. Carrigan, Steven D. Naumann, Houston, Paul R. Heyburn, Beaumont, Robert L.**
**Ramey, Corpus Christi, John Michael McKinley, Diane S. Manson, for Appellees**
**Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.**
*OPINION*
**JAMES T. WORTHEN, Chief Justice.**

This is an appeal from a summary judgment granted in favor of Appellees, Propac Industries, Ltd., East Texas Machinery Rental, Inc., and Deere & Company, d/b/a John Deere Company. Appellant, Dewayne Rogers Logging, Inc., raises four issues on appeal. We affirm.

*BACKGROUND*

In late 1998, Dewayne Rogers Logging, Inc., solely owned by Dewayne Rogers, purchased a Propac delimber attached to a 690E John Deere Excavator (the "machine") from East Texas Machinery. Rogers Logging took the machine on demonstration for approximately one week before purchasing it on December 1, 1998. Dewayne Rogers used the machine to remove limbs from the trunk of a tree, measure the log, and cut it for removal to a sawmill. He called it "a fine piece of machinery," and stated that it met his expectations. Maintenance records on December 7, 1998 showed it had sixty hours of use, and by April 11, 2000, over three thousand hours of use. Deere and Propac gave Rogers Logging six month warranties on the machine, but disclaimed all implied warranties. On July 6, 2000, the machine caught fire late in the day when no one was present and was totally destroyed. Lloyds of London reimbursed its insured, Rogers Logging, for the loss of the machine. In exchange, Rogers Logging executed an assignment of its claims for loss of the machine to Lloyds.

On July 11, 2001, Lloyds brought suit against Deere, Propac, and East Texas Machinery (collectively, "Appellees") in Rogers Logging's name as its subrogee.

[299 S.W.3d 381]

The causes of action alleged against Appellees included negligence, gross negligence, strict liability, violation of the Deceptive Trade Practices Act ("DTPA"), breaches of express and implied warranties, breach of contract, and fraud. Appellees filed both traditional and no evidence motions for summary judgment. After hearings on the motions, the trial court ultimately granted all of them and entered a final take nothing judgment in favor of Appellees. This appeal followed.

*STANDARD OF REVIEW*

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). The movant must either negate at least one



essential element of the nonmovant's cause of action or prove all essential elements of an affirmative defense. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995). Once the movant has established a right to summary judgment, the nonmovant has the burden to respond to the motion and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678-79 (Tex. 1979). A defendant moving for summary judgment on an affirmative defense has the burden to conclusively establish that defense or, more specifically, prove each essential element of that defense. *Rhone-Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *The Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996).

After adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. TEX.R. CIV. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged evidence. *See Macias v. Fiesta Mart, Inc.,* 988 S.W.2d 316, 317 (Tex.App.-Houston [1st Dist.] 1999, no pet.). We review a no evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750-51 (Tex. 2003). A no evidence motion is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See id.* at 751. If the evidence supporting a finding rises to a level that would enable reasonable, fair minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Id.* Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact, and the legal effect is that there is no evidence. *See id.*

In both traditional and no evidence summary judgment motions, we review the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *See* TEX.R. CIV. P. 166a(c). If the trial court's order granting summary judgment does not specify the grounds relied on for the ruling, we will affirm if any of the theories advanced are meritorious. *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993).

[299 S.W.3d 382]

When a party moves for both a traditional and a no evidence summary judgment, we first review the trial court's summary judgment under the no evidence standard of Rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). If the no evidence summary judgment was properly granted, we do not reach arguments under the traditional motion for summary judgment. *See id.*

### SPECIAL EXCEPTIONS

As part of its first issue, Rogers Logging argues that Propac's no evidence motion for summary judgment relating to strict liability, negligence, and gross negligence, which Deere joined, is nothing more than a special exception. As part of its second issue, Rogers Logging contends that Deere's and Propac's motions for summary judgment regarding the DTPA violations and breach of express warranty claims are also special exceptions.

*Applicable Law*



A no evidence motion for summary judgment must state the elements as to which the movant contends there is no evidence. TEX.R. CIV. P. 166a(i); *Callaghan Ranch, Ltd. v. Killam,* 53 S.W.3d 1, 3 (Tex.App.-San Antonio 2000, pet. denied). The motion must be specific in challenging the evidentiary support for an element of a claim or defense; conclusory motions or general no evidence challenges to an opponent's case are not authorized. *Id.* When a party fails to state a cause of action or fails to plead all the elements of a cause of action or defense, the opposition may file special exceptions. *Nassar v. Hughes,* 882 S.W.2d 36, 38 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

*Analysis*

We have reviewed the challenged no evidence summary judgment motions. For each claim addressed in the motions, Deere and Propac alleged at least one element that they contend is without evidentiary support. For example, regarding strict liability, negligence, and gross negligence, Deere and Propac alleged there is no evidence that Rogers Logging incurred any "physical" or actual harm to either persons or other property. *See Killam,* 53 S.W.3d at 3. Regarding the DTPA and breach of express warranty claims, Deere and Propac alleged that Lloyds, as Rogers Logging's subrogee, was not a consumer under the DTPA. *See Killam,* 53 S.W.3d at 3. Deere's and Propac's no evidence summary judgment motions conform to the requirements of Texas Rule of Civil Procedure 166a(i). Therefore, we cannot agree that the motions are actually special exceptions. Accordingly, we overrule the part of Rogers Logging's first and second issues pertaining to that complaint.

## ECONOMIC LOSS RULE

As part of its first issue, Rogers Logging contends that the trial court erred in granting summary judgment in favor of Deere and Propac on its strict liability, negligence, and gross negligence claims. Deere and Propac argue that the economic loss rule bars recovery.

In determining whether the plaintiff may recover on a tort theory, it is instructive to examine the nature of the plaintiff's loss. *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991). When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract. *Id.* Under the economic loss rule, a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim. *Sterling Chems., Inc. v. Texaco, Inc.,* 259 S.W.3d 793, 796 (Tex.App.Houston [1st Dist.] 2007, pet. denied). In other words, the economic loss rule precludes recovery

[299 S.W.3d 383]

of economic losses in negligence when the loss is the subject matter of the contract between the parties. *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.,* 29 S.W.3d 282, 285 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

In their no evidence summary judgment motions, Deere and Propac alleged there is no evidence that Rogers Logging suffered any personal injury or any property damage except the destruction of the machine that is the subject of the contract between the parties. Therefore, they urged that Rogers Logging could not maintain its claims for strict liability, negligence, and gross negligence. Rogers Logging did not respond with any summary judgment evidence that the fire produced any damages other than the destruction of the machine itself. Consequently, the economic loss rule precludes recovery on Rogers Logging's strict liability, negligence, and gross negligence claims. *See Coastal Conduit & Ditching, Inc.,* 29 S.W.3d at 285. Thus, the trial court did not err in granting Deere and Propac's no evidence motions for summary judgment regarding those claims. Accordingly, we overrule that portion of Rogers Logging's



first issue challenging the summary judgment against Deere and Propac on the strict liability, negligence, and gross negligence claims.

## MANUFACTURING, DESIGN, AND MARKETING DEFECTS

As part of its first issue, Rogers Logging argues that the trial court erred in granting summary judgment in favor of East Texas Machinery on the issues of strict liability, negligence, and gross negligence based upon the manufacture, design, and marketing of the machine. East Texas Machinery filed a no evidence motion for summary judgment, alleging that Rogers Logging presented no evidence of one or more elements of its manufacturing, design, and marketing defect claims.

### Manufacturing Defect

To recover for a manufacturing defect, a plaintiff must prove that the product was defective when it left the hands of the manufacturer, and that the defect was a producing cause of the plaintiff's injuries. *See Ridgway,* 135 S.W.3d at 600; *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 844 (Tex.2000). A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *Ridgway,* 135 S.W.3d at 600. In its no evidence motion for summary judgment, East Texas Machinery alleged, in part, that there was no evidence that the machine was defective. In response, Rogers Logging pointed to the affidavit of Frank Johnson and an engineering report attached to the affidavit. However, neither Johnson's affidavit or the engineering report suggested or concluded that the machine deviated from the specifications or planned output when it left Propac and Deere. Thus, Rogers Logging has not raised a fact issue as to the existence of a manufacturing defect.

### Design Defect

A design defect renders a product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. *Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999). To recover for a design defect, a plaintiff must prove that there is a safer alternative design. *Id.* An alternative design must substantially reduce the risk of injury and be both economically and technologically feasible. *Id.; see* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(b) (Vernon 2005).

[299 S.W.3d 384]

In its no evidence motion for summary judgment, East Texas Machinery alleged, in part, that there was no evidence that a safer alternative design existed. In response, Rogers Logging again referred to Johnson's affidavit. In his affidavit, Johnson stated as follows:

> The equipment was defectively designed so as to render it unreasonably dangerous to Dewayne Rogers. In particular, the design of the electrical system allowed the ordinary and intended [user] of the product to be prone to the electrical arching that occurred and was the proximate cause of the underlying fire. A safer alternative design that would have incorporated additional insulation of the electrical wiring and/or fused the wiring on the equipment at issue existed at the time the product was manufactured. The safer alternative design would have prevented or significantly reduced the risk of electrical fire made the basis of this lawsuit, without substantially impairing the product's utility. Furthermore, the safer alternative design was economically and technologically feasible at the time the product left the control of the defendants by the application of existing or reasonably achievable scientific knowledge.



Conclusory affidavits are not enough to raise fact issues. *Ryland Group, Inc.,* 924 S.W.2d at 122. Texas Rule of Civil Procedure 166a(f) requires that affidavits used as summary judgment evidence "set forth such facts as would be admissible in evidence, and [ ] show affirmatively that the affiant is competent to testify to the matters stated therein." *See* TEX.R. CIV. P. 166a(f); *Ryland Group, Inc.,* 924 S.W.2d at 122. Further, conclusory statements in affidavits are not proper as summary judgment proof if there are no facts to support those conclusions. *Dolcefino v. Randolph,* 19 S.W.3d 906, 930 (Tex. App.-Houston [14th Dist.] 2000, pet. denied).

In his affidavit, Johnson concludes that the safer alternative design would have "prevented or significantly reduced the risk of electrical fire," and that it was "economically and technologically feasible." However, Johnson fails to state any facts supporting these conclusions. Because Johnson's affidavit was conclusory as to two essential elements of Rogers Logging's claim, it was insufficient to raise a fact issue as to those elements.

### Marketing Defect

A marketing defect occurs when a defendant knows or should have known of a potential risk of harm presented by the product but markets it without adequately warning of the danger or providing instructions for safe use. *USX Corp. v. Salinas,* 818 S.W.2d 473, 482 (Tex. App.-San Antonio 1991, writ denied). The elements that must be proved to recover for a marketing defect are as follows: (1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; (2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; (3) the product must possess a marketing defect; (4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury. *Id.* at 482-83. A product supplier is not liable for a failure to warn of dangers that were unforeseeable at the time the product was marketed. *Id.* at 483. Thus, a plaintiff must show that the product supplier knew or should have known of the risks at the time of marketing. *Id.*

[299 S.W.3d 385]

In its no evidence motion for summary judgment, East Texas Machinery alleged, in part, that there was no evidence that it actually knew or should have reasonably foreseen the risk of harm at the time the machine was marketed. Rogers Logging did not respond with any evidence that East Texas Machinery knew at the time the machine was marketed that there was a possible fire danger. Johnson states in his affidavit that a "retailer should have foreseen that the intended use of the equipment may result in severe wire fatigue and damage to the wire insulation requiring additional safeguards and/or precautions to prevent exposure of the electrical wires on the equipment." However, Johnson fails to state any facts supporting his conclusion that East Texas Machinery reasonably should have foreseen the risks of a possible fire danger when the machine was marketed. *See id.* Thus, Rogers Logging failed to raise a fact issue as to this element.

### Negligence and Gross Negligence

Rogers Logging states that, as an alternative to strict liability, it has a claim against East Texas Machinery for negligence and gross negligence in the design, manufacture, and marketing of the machine. To prevail on a claim of negligence against the supplier of an allegedly defective product, a plaintiff must prove a legal duty owed to the plaintiff by the defendant, breach of that duty, and damages to the plaintiff proximately caused by the breach of the duty. *DeGrate v. Executive Imprints, Inc.,* 261 S.W.3d 402, 409 (Tex.App.-Tyler 2008, no pet.) (citing *Lucas v. Tex. Indus., Inc.,* 696 S.W.2d 372, 376-77 (Tex.1984)). To establish breach of duty, the plaintiff must show that the defendant did something an ordinarily



prudent person exercising ordinary care would not have done under those circumstances, or that the defendant failed to do that which an ordinarily prudent person would have done in the exercise of ordinary care. *Lincoln Prop. Co. v. DeShazo,* 4 S.W.3d 55, 61 (Tex.App.-Fort Worth 1999, pet. denied). In its no evidence motion for summary judgment, East Texas Machinery alleged there is no evidence of any negligent acts or omissions by East Texas Machinery that caused Rogers Logging's damages.[1] Rogers Logging did not respond with evidence of any negligent acts or omissions by East Texas Machinery that caused its damages. Consequently, Rogers Logging has not raised a fact issue on whether East Texas Machinery breached any duty it had to Rogers Logging.

Other than in worker's compensation cases, a finding of ordinary negligence is a prerequisite to a finding of gross negligence. *Shell Oil Co. v. Humphrey,* 880 S.W.2d 170, 174 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Because Rogers Logging has not raised a fact issue as to East Texas Machinery's breach of duty, it has not raised a fact issue as to its gross negligence. *See id.*

### *Conclusion*

The trial court did not err in granting East Texas Machinery's no evidence summary judgment on Rogers Logging's strict liability, negligence, and gross negligence claims. Accordingly, we overrule that part of Rogers Logging's first issue complaining of East Texas Machinery's no evidence summary judgment on these claims.

[299 S.W.3d 386]

## *DTPA AND EXPRESS WARRANTY CLAIMS*

As part of its second issue, Rogers Logging contends that the trial court erred in granting summary judgment in favor of Appellees on the DTPA and breach of express warranty claims.

### *Motions for Summary Judgment*

Deere and Propac filed no evidence and traditional motions for summary judgment alleging that Lloyds, as Rogers Logging's subrogee, did not have standing to pursue a claim under the DTPA as a consumer. East Texas Machinery filed a no evidence motion for summary judgment asserting there was no evidence that Lloyds was a consumer under the DTPA. In order to pursue a claim under the DTPA, an entity must qualify as a consumer. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a) (Vernon Supp. 2008); *see also Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995). "Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services. TEX. BUS. & COM. CODE ANN. § 17.45(4) (Vernon Supp. 2008). However, the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more. *Id.*

In its petition, Rogers Logging states that Lloyds, after paying for the loss of the machine, became its subrogee. The summary judgment evidence shows that Rogers Logging gave Lloyds a written assignment after Lloyds paid Rogers Logging's claim. Lloyds, as Rogers Logging's subrogee, admits that it has assets of more than $25 million and that it could not, by itself, maintain consumer status in an independent action under the DTPA. *See Henderson v. Cent. Power & Light Co.,* 977 S.W.2d 439, 444 (Tex.App.-Corpus Christi 1998, pet. denied).

### *No evidence motions for summary judgment*



Lloyds contends that Appellees' no evidence motions for summary judgment are improper because lack of consumer status under the DTPA is an affirmative defense. The defendant has the burden to plead and prove the applicability of the $25 million exception to DTPA consumer status as an affirmative defense. *Eckman v. Centennial Savings Bank,* 784 S.W.2d 672, 674-75 (Tex.1990). Thus, as movants, Appellees had the burden to prove that Lloyds was not a consumer under the DTPA. *See Harrill v. A.J.'s Wrecker Svc., Inc.,* 27 S.W.3d 191, 194 (Tex.App.-Dallas 2000, pet. dism'd w.o.j.). The party with the burden of proof may never properly file a no evidence motion for summary judgment on an affirmative defense. *See* Judge David Hittner & Lynne Liberato, *Summary Judgments in Texas,* 47 S. TEX. L.REV. 409, 415 (Spring 2006). Because Appellees had the burden of proof regarding Lloyds' lack of consumer status under the DTPA, their no evidence motions for summary judgment were improper, and the trial court erred in granting them.

### *Deere's and Propac's Traditional Motions for Summary Judgment*

Deere and Propac also filed traditional motions for summary judgment alleging that Lloyds cannot be a consumer because it has assets in excess of $25 million. In response, Lloyds admitted that it has assets of more than $25 million and that it could not, by itself, maintain consumer status in an independent action under the DTPA. However, Lloyds claimed that, upon joining its subrogation claim with the DTPA claims of Rogers Logging, it has consumer status. Moreover, Lloyds argues that subrogation is not an assignment. Subrogation is the right of one who

[299 S.W.3d 387]

has paid an obligation, that another should have paid, to be indemnified by the other. *Int'l Elevator Co., Inc. v. Garcia,* 73 S.W.3d 420, 421 (Tex.App.-Houston [1st Dist.] 2002, no pet.). DTPA claims generally cannot be assigned by an aggrieved consumer to someone else. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 92 (Tex.2004). Specifically, a subrogee who cannot qualify as a consumer in its own right may not assume the status of its insured for the purposes of pursuing a DTPA claim. *Trimble v. Itz,* 898 S.W.2d 370, 372 (Tex. App.-San Antonio 1995, writ denied). As mentioned earlier, Lloyds has admitted that it cannot, by itself, maintain consumer status. Moreover, as Rogers Logging's subrogee, Lloyds may not pursue claims under the DTPA by assuming Rogers Logging's status as a consumer. *See Trimble,* 898 S.W.2d at 372. Therefore, Lloyds does not have standing to pursue its DTPA claims as Rogers Logging's subrogee. *See* TEX. BUS. & COM.CODE ANN. § 17.45(4); *Trimble,* 898 S.W.2d at 372. Additionally, Rogers Logging stated in its responses to Deere's and Propac's motions for summary judgment that its DTPA claims were based on a breach of express warranty. Without standing to bring its DTPA claims, it cannot pursue its breach of express warranty claims. Therefore, the trial court did not err in granting Deere's and Propac's traditional motions for summary judgment regarding Rogers Logging's DTPA and breach of express warranty claims.

### *East Texas Machinery's Traditional Motion for Summary Judgment*

East Texas Machinery filed a traditional motion for summary judgment alleging that Rogers Logging's DTPA claims arise from the same facts as its breach of contract claims and are, therefore, barred by law. Rogers Logging responded that its DTPA claims arise from a breach of express and implied warranties, not contract.[2] More specifically, Rogers Logging contended that East Texas Machinery violated subsections 17.46(b)(5), (7), and (9), and 17.50(a)(2) of the DTPA.

Under the DTPA, a consumer may recover damages incurred as a result of another's false, misleading, or deceptive acts or practices. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a)(1) (Vernon Supp. 2008). However, mere breach of contract, without more, does not violate the DTPA. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998). But when



representations are made outside the contract, a violation of the DTPA may occur. *Cont'l Dredging, Inc. v. De-Kaizered, Inc.,* 120 S.W.3d 380, 390 (Tex.App.-Texarkana 2003, pet. denied). Whether a breach of contract rises to the level of a misrepresentation sufficient to trigger the DTPA is a fact driven inquiry that, once the facts are ascertained, is a question of law. *Id.* at 389. When a representation by a defendant causes no harm itself, but instead the injury or damage was caused by the breach of contract, that injury is governed by contract law, not the DTPA. *See Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 14-15 (Tex. 1996). Further, when the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *Cont'l Dredging,* 120 S.W.3d at 389-90 (quoting *Bekins Moving & Storage Co. v. Williams,* 947 S.W.2d 568, 577 (Tex. App.-Texarkana 1997, no pet.)).

[299 S.W.3d 388]

Rogers Logging admits that the only loss suffered was the destruction of the machine itself, the subject of the contract between the parties. All of the representations made by East Texas Machinery to Rogers Logging, if any, were within the customer purchase order. Because Rogers Logging admits it did not suffer any injury other than the economic loss to the machine itself, we conclude that its injury is governed by contract law, not the DTPA. Thus, the trial court did not err in granting East Texas Machinery's traditional motion for summary judgment regarding Rogers Logging's DTPA and breach of express warranty claims.

### *Conclusion*

The trial court did not err in granting Appellees' traditional motions for summary judgment on Rogers Logging's DTPA and express warranty claims. Accordingly, we overrule the portion of Rogers Logging's second issue regarding the traditional summary judgment in Appellees' favor on these claims.

## *INTERLOCUTORY ORDERS*

As part of its second issue, Rogers Logging argues that the trial court erred when it entered its final judgment because that judgment conflicted with its earlier rulings. Interlocutory orders do not become final until they are merged into the final judgment. *Webb v. Jorns,* 488 S.W.2d 407, 409 (Tex.1972). A trial court has the inherent authority to change or modify any interlocutory order until the judgment becomes final. *Rush v. Barrios,* 56 S.W.3d 88, 98 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

In 2004, the trial court granted summary judgment against Rogers Logging on its strict liability, negligence, and gross negligence claims. The trial court denied Appellees' motions for summary judgment regarding Rogers Logging's DTPA and "U.C.C." claims. Later, however, the trial court granted Deere's and Propac's motions for summary judgment on Rogers Logging's DTPA and express warranty claims. In its final judgment, the trial court granted all no evidence and traditional motions for summary judgment filed by Appellees. The judgment stated that it was a "final order disposing of all parties and all claims and is appealable." Because the trial court's interlocutory orders were not final until they were merged into the final judgment, and the trial court had the inherent authority to change any interlocutory order until such time, we conclude the trial court did not err in entering its final judgment. *See Rush,* 56 S.W.3d at 98. Accordingly, we overrule that portion of Rogers Logging's second issue regarding previous interlocutory orders.

## *BREACH OF CONTRACT*

As part of its fourth issue, Rogers Logging contends the trial court erred in granting summary judgment in favor of Appellees on its breach of contract claims. Rogers Logging argues that Appellees breached the customer purchase order and breached a contract among themselves regarding warranties.[3]



The essential elements of breach of contract are (1) a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of that breach. *B & W Supply, Inc. v. Beckman,* ___ S.W.3d ___, ___ (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (not yet released

[299 S.W.3d 389]

for publication). Moreover, to prevail on a breach of contract claim, one must be a party to the contract. *Graham v. Turcotte,* 628 S.W.2d 182, 183 (Tex.App.-Corpus Christi 1982, no writ).

Deere and Propac filed no evidence motions for summary judgment alleging that they were not parties to the customer purchase order and, therefore, there is no evidence of a contract between them and Rogers Logging. Rogers Logging responded to those motions, but did not provide evidence that Deere and Propac were parties to the customer purchase order. Nor did Rogers Logging provide evidence of any other document evidencing a contract between it and either Deere or Propac.

In its complaints regarding the contract to which Appellees are a party, Rogers Logging appears to refer to the John Deere excavator conversion approval application. This document is an application to Deere for its approval in converting a John Deere excavator by attaching a Propac delimber to it. The application is in the form of a checklist, is signed by representatives of Deere, Propac, and East Texas Machinery, and is approved by Deere. The summary judgment evidence shows, and Rogers Logging admits, that it was not a party to that contract. Because Rogers Logging was not a party to the conversion approval application, it cannot seek recovery for breach of that contract.[4] *See Graham,* 628 S.W.2d at 183.

In its no evidence motion for summary judgment, East Texas Machinery alleges that there is no evidence that it breached its contract (the customer purchase order) with Rogers Logging. Rogers Logging responded to the motion, but did not provide any evidence supporting its contention that East Texas Machinery breached the customer purchase order.

Because Rogers Logging did not produce any evidence supporting the elements challenged by Appellees, the trial court did not err in granting Appellees' no evidence motions for summary judgment regarding Rogers Logging's breach of contract claims. Accordingly, we overrule the portion of Rogers Logging's fourth issue regarding its breach of contract claims.

## IMPLIED WARRANTIES

As part of its fourth issue, Rogers Logging contends that the trial court erred in granting summary judgment in favor of Appellees on its implied warranty claims. In their no evidence motions, Appellees alleged that the customer purchase order disclaimed the implied warranties of merchantability and fitness for a particular purpose. Therefore, they contended, Rogers Logging cannot produce evidence of any implied warranties.

### Applicable Law

Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. TEX. BUS. & COM.CODE ANN. § 2.314(a) (Vernon 2009). An implied warranty of fitness for a particular purpose may be excluded or modified. *Id.* § 2.315 (Vernon 2009). To exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchantability and in the case of a writing,



[299 S.W.3d 390]

must be conspicuous. *Id.* § 2.316(b) (Vernon 2009). To exclude or modify any implied warranty of fitness, the exclusion must be by a writing and conspicuous. *Id.* The Texas Business and Commerce Code defines "conspicuous" as follows:

> (10) "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.* § 1.201(10)(A), (B) (Vernon 2009).

A disclaimer must be disclosed to the buyer before the contract of sale has been completed, unless the buyer later agrees to the disclaimer as a modification of the contract. *Womco, Inc. v. Navistar Int'l Corp.,* 84 S.W.3d 272, 279 (Tex.App.Tyler 2002, no pet.). One of the underlying purposes of section 2.316 of the Texas Business and Commerce Code is to protect a buyer from surprise by permitting the exclusion of implied warranties. *Id.*

### *Analysis*

The customer purchase order signed by Rogers Logging for the machine contained the following language in bold, all capital letters:

**NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS IS MADE.**

Because this language mentions merchantability, is in capital letters equal in size to the surrounding text, and is in contrasting bold type, the disclaimer is conspicuous and, thus, is an effective disclaimer of the implied warranties of merchantability and fitness. *See* TEX. BUS. & COM.CODE ANN. § 2.316(b).

Rogers Logging did not present any evidence regarding the existence of implied warranties. Here, Rogers Logging contends that the disclaimers are not effective because they were not communicated to it before the machine was delivered. *See Womco, Inc.,* 84 S.W.3d at 279. In *Womco,* the issue was whether the disclaimer had been communicated to the buyers prior to the completion of the contract for sale. *See id.* at 280. In this case, the contract of sale was not completed until Rogers Logging and East Texas Machinery signed the customer purchase customer order on December 1, 1998. The customer purchase order included the disclaimers of the implied warranties of merchantability and fitness. Thus, the disclaimers were communicated to Rogers Logging before completion of the contract of sale. *See id.*

Because the disclaimers complied with the Texas Business and Commerce Code and were communicated before completion of the sale, they were effective. Therefore, the trial court did not err in granting Appellees' no evidence motions for summary judgment regarding Rogers Logging's implied warranties claims. Accordingly, we overrule that portion of Rogers Logging's fourth issue regarding the implied warranties claims.



[299 S.W.3d 391]

*FRAUD*

As part of its fourth issue, Rogers Logging contends that the trial court erred in granting summary judgment in favor of Appellees on its fraud claims. Rogers Logging argues that Appellees committed fraud in two ways—by failing to disclose "significant fire hazards" relating to the machine and by selling the machine as new when it was used. Appellees filed no evidence motions for summary judgment relating to Rogers Logging's fraud claims alleging that, in response to discovery requesting documents supporting its fraud claims, Rogers Logging has produced no evidence.

*Analysis*

The elements of fraud are (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 758 (Tex.2001). Fraud by omission is a subcategory of fraud because the omission or nondisclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.,* 217 S.W.3d 653, 670 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). A failure to disclose does not constitute fraud unless there is a duty to disclose the information. *Id.* When one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue. *Id.* at 670-71. However, a party cannot be guilty of fraudulently or intentionally concealing facts of which he is not aware. *HTM Restaurants, Inc. v. Goldman, Sachs & Co.,* 797 S.W.2d 326, 329 (Tex.App.-Houston [14th Dist.] 1990, writ denied) (citing *Barnard v. Thompson,* 138 Tex. 277, 158 S.W.2d 486 (1942)).

*Analysis*

Rogers Logging contends that Deere became concerned about a possible fire danger relating to the machine and communicated those concerns to Propac in 1999. Thus, Rogers Logging argues that Appellees had a duty to convey that same information to it. For such a duty to have arisen, Appellees must have received new information that made an earlier representation misleading or untrue. *See Four Bros. Boat Works,* 217 S.W.3d at 670-71. Rogers Logging presented no evidence that Appellees made any representation at the time of the sale relating to whether the machine was free from defects. Furthermore, the customer purchase order signed by Rogers Logging on December 1, 1998 specifically stated that no "representations" were being made "as to the quality, performance, or freedom from defect of its products." And finally, Rogers Logging presented no evidence that any of the appellees knew at the time of the sale that there was a possible fire danger. A "material representation" is the first element of fraud. *See In re FirstMerit Bank, N.A.,* 52 S.W.3d at 758. Rogers Logging has not presented evidence showing that any of the appellees made a material misrepresentation about the condition of the machine and therefore cannot show that any appellee had a duty to inform Rogers Logging about the possible fire danger.

Rogers Logging also contends that the machine was marketed as new. Rogers Logging states that when the machine was first serviced on December 7, 1998, the meter showed sixty hours of use.

[299 S.W.3d 392]



As such, Appellant argues that this representation was fraudulent. We disagree. The summary judgment evidence shows that Rogers Logging used the machine for approximately one week on a demonstration basis before purchasing it on December 1, 1998. At the time of its first servicing, Rogers Logging had used the machine for approximately two weeks. Rogers Logging has not presented evidence that the meter showed any hours of use at the time Rogers Logging took the machine on a demonstration. Therefore, there is no evidence that the representation was false.

The trial court did not err in granting Appellees' no evidence motions for summary judgment regarding Rogers Logging's fraud claims. Accordingly, we overrule the portion of Rogers Logging's fourth issue regarding its fraud claims.

*MOTION FOR CONTINUANCE*

In its third issue, Rogers Logging contends that the trial court abused its discretion by refusing to grant its motion for continuance before hearing Deere's no evidence and traditional motions for summary judgment on July 31, 2007. When reviewing a trial court's order denying a motion for continuance, we consider on a case by case basis whether the trial court committed a clear abuse of discretion. *Joe v. Two Thirty Nine J.V.,* 145 S.W.3d 150, 161 (Tex.2004). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.* We consider the following nonexclusive factors when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery: (1) the length of time the case has been on file; (2) the materiality and purpose of the discovery sought; and (3) whether the party seeking the continuance has exercised due diligence to obtain the discovery sought. *Id.*

Rogers Logging alleged two grounds in its motion for continuance. First, it alleged that it had been refused the opportunity to depose East Texas Machinery's corporate representative. Rogers Logging's motion for continuance was filed over six years after it began the suit. We do not consider that a lapse of over six years without securing the deposition of a corporate representative showed due diligence on the part of Rogers Logging. *See id.*

Second, Rogers Logging alleged that Deere had refused to supplement written discovery and was withholding material evidence necessary in order to respond to Deere's motion for summary judgment. In its brief, Rogers Logging contends that after the deposition of Deere's corporate representative on August 31, 2006, it sent requests for admissions to Deere. Although Rogers Logging complains that Deere refused to answer the admissions in the affirmative, the record does not show that Rogers Logging filed a motion to compel these admissions. Failure to file a motion to compel discovery or otherwise attempt to obtain the items objected to may indicate a lack of diligence. *See Barron v. Vanier,* 190 S.W.3d 841, 851 (Tex. App.-Fort Worth 2006, no pet.). Again, by failing to file a motion to compel discovery, Rogers Logging displayed a lack of due diligence. *See Joe,* 145 S.W.3d at 161.

Because Rogers Logging did not exercise due diligence in obtaining the deposition of East Texas Machinery's corporate representative or in obtaining necessary discovery from Deere, the trial court did not abuse its discretion in denying Rogers Logging's motion for continuance. Accordingly, we overrule Rogers Logging's third issue.

[299 S.W.3d 393]

*DISPOSITION*

Having overruled Rogers Logging's four issues, we ***affirm*** the judgment of the trial court.



---------------

Notes:

1. We interpret this as an allegation that there is no evidence of any breach of duty by East Texas Machinery.

2. We will discuss Rogers Logging's complaint regarding implied warranties later in this opinion.

3. The customer purchase order is Rogers Logging's order for the excavator and delimber. It also includes Rogers Logging's promise to pay for the machine and provisions relating to express and implied warranties.

4. Rogers Logging also suggests that "none of the parties to that agreement stood to benefit *more* than the ultimate consumer of the delimber machine. In this case, that `third party beneficiary' was the Appellant." However, Rogers Logging provides no argument or citations to authorities supporting its statement that it is a third party beneficiary of the conversion approval application. *See* TEX. R.APP. P. 38.1(i). Therefore, we do not address that issue.

---------------



**Page 661**
**678 S.W.2d 661**
**40 UCC Rep.Serv. 764**
**STATE NATIONAL BANK OF EL PASO, Appellant,**
**v.**
**FARAH MANUFACTURING COMPANY, INC., Appellee.**
**No. 08-82-00160-CV.**
**Court of Appeals of Texas,**
**El Paso.**
**Aug. 29, 1984.**
**Rehearing Denied Nov. 7, 1984.**

**Page 666**

Marvin S. Sloman, Robert L. Blumenthal, Carrington, Coleman, Sloman & Blumenthal, Dallas, Robert J. Hearon, Jr., Pamela Stanton Baron, Graves, Dougherty, Hearon & Moody, Austin, Raymond C. Caballero, El Paso, for appellant.

Tom Thomas, Kolodey, Thomas, Dooley & Yeager, Dallas, for appellee.

Before STEPHEN F. PRESLAR, C.J., and WARD and SCHULTE, JJ.

OPINION

SCHULTE, Justice.

This case centers around a management change clause contained in a $22,000,000.00

Page 667

loan agreement. The jury found Appellant bank, acting alone or in conspiracy with any of the other lenders, committed acts of fraud, duress and interference, proximately resulting in damages to Appellee, and set damages at $18,947,348.77. We reform and affirm.

The management change clause set forth in Section 6.1(g) of the February 14, 1977, loan agreement made it an event of default if there occurred:

Any change in the office of President and Chief Executive Officer of Farah [Manufacturing Company, Inc.] or any other change in the executive management of Farah [Manufacturing Company, Inc.] which any two Banks shall consider, for any reason whatsoever, to be adverse to the interests of the Banks.

For space economy we will refer to individuals involved by surnames only unless the same surname for different individuals requires the addition of a given name or initials for clarity. William F. Farah will be referred to as Farah. His son, Jimmy Farah will be J. Farah; Farah Manufacturing Company, Inc. will be denoted by the initials FMC. The State National Bank of El Paso will be State National; Continental Illinois National Bank and Trust Company of Chicago will be merely Continental; Republic Bank Dallas N.A. (formerly Republic National Bank of Dallas) will be Republic; The Prudential Insurance Company of America will be called Prudential. Prudential was a separate creditor of FMC pursuant to a 1971 loan agreement. An amended and restated creditors' agreement included Prudential and was made part of the



February 14, 1977, loan agreement. Where dates indicate a month only, the year intended is 1977; otherwise the year will be shown. Chief Executive Officer will be denoted as CEO; Chief Operating Officer by the letters COO.

As to the facts, certain events require preliminary mention. FMC began in 1919 as a family owned apparel manufacturer. Farah became CEO in 1964. In 1967 FMC went public. By 1970, the company had plants in Texas and overseas with annual sales of $136,000,000.00. Beginning in 1972, the firm suffered a strike and a nationwide boycott. The strike was settled in 1974. During the period 1972-1976 FMC experienced a pre-tax loss of $43,965,000.00. On July 9, 1976, the FMC Board named one of its members, Leone, as CEO of FMC replacing Farah. On February 14, 1977, a preexisting loan agreement between FMC, State National, Continental and Republic was amended and included the management change clause previously set forth. At the following March 7 Annual Directors' Meeting, Farah made a presentation to be reinstated as CEO. Within days thereafter, Frost, Kozmetsky, Leone and Lerner resigned as directors. Leone remained, however, as CEO. On March 14, Farah made his management presentation to the lenders at Republic in Dallas. Republic was the agent bank for the lenders. Two days later, Farah met Bunten, Senior Vice-President of Republic, on an airplane going to New York. Farah testified that as a result of what he understood Bunten to say, regarding FMC management, he (Farah) cut his New York merger effort short and returned to El Paso, Texas, to prepare to resume control of FMC as CEO. Conroy, a director of FMC, as well as of State National, let the lenders know that he too was available to be CEO. On March 15, Bunten of Republic named Tom Foster of Republic to handle the FMC loan. Tom Foster hired attorney Donohoe to assist him. On March 18, the FMC Board reconvened. Farah pressed his bid to be CEO. Azar was elected a director. Director Gordon Foster was designated to ask the lenders for their position on a management change. On March 19, Conroy met with Azar, the possible swing director, to urge his own candidacy for CEO. Azar initially rejected Conroy. The next day Conroy met with Houghton, a State National vice-president, who had previously worked for Farah at FMC. Houghton tried to discourage Azar's support of Farah. On March 21, the lenders met again at Republic in Dallas and Tom Foster and attorney Donohoe left for El Paso. On March 22, Donohoe drafted and Tom Foster signed and delivered the

Page 668

lenders' response to the management query from the FMC Board. That day also saw a meeting between the lenders and Director Gordon Foster, and a meeting between the lenders and Conroy. On March 23, the lenders faced Azar and Farah; Conroy was elected CEO replacing Leone and Gordon Foster was elected Chairman replacing Farah. On the same day, Continental met with consultant Galef. On April 4, the following were elected to the FMC Board: Pulley, a recently retired Republic officer who had originally approved the FMC loan; Williams, who was also a director of State National; and Jaynes, who had originally declined, asserting a conflict of interest, and reconsidered at the request of Gordon Foster.

On May 27, at the instance of the lenders, FMC hired Galef as consultant. On July 30, Conroy resigned as CEO and Galef was elected to that office. The fall of 1977 saw litigation between Farah and the directors. The terms of the settlement released the directors from all claims asserted in this present suit. Under Galef, on October 4-6, some FMC machinery was auctioned and sold. On November 15, the mill auction was held. During November both Farah and Azar resigned from the FMC Board. In January, 1978, Farah initiated his proxy fight. In that regard in March 1978, Farah prevailed in litigation brought against him by Clifford and Virginia Farah to remove Farah as trustee under the trust holding their stock. The loan was restructured on April 3, 1978. Four days later Galef was out and Farah was again CEO of FMC.



State National Bank, defendant below and Appellant here, characterizes the case as one arising out of warnings issued to FMC in March, 1977, by Republic, State National and Continental in reliance on the management change clause above set forth. Appellant's position is that when Farah attempted to persuade FMC's board to elect him CEO, the banks stated their intent to enforce their right under the loan agreement to treat Farah's election as a default and call their loan. Appellant insists that the warnings of the banks did not exceed their legal rights under the change clause (and otherwise) and further that FMC failed to adduce evidence to establish a cognizable cause of action. State National maintains that the banks made the loan to FMC in reliance upon FMC's assurances in 1976 that the company was under new management and that the banks would be protected by the management change clause against any future change in management. It is also maintained by State National that the covenant was a provision freely given by FMC, that it was undisputedly lawful, and that the subsequently strengthened and amended clause was approved by the entire FMC board with the clear understanding that the covenant could be used to resist an effort by Farah to return as CEO.

On the other hand, FMC, plaintiff below and Appellee here, asserts the general position that under the management change clause, when it became apparent that Farah was about to regain control of FMC, which was unacceptable to the banks, that the banks had two legitimate options. They could attempt to call the loan or elect not to and live with Farah as CEO. Instead, Appellee maintains, the banks chose a third option and unlawfully prevented Farah's election and installed directors and officers to keep Farah out of management. The claim is made that the "hand picked minions" mismanaged the company and stripped it of valuable assets for unnecessary loan prepayments. Further, Appellee asserts, when the banks defrauded and coerced FMC's directors to prevent Farah's return to management, they defrauded and coerced FMC itself. When they installed their own choice of management, stacked the FMC board and undertook the actions to exclude Farah from management, the banks interfered with FMC's management and corporate governance rights through an unlawful course of conduct marked with deception and coercion. These alleged wrongful acts are stated to have proximately caused damages to FMC in two respects. First, the incompetent management installed and perpetuated by the

Page 669

banks resulted in losses and auction sale damages. Second, their preventing the election of competent management caused losses and lost profits. Appellee finally contends Farah fought his way back into control, saved the company from bankruptcy and restored it to profitability.

The case before us was in trial for over two months, resulting in a statement of facts of some seven thousand pages and exhibits of over two thousand pages. The jury of twelve received the case on December 30, 1981, and returned its verdict on January 13, 1982. Ten members of the jury in response to special issues found that the State National, acting alone or in conspiracy with any of the other lenders, at any time after February, 1977, committed any act or acts of:

Question No. 1A. Fraud

Question No. 1B. Duress

Question No. 1C. Interference

Question No. 2. Proximately causing as to 1A, 1B and 1C, damages to FMC as follows: (conditioned on an affirmative answer to any or all of 1A, 1B, or 1C above)



Question No. 3A. Actual losses after March 23, 1977--$2,668,000.00.

Question No. 3B. Lost profits after March 23, 1977--$15,482,500.00.

Question No. 3C. The difference between market value and actual sale prices of assets and equipment sold at auction sales--$721,848.77.

Question No. 3D. Lost profits from auction sales--$75,000.00.

Further in response to Questions Nos. 4 and 5, the jury found that the acts previously inquired about were not actuated by malice and therefore fixed no exemplary damages. The trial court overruled State National's motion for judgment non obstante veredicto and entered judgment on the verdict. State National's motion for a new trial was overruled.

State National raises twenty-seven points of error, essentially attacking the legal and factual sufficiency of the evidence to support the jury's findings to special issue Questions Nos. 1A, 1B, 1C, 2, 3A, 3B, 3C, and 3D previously set forth as well as the conspiracy finding in the preface portion of Question No. 1. Additional points urge that as a matter of law FMC did not have an actionable claim for fraud, duress or interference; that as a matter of law FMC is not entitled to damages for lost profits and auction sales. Other points urge error in submission of Questions Nos. 1 and 3, and in the admission of certain evidence. A final point asks the judgment be reversed and rendered or alternatively reversed and remanded. FMC urges a cross-point that the trial court erred in defining malice in connection with exemplary damages; and two conditional cross-points regarding exclusion of evidence and the denial of an order to produce.

In that many of the points of error concern legal and factual insufficiency assertions, we set forth here the standards of review we apply to such points to avoid repetition under each of them. In considering a "no evidence" legal insufficiency point, we consider only the evidence which tends to support the jury's findings and disregard all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex.1965). A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. Carrasco v. Goatcher, 623 S.W.2d 769 (Tex.App.--El Paso 1981, no writ). It is not within the province of the court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness' testimony. Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792 (1951). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d

Page 670

508 (1947); Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W.2d 820 (1947).

Before beginning a discussion of the points of error, we will expand on certain evidence previously outlined indicating in part the position of the parties in regard thereto, with a further factual treatment under the points as appropriate. Appellant's version of the facts covers over sixty pages of its original brief and that of the Appellee some one hundred pages. Appellant's supplemental response to Appellee's



statement of facts covers an additional seventy-eight pages of statement of facts. We will be as sparing as possible.

Following the strike and boycott of 1972-1974, and substantial losses, on March 3, 1976, the FMC Board unanimously elected Leone, an FMC director since 1973 and chosen by Farah to succeed him, as president and COO. Farah retained his positions as board chairman and CEO. Farah assigned to Leone nearly all executive responsibility in expectation that Leone would offer a different style of management. The lenders had no input in Leone's election. On the same day, Farah's son, J. Farah, was elected as a director. The board then consisted of Farah, J. Farah, Conroy, Leone, Gordon Foster, Frost, Kozmetsky and Lerner.

At its meeting on July 9, 1976, the board demanded that Farah resign as CEO. A resolution, introduced by Farah and naming Leone as new CEO, was passed. Farah retained the title of board chairman, a ceremonial position with no management responsibilities. His resignation as CEO was demanded on the basis that he was the cause of FMC's management problems and poor financial condition.

Farah later deemed Leone incapable of properly managing the company and unable to quickly adjust to changes in market demand for fashions. Under Leone, FMC's sales and profits declined. Farah urged Leone to change his practices. Both Leone and the board viewed this as unwarranted interference.

In the spring of 1976, FMC had begun to seek a $30,000,000.00 loan to survive losses. An interim agreement was arrived at to be followed in October, 1976, by a finalized loan agreement. Both contained management change clauses. On February 14, 1977, a restructured collateralized loan agreement was reached. FMC maintains that the appraised value of the collateral was $72,000,000.00 which amount is disputed by State National. This latest agreement had the strengthened management change clause earlier set forth in this opinion.

At a shareholders' meeting on March 7, 1977, Farah sought to have a new board of directors elected to insure his return to management. Farah proposed to the board that he be elected CEO. Several factors induced him to change his mind and to vote for the incumbent board which he believed would elect him CEO anyway. Because of the management change clause, the board declined absent a statement of position from the lenders. The lenders initially refused to assert a position. The board suggested Farah personally present his management proposal to the lenders. He did so at Republic in Dallas on March 14, 1977, stressing his return as CEO was the only way to save FMC. After his presentation, Farah was asked to leave the meeting so the lenders could discuss the matter. State National voiced opposition to Farah. No decision was reached. Farah was informed of their indecision and that a change in CEO could constitute a violation of the management change clause. FMC Director Conroy, unknown to Farah, let the lenders know of his (Conroy's) interest in becoming CEO. Conroy was also a director of State National. As of March 14, the lenders knew that if Leone resigned, his successor would be either Farah or Conroy. As stated, Republic was the agent bank for the lenders, including Prudential. On March 15, Bunten of Republic, assigned the daily handling of the loan to Tom Foster of Republic. Tom Foster hired attorney Donohoe to assist him.

On March 16, Farah talked to Bunten, the senior loan officer of Republic, on a

Page 671



flight to New York and repeated the proposal he had made to all the lenders in Dallas two days before. Farah testified, "[h]e (Bunten) said he felt that we ought to disregard the covenant as being boiler plate, they had it in all of their agreements, and run the business and get the thing back in shape." Farah began planning his return to management. Leone tendered his resignation as CEO on March 17. On March 18, Lerner resigned from the board. (Frost and Kozmetsky had resigned on March 9). Farah nominated three new directors. Only Azar accepted. He was elected. Farah demanded he (Farah) be elected CEO. The directors resisted and Director Conroy asked to be named CEO. Conroy stated the management clause was designed to exclude Farah. Gordon Foster noted a potential default in the loan, and the board named him to talk to the lenders. On March 18 and 19, Gordon Foster talked to Tom Foster, in support of Conroy for CEO. Tom Foster testified from his notes of that meeting that Farah had a probable three of the five directors' votes for CEO. Conroy met with Azar conveying his own desire to be CEO. Azar persisted in his support of Farah in talking to Conroy and Houghton of State National. Azar in speaking to Houghton learned that Houghton believed Farah to be incapable, and he expressed to Azar his bitterness and anger toward Farah in a business sense. Notes prepared by Bettina Whyte of Continental reflect the feeling of that bank that, if Farah were elected he should be strongly controlled and have life made miserable for him.

Attorney Donohoe met with Tom Foster on March 20 to determine his course at the March 21 lenders' meeting. Tom Foster's notes indicate the alternatives discussed. One note indicated Azar was viewed as the swing vote on the board in probable favor of Farah. The lenders met on March 21. State National opposed Farah. Attorney Smith for State National testified that the bank's initial participation in the loan had been reliant upon Farah's noninvolvement in management and the inclusion of the management change clause. Continental's position was similar.

The lenders analyzed the ramifications of FMC's bankruptcy, should a default be declared, and their exposure to liability for changes in FMC management. According to the testimony of Daugherty, President of State National, the lenders felt that their only legitimate options, should Farah become CEO, were to either call the loan or let Farah hold office unmolested. Daugherty testified that neither choice was acceptable to the banks. They were adverse to the bankruptcy of FMC. As FMC was not otherwise in default on the loan at the time, State National was unwilling to put El Paso's largest private employer into bankruptcy.

Notes regarding the lender meeting of March 21 in Dallas appear at pages 8575-76 of the documentary portion of the statement of facts. These were identified by Bettina Whyte of Continental and received in evidence. As identified therein and through Whyte's testimony, it appears that the following were present: attorney Smith, Houghton and Updike from State National, Bunten, Tom Foster and attorney Donohoe from Republic, Jim Wilson and Bettina Whyte. The notes as deciphered by Whyte conclude with Bunten's plan: (1) Willie [Farah] stay on as chairman; (2) Name Conroy or Conroy and Leone as president and COO; (3) Tell Willie we pull the plug if he goes in as CEO; (4) Willie work for merger only; and (5) whoever is running it, follow Willie's plan and be endorsed by Willie. The notes finally conclude with "[w]e'll take any management other than Willie." In addition to the notes, when asked if any decision had been made on March 21 to call the loan if Farah were elected CEO, Whyte responded, "[t]here was no decision."

There is some evidence from State National that the lenders had agreed on March 21 to put FMC on notice that a default would be declared under the management change clause should Farah be elected CEO and to call the loan and to immediately accelerate the debt. However,



Page 672

there is other evidence that a decision regarding default had not been reached on March 21. In addition to the testimony of Whyte, Matkin, Chairman of the Board of State National, testified that he did not think a decision to default had ever been made. Boyer of State National testified that State National had decided to call the loan if Farah returned to CEO; however, he could find no reference to any such decision in the loan committee minutes. Testimony conflicts as to whether a default would occur automatically upon Farah's election or whether it would require a subsequent decision. Tom Foster and Donohoe were instructed to attend the upcoming board meeting and to advise the board of the lenders' position. Donohoe testified by deposition that he was not authorized to tell FMC that there would be a default if Farah was elected, nor was he authorized to say that there would have to be another meeting of the lenders before any default would be declared regarding that as his "business." He maintained that no decision had been made to call the loan at the Dallas meeting of March 21. He responded that to tell the board there might never be a default declared could be misleading. He also acknowledged that telling them that default would not be waived could create the impression there was going to be a default.

Then on March 22, Donohoe drafted a letter conveying the lenders' position to the board. The letter approved by all the lenders was signed by Tom Foster and delivered to Gordon Foster prior to the board meeting to be held that day. Farah testified that at the time of the board meeting he was unaware of the lenders' meeting of the previous day. He anticipated he would be elected CEO and that his election would be approved by Bunten of Republic, to whom he had spoken on the plane trip to New York. The letter of March 22 read in part:

The Banks wish to advise the Board that a change of executive management which includes the election of Mr. William Farah as chief executive of the Company or results in his being the power to generally supervise and control the operations and affairs of the Company is unacceptable to the Banks, and the Banks will not grant any waiver of default based thereon. The Banks are, however, willing to consider a waiver of the default clause ... if the Board decides that a change in the office of the Chief Executive of the Company (involving others than Mr. Farah) is in the best interests of the Company. The Banks do not intend hereby and do not waive any default based on the developments in the Company constituting a material adverse change of circumstances .... The Banks are still considering their position regarding the events which have and are coming to their attention.

Tom Foster testified that the lenders did not want to call the loan and create a default which would result in FMC's bankruptcy. He admitted that, if Farah were elected, the lenders had a choice of either doing nothing or attempting to call the loan. Although the interpretation of the letter was left to the board, he conceded that the statement of the lenders, that they would not waive a default, could have created an impression that there would be a default if Farah were elected. He admitted that the "clear understandings" set forth in the further portion of the letter which read:

Mr. Farah has been making serious efforts to take over the operating management of the company, contrary to what we thought were the clear understandings of the Banks and Company....

were not expressed in the loan agreement. He also conceded that the loan agreement did not pertain to the election of directors.

Gordon Foster presented the letter to the board. Farah disregarded it as inconsistent with what Bunten had told him. J. Farah decided to cast his vote for Leone to remain as CEO. Gordon Foster warned the board it could not vote to put FMC in default and that the loan would probably be called if Farah were elected. Azar testified that the letter gave him the impression



Page 673

that the lenders would close the company or call the loan if Farah were elected. Farah nominated Richard Jaeger and Charles Wood as directors hoping that their presence on the board would insure his election as CEO. Gordon Foster and other directors took exception to these nominations. The meeting was recessed without an election of new directors or CEO.

Afterwards, Gordon Foster met with the lenders and told them of Leone's pending resignation and that Farah, who would continue his efforts despite the letter, would be elected unless he were stopped in some manner. He also told them that Conroy still wanted to be CEO and that Wood and Jaeger would probably be elected at the next day's board meeting. Gordon Foster admitted having testified on a prior occasion that the lenders then discussed the forthcoming removal of Farah. Attorney Smith denied such discussion but admitted the likelihood of Farah's election at that point. Tom Foster also so conceded and added that the lenders would either have to accept Farah or to call the loan. The lenders then met with Leone to confirm his desire to resign as CEO and with Conroy, who expressed his interest in the position.

Gordon Foster, who had earlier agreed to support Conroy, viewed Conroy as the only choice for CEO since Farah was unacceptable to both him and the lenders. Tom Foster supported Conroy since Conroy was the one who State National wanted as CEO.

On March 23, the lenders met to discuss the position they would take at FMC's board meeting to be held later that day. Tom Foster's notes from the meeting reveal the following alternatives: (1) stop the board meeting if the lenders do not want Farah in; (2) get a new board with probable lender indemnification if the lenders want other management; and (3) allow Farah to have the position for 30-60 days after which the loan will be called. Other possible actions included: (1) making a public statement; (2) shrinking the board; and (3) going to New York to sell the company. His notes also reflect: (1) Farah is unacceptable to lenders; (2) based on information received to date, there appears to have been a change in executive management and a material adverse change in the company, both of which are events of default enabling acceleration; (3) institute the plan to declare a default unless the following occurs: (a) an independent board is created with Farah preferably off, and (b) the lenders will make no commitment but will assist the board in finding outside directors (employees unacceptable); (4) lenders want a CEO reaffirmed or elected today; (5) issue a press release stating: (a) election of a new board, (b) a CEO is in place, and (c) Farah endorsed the changes; and (6) Farah should pursue a merger. Foster testified about various factors which he felt constituted a material adverse change. Donohoe differed with Foster's plans to convey to the board that a default would be declared under the management and material adverse change clauses in the event of Farah's election.

Also on March 23, the lenders then met with Azar, J. Farah, Conroy and others at Azar's own place of business in El Paso. Azar described Donohoe as the spokesman for the lender group and said Donohoe opened the meeting by saying that "Willie [Farah] was not acceptable as a chief executive officer and president." Azar said he told Donohoe that Farah was the only one who could turn the company around. When asked what else Donohoe had said, Azar responded, "[w]ell, it got to the point where if Willie Farah was elected president of the company, why, he would automatically bankrupt the company and he would padlock it the next day." Azar said that after talking to attorney Thomas on the phone he came back and told Donohoe that "he could take his loan agreement and shove it up his ass." Azar explained he did that "trying to determine how serious they were about bankrupting and closing the company, what was his intent. I intended to push him to the very brink and very edge and find out." Azar said Donohoe's



response was "[w]e will." Azar said he then believed Donohoe would bankrupt and padlock the company if the board elected

Page 674

Farah. He said as a result of the meeting, "I was fearful of putting the company in bankruptcy. So I agreed to talk to Mr. Farah and ask him to stand down and not stand for election." In regard to Azar's personal liability, although there was considerable testimony to the contrary, Azar testified Donohoe told him that he (Azar) would be personally liable as a director if he caused FMC's bankruptcy by electing Farah. There is evidence that Azar had access to and consulted with legal counsel during the meeting.

Also, at the Azar meeting, J. Farah criticized his father's views on management of FMC and indicated he could not support him for CEO, expressing emotional pressure and danger from the management change clause. There was also a discussion regarding the replacement of Leone as CEO, the unacceptability of Farah for that position and the desire of Conroy to acquire that office. In addition to his own vote, Conroy had J. Farah's support. Initially disagreeing with Conroy's capabilities, Azar reversed his position at the Azar meeting and decided to abandon his support of Farah. Azar also testified that the lenders never told him that they would not, in fact, bankrupt FMC if Farah were elected. Several of those in attendance at the Azar meeting testified that Donohoe did not make any statement regarding bankrupting and padlocking the company. Tom Foster admitted that Azar was not informed of the lenders' meeting of March 21 or any decision that a default would be declared only after Farah's election or that a default might never be declared.

Farah testified that he had Wood and Jaeger present before the board meeting later on March 23, expecting to have them elected to the Board. The same four lender representatives who were present at the meeting at Azar's place of business earlier were also nearby, including attorney Donohoe of Republic. Farah said that prior to the board meeting, Donohoe "started in" on him by telling him that he (Farah) had been a very incompetent person, had lost $37,000,000.00 and that he (Donohoe) was going to put the company into bankruptcy and padlock the doors the next morning. Farah testified Donohoe "pounded on the table right in front of me, right in my face there," and repeated the statement regarding bankrupting the company and padlocking the doors. Farah said he put the papers he was preparing for the meeting in his briefcase and left the room. Farah said he believed what Donohoe told him and "he (Donohoe) scared the devil out of me." Several witnesses testified that neither Donohoe nor any other of the lender representatives told Farah that FMC would be bankrupted or padlocked.

In accordance with his representation that he would talk to Farah, Azar met with Farah prior to the board meeting. Azar testified he told Farah that the lenders wanted Farah to resign as board chairman and to elect in his stead Gordon Foster (an employee of El Paso National Bank) and Conroy (a director of State National) as CEO. Azar asked Farah to stand down and told him of assurances by the lenders that they would bankrupt and padlock the company. Azar said he (Azar) believed there was no other way to save FMC and that the election of Gordon Foster and Conroy was the only way to prevent FMC's bankruptcy. Farah testified he believed what Azar and Donohoe had told him and that after talking to Azar, "I went to the board meeting, nominated Mr. Conroy to be chief executive officer and Mr. Gordon Foster to be Chairman."

Gordon Foster and Conroy were unanimously elected as nominated. Azar testified that his feelings for Conroy had not changed. Gordon Foster testified that in his opinion, in spite of reservations, Conroy was the only one available who could assume the position. The lenders agreed not to deem Conroy's election as an event of default.



There is evidence that Wood and Jaeger were not nominated nor elected at the board meeting due to the lenders' objection to their election. The lenders regarded them as Farah's personal employees and Tom Foster described them as Farah's

Page 675

"puppets." The evidence shows that such an election was unacceptable to the lenders. There is no provision in the loan agreement regarding changes in the board. State National maintains that there is no evidence of any statement being made by a lender representative to a board member regarding the lenders' position on Wood and Jaeger. Gordon Foster testified that they were not elected due to opposition from other board members. Farah testified that it was the March 22 letter which kept him from nominating Wood and Jaeger. It is the State National's position that the election of the CEO depended upon the exercise by Farah of his voting power which Farah knew he had but which he failed to exercise. The minutes of the March 23 board meeting in evidence state in part:

Mr. Donohoe, representing Republic ..., came into the meeting along with Mr. Smith, representing the State National ... as well as Mr. Updike, Senior Vice President of The State National Bank. Mr. Donohoe indicated that the Banks objected to the nomination of Mr. Charles Wood and Mr. Richard Jaeger to the Board .... The Banks would be willing to discuss more positions with responsible individuals. The Banks wanted to be in a position to assure candidates that they could come on the Board without any substantial liabilities to themselves.

Attorney Smith of State National testified that he and Donohoe did not go into the boardroom. Smith did state the opinion, however, that the management change clause prohibited FMC from doing indirectly what it could not do directly (i.e. electing Wood and Jaeger in order to put Farah in control).

FMC cites to testimony and documentary evidence constituting admissions by the lenders of their complicity in the events of March 23. In this respect, notes prepared by Bettina Whyte reflect the insistence by Republic to remove Farah as board chairman and to choose a replacement for Leone acceptable to the lenders. Daugherty was cross-examined regarding an interview of Daugherty by the Texas Business Magazine indicating that State National was instrumental in selecting Conroy as FMC's CEO. Daughtery responded he was not sure he was quoted correctly and that perhaps "instrumental" was too strong a word. Also, a form letter received in evidence, without objection, as Plaintiff's Exhibit No. 138 was sent to from fifty to one hundred of FMC's customers by Houghton on State National letterhead. The letter dated April 18, 1977, states in part:

I am writing this letter to solicit your support of a thing very close to me personally, to the City of El Paso and I believe, to retail trade everywhere. I am sure you have read reams of material about Farah Manufacturing over the past year or more. The company recently went through a control struggle. The creditors, State National Bank of El Paso, Republic National of Dallas, and Continental Illinois of Chicago, blocked such a move because of a covenant in the loan agreement which prohibited change in the Chief Executive Officer without consent of the lender. The company has been through much turmoil and strife during the past six years; we felt this change would not help that situation.

However, now, under the able leadership of William (Bill) Conroy, who held the office of Executive Vice President while I was with Farah, and who recently has been in charge of foreign operations, things will hopefully turn around....



After March 23, Farah pursued merger negotiations with Vanity Fair Corporation (VF). On March 24, the lenders met to discuss the FMC situation. By the end of the month, Tom Foster and other lender representatives had conducted numerous meetings and discussions with Gordon Foster and Conroy concerning FMC's financial condition, rumors of a new move by Farah to regain control and the new director candidates, Pulley, Jaynes and Williams. Bunten, Donohoe and Tom Foster spoke with Pulley regarding his candidacy. Pulley, a long-time employee of Republic, agreed to serve only if he were indemnified by Republic. Republic agreed and executed an

Page 676

indemnity agreement. Continental and State National refused to participate in the proposed indemnity.

By April 1, Bettina Whyte's notes indicate that the "ship has stopped rocking" and the management situation was under control and that Pulley, Jaynes and Williams would be elected as directors. Although the evidence shows that Gordon Foster knew that they would be proposed as directors, neither Farah nor Azar knew that new directors would be elected on April 4. Farah and Azar further testified they were also unaware of who the candidates were until the day of the board meeting. Tom Foster admitted that, on April 4, there was no requirement that additional directors be elected to the board since the existing five directors were sufficient to conduct business.

Upon their arrival at the April 4 board meeting, Pulley, Donohoe and Tom Foster met with Williams, Jaynes, Gordon Foster and Conroy. Williams, a member of the State National Board, was recommended to the board by Conroy, also a member of the State National Board. Williams was elected. Azar cast the only dissenting vote on the basis of a conflict of interest arising from Williams' service on the State National Board. Jaynes, who was nominated by Azar, was elected unanimously. Close to both Farah and Gordon Foster, Jaynes was considered by Farah to be competent and independent.

After the election of Williams and Jaynes, J. Farah resigned from the board to permit the election of Pulley. Pulley was nominated by Farah to fill that vacancy. Azar dissented because of conflict of interest, Pulley's connections with Republic. By resolution, the board unanimously approved the proposed indemnity agreement. An executive committee with essentially the full power of the board was created and included Gordon Foster, Pulley, Williams and Conroy.

FMC emphasizes testimony regarding Pulley's continuing ties to Republic, his efforts for State National and his final approval for Republic's participation in the loan to FMC, and his close association with Tom Foster in other "workout" arrangements such as a Republic loan to another company, Jetco. In that instance Pulley had worked with both Donohoe and Tom Foster. The Jetco loan was made jointly with El Paso National Bank at a time when Jetco was encountering financial problems. El Paso National Bank was the successor trustee to Farah on the trust stock of Clifford and Virginia Farah. Young of El Paso National Bank had been involved in his bank's participation with Republic in the Jetco loan. He had given his approval, at the request of Republic, for Gordon Foster, an employee of his bank, to become chairman of FMC's board. Gordon Foster had dealings with Prudential and was a servicing officer for El Paso National Bank on loans to competitors of FMC. Conroy, a State National shareholder, had loans from State National.

After the April 4 meeting, FMC's board consisted of Farah, Azar, Conroy, Gordon Foster (chairman), Williams, Jaynes and Pulley. Although Farah testified that he voted for each of the new members so as not to cross Donohoe, there is evidence that Farah felt comfortable with the new board as being comprised of good business men. There is also evidence from FMC witnesses regarding the honor,



dedication, ability and contributions of Conroy, Gordon Foster, Williams, Jaynes and Pulley and the fact that none of them breached any fiduciary duty or were dominated by the lenders. State National cites to testimony to support its position that none of the lenders had instructed the directors on how to vote for the director nominees on April 4.

According to FMC, the board became a five-to-two voting board with Farah and Azar in the minority on most occasions. According to State National, there is no evidence that, after March 23, 1977, any particular vote of any FMC director or any of FMC's daily decisions were dictated by the lenders.

The record shows that with FMC's financial condition still declining, while Conroy was CEO, the question of hiring Grisanti

Page 677

and Galef arose. The consulting firm was known to both Continental and Republic. Tom Foster for Republic, acting as agent for the lenders, "respectfully requested" that FMC hire the firm in connection with a revision in the loan agreement. The revision was designed to eliminate existing defaults and to provide additional funds. Tom Foster admitted that there was nothing in the loan agreement which allowed the lenders to name consultants for FMC. On May 27, the board voted to hire Grisanti and Galef for $1,000.00 per day. Farah and Azar voted in favor of retaining the firm. Azar testified he viewed its employment as "pretty much a requirement" to continue or increase the loan. Galef accepted the consultant role.

From the evidence it appears that after concluding that Conroy could not save FMC, Galef proposed to the lenders in June that he replace Conroy as CEO. He indicated to them his plan to make sizeable loan prepayments during the next several months by selling company assets. The lenders approved of his becoming CEO. Galef presented his proposal to the board and expressed that he could have FMC "in the black in 90 days." Tom Foster admitted that Galef's projection for profitability never materialized. Galef also proposed that Farah be used as a consultant in manufacturing and management. At the July 30 board meeting, Galef was unanimously elected as CEO. Farah testified he supported Galef in order to save FMC from Conroy and because Galef had asked him (Farah) to serve as a consultant. Farah viewed this as the only way he could return to management. Azar testified he supported Galef because Galef had agreed to use Farah and because of the continued existence of the management change clause.

State National had expressed opposition to Farah as a consultant. Unable to determine whether Galef's election was adverse to their interests, the lenders did agree to waive the management change clause in favor of Galef's election. The consternation caused by Galef's suggestion to use Farah, according to Tom Foster, was reported to him by Gordon Foster. Once elected, Galef did not use Farah as a consultant.

State National cites to evidence reflecting that FMC's inventories, operations and operating costs were reduced during the several months while Conroy was CEO. Conroy testified that he had been required to take writedowns on inventory that Farah had previously committed the company to purchase. On the other hand, FMC maintains that the evidence shows Conroy was indecisive and inexperienced in merchandising, marketing, sales and manufacturing, and that although he had time to do so, Conroy failed to take any action to remedy problems in the 1977 fall line of products. FMC asserts the evidence shows Conroy maintained unnecessary and excessive administrative expenses and operating costs which included regional sales offices and international manufacturing facilities. FMC lost production contracts because it was unable to timely deliver quality goods. As Conroy continued to miss his budget and sales



projections, FMC's sales and order rates continued to decline. Conroy resigned from the board on September 24, 1977.

FMC also maintains that the evidence shows Galef was inexperienced in the men's apparel business. Galef failed to make improvements in the 1977 fall line and was responsible for introducing the 1978 spring line which was too expensive, poorly priced and contrary to market demand. The spring line, although heavily advertised, received poor public response. As a result thereof, many orders were cancelled and excess inventory accumulated. With FMC losing much of its market to competitors by early 1978, Farah testified that Galef introduced the 1978 fall line with the dominant theme the same as that in the previously unsuccessful spring line.

FMC presented evidence showing that Galef expanded FMC's regional sales operations, increased costs of selling and advertising expenses, maintained high administrative costs and eliminated credit analysis

Page 678

for new customers. He raised employees' salaries but fired or forced the resignation of many of FMC's top salesmen. FMC experienced delivery problems and a decline in manufacturing efficiency. Mill credit deteriorated and interest costs increased. Galef's efforts failed to have FMC meet his forecasts for sales and profits (losses). Orders were cancelled, sales declined and losses continued to increase.

While Galef was CEO, assets of FMC were sold at internationally publicized auctions. The net proceeds from the sales were used to make prepayments on FMC's loan. FMC points to the evidence that the auctions stripped it of valuable assets and that its competitors purchased much of the machinery and equipment for use in competition with FMC and that State National financed the purchase of certain auctioned assets by one of FMC's competitors. FMC presented evidence, as well, that Tom Foster selected the auctioneer, Irving Rosen, and made arrangements for the auction with him; that as a result of the auctions, employee morale suffered and FMC's customers lost confidence in its ability to produce and timely deliver quality goods. Farah and Azar had opposed the board's resolution for the auction of the itemized assets. It is State National's position that the machinery and equipment sold were in excess of FMC's operating needs. The lenders requested FMC to sell the assets pursuant to a promise made by FMC in June, 1976, that it would do so. Such promise had been an inducement for the lenders to make the loan.

It appears that after the April elections, Gordon Foster recognized a responsibility to stay on as board chairman so as to have a hand in choice of management. In May, the lenders noted that Farah was satisfactorily under control. They also noted that FMC would go into bankruptcy if management failed and that this would result in a derivative suit instituted by Farah for failure to represent the shareholders and for interference with management. There was evidence that if the bank loan were called and accelerated that would trigger the acceleration of Prudential's $10,000,000.00 loan as well as put FMC's $10,000,000.00 in debentures in default, resulting in a demand on FMC in excess of $40,000,000.00.

Evidence reveals that the lenders favored an FMC merger with VF Corporation since they felt that VF would relieve them of any liability for past occurrences. The lenders discussed among themselves, a side agreement with VF in fear that control of FMC would revert to Farah if VF failed to pursue its contemplated purchase of newly issued stock and its acquisition of a purchase option and the Farah family voting trust. The proposed agreement provided that the voted stock would be transferred to Jaynes, Pulley, Williams and Gordon Foster, as trustees, if VF were prevented from purchasing the stock or, if after its purchase, it failed to vote the stock for specified directors. It also provided that VF would transfer



the option to the lenders if, within sixty days before expiration, it failed to exercise the option to purchase the Farah family stock in trust. Whyte of Continental testified that the banks had no legal claim against the Farah family stock. Tom Foster testified that Farah was not informed of the side agreement. The lenders met and discussed the matter with representatives of VF, however, the entire VF deal eventually died.

Farah filed a derivative suit to enjoin the November auction of FMC's fabric mill. The proceeds from the auction were intended for prepayment of the loan. Directors (G. Foster, Williams, Jaynes, Galef and Pulley) then filed a suit for damages against Farah. Farah's derivative suit was unsuccessful. He settled with the directors in the other litigation. He, as well as FMC, released the named directors from all liability on claims now asserted against State National. Although State National and Continental refused to participate, Republic agreed to pay for the directors' legal fees that Pulley submitted under his indemnity agreement.

On November 10, 1977, the board passed a resolution calling for Farah's resignation as a director. Although Farah and Azar

Page 679

dissented, they both soon resigned. In January, 1978, Farah gave notice of a proxy fight that he was preparing in order to elect a slate of directors at the March board meeting whereby he could be reinstated as CEO. Clifford and Virginia Farah responded with a suit to remove Farah as trustee under the trust holding their stock. This was viewed by Farah as a measure to force his vote for the incumbent board. There is evidence that the lenders took an active interest to oppose Farah in his proxy fight and in his suit with Clifford and Virginia. Farah prevailed in the suit. This ultimately meant success for him in his proxy fight.

In January, 1978, FMC's financial condition was critical. At this time, the lenders determined that they were no longer willing to finance FMC's day-to-day operations although they did want to maintain some type of a long-term loan. FMC's short-term debts were soon to be due. Prior to Farah's return, the lenders had decided that the loan would be restructured whereby the management change clause would be deleted if: (1) FMC repaid the short-term debt by the middle of February, 1978; and (2) the long-term debt were substantially reduced and prepaid through third party accounts receivable financing. These conditions were met and the way was paved for Farah's return as CEO. The restructuring document originally contained a release for lender liability. When discovered by FMC, it was deleted.

In April, 1978, FMC's financial condition was desperate. Ray Williams (not the same Director Williams previously mentioned), FMC's president at the time of trial, testified that FMC was close to bankruptcy without official declaration of the act. As there was a deficiency in FMC's ready cash for payment of day-to-day operations, many expenses went unpaid. The company had a liquidity deficit exceeding $1,000,000.00 since an overdraw, approximating $1,500,000.00 on the new accounts receivable loan arranged by Galef, had been prepaid to the lenders. Under the newly amended loan agreement, FMC was required to make four consecutive monthly payments, each in the amount of $250,000.00. Sales were down. Expenses were high. The company was selling the wrong products which were also underpriced. There were delivery problems. There was no credit from suppliers. Customer credit restrictions were relaxed and customer relationships had deteriorated. The physical plant was in disrepair and employee morale was low.



Damage testimony regarding actual losses and lost profits primarily came from Killman, a certified public accountant. His calculations were based on an extensive examination of FMC's internal documents and financial statements. He testified FMC's operating loss for the period April 1, 1977, through March 31, 1978, during the leadership of Conroy and Galef, totalled $10,162,000.00. The jury found $2,668,500.00. To determine lost profits Killman used the "trend line methodology." In making the initial calculations, he eliminated the 1972-1974 strike boycott period as being an extraordinary circumstance. To meet a defense objection to this elimination, he recalculated and included the deleted period. He used FMC's actual sales for a base period, first 1959 through 1971, and next 1959 through 1975. He calculated the average sales trend for the indicated years. The trend of increasing sales was then applied to the damage period for a projection of the sales therein. FMC's average profit rate of 10.9 percent of sales for the base period was then applied to projected sales in order to project profits. To arrive at lost profits, projected profits were compared with the actual results. His first lost profit figure (based on 1959-1971) was $51,232,000.00 for the four-year, seven-month damage period. His second lost profit figure (based on 1959-1975) was $24,377,000.00 for the damage period. The jury found $15,482,000.00, well within either of the figures thus dually calculated.

Auction damages were principally evidenced by the testimony of auctioneer Rosen and appraiser expert Kitson and will be further treated under the discussion of Appellant's point attacking the jury's verdict.

Page 680

Killman, previously mentioned, testified as well regarding the lost profits from auction sales. The jury finding of $75,000.00 was substantially below Killman's testimony of $308,000.00 as to this element. His calculation was based on the interest effects of the lower proceeds from such sales, based on the assumption that FMC would have applied the greater amount it claims should have been received to reduce the loan thus reducing the interest required to be paid. Also as to damages, Ray Williams (FMC President at time of trial) testified to the effect of lost capital on sales and profits. Dow, FMC's machine shop manager, testified to damage to FMC due to auction sales and effect on subsequent operations.

Witnesses associated with a major supplier, a retailer (Macy's), as well as a competitor of FMC, each testified as to FMC's condition at the time of Farah's return. Testimony from the supplier reflects that FMC was then selling the wrong products. The retailer testified that FMC couldn't compete with its major competitors since it did not have a viable line of products. It had become an item supplier of selected garments used to fill a line rather than a line supplier of a substantial number of products. A former Levi Straus executive testified that his company felt FMC would disappear from the market as a competitor.

By March 25, 1978, Williams, Jaynes and Gordon Foster had resigned from the board. Pulley and Galef continued to serve on the new board until Pulley's resignation on or about April 7, 1978, and Galef's resignation on April 12, 1978. On April 4, 1978, the FMC board approved the restructured loan agreement. Although FMC failed to make several payments that were due in the spring of 1978, those payments were made in July. By July of 1979, FMC had refinanced and then repaid the loan in full.

FMC cites to considerable testimony regarding Farah's abilities and the high regard in which he is now held by others in the apparel industry for his success in turning FMC around after his return. After his return, he reduced selling and administrative costs, disposed of unusable inventory to generate working capital, expanded international sales and regenerated employee, supplier and retailer confidence in FMC and its products. Since Farah's return to management, FMC has consistently experienced an



increase in sales and profits and has regained its position as an effective competitor with other manufacturers of apparel.

State National, by Points of Error Nos. One through Three, challenges the legal and factual sufficiency of the evidence to support the jury's finding of fraud in special issue Question No. 1A. Point of Error No. One states that there is no evidence to support the finding. In Point of Error No. Two, State National alleges that the trial court erroneously rendered judgment on such finding because as a matter of law FMC does not have an actionable claim for fraud. Point of Error No. Three states that the evidence is factually insufficient to support the finding.

FMC's cause of action for fraud focuses upon the March 22 letter and the statements made by Donohoe to Farah and other board members on March 23 of bankruptcy and padlocking if Farah were elected as CEO. The evidence is legally and factually sufficient, albeit conflicting, that on March 21 the lenders had either decided not to declare a default which would result in FMC's bankruptcy or reached no decision on the matter. Neither position was conveyed to the board. Regardless of the position taken, the "warnings" (representations) made in the letter and by Donohoe are characterized by FMC as false threats constituting fraud.

Fraud may be effected by a misrepresentation. As such, it was held in Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas, 516 S.W.2d 138, 142, 143 (Tex.1974);

A representation consists of words or other conduct manifesting to another the existence of a fact, including a state of mind. It may be made directly to the other or by a manifestation to third persons intended to reach the other. A misrepresentation is a representation which,

Page 681

under the circumstances, amounts to an assertion not in accordance with the facts.

* * *

[T]o constitute actionable fraud it must appear: (1) That a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury. The gist of an action based upon fraud is found in the fraud of defendant and damage to plaintiff. (Emphasis added).

A representation literally true is actionable if used to create an impression substantially false. Blanton v. Sherman Compress Co., 256 S.W.2d 884 (Tex.Civ.App.--Dallas 1953, no writ). A false representation may consist of a deceptive answer or any other indirect but misleading language. North America Life Insurance Company v. Wilburn, 392 S.W.2d 364 (Tex.Civ.App.--Dallas 1965, no writ).

Tom Foster admitted that, although the interpretation of the March 22 letter was left to the board, the letter could have created an impression that there would be a default if Farah were elected as CEO. The letter's author, attorney Donohoe, made the same admission. The Restatement (Second) of Torts sec. 527 (1977) states:

A representation that a maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made:



(a) with the intention that it be understood in the sense in which it is false, or

(b) without any belief or expectation as to how it will be understood, or

(c) with reckless indifference as to how it will be understood.

FMC maintains that the lenders were required to exercise good faith in their representations made to FMC on March 22 and 23. Smith (Attorney for State National) admitted that the parties to the loan agreement were legally obligated to deal in good faith with one another. In regard to good faith, the Texas Business and Commerce Code (Vernon 1968) provides:

Sec. 1.203. Every contract or duty within this title implies an obligation of good faith in its performance or enforcement.

Sec. 1.201(19). "Good faith" means honesty in fact in the conduct or transaction concerned.

FMC also maintains that once the lenders voluntarily conveyed information which was false or misleading (the March 22 letter and the representations attributed to Donohoe) and which would influence Farah and other board members, then the lenders were under a duty to disclose the whole truth regarding any decision on default. Where there exists such a duty of disclosure, a deliberate suppression of material facts constitutes fraud. Wilson v. Jones, 45 S.W.2d 572 (Tex.Comm'n App.1932, holding approved). See also: Restatement (Second) of Torts secs. 529, 551(2)(b) and Comment (g) (1977).

Despite the foregoing arguments and authorities advanced by FMC, State National asserts a two-fold position upon which it maintains that there is no legal basis for an actionable claim of fraud. First, it maintains that fraud cannot arise from a warning of an intention to enforce legal rights. It argues that the issue is not whether the lenders had yet to commit to do what they had warned. Rather, the issue is whether they had a legal right to do it.

State National cites to no cases directly supporting this position. It cannot overcome the legal and factual sufficiency of the evidence that the lenders made false material representations which they knew to be false and which, as intended, were relied and acted upon by Farah and other board members. The representations that a default would be declared and the company bankrupted and padlocked if Farah were elected as CEO concern a material fact and amount to more than a mere opinion, judgment, probability or expectation on the part

Page 682

of the lenders. See: Trenholm v. Ratcliff, 646 S.W.2d 927 (Tex.1983). Compare: Hicks v. Wright, 564 S.W.2d 785 (Tex.Civ.App.--Tyler 1978, writ ref'd n.r.e.). The March 22 letter and representations created a false impression regarding the lenders' decision (or lack of decision) to declare a default.

In the second aspect of this position, State National maintains that fraud cannot arise from a misrepresentation of future performance unless performance of the act is beneficial to the promisee and the promisee is injured by its nonperformance. Simply put, the injury must arise from the nonperformance of the act rather than the mere representation that the act will occur. A number of "false promise" cases are cited which allegedly establish the basis for actionable fraud arising from a false promise. The premise in these cases is asserted to be a promise followed by an injury which results from the nonperformance of what was promised. Thus, there was a transaction in which the plaintiff would have



been "better off" had the defendant done what he promised he would do. This element is argued to be absent in FMC's claim of fraud.

State National's reasoning is unsound. The cited cases deal with promises which, when made, may have been intended to be performed but which were later unperformed. The causes of action arose from breaches of the promised acts. However, the basic element of actionable fraud is a material representation which, when made, is known by the speaker to be false and which results in damage to another. Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas, supra.

This Court in Southwestern Bell Telephone Co. v. Meader Construction Co., 574 S.W.2d 839, 842 (Tex.Civ.App.--El Paso 1978, writ ref'd n.r.e.) stated a rule directly in conflict with the argument raised by State National. It held:

[S]ince the state of mind of a person making a representation is a fact, it is susceptible of being misrepresented and thus can become the basis of a suit for fraudulent representation. Where a promise regarding future action is made with the intent that it will not be performed and is made to deceive a person, then it is actionable as a fraudulent representation. (Emphasis added).

See: Restatement (Second) of Torts sec. 530(1) (1977).

In Trenholm v. Ratcliff, supra, the speaker, having special knowledge of the facts, made a representation regarding the occurrence and existence of such facts in the future. At the time of the representation, the speaker had no actual control over their occurrence or existence in the future. Thus, the representation was recklessly made. The court held at 931:

These are direct representations of present facts which are so intertwined with his future prediction that the whole statement amounts to a representation of facts. A jury finding of recklessness is sufficient to establish a basis for misrepresentation of facts.

FMC is entitled to a claim of fraud for injuries arising from a promise which was not intended to be performed as opposed to a promise which may have been intended to be performed but which was later unperformed. As previously stated, the representations made amounted to more than a mere opinion, judgment, probability or expectation on the part of the lenders.

If a representation is one to do a future act, the intention not to perform that act may be proven by circumstances. Ryan Mortgage Investors v. Berton Land Development Corporation, 586 S.W.2d 887 (Tex.Civ.App.--Beaumont 1978, no writ). Accord: Isenhower v. Bell, 365 S.W.2d 354 (Tex.1963).

As a matter of law, FMC has established a cause of action for fraud. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. One through Three are overruled.

Page 683

Points of Error Nos. Four through Six raise issue with the legal and factual sufficiency of the evidence to support the jury's finding of duress in special issue Question No. 1B. Point of Error No. Four states that there is no evidence to support the finding. In Point of Error No. Five, it is asserted that the trial court erroneously rendered judgment on such finding because as a matter of law FMC does not have an actionable claim for duress. Point of Error No. Six states that the evidence is factually insufficient to support the finding.



FMC's cause of action for duress focuses upon the March 22 letter, the statements made by Donohoe to Farah and other board members on March 23, and the lenders preventing the election of Wood and Jaeger as directors. The most difficult question posed by State National is whether as a matter of law FMC has established a cause of action for duress whereby it may recover damages.

State National advances five reasons why FMC has no legal basis for an actionable claim of duress. First, it asserts that FMC undertook no new obligation to any lender under duress. In this regard, it is asserted none of the lenders received any undue or unjust benefit that can or should be recovered by FMC.

One authority is cited for support of the traditional view that duress is not fraud nor is it, in and of itself, a recognizable tort. However, it is now generally recognized that the remedy for duress is one which is restitutionary in nature whereby the victim seeks either to be relieved from the obligation he assumed under duress or to recover the value of that which he delivered (damages). D. Dobbs, Remedies sec. 10.2 (1973). As to the damages aspect of the remedy, see: e.g., Sanders v. Republic National Bank of Dallas, 389 S.W.2d 551 (Tex.Civ.App.--Tyler 1965, no writ). See generally: 13 Williston on Contracts sec. 1627B (3d ed. 1970); Restatement of Restitution sec. 71 (1937).

In the only Texas case found to address the point, it was held that duress is a tort. Housing Authority of City of Dallas v. Hubbell, 325 S.W.2d 880, 902 (Tex.Civ.App.--Dallas 1959, writ ref'd n.r.e.). There, the court stated:

[Duress] often arises in connection with breach of contract, but it is nevertheless a tort, .... One who sustains damage as a result of being subjected to duress may sue as plaintiff against the wrongdoers. "Economic coercion", the basis of Lewis' cause of action, is generally considered a form of duress.

In Housing Authority, the plaintiff had sought lost profits as a portion of the damages sustained as a result of his being subjected to duress. The jury's finding of damages did not include lost profits. Although the appellate court reversed the judgment awarding damages upon other grounds for recovery, it affirmed that portion of the judgment awarding damages for duress. There was no specific holding upon the plaintiff's right to recover lost profits as damages for duress. The issue of whether FMC is entitled to lost profits will be discussed later.

As noted in Reaugh v. McCollum Exploration Co., 139 Tex. 485, 163 S.W.2d 620, 621 (1942):

The fundamental purpose underlying all rules of damages, other than punitive damages, is to indemnify the injured party for the pecuniary loss suffered by him, placing him as nearly as possible in the position that he would have occupied but for the injury in question.

Pecuniary compensation may be had for an injury done or wrong sustained as a consequence of either a breach of a contractual obligation or a tortious act. H.L. McRae v. Lindale Independent School District, 450 S.W.2d 118 (Tex.Civ.App.--Tyler 1970, writ ref'd n.r.e.).

As to those arguments that FMC undertook no new obligation to any lender under duress and that none of the lenders received any undue or unjust benefit that can or should be recovered by FMC, a better understanding of them can be had by first undertaking a discussion of the next two reasons advanced by State National for

Page 684



maintaining that there is no legal basis for an actionable claim of duress.

The second and third reasons advanced by State National are discussed together. The second reason states that there is no duress from warnings about enforcing or about the consequences of enforcing contractual rights. The third states that there is no duress when there is no imminent harm or when adequate means of protection are available from the courts.

Dale v. Simon, 267 S.W. 467, 470 (Tex.Comm'n App.1924, judgmt adopted) is the leading case as to the elements of and the limitations upon a cause of action for duress. It was there held:

There can be no duress unless there is a threat to do some act which the party threatening has no legal right to do. Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. The restraint caused by such threat must be imminent. It must be such that the person to whom it is directed has no present means of protection.

Further elements stated are in regard to the availability of the courts to the threatening party in the enforcement of his legal right:

Where a demand made is wrongful or unlawful, and it is necessary for the party making such demand to resort to the courts to enforce same, there is no duress, for the one upon whom demand is made has adequate means of protection, and there is no imminent restraint .... But where the party making such demand has, or is supposed to have, the power to injure the business or property interests of the one upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces a compliance with his demand, against the will of such party through fear of injury to his business or property interests, such threats amount to duress, if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof.

It has been held that threatening to do that which a party has a legal right to do cannot form the basis of a claim of duress by business compulsion. The vice arises only when he employs extortive measures, or when, lacking good faith, he makes improper demands. Sanders v. Republic National Bank of Dallas, supra (recovery on a promissory note for "interim" rent allegedly executed in response to a threat to cancel a contract of sale on property from the promisee to the promisor). It was also held in that case that the contract of sale provided for the payment of rent, that the promisee voluntarily executed the promissory note with full knowledge of all facts and without duress, and that the benefit of rental payment accruing to the promisee by the contract of sale supplied the consideration for the execution of the promissory note in payment thereof. Sanders v. Republic National Bank of Dallas, supra, at 554, 555. In another case it was held that devices applied by a party are not coercive when they are foreseeable ramifications of a breakdown in the performance of the threatened party's contractual obligations. Eggleston v. Humble Pipe Line Company, 482 S.W.2d 909 (Tex.Civ.App.--Houston [14th Dist.] 1972, writ ref'd n.r.e.).

For a detailed analysis of the law and related cases on the threatening party's resort to courts, see: Ward v. Scarborough, 236 S.W. 434 (Tex.Comm'n App.1922, judgmt adopted). Of particular note therein is the cited case of Harris v. Cary, 112 Va. 362, 71 S.E. 551 (1911).

FMC's position relies upon the lenders' warnings to declare a default (and to accelerate payment of the loan) having been undertaken in bad faith. It cites to Section 1.208 of the Texas Business and Commerce Code (Vernon 1968) which provides, in pertinent part:



Page 685

A term providing that one party ... may accelerate payment or performance ... "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired.

Even where an insecurity clause is drafted in the broadest possible terms, the primary question is whether the creditor's attempt to accelerate stemmed from a reasonable, good-faith belief that its security was about to become impaired. Sheppard Federal Credit Union v. Palmer, 408 F.2d 1369 (5th Cir.1969). Acceleration clauses are not to be used offensively such as for the commercial advantage of the creditor. They do not permit acceleration when the facts make its use unjust or oppressive. Brown v. Avemco Investment Corporation, 603 F.2d 1367 (9th Cir.1979, citing Vaughan v. Crown Plumbing & Sewer Service, Incorporated, 523 S.W.2d 72 (Tex.Civ.App.--Houston [1st Dist.] 1975, writ ref'd n.r.e.), and Bischoff v. Rearick, 232 S.W.2d 174 (Tex.Civ.App.--El Paso 1950, writ ref'd n.r.e.). The court in Brown also held that Section 1.208 applies to clauses which provide for acceleration at the option of the creditor (at page 1378), and to "default" acceleration clauses (at page 1380).

State National relies upon the holdings in three cases wherein the courts were said to have upheld the enforcement of either optional acceleration or due-on-sale clauses. In Sonny Arnold, Inc. v. Sentry Savings Association, 633 S.W.2d 811, 816 (Tex.1982), the court was merely called upon to decide whether an optional acceleration clause, as executed, was valid and enforceable but in that case there was no allegation that there was anything wrongful or improper in the manner in which the clause was enforced. In Crestview, Ltd. v. Foremost Insurance Company, 621 S.W.2d 816, 820, 823 (Tex.Civ.App.--Austin 1981, writ ref'd n.r.e.), the alleged wrongdoer was found not to have enforced the due-on-sale clause in an unreasonable, inequitable, unjust or oppressive manner. However, the court noted that the issue regarding such conduct is to be determined by the facts of the case. In Casey v. Business Men's Assurance Company of America, 706 F.2d 559 (5th Cir.1983), the alleged wrongdoer acted within the precise rights conferred upon him in a due-on-sale clause. As all of the above-cited cases are factually distinguishable, they do not control the disposition of the duress issue herein.

In Vaughan v. Crown Plumbing & Sewer Service, Incorporated, supra, at 76, equity permitted consideration of the great disparity between the holder's loss of use of an overdue installment and the hardship which would result to the owner of the property if immediate foreclosure were permitted. Further, exercise of an optional right of acceleration, not for the purpose of protecting the debt or preserving the security, but for the purpose of coercing the maker to pay the entire debt or forfeit his property, was relevant to the equitable considerations to be made. Duress may be evidenced when a threatening party acts oppressively to further his own economic interests. Brown v. Avemco Investment Corporation, supra; Mitchell v. C.C. Sanitation Company, Inc., 430 S.W.2d 933 (Tex.Civ.App.--Houston [14th Dist.] 1968, writ ref'd n.r.e.).

The question of duress frequently turns on the motive upon which a claim is based. 13 Williston on Contracts sec. 1607 (3d ed. 1970). According to the Restatement (Second) of Contracts sec. 176 (1981):

(1) A threat is improper if

* * *

(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.



(2) A threat is improper if the resulting exchange is not on fair terms, and

(a) the threatened act would harm the recipient and would not significantly benefit the party making the threat,

... or

(c) what is threatened is otherwise a use of power for illegitimate ends.

Page 686

Economic duress (business coercion) may be evidenced by forcing a victim to choose between distasteful and costly situations, i.e., bow to duress or face bankruptcy, loss of credit rating, or loss of profits from a venture. 13 Williston on Contracts sec. 1617 (3d ed. 1970), citing Housing Authority of City of Dallas v. Hubbell, supra.

There is evidence that the loan to FMC was not in default at the time the warnings were given by the lenders on March 22 and 23. There was then no impaired prospect of repayment but for the perpetuation of FMC's alleged poor financial condition or perhaps for the possibility of Farah's election as CEO (in view of his past performance). Admittedly, his election could have constituted a default under the management change clause thereby enabling the lenders to legitimately enforce their legal rights.

However, there was no circumstance to authorize the manner in which the warnings to declare default were made. This is particularly true when given the evidence that the lenders previously had either decided not to declare a default which would result in FMC's bankruptcy or reached no decision on the matter. For an analogous situation, see: Leeper v. Beltrami, 53 Cal.2d 195, 1 Cal.Rptr. 12, 19, 347 P.2d 12, 19 (1959). That was a suit to recover money paid upon a threat to foreclose on a mortgage which the defendants knew to have been already satisfied. The court held that the defendants, in making such threats, knew that the asserted claim was false. Such constituted duress.

FMC did undertake a new obligation to the lenders under duress. By virtue of the warnings made on March 22 and 23, it became specifically and absolutely obligated not to have Farah elected as CEO. Under the management change clause, however, Farah could have been elected. The board had been under no obligation to see that such would not occur. In the "event" that it did, then it was the legitimate option of the lenders to determine whether or not it should be viewed as a default. Instead, they chose to issue warnings designed to force the board to elect someone other than Farah.

It is argued that the management change clause was approved by the entire FMC board with the clear understanding that the clause could be used to resist an effort by Farah to return as CEO. It is true that use of the management change clause had been perceived by the board in context with the legitimate options available to the lenders. However, the evidence reflects that there was no anticipation of the manner in which it was ultimately used.

The lenders accrued an unjust benefit merely by their efforts to insure that FMC would be managed by those who had been "previously approved." They had the power to injure the business and property interests of FMC upon the issuance of their warnings. The evidence is sufficient that injury was sustained by virtue of the lenders' pressure to have Conroy and others manage FMC and to have Farah excluded from active management.



As admitted by the lenders, legitimate options were at their disposal. Such options, however, were not pursued. The very nature of their warnings constitutes duress. It caused Farah and other board members to do what they would not have otherwise done. That Donohoe threatened to bankrupt and padlock FMC the next day, the threat was made imminent. It gave Farah and others the impression that the only way to save FMC was to submit to the lenders' demand that Farah not be elected. Their legal right to declare default could have been achieved without resort to the courts. Thus, the evidence establishes that the elements of an actionable claim of duress have been met. Dale v. Simon, supra. State National's first three reasons for FMC's nonentitlement to a cause of action for duress are without merit.

Its fourth reason states that FMC's claim of vulnerability to duress cannot be based upon pre-existing financial difficulties for which FMC was responsible. FMC does not contend that the lenders were responsible for its financial condition or situation

Page 687

prior to the time they issued their warnings. However, FMC does maintain that at the time the warnings were made the loan was not in default. Thus, the duress could not have resulted from an existing financial condition. Rather, it turned on the threat of default and imminent bankruptcy and padlocking. There is evidence to support this position.

State National relies heavily upon the case of First Texas Savings Association of Dallas v. Dicker Center, Inc., 631 S.W.2d 179, 185 (Tex.App.--Tyler 1982, no writ), and cases cited therein, for support of its position. In First Texas, the court stated:

It seems to be a settled principle of law that economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress.... A charge of economic duress or business compulsion must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or in his fear of what a third person might do ....

In First Texas, the plaintiff was concerned about his inability to cope with his poor financial condition existing prior to the time of the alleged duress. There, as here, no contention was made that the defendant was responsible for the plaintiff's financial condition. The plaintiff in First Texas testified that he succumbed to the defendant's alleged duress and threat to keep a $40,000.00 CD (a good faith deposit by plaintiff to secure an allegedly breached $2,000,000.00 loan commitment from defendant), but that he did so because he needed funds. Not only did the court find that the defendant had a legal right to retain the good faith deposit, it also found that the plaintiff's pressing need for the $40,000.00 was unsupported by the evidence. It held that there was no duress since the plaintiff's claim was based entirely upon his financial distress for which he was responsible.

The First Texas case and those like it are clearly distinguishable. FMC's claim of duress does not rest upon its pre-existing financial condition as the basis for Farah and other board members having submitted to the lenders' threats. It rests primarily upon the acts and conduct of the lenders and the ramifications carried by their threats. Since FMC's pre-existing financial condition is not relevant to its cause of action for duress, State National's fourth reason is without merit.

Its fifth reason states that the opinions expressed by the lenders as to indirect changes in management, or as to the personal liability of the directors (Azar) for FMC's bankruptcy upon default, do not constitute duress. The first matter involves Farah's attempt to have Wood and Jaeger elected to the board. Tom Foster admitted that the loan agreement did not pertain to the election of directors. There is



evidence that the lenders viewed Wood and Jaeger as personal employees of Farah and that Tom Foster viewed them as Farah's "puppets" and that the lenders viewed the management change clause as prohibiting the election of Wood and Jaeger to enable Farah to indirectly control FMC. There is sufficient evidence that the election of Wood and Jaeger was prevented by the lenders' objection thereto. The cases cited by State National do not directly support its position on the matter. Duress was effected to prevent the election of Wood and Jaeger as were the warnings made in regard to default and bankruptcy.

Although there is no merit to State National's position on the preceding matter, there is merit to its position regarding the statement made to Azar that he would be personally liable as a director if he caused FMC's bankruptcy by electing Farah. There is evidence that the statement was not made by the lenders. Even if it had been made, it was an expression of a legal opinion. Azar had access to legal counsel with whom he conferred on the matter. Thus, the statement could not constitute duress. Dial Temp Air Conditioning Company v. Faulhaber, 340 S.W.2d 82 (Tex.Civ.App.--Dallas 1960, writ ref'd n.r.e.). Despite such a holding, there remains

Page 688

sufficient evidence of other acts constituting duress.

As a matter of law, FMC has established a cause of action for duress. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Four through Six are overruled.

Points of Error Nos. Seven through Nine challenge the legal and factual sufficiency of the evidence to support the jury's finding of interference in special issue Question No. 1C. Point of Error No. Seven states that there is no evidence to support the finding. It is alleged in Point of Error No. Eight that the trial court erroneously rendered judgment on such finding because as a matter of law FMC does not have an actionable claim for interference. Point of Error No. Nine states that the evidence is factually insufficient to support the finding.

Appellee's position in regard to interference centers on this, that the lenders went well beyond their March 22, 1977 letter. Appellee asserts that after Azar's vote was reversed and Farah was neutralized, the lenders continued to interfere with FMC's rights to lawful management and proper corporate governance, by installing Conroy as CEO, forcing Farah's resignation and substituting Gordon Foster as chairman. Appellee further asserts that the evidence shows the lenders prevented the election of Wood and Jaeger to the board, caused J. Farah to resign and packed the board with hand-picked nominees; that they first installed Galef as a consultant and later as CEO; and encouraged and financially supported costly litigation and a proxy fight against Farah when he sought to restore lawful management to the company. Appellee urges that the evidence shows that the lenders' acts of interference were patent, continuing and without justification.

Three reasons are asserted by State National in support of its position that FMC has no legal basis for an actionable claim of interference. The first reason states that the lenders were legally justified and privileged to issue warnings based upon the exercise of contractual rights or upon a financial interest. The second states that there is no evidence showing an intent by the lenders to harm FMC.

Interference with another's business relations with a third party is actionable only if the interference is motivated by malice and no useful purpose of the inducing party is subserved. Morris v. Jordan



Financial Corporation, 564 S.W.2d 180 (Tex.Civ.App.--Tyler 1978, writ ref'd n.r.e.). In Davis v. Lewis, 487 S.W.2d 411, 414 (Tex.Civ.App.--Amarillo 1972, no writ), it was conversely held:

[O]ne may lawfully induce another to refrain from having business relations with a third person, although it injuriously affects such third person, provided his action be to some legitimate interest of his own, and no definite legal rights, such as contract rights, are thereby violated.... Further, one who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor does not employ improper means and acts to protect his interest from being prejudiced by his relations.

One is privileged to interfere with a contract between others when he does so in the bona fide exercise of his own rights or when he possesses an equal or superior interest to that of the plaintiff in the subject matter. Black Lake Pipe Line Company v. Union Construction Company, Inc., 538 S.W.2d 80 (Tex.1976); White v. Larson, 586 S.W.2d 212 (Tex.Civ.App.--El Paso 1979, no writ); Morris v. Jordan Financial Corporation, supra.

In Davis v. Lewis, supra, the court concluded that business relations interference is actionable only if both malice and illegal action combine to produce an injury. Malice, in this connection, is not to be understood in its proper sense of ill will against a person, but in its legal sense, as characterizing an unlawful act, done intentionally without just cause or excuse. Light v. Transport Insurance Company, 469 S.W.2d 433 (Tex.Civ.App.--Tyler 1971,

Page 689

writ ref'd n.r.e.). See: White v. Larson, supra. In this perspective, that malice constitutes an intentional and unlawful interference, then that is all that must be proven to establish a cause of action to recover actual damages. Actual malice (ill will, spite, evil motive, or purposing the injury of another) need not exist. Clements v. Withers, 437 S.W.2d 818 (Tex.1969); Herider Farms-El Paso, Inc. v. Criswell, 519 S.W.2d 473 (Tex.Civ.App.--El Paso 1975, writ ref'd n.r.e.).

In Armendariz v. Mora, 553 S.W.2d 400, 404 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.), this Court held:

To maintain the action for interference with the contract, it must be established that (1) there was a contract subject to interference, (2) the act of interference was wilful and intentional, (3) such intentional act was a proximate cause of Plaintiff's damage, and (4) actual damage or loss occurred.

The proof of these elements establishes a prima facie case of interference. It then becomes incumbent upon the part of the defendant to show that his acts were either justified or privileged. Armendariz v. Mora, supra. See: Herider Farms-El Paso, Inc. v. Criswell, supra. But see: White v. Larson, supra. In all cases, the act of interference must be without legal right or justifiable cause on the part of the defendant. White v. Larson, supra; Herider Farms-El Paso, Inc. v. Criswell, supra.

Interference embraces within its scope all intentional invasions of contractual relations, including any act injuring or destroying property and so interfering with the performance of the contract itself, regardless of whether breach of contract is induced. It presupposes knowledge of the plaintiff's interests or, at least, of facts that would lead a reasonable man to believe in their existence. Tippett v. Hart, 497 S.W.2d 606 (Tex.Civ.App.--Amarillo), writ ref'd n.r.e. per curiam, 501 S.W.2d 874 (1973).



According to the court in Light v. Transport Insurance Company, supra, at 439, interference is wrongful:

[I]f acts complained of do not rest on some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated .... (Emphasis added).

See: Leonard Duckworth, Inc. v. Michael L. Field & Company, 516 F.2d 952 (5th Cir.1975), citing to Light in application of Texas law. Compare: International Bank of Commerce of Laredo v. Union National Bank of Laredo, 653 S.W.2d 539 (Tex.App.--San Antonio 1983, writ ref'd n.r.e.), wherein there was no evidence that the alleged wrongdoer had acted under anything other than a good faith belief that it could exercise certain rights.

A justifiable business interest does not grant absolute privilege to interfere with a contractual relationship between others. Frank Coulson, Inc.-Buick v. General Motors Corporation, 488 F.2d 202, 206, (5th Cir.1974). In determining the propriety of interference, the court in Coulson noted that various factors must be weighed. It stated:

Various important factors have been identified, however, which relate to an appraisal of the private interests of the parties involved as well as to a consideration of the social utility of these private interests. The principal issue thus becomes whether the social benefits derived in permitting acts of intervention outweigh the harm to be expected therefrom.

The jury was instructed in the case now before us as follows:

[A]ny intentional invasion of, or interference with, property or property rights, causing injury without just cause or excuse, constitutes "interference." It must be shown that the conduct was willful and intentional and actual malice need not be shown.

Arguably, the instruction misplaced the burden of proof by requiring FMC to show that acts of interference were without just

Page 690

cause or excuse. Armendariz v. Mora, supra. Yet, it properly eliminated "actual malice" as an element to be proved for recovery. Clements v. Withers, supra. Interference requires only that acts be done willfully and intentionally. This does not require that the acts be shown to have been undertaken with an intent to harm. Armendariz v. Mora, supra.

Regardless of the manner in which the burden of proof was placed, FMC proved a prima facie case of interference by legally sufficient evidence. There is also legally sufficient evidence that acts of interference were undertaken without just cause or excuse.

As its third reason asserted to support the proposition that FMC has no legal basis for an actionable claim of interference, State National argues that there is no evidence of interference with an existing or reasonably probable future contract or business relation. Admittedly, actionable interference has traditionally been found to fall within one of these two categories. See generally: Davis v. Lewis, supra, and other cases cited herein.

The central theme of FMC's case is that the lenders interfered with FMC's own business relations and protected rights. Although the lenders may have been acting to exercise legitimate legal rights or to



protect justifiable business interests, their conduct failed to comport with the standards of fair play. Light v. Transport Insurance Company, supra; Leonard Duckworth, Inc. v. Michael L. Field & Company, supra. Upon consideration of the private interests of the parties and of the social utility thereof, the social benefits derived from permitting the lenders' interference are clearly outweighed by the harm to be expected therefrom. Frank Coulson, Inc.-Buick v. General Motors Corporation, supra.

In view of the foregoing principles, the evidence is legally sufficient that the lenders interfered with FMC's business relations, its election of directors and officers and its protected rights. FMC was entitled to have its affairs managed by competent directors and officers who would maintain a high degree of undivided loyalty to the company. See: International Bankers Life Insurance Company v. Holloway, 368 S.W.2d 567 (Tex.1963); Canion v. Texas Cycle Supply, Inc., 537 S.W.2d 510 (Tex.Civ.App.--Austin 1976, writ ref'd n.r.e.). State National cites to a case involving a suit for the breach by a director of his fiduciary duty to properly manage a company. Meyers v. Moody, 693 F.2d 1196, 1211 (5th Cir.1982) cert. denied 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). There, the court approved an instruction to the jury that directors "are not responsible for ordinary mistakes of business judgment." If State National is relying upon such a principle to diminish its own liability for actions undertaken by FMC's directors, it should have submitted an appropriate instruction. However, it failed to do so.

The evidence is factually sufficient that the interference compelled the election of directors and officers whose particular business judgment and inexperience and whose divided loyalty proximately resulted in injury to FMC. The interference by the lenders was done willfully, intentionally and without just cause or excuse. As a matter of law, FMC has established a cause of action for interference. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Seven through Nine are overruled.

In Points of Error Nos. Ten through Twelve, State National challenges the legal sufficiency of the evidence to support the jury's finding in special issue Question No. 2, that any act or acts inquired about in special issue Question No. 1 proximately caused any damage to FMC, either by fraud (point no. ten), by duress (point no. eleven), or by interference (point no. twelve). In conjunction with the foregoing, it is alleged that: (a) neither State National nor any other lender caused the FMC board's actions; (b) State National is not liable for acts by FMC's directors that FMC has acknowledged were proper; and (c) any alleged injury to FMC resulted from Farah's failure to exercise his voting control.

Page 691

Point of Error No. Thirteen states that the evidence is factually insufficient to support the finding.

The two elements of proximate cause are cause in fact and foreseeability. Both elements must be present and may be established by direct or circumstantial evidence. Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred. McClure v. Allied Stores of Texas, Inc., 608 S.W.2d 901 (Tex.1980). Foreseeability is established by proof that the actor, as a person of ordinary intelligence and prudence should have anticipated the danger to others [by his act]. The rule does not require that he anticipate just how injuries will grow out of the situation. Clark v. Waggoner, 452 S.W.2d 437 (Tex.1970).

Proximate cause is an issue to be determined by the trier of fact. Clark v. Waggoner, supra. It cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force, McClure v. Allied Stores of Texas, Inc., supra, which is based upon reasonable probabilities and which



precludes the fact finder from having to make an arbitrary choice between unproven conclusions. Insurance Company of North America v. Myers, 411 S.W.2d 710 (Tex.1966).

The foregoing rule applies to situations wherein the proof discloses that a given result may have occurred by more than one proximate cause and whereby the fact finder must ascertain the efficient cause. Lenger v. Physician's General Hospital, Inc., 455 S.W.2d 703 (Tex.1970). Where injury or damage has resulted from a wrongful act which is the original cause of an event, in that such event is a part of a chain of events set in motion by a party, such party may be held responsible for the total results. Holt v. Ray, 435 S.W.2d 568 (Tex.Civ.App.--Eastland, 1968, no writ), citing El Paso Electric Co. v. De Nunez, 118 S.W.2d 914 (Tex.Civ.App.--El Paso 1938, writ dism'd). As set forth in Clark v. Waggoner, supra at 440:

The act of a third person which intervenes and contributes a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer if such act ought to have been foreseen.... An act wanting in ordinary care which actively aids in producing an injury as a direct and existing cause need not be the sole cause; but it must be a concurring cause and such as might reasonably have been contemplated as involving the result under the attending circumstances.

Contrary to the arguments of State National, the evidence is legally and factually sufficient that the lenders proximately caused the actions of the board both on and after March 23. Azar was recognized as the swing vote. The evidence is legally and factually sufficient that, the lenders caused: Azar's alteration of his position which had been to support Farah's return as CEO; Conroy's election as CEO; Farah's removal as board chairman; Gordon Foster's election to such position; and the non-election of Wood and Jaeger as directors. The evidence is legally and factually sufficient that, after March 23, the lenders proximately caused: the election of Williams, Jaynes and Pulley as directors; the hiring of the Grisanti and Galef firm as a consultant to FMC; and the sale of assets at auction.

According to State National, the lenders were not involved in FMC's operations. First, it argues that any damages sustained as result of the events on or after March 23 are attributable solely to the problems generated during FMC's prior management. Second, it maintains that none of the management decisions rendered by the board after March 23 were dictated by the lenders. Thus, it cannot be liable for any damages resulting from such decisions. It concludes that FMC's performance during the year in controversy was the product of various "inseparably entwined" circumstances unrelated to any lender. Despite such contentions, there is evidence that the

Page 692

elements of proximate cause (cause in fact and foreseeability) exist. McClure v. Allied Stores of Texas, Inc., supra. The acts of the lenders related to the events of March 23 set in motion a chain of foreseeable events from which FMC sustained injury and for which State National may be held accountable. Clark v. Waggoner, supra; Holt v. Ray, supra.

State National next argues that it was not liable for acts by FMC's directors that FMC has acknowledged were proper. It cites to the release by FMC on the claims asserted against the directors for their conduct on the board. Such claims were noted in the release to be "without merit." The release was introduced as an exhibit by FMC. State National contends that the release now constitutes a binding [judicial] admission by FMC that there was no improper board action for which State National can be held liable. There is no merit to this position.



A five-prong test has been prescribed in order to bind a party to an admission which is made by him or by his witness during the course of a judicial proceeding and which binds the party contrary to an essential fact embraced in his theory of recovery. One of these requirements is that the statement be deliberate, clear and unequivocal. Tex-Wis Company v. Johnson, 534 S.W.2d 895 (Tex.1976). When the statement is modified or explained by the party, it does not constitute a binding judicial admission which would defeat his right of recovery. Esteve Cotton Company v. Hancock, 539 S.W.2d 145 (Tex.Civ.App.--Amarillo 1976, writ ref'd n.r.e.). Where there is testimony by the party (or any of his witnesses) which contradicts the statement, the effect of all such testimony amounts to an equivocation and does not meet the requirement that the statement be clear and unequivocal. William B. Roberts, Inc. v. McDrilling Company, Inc., 579 S.W.2d 335 (Tex.Civ.App.--Corpus Christi 1979, no writ). See: Tex-Wis Company v. Johnson, supra.

Notwithstanding the terms contained in the release, the evidence reflects that certain acts improperly undertaken by FMC's directors now form a basis of FMC's claim against State National. As such, the release may more properly constitute an informal statement made incidentally in the course of judicial proceedings which is inconsistent with FMC's present position. It may be inferred from the release that the facts in issue are not as FMC now claims. Thus, the release is an extra-judicial admission or quasi-admission. It is admissible against, but not conclusive upon, FMC. It merely forms a part of the evidence and its weight and probative force are matters for the jury. Esteve Cotton Company v. Hancock, supra.

In any event, the release does not absolve State National of liability. As stated in McMillen v. Klingensmith, 467 S.W.2d 193, 196 (Tex.1971):

The rule is a simple one. Unless a party is named in a release, he is not released .... a release of a party or parties named or otherwise specifically identified fully releases only the parties so named or identified, but no others.

There is evidence that the election of the CEO depended upon the exercise by Farah of his voting power which Farah knew he had but which he failed to exercise. State National contends that any injury to FMC resulted from Farah's failure to exercise this power. However, the evidence clearly reflects that in March, 1977, Farah was constrained to exercise such power. In early March, 1977, he was threatened with suit by Clifford and Virginia Farah if he attempted to vote their trust stock for a new board or for his return to management. On March 23, he was subject to the warnings by the lenders that FMC would be bankrupted and padlocked if he were elected as CEO.

At the April 4 board meeting, he continued to feel intimidated by Donohoe. At the July 30 board meeting when Galef was elected as CEO, Farah was under the impression that Galef would have him serve as a consultant. Not until late in the year and after he was forced to resign as a

Page 693

director did Farah determine that he had no choice but to exercise his voting power. Even then, it meant a confrontation with Clifford and Virginia Farah on his voting of the trust stock. Under the circumstances, it is not unreasonable that he failed to do so earlier.

State National has offered no legitimate reason why as a matter of law the acts of fraud, duress and interference did not proximately cause any damage to FMC. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Ten through Thirteen are overruled.



Point of Error No. Fourteen challenges the overruling of State National's motion for a new trial due to the erroneous submission of special issue Question No. 1, which asked the jury if State National acting alone or with any of the other lenders committed acts of fraud, duress and interference. We have fully considered the briefs and contentions of the parties regarding this point. We first reject the contention that the court was not afforded an opportunity to correct any errors in the charge so that the case could be properly submitted. See: Northcutt v. Jarrett, 585 S.W.2d 874 (Tex.Civ.App.--Amarillo) writ ref'd n.r.e. per curiam, 592 S.W.2d 930 (Tex.1979). We next determine that the merits of the point were not waived and should be considered. Rule 277, Tex.R.Civ.P. Having considered them, upon examination of the issue in question, the instructions related thereto, we believe the issue and the instructions clearly confined the jury to the facts as pled and proved. The trial court did not abuse its discretion in submitting the issue broadly or in submitting the related instructions. Since the issue and instructions were properly submitted, there was no abuse of discretion in refusing the requested issues and instructions of State National which were unnecessary to assist the jury in answering the questions. See: Union Oil Company of California v. E.J. Richard, 536 S.W.2d 955 (Tex.Civ.App.--Beaumont 1976, no writ). Point of Error No. Fourteen is overruled.

Points of Error Nos. Fifteen and Sixteen raise issue with the legal and factual sufficiency of the evidence to support the jury's finding of actual losses in special issue Question No. 3A. Actual losses were awarded in the amount of $2,668,000.00. Generally, State National contends that there is no evidence that it caused such damages to be incurred or that the losses were attributable to the alleged mistakes of FMC's management during the year in controversy (April, 1977, through March, 1978) or to any lender action as distinguished from circumstances existing or events occurring prior to that time.

Although the uncertainty of damage is not fatal to recovery once the fact of damage is established, it is nevertheless a reasonable degree of certainty with which the extent of damage must be shown. Southwest Battery Corporation v. Owen, 131 Tex. 423, 115 S.W.2d 1097 (1938). Killman testified that FMC's operating loss totaled $10,162,000.00 during the year in controversy. State National argues, however, that there is no evidence with which its liability can be ascertained as to any portion thereof.

Its position is contrary to the evidence here and to the holding in Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2, 415 S.W.2d 890, 896 (Tex.1967). There, the court stated:

It is true that the evidence does not establish to a mathematical certainty the exact amount of damages caused by appellant alone, nor does it separate with exact accuracy the damages caused by appellant from that caused by others ...; but the law does not require such exactness. Where the evidence establishes that a plaintiff has suffered substantial damages, he is not to be denied a recovery merely because others than the defendant contributed to bring about his loss and he is unable to show distinctly the amount of damages contributed by each tort-feasor. All that the law requires is that the best evidence of which a case is susceptible be produced, and if

Page 694

from such evidence the amount of damages caused by the defendant can be inferred or estimated by the jury with reasonable certainty, then the amount of such damages is for the jury.

Compare: Globe Aircraft Corporation v. Thompson, 203 S.W.2d 865 (Tex.Civ.App.--Fort Worth 1947, no writ).



The evidence is legally sufficient to support the jury's finding of $2,668,000.00. Cases cited by State National pertain to situations wherein there was no evidence to support a recovery of damages. The evidence is also factually sufficient to support the finding. Points of Error Nos. Fifteen and Sixteen are overruled.

Points of Error Nos. Seventeen through Nineteen address the legal and factual sufficiency of the evidence to support the jury's finding of lost profits in special issue Question No. 3B. Point of Error No. Seventeen states that there is no evidence to support the finding. In Point of Error No. Eighteen, State National alleges that the trial court erroneously rendered judgment on such finding because as a matter of law FMC is not entitled to a recovery. Point of Error No. Nineteen states that the evidence is factually insufficient to support the finding.

In contrast to the jury's finding of $15,482,500.00, Killman testified that FMC lost profits totaling $51,232,000.00 (by use of the base period of 1959 through 1971). His calculations derived from the base period of 1959 through 1975 reflect lost profits totaling $24,377,000.00.

Numerous reasons are advanced by State National in support of its position that FMC has no legal basis for recovery. First, it is argued that the evidence does not distinguish between the effects of the lenders' alleged conduct and other known factors affecting FMC's profits. This argument is contrary to the holdings in cases previously cited. Clark v. Waggoner, supra; Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2, supra.

Numerous reasons are raised which, when construed together, allege that FMC's lost profits cannot be intelligently estimated. They are: there is no evidence that Killman's base period is comparable to the damage period; his testimony, the only evidence of lost profits, was based upon unproven, incomplete, contradictory and unreliable assumptions; the unpredictability of FMC's business rendered the projection of lost profits conjectural; and FMC was not an established business making a profit at the time of the alleged injury.

Unlike the situation in Birge v. Toppers Menswear, Inc., 473 S.W.2d 79, 85 (Tex.Civ.App.--Dallas 1971, writ ref'd n.r.e.), the evidence is legally sufficient that Killman's base period is comparable to the damage period. This is particularly true if the period of 1959 through 1975 is considered as the one upon which the jury based its finding. As stated in Birge:

If proof of lost profits is to be made by opinions or estimates of loss, these must be predicated upon factual data derived from previous operation of such business; e.g., previous profits earned, and similar facts and circumstances which afford a basis for the computation of such probable losses.

The general rule for the recovery of lost profits by an established business was set forth in Southwest Battery Corporation v. Owen, supra, 115 S.W.2d at 1098:

In order that a recovery may be had on account of loss of profits, the amount of loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in



Page 695

business which might have been expected in light of past development and existing conditions.

Anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations or a change in business, or where there is no evidence from which they may be intelligently estimated. Copenhaver v. Berryman, 602 S.W.2d 540 (Tex.Civ.App.--Corpus Christi 1980, writ ref'd n.r.e.), citing Southwest Battery Corporation v. Owen, supra; General Supply and Equipment Company, Inc. v. Phillips, 490 S.W.2d 913 (Tex.Civ.App.--Tyler 1972, writ ref'd n.r.e.). In Copenhaver, the court utilized the appropriate standards for review in upholding the trial court's judgment which had denied recovery of lost profits. In General, at 920, it was held that there was no evidence in the record to support the estimate of lost profits. The testimony showed that there had never been a profit in the business allegedly damaged. See also: Clarostat Mfg., Inc. v. Alcor Aviation, Inc., 544 S.W.2d 788 (Tex.Civ.App.--San Antonio 1976, writ ref'd n.r.e.), wherein it was held that there was no evidence in the record supporting the conclusion that the profits allegedly lost by the plaintiff were due to the defendant's breach of warranty.

Although the holding was based upon facts inapposite to those herein, the court in Schoenberg v. Forrest, 253 S.W.2d 331, 334 (Tex.Civ.App.--San Antonio 1952, no writ) determined that lost profits would be recoverable if the evidence showed the extent of the damages as a matter of just and reasonable inference. See: Arabesque Studios, Inc. v. Academy of Fine Arts International, Inc., 529 S.W.2d 564 (Tex.Civ.App.--Dallas 1975, no writ).

Under the rules established for a party to recover lost profits, the evidence is legally and factually sufficient that the base and damage periods are comparable, especially in view of Killman's calculations derived from the period of 1959 through 1975, during the latter part of which FMC sustained heavy losses. FMC was an established business despite the fact that it had sustained these losses in the several years preceding the damage period. The omission of the year 1976 from either base period would not affect its ability to recover lost profits. The closely analogous case of Verette v. Travelers Indemnity Company, 645 S.W.2d 562 (Tex.App.--San Antonio 1982, no writ) supports these conclusions. See: Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340 (1955), wherein recovery of lost profits was allowed as to a wholesale business which had been in operation for a short period of time and which had not realized any profits during such period.

State National argues that FMC's recovery is dependent upon uncertain and changing conditions, such as market fluctuations in the men's apparel business. This unpredictability of FMC's business is stated to render the projection of lost profits conjectural. Admittedly, the men's apparel business is volatile in nature due to the changes in market demand. However, in Pace v. Jackson, supra, at 348, the court noted that any recovery of lost profits may be construed as being speculative.

Killman utilized a satisfactory methodology to calculate lost profits. See: White v. Southwestern Bell Telephone Company, Inc., 651 S.W.2d 260 (Tex.1983). Killman's assumptions relied either upon facts in evidence or upon inferences reasonably drawn therefrom. This enabled him to properly render an expert opinion as to the profits lost by FMC. Casey v. Barkley, 527 S.W.2d 256 (Tex.Civ.App.--Corpus Christi 1975, writ ref'd n.r.e.); Wheatheart Feeders, Inc. v. Pletcher, 453 S.W.2d 902 (Tex.Civ.App.--Amarillo 1970, writ dism'd). The factual basis upon which he arrived at his expert opinion and the inadequacy or vulnerability of his opinion goes to the weight and credibility of his testimony rather than its admissibility. Tenngasco Gas Gathering Company v. Fischer, 624 S.W.2d 301 (Tex.App.--Corpus Christi 1981, writ ref'd n.r.e.); Thate v. Texas & Pacific Railway Co., 595 S.W.2d 591 (Tex.Civ.App.--Dallas 1980, no writ); Boyett v.



Page 696

Enders, 456 S.W.2d 701 (Tex.Civ.App.--Waco 1970, no writ).

Thus, the jury was entitled to weigh the evidence regarding lost profits. Apparently, it chose not to accept the entire amount as testified to by Killman. Even if the base period of 1959 through 1975 is the one upon which the jury relied, its finding is within the range of Killman's calculations. As it was free to do so, the jury must have determined that State National was not the sole cause of FMC's lost profits during the damage period.

As a final matter, State National argues that there is no rational basis for an award of lost profits after Farah's return as CEO in 1978. As stated by FMC, no limiting or explanatory instruction on the matter was requested. Notwithstanding that, the principal case upon which State National relies is not dispositive. Lewis v. Mobil Oil Corporation, 438 F.2d 500 (8th Cir.1971).

Lewis involved a cause of action for breach of warranty. The plaintiff, a sawmill operator, was allowed to recover lost profits for the period during which he was attempting to operate his machinery with defective oil acquired from the defendant. However he was not permitted to recover lost profits for the period following his discovery of the oil's unsuitability and during which he began using oil that was satisfactory. It was the plaintiff's contention that he was entitled to such recovery because of the expenses and shut-down time experienced during the period when the defective oil was in use. The court held in Lewis, supra, at 508:

The failure to produce at full capacity during the period when he was not using [the defective oil] was not due to a breach of warranty but was clearly due to the plaintiff's capital resources. The defendant oil company cannot be held responsible for the capitalization of plaintiff's business. If it is indeed the case, as plaintiff contends, that there was a readily available market for his extra production at a reasonable profit, surely there were conventional sources available to finance this production.

At trial, Ray Williams testified that there had been a reduction in working capital during the damage period and that FMC had not fully recovered from the depressed sales and profits resulting therefrom. There is evidence that other problems were experienced during the leadership of Conroy and Galef which had an impact upon FMC's sales and profits. For these reasons, Lewis is distinguishable. FMC is entitled to the recovery of damages which would place it as nearly as possible in the position it would have occupied but for the injury in question. Reaugh v. McCollum Exploration Co., supra.

As a matter of law, FMC is entitled to the recovery of lost profits. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Seventeen through Nineteen are overruled.

Points of Error Nos. Twenty through Twenty-two concern the legal and factual sufficiency of the evidence to support the jury's finding of auction damages in special issue Questions Nos. 3C and 3D. In Point of Error No. Twenty State National contends that there is no evidence that State National was responsible for FMC's selection of the auction method of sale nor that the amount received was less than the market value. State National argues that the jury finding in special issue Question No. 3C was calculated pursuant to the claim that it was responsible for the fact of sale and that there is no evidence of a market value other than the auction market for assets sold and thus no basis for the jury's apparent finding of some market value other than that established at the October auction. For the reasons set forth in regard to Point of Error No. Twenty, State National asserts in Point of Error No. Twenty-one that



recovery of lost profits from auction sales is improper because as a matter of law FMC is not entitled thereto and that there is no evidence of any such loss of profits. State National argues that the interest effects as testified to by Killman do not constitute lost profits and that Killman's theory is invalidated due to his

Page 697

oversight of the fact that the loss of profits relies upon orderly liquidation value contemplated by the disposition of assets through protracted and piecemeal sales, and if the proceeds from such sales were used to pay down the loan, then payments would be piecemeal and would at times be different. Point of Error No. Twenty-two contends the evidence is factually insufficient to support the finding of any damages arising from the auction sales.

We refer first to the rule as stated in Wendlandt v. Wendlandt, 596 S.W.2d 323, 325 (Tex.Civ.App.--Houston [1st Dist.] 1980, no writ):

Fair market value has been consistently defined as the amount that a willing buyer, who desires to buy, but is under no obligation to buy would pay to a willing seller, who desires to sell, but is under no obligation to sell.... This standard or test presupposes an existing, established market.

The lower of Kitson's figures ($1,300,670.00) which he described as the orderly liquidation value of the assets sold, fits within this definition. Despite the fact that no other markets were shown by Kitson to exist, the jury was entitled to rely upon the lower figure. Lo-Vaca Gathering Co. v. Moore, 403 S.W.2d 161 (Tex.Civ.App.--Austin 1966, no writ). Kitson testified that the orderly liquidation value was basically the same as fair market value in this instance. However, he also provided the jury with two figures, $1,300,670.00 as the orderly liquidation value and $1,600,775.00 as fair market value. We believe the Appellee is bound by such testimony to the lower figure under the charge of the court. It is clear that the jury employed the larger figure. In other words, the jury took the larger of Kitson's figures, $1,600,775.00, and subtracted the gross proceeds received from the auction, that is $878,926.23, to arrive at their verdict of $721,848.77 in response to special issue Question No. 3C. A jury is entitled to weigh expert testimony regarding the value of the property and any damage sustained thereto. Maxey v. Texas Commerce Bank of Lubbock, 571 S.W.2d 39 (Tex.Civ.App.--Amarillo 1978), writ ref'd n.r.e. 580 S.W.2d 340 (1979). However, the evidence only supports deducting the proceeds from $1,300,670.00 and a verdict of $421,743.77 in response to special issue Question No. 3C. Appellee's suggestion of remittitur at page 206 of its original brief should be granted in the sum of $300,105.00, this Court finding the damages specified to be excessive in that amount. A reviewing court may reduce the amount of the trial court's judgment to conform to the evidence. In doing so, we are empowered to reform the judgment entered. Wenk v. City National Bank, 613 S.W.2d 345 (Tex.Civ.App.--Tyler 1981, no writ), and cases therein cited. Aside from the excess in damages, State National has not advanced any authoritative reason why FMC is not entitled to recovery of auction damages as a matter of law. With the reformation of the damages in special issue Question No. 3C, the evidence is legally and factually sufficient to support the jury's findings of auction damages. Points of Error Twenty through Twenty-two, aside from the reformation under Point of Error Twenty-two, are overruled.

Point of Error No. Twenty-three urges error in the damage submission contained in special issue Question No. 3 and the accompanying instruction on "market value." We have considered all of Appellant's contentions regarding this question and believe that the trial court, in exercising its discretion, properly submitted the issue and instructions to enable the jury to make an award of damages on proper grounds and correct principles of law. Any error arising from the instructions has been remedied by our



reduction of the jury's findings as to auction damages. From an examination of State National's requested instructions, we believe the trial court did not abuse its discretion in refusing to submit them, as they were unnecessary to assist the jury in answering the various questions regarding damages. Thomas v. Oil & Gas Building, Inc., 582 S.W.2d 873 (Tex.Civ.App.--Corpus Christi 1979, writ ref'd n.r.e.). Specifically, we

Page 698

respond to Appellant's requested instructions relating to lost profits for duress and fraud. As to duress, duress is a tort in Texas. Housing Authority of City of Dallas v. Hubbell, supra. The fundamental principle underlying all rules of damages, other than punitive, is to indemnify the injured party for the pecuniary loss suffered, to place him as nearly as possible in the position he would have occupied but for the injury. Reaugh v. McCollum Exploration Co., supra and see: McClung Cotton Co., Inc. v. Cotton Concentration Co., 479 S.W.2d 733 (Tex.Civ.App.--Dallas 1972, writ ref'd n.r.e.). As to fraud the measure is that which affords the complaining party the amount of loss resulting directly and proximately upon him. Morriss-Buick Co. v. Pondrom, 131 Tex. 98, 113 S.W.2d 889 (Tex.Comm'n App.1938, opinion adopted); Traylor v. Gray, 547 S.W.2d 644 (Tex.Civ.App.--Corpus Christi 1977, writ ref'd n.r.e.). Fraud allows recovery for lost income. Success Motivation Institute, Inc. v. Lawlis, 503 S.W.2d 864 (Tex.Civ.App.--Houston [1st Dist] 1973, writ ref'd n.r.e.) and for loss of probable yield of crops. International Harvester Company v. Kesey, 507 S.W.2d 195 (Tex.1974). FMC is entitled to recovery for duress and fraud. Furthermore, lost profits are recoverable for tortious interference. Beam v. Voss, 568 S.W.2d 413 (Tex.Civ.App.--San Antonio 1978, no writ); Tippett v. Hart, supra. Nor do we believe that special issue Questions Nos. 3A and 3B permit a double recovery. In view of the evidence which distinguished actual losses from lost profits, we need not suspect that the jury confused the terms. Both are terms of common usage and meaning which can be readily understood. See: Mangham v. Hall, 564 S.W.2d 465 (Tex.Civ.App.--Corpus Christi 1978, writ ref'd n.r.e.). Point of Error No. Twenty-three is overruled.

Points of Error Nos. Twenty-four and Twenty-five challenge the legal and factual sufficiency of the evidence to support the conspiracy finding of the jury in response to special issue Question No. 1. An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Massey v. Armco Steel Company, 652 S.W.2d 932 (Tex.1983). We believe the evidence is legally and factually sufficient to establish all essential elements of an actionable civil conspiracy set forth in Massey v. Armco Steel Company, supra. Points of Error Nos. Twenty-four and Twenty-five are overruled.

Point of Error No. Twenty-six urges error in the admission of a substantial amount of evidence which Appellant contends had the cumulative effect of prejudicing State National. The point concerns forty-five documents and four hundred pages of testimony. Even with a liberal interpretation of Rule 418(d) Tex.R.Civ.P., the point is multifarious. Appellant's argument that the cumulative effect is prejudicial merely compounds the problem of directing the court's attention to the error relied upon and of enabling the Court to determine the question of reversible error. Rule 418(e) Tex.R.Civ.P. Nor has Appellant demonstrated that the evidence complained of was reasonably calculated to and probably did cause the rendition of an improper judgment. See: Hernandez v. Heldenfels, 374 S.W.2d 196 (Tex.1963); Pittman v. Baladez, 312 S.W.2d 210 (Tex.1958). Point of Error No. Twenty-six is overruled.



By Point of Error No. Twenty-seven, State National asks this Court to reverse and render, or alternatively, reverse and remand. We have determined that the proper disposition is to reform and affirm. The point is overruled.

FMC urges one cross-point and two conditional cross-points. The first complains of the trial court's definition of malice in regard to exemplary damages. The other two concern exclusion of certain evidence in regard to damages and the court's failure to order production of certain documents. We find no merit in any of the cross-points. Its first point has not been preserved. Chappell v. Dwyer, 611 S.W.2d 158 (Tex.Civ.App.--El Paso 1981,

Page 699

no writ). As to the damage point, the "before and after" approach is the accepted method of calculating lost profits in Texas. Southwest Battery Corporation v. Owen, supra. In regard to the production question, the attorney-client privilege precluded production. Maryland American General Insurance Company v. Blackmon, 639 S.W.2d 455 (Tex.1982). Appellee's cross-points are overruled.

Appellee's suggestion of remittitur in the sum of $300,105.00 is granted and the trial court's judgment is reformed to award Appellee judgment in the total sum of $18,647,243.77 (instead of $18,947,348.77). Otherwise, the judgment of the trial court is in all things affirmed.

Reformed, and as reformed, affirmed.



**Page 1**
**PASTOR BOBBY BROADNAX, Appellant,**
**v.**
**KROGER TEXAS, L.P. AND SECURITAS SECURITY SYSTEMS U.S.A., INC., Appellee.**
**No. 05-04-01306-CV.**
**Court of Appeals of Texas, Fifth District, Dallas.**
**Opinion Filed August 24, 2005.**
**On Appeal from the County Court at Law No. 1, Dallas County, Texas, Trial Court Cause No.**
**CC-03-10763-A.**
**Affirmed.**
**Before Justices MORRIS, LANG, and MAZZANT.**
**MEMORANDUM OPINION**
**Opinion By Justice LANG.**

Appellant, Pastor Bobby Broadnax,[1] appeals the trial court's final summary judgment in favor of appellees, Kroger Texas, L.P. (Kroger) and Securitas Security Systems U.S.A., Inc. (Securitas),[2] for matters arising from his false imprisonment claim.

In ten issues, Broadnax argues the trial court erred when it granted traditional summary judgment in favor of Securitas, and traditional and no-evidence summary judgment in favor of Kroger. Broadnax complains the trial court erred because: (1) he is a consumer under the Texas Deceptive Trade Practices Act (DTPA) as it applies to his claims; (2) there is an issue of fact regarding the terms of the contract between Securitas and Kroger; (3) he was a third-party beneficiary under the contract between Securitas and Kroger; and (4) Texas law does not require the establishment of an agency relationship to affix vicarious liability for his DTPA and false imprisonment claims.

For the reasons set out below, we decide Broadnax's ten issues against him. We affirm the trial court's final summary judgment. Because the issues in this appeal are well settled, we issue this memorandum opinion. *See* Tex. R. App. P. 47.4.

I. FACTUAL AND PROCEDURAL BACKGROUND

In 1994, Securitas contracted with Kroger to provide security services at Kroger's store in Bellaire, Texas. That contract provided for "general security services," including uniformed guards on the premises, but not for the protection of customers. No third parties were mentioned in the contract.

On April 23, 2003, Broadnax entered the Kroger store, paid for items at the pharmacy, then proceeded toward the exit doors. Before reaching the exit, Broadnax was approached by a male security guard. Broadnax was 6'2" tall and weighed 250 pounds. The male security guard was between 5'5" and 5'8" tall, and weighed approximately 150 pounds. The record does not reflect that the security guard was armed.

The security guard asked to see Broadnax's bags. Broadnax asked whether such a search was "normal store policy." The security guard said that it was not, and again, in a "louder" voice, asked to search the bags. Broadnax held up his bags and allowed the security guard to check their contents against his receipt. The security guard patted Broadnax down and then, he walked away.

The encounter between Broadnax and the security guard lasted less than five minutes. During this encounter, the security guard did not: (1) put his hands on Broadnax to move or confine him; (2) ask Broadnax to go to some other part of the store; or (3) tell Broadnax he could not leave the store.



Broadnax sued Kroger and Securitas for false imprisonment, breach of contract, and violation of the DTPA. Securitas filed a motion for traditional summary judgment seeking judgment, as a matter of law, on Broadnax's causes of action. Broadnax responded with his two page, two paragraph affidavit and excerpts from his deposition. Securitas generally objected to Broadnax's affidavit claiming: (1) it makes conclusory statements of fact and law without offering legal or factual support; and (2) it is a sham affidavit because it contradicts Broadnax's deposition testimony. Also, Securitas specifically objected to paragraph two of Broadnax's affidavit claiming: (1) it presents improper legal conclusions; (2) it gives opinions that are not within Broadnax's personal knowledge; (3) it constitutes hearsay; and (4) it contradicts Broadnax's earlier deposition testimony. The trial court overruled Securitas's general objections and sustained its specific objections to paragraph two of the affidavit. Also, the trial court granted Securitas's motion for traditional summary judgment without stating the grounds for its decision.

Approximately one month after Securitas filed its motion for traditional summary judgment, Kroger filed its own motion for traditional and no-evidence summary judgment. Broadnax responded with the same affidavit and deposition testimony he offered in opposition to Securitas's motion for traditional summary judgment. Kroger objected to Broadnax's affidavit. Kroger's objections were identical to Securitas's objections. The record does not contain a ruling on Kroger's objections. The trial court granted Kroger's motion for summary judgment, which requested summary judgment on both traditional and no-evidence grounds, without stating the grounds for its decision and issued its final summary judgment ordering that Broadnax take nothing on any of his claims.

## II. EVIDENTIARY CONSIDERATIONS

Kroger argues we may not consider Broadnax's affidavit because it was excluded by the trial court and Broadnax has not properly challenged the trial court's ruling on appeal. As a result, before we may address the merits of Broadnax's issues, we must determine whether we may consider Broadnax's affidavit.

The record shows the trial court expressly overruled Securitas's general objections and sustained it's specific objections to paragraph two of Broadnax's affidavit. Broadnax does not appeal the trial court's ruling that sustained Securitas's objections to paragraph two of his affidavit. Accordingly, we do not consider any of the testimony in paragraph two of Broadnax's affidavit when evaluating whether the trial court erred when it granted traditional summary judgment in favor of Securitas.

### A. Kroger's Objections to Broadnax's Affidavit

Kroger generally objected to Broadnax's affidavit claiming: (1) it makes conclusory statements of fact and law without offering legal or factual support; and (2) it is a sham affidavit because it contradicts Broadnax's deposition testimony. Kroger's general objections state the following:

**1. General Objections:** Throughout his affidavit, Bobby Broadnax makes conclusory statements of fact and law without offering legal or factual support. These conclusory statements are improper summary judgment evidence. [citations omitted]. Since almost all of the statements made in the affidavit are conclusory, [Kroger] prays that the affidavit of Bobby Broadnax be stricken in its entirety.

Moreover, [Kroger] objects to this sham affidavit, in that it appears to be contradicted by [Broadnax's] earlier deposition testimony in an attempt to create a fact issue. A "sham" affidavit is one that contradicts the affiant's earlier testimony for the purpose of creating a fact issue to avoid summary judgment. [citation omitted]. A party cannot defeat a motion for summary judgment with an affidavit contradicting earlier testimony without explaining a reason for the change. [citations omitted].



Also, Kroger specifically objected to paragraph two of Broadnax's affidavit claiming: (1) it presents improper legal conclusions; (2) it gives opinions that are not within Broadnax's personal knowledge; (3) it constitutes hearsay; and (4) it contradicts Broadnax's earlier deposition testimony. Kroger's specific objections state the following:

**2. Paragraph 2:** [Kroger] objects to the improper legal conclusions and opinions presented herein that are not within [Broadnax's] personal knowledge, as well as hearsay contained herein.

[Kroger] further objects to this paragraph because it is in contradiction to [Broadnax's] earlier testimony. For example, in [Broadnax's] [affidavit, he states that the Securitas employee "intentionally blocked my path to the exit of the store." He further states that the Securitas employee" restricted my movement. . . ." In his deposition, [Broadnax] testified that the Securitas security guard merely stood in front of him and did not physically block the entire path of the aisle in which they were standing at the time of the encounter in question. [reference omitted].

Moreover, in his Affidavit [sic], [Broadnax] states that the Securitas employee "made it clear to me that I was not free to leave until he finished with whatever investigation he was going to do." However, in his deposition, [Broadnax] testified that the Securitas security guard never told him that he could not leave the store during the encounter in question. [reference omitted].

Paragraph two of Broadnax's affidavit states:

2. On April 23, 2003, I was detained by a Securitas employee in the Kroger store at 10677 East Northwest Highway in Dallas, Texas. All of the employee's actions were done without my consent. The employee intentionally blocked my path to the exit of the store. The employee interfered substantially with my liberty. The employee restricted my movement without my consent. The employee made it clear to me that I was not free to leave until he finished with whatever investigation he was going to do. The employee yelled at me in a loud and unprofessional tone, and demanded that I permit him to search my bags. This threat of detention inspired in me a just fear of injury to my person, reputation, or property. In my opinion, it was the employee's specific intent to confine and detain me in order to subject me to an unreasonable search.

*B. Trial Court's Rulings on Kroger's Objections*

Kroger contends we may not consider Broadnax's affidavit because the trial court orally sustained its objections to his affidavit, excluding it from evidence. In the alternative, Kroger contends it is implied that the trial court sustained its objections because the trial court sustained Securitas's objections.

1. Trial Court Did Not Expressly Rule

There is nothing in the record showing the trial court ruled on any of Kroger's objections to Broadnax's affidavit. Kroger claims the trial court orally sustained its objections to Broadnax's affidavit. However, no reporter's record has been filed in this case. We conclude there is no express ruling by the trial court sustaining Kroger's objections to Broadnax's affidavit. Accordingly, we review the record to determine whether the trial court implicitly sustained Kroger's objections.

2. Trial Court Implicitly Ruled

The record shows Kroger and Securitas both objected to Broadnax's affidavit on the same grounds. The trial court expressly overruled Securitas's general objections and sustained it's specific objections to



paragraph two of Broadnax's affidavit. Also, the trial court granted summary judgment in favor of both Kroger and Securitas.

The Texas Rules of Appellate Procedure permit a trial court's ruling to be either express or implicit. *See* Tex. R. App. P. 33.1(a)(2)(A). A ruling is implicit if it is unexpressed, but capable of being understood from something else. *Well Solutions, Inc. v. Stafford,* 32 S.W.3d 313, 316 (Tex. App.-San Antonio 2000, no pet.). For there to be an implicit ruling on a party's objections to summary judgment evidence, there must be some indication that the trial court ruled on the objections in the record or in the summary judgment itself, other than the mere granting of the summary judgment. *See e.g., SSP Partners v. Gladstrong Investments (USA) Corp.,* No. 13-02-671-CV, 2005 WL 774505 (Tex. App.-Corpus Christi 2005, no pet. h.).

There is a split of authority regarding whether, pursuant to Texas Rule of Appellate Procedure 33.1(a)(2)(A), an objection to summary judgment evidence can be preserved by an implicit ruling without a written, signed order. *Stewart v. Sanmina Texas L.P.,* 156 S.W.3d 198, 206 (Tex. App.-Dallas 2005, no pet.); *Allen ex rel. B.A. v. Albin,* 97 S.W.3d 655, 661-63 (Tex. App.-Waco 2002, no pet.). However, it is clear the better practice is for the trial court to disclose, in writing, its rulings on all evidence before the time it enters the order granting or denying summary judgment. *See Stewart,* 156 S.W.3d at 206; *Allen,* 97 S.W.3d at 663. On this record, we decline the invitation to conclude the trial court implicitly ruled on Kroger's objections. Accordingly, we review Kroger's objections to determine if Kroger preserved them for appeal and, if so, whether Kroger's objections prohibit us from considering Broadnax's affidavit.

*C. Preservation*

For preservation purposes, an appellate court treats a party's objections to defects in the "form" and "substance" of a document differently. *See Choctaw Properties, L.L.C. v. Aledo I.S.D.,* 127 S.W.3d 235, 241 (Tex. App.-Waco 2003, no pet.). Defects in the form of the affidavit must be objected to and the opposing party must have the opportunity to amend the affidavit. *Brown v. Brown,* 145 S.W.3d 745, 751 (Tex. App.-Dallas 2004, pet. denied). The failure to obtain a ruling on an objection to the form of the affidavit waives the objection. *Id.* For example, objections to defects in the form of an affidavit include: (1) lack of personal knowledge; (2) hearsay; (3) statement of an interested witness that is not clear, positive, direct, or free from contradiction; and (4) competence. *See Stewart,* 156 S.W.3d at 207 (lack of personal knowledge and hearsay); *Choctaw,* 127 S.W.3d at 241 (interested witness, hearsay, and lack of personal knowledge); *Rizkallah v. Conner,* 952 S.W.2d 580, 585-86 (Tex. App.-Houston [1st Dist.] 1997, no pet.) (lack of personal knowledge and competence).

Defects in the substance of an affidavit are not waived by the failure to obtain a ruling from the trial court on the objection, and may be raised by an appellee for the first time on appeal. *See Stewart,* 156 S.W.3d at 207. Substantive defects are those that leave the evidence legally insufficient, and include affidavits which are nothing more than legal or factual conclusions. *Stewart,* 156 S.W.3d at 207. For example, objections to defects in the substance of an affidavit include: (1) conclusory statements; and (2) lack of jurat. *See Stewart,* 156 S.W.3d at 207 (conclusory); *Brown,* 145 S.W.3d at 751 (conclusory); *Choctaw,* 127 S.W.3d at 241-42 (lack of jurat and conclusory).

1. Objections to Defects in the Form of Broadnax's Affidavit

Kroger's general objection that Broadnax's affidavit is a sham affidavit because it contradicts his deposition testimony is an objection complaining of a defect in the form of his affidavit.[3] *See Choctaw,* 127 S.W.3d at 241 (objection that statement of an interested witness is not clear, positive, direct, or *free from contradiction* is defect of form complaint). Also, Kroger complains of a defect in the form of Broadnax's affidavit in its specific objections that complain paragraph two of the affidavit: (1) gives



opinions that are not within Broadnax's personal knowledge; (2) constitutes hearsay; and (3) contradicts Broadnax's earlier deposition testimony. *See Stewart,* 156 S.W.3d at 207; *Choctaw,* 127 S.W.3d at 241.

We conclude Kroger's objections that Broadnax's affidavit is a sham affidavit, is not within his personal knowledge, is hearsay, and contradicts his deposition testimony have not been preserved for appellate review because Kroger did not obtain an express or implied ruling on these objections and they allege defects of form. *See e.g., Choctaw,* 127 S.W.3d at 241. Accordingly, we must review the record to determine whether Kroger's remaining objections complaining of a defect in the substance of Broadnax's affidavit prohibit us from considering it when reviewing the merits of his appeal.

2. Objections to Defects in the Substance of Broadnax's Affidavit

Kroger's remaining objections to Broadnax's affidavit which complain of a defect in the substance of the affidavit are: (1) Kroger's general objection that Broadnax's affidavit makes conclusory statements of fact and law without offering legal or factual support; and (2) Kroger's specific objection that paragraph two of his affidavit presents improper legal conclusions.

Kroger does not identify which statements in the affidavit are conclusory and improper legal conclusions, or describe the basis for its objections. It is unclear how the unidentified statements in the affidavit are conclusory or improper legal conclusions. Kroger's objections are not sufficiently specific. *See Stewart,* 156 S.W.3d at 207. Accordingly, we conclude that we may consider Broadnax's affidavit in our review of the merits of his appeal as to Kroger because Kroger has not shown that Broadnax's affidavit is substantially defective.

III. SUMMARY JUDGMENT STANDARD OF REVIEW

When the trial court does not specify the basis for its summary judgment, the appealing party must show on appeal that each independent ground alleged is insufficient to support the summary judgment granted. *See FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000);*Star-Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995); *see also Adams v. First Nat. Bank of Bells/Savoy,* 154 S.W.3d 859, 867 (Tex. App.-Dallas 2005, no pet.); *Caldwell v. Curioni,* 125 S.W.3d 784, 789 (Tex. App.-Dallas 2004, pet. denied). Both the no-evidence and traditional grounds for summary judgment are evaluated to determine whether the trial court was correct under any theory. *See Alaniz v. Hoyt,* 105 S.W.3d 330, 344 (Tex. App..Corpus Christi 2003, no pet.); *McKillip v. Employers Fire Ins. Co.,* 932 S.W.2d 268, 270 (Tex. App..Texarkana 1996, no pet.). An appellate court must affirm the summary judgment if any one of the movant's theories, which supports the summary judgment, has merit. *Star-Telegram,* 915 S.W.2d at 473; *Adams,* 154 S.W.3d at 867.

*A. Traditional Summary Judgment*

The standard for reviewing a traditional summary judgment under Texas Rule of Civil Procedure 166a(c) is well established. *See Sysco Food Servs. v. Trapnell,* 890 S.W.2d 796, 800 (Tex. 1994); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548-49 (Tex.1985); *see also Caldwell,* 125 S.W.3d at 789. A traditional summary judgment is reviewed *de novo* to determine whether a party's right to prevail is established as a matter of law. *Caldwell,* 125 S.W.3d at 789; *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex. App.-Dallas 2000, pet. denied). When reviewing the record in an appeal involving a traditional summary judgment, the reviewing court must: (1) place the burden of showing that there is no genuine issue of material fact on the party that moved for traditional summary judgment; (2) take all evidence favorable to the nonmovant as true; and (3) indulge every reasonable inference and resolve all doubts in favor of the nonmoving party. *Eg., M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23-24 (Tex.2000) (per curiam)*; see also Caldwell,* 125 S.W.3d at 789.



*B. No-evidence Summary Judgment*

The same legal sufficiency standard of review that is applied when reviewing a directed verdict is also applied when reviewing a no-evidence summary judgment. *See Gen. Mills Rests., Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 832-33 (Tex. App.-Dallas 2000, no pet.). When reviewing a no-evidence summary judgment, an appellate court must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented. *Gen Mills,* 12 S.W.3d at 833. A reviewing court views all of the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered and disregards all contrary evidence and inferences. *See Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997); *see also Gen. Mills,* 12 S.W.3d at 833. A no-evidence summary judgment is improperly granted if the nonmovant presents more than a scintilla of probative evidence to raise a genuine issue of material fact. *Gen. Mills,* 12 S.W.3d at 833. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow,* 953 S.W.2d at 711.

## IV. DECEPTIVE TRADE PRACTICES ACT

In his second and third issues, Broadnax contends the trial court erred when it granted Securitas's traditional motion for summary judgment and Kroger's traditional and no-evidence motion summary judgment because he raised an issue of material fact regarding his consumer status under the DTPA. Securitas and Kroger respond that Broadnax failed to raise an issue of material fact precluding summary judgment on his DTPA claim. Securitas contends Broadnax's underlying claim fails to give rise to a DTPA claim because the security services were incidental to the grocery store's goods and services, and Broadnax was the subject, not the recipient, of the security services. Kroger contends that Broadnax's DTPA claim is not based on the goods and services he sought or purchased. We agree with Securitas and Kroger on these points.

*A. Applicable Law*

To prove a cause of action for a violation of the DTPA, a plaintiff must first establish his status as a "consumer." *Eckman v. Centennial Sav. Bank,* 784 S.W.2d 672, 674 (Tex. 1990). The DTPA defines a "consumer" as "an individual who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code Ann. § 17.45(4) (Vernon Supp. 2004). There is a two part test for determining whether a person is a "consumer" under the DTPA: (1) the plaintiff must have sought or acquired goods or services by purchase or lease; and (2) the goods or services sought or acquired must form the basis of the DTPA complaint. *Ramirez v. H.E. Butt Grocery Co.,* 909 S.W.2d 62, 68 (Tex. App.-Waco 1995, writ denied). Regardless, the service must be directly related to the sale of the goods and not merely incidental. *See, e.g., id.*; *Henry v. Cullum Co.,* 891 S.W.2d 789, 794 (Tex. App.-Amarillo 1995, writ denied). A plaintiff's status as a "consumer" is a question of law. *See Allied Towing Serv. v. Mitchell,* 833 S.W.2d 577, 581 (Tex. App.-Dallas 1992, no writ).

*B. Application of the Law to the Facts*

Broadnax alleged DTPA violations against both Kroger and Securitas. He claims he is a consumer under the DTPA because he sought to acquire goods from Kroger or, in the alternative, because he was a beneficiary of the services provided by Securitas to Kroger.[4] Broadnax cites us to *Allied* to support his argument that he is a consumer under the DTPA. *See Allied,* 833 S.W.2d 577. He claims *Allied* is similar to the facts of his case because: (1) he was lawfully on Kroger's premises; (2) although he did not go to Kroger to buy security services, those security services form the basis of his complaint; and (3) Kroger directly benefitted from the security services.



In *Allied,* the plaintiff was a consumer of services at a bar that provided free parking for patrons only. *Id.* at 580. To provide that service, the bar hired a towing company to patrol the parking lot and tow unauthorized vehicles. While plaintiff was at the bar, the towing service removed his car. The plaintiff ultimately paid the towing company for the tow, then brought suit for damages to his vehicle. *Id.* at 581. In finding that plaintiff was a "consumer" under the DTPA, the court looked to the connection between the plaintiff's use of the bar's free parking and his car being towed. *Id.* at 582. Also, the court noted that plaintiff paid for the unsolicited service. *Id.* at 581.

The facts in this case are distinguishable from the facts in *Allied.* Broadnax received no services from Securitas. Rather, he was briefly questioned by a security guard hired by Kroger for "general security services." Also, the security services Broadnax claims Kroger misrepresented were security services provided by Securitas to Kroger to prevent shoplifting and are incidental to Kroger's sale of goods to Broadnax. These facts are unlike the facts of *Allied,* which involved involuntary acquisition or involuntary bailment, where the plaintiff paid for the involuntary or incidental service. Broadnax made no payment to Securitas or Kroger for security services.

Accordingly, we conclude Broadnax did not raise an issue of material fact regarding his status as a "consumer," precluding summary judgment on his DTPA claims against Securitas and Kroger.

Broadnax's second and third issues are decided against him.

## V. FALSE IMPRISONMENT

In his fifth and sixth issues, Broadnax claims the trial court erred when it granted Securitas's traditional motion for summary judgment and Kroger's traditional and no-evidence motion for summary judgment on his false imprisonment claims. Securitas and Kroger respond that the trial court properly granted summary judgment because they disproved the elements of detention and lack of consent. We agree with Securitas and Kroger.

### A. Applicable Law

To establish the intentional tort of false imprisonment, a plaintiff must plead and prove that the defendant: (1) willfully detained him; (2) without his consent; and (3) without legal authority or justification. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995). Any intentional conduct that places a person in a position where he cannot exercise his will in going where he may lawfully go constitutes false imprisonment. *Wal-Mart Stores, Inc. v. Odem,* 929 S.W.2d 513, 520-21 (Tex. App.-San Antonio 1996, pet. denied). Specifically, a detention may be accomplished by violence, threats, or any other means that restrains or wrongfully interferes with a person's freedom. *Randall's Food Markets,* 891 S.W.2d at 644-45. However, where a plaintiff voluntarily complies with a simple request to remain and establish his or her innocence, no cause of action for false imprisonment arises. *See Martinez v. Goodyear Tire & Rubber Co.,* 651 S.W.2d 18, 21 (Tex. App.-San Antonio 1983, no writ); *J.C. Penny Co. v. Romero,* 318 S.W.2d 129, 130 (Tex. Civ. App.-San Antonio 1958, writ ref'd n.r.e.).

A person can be detained by physical force or by threat. *See Odem,* 929 S.W.2d at 520-21 (holding that plaintiff was detained by force when employee grabbed her arm, stopped her and searched her purse). However, the physical force or threat must result in the detention, and not mere intimidation of the person. *Safeway Stores v. Amburn,* 388 S.W.2d 443, 447 (Tex. App.-Fort Worth 1965, no writ). Where it is alleged that a detention is effected by a threat, the plaintiff must demonstrate that the threat was such as would inspire in the threatened person a just fear of injury to his person, reputation, or property. *Randall's Food Markets,* 891 S.W.2d at 645. In considering whether a person was so threatened, the court should consider several factors, such as the relative size, age, experience, sex and physical demeanor of the



participants. *Black v. Kroger Co.,* 527 S.W.2d 794, 800 (Tex. Civ. App.-Houston [1st Dist.] 1975, writ dism'd).

In *Fojtik v. Charter Medical Corp.,* 985 S.W.2d 625 (Tex. App.-Corpus Christi 1999, pet. denied), the plaintiff, an alcohol-rehabilitation patient, filed a false imprisonment claim arising out of the hospital's alleged refusal to allow him to leave. Plaintiff was not physically restrained, but alleged that he was detained against his will by threats that, if he did not submit to his detention, he would be forcibly committed and "brought in in [sic] handcuffs." *Fojtik,* 985 S.W.2d at 630. In deciding whether the evidence raised a question of fact, the court of appeals sought to determine "to what extent must plaintiffs insist on their freedom and have it denied to them before they can recover for false imprisonment?" *Id.* at 631. After comparing the plaintiff and defendant, the court concluded that "[n]one of the factors that are considered in evaluating whether threats are sufficient to overcome the plaintiff's free will, i.e., the relative size, age, experience, sex, and physical demeanor of the participants, weigh in Fojtik's favor." *Id.* The court noted that plaintiff was not small in stature, nor was he physically restrained, and "[a]lthough he was threatened with the police, there were no other factors adding to the intimidating effect of those threats[.]" *Id.* Finally, the court concluded that "there is nothing in this case to suggest that Fojtik was a person whose weakness or susceptibility to intimidation might excuse his failure to insist on leaving when he felt he was falsely imprisoned." *Id.* Accordingly, there was no issue of material fact which survived summary judgment. *Id.*

### B. Application of the Law to the Facts

Broadnax argues he raised an issue of material fact regarding whether the Securitas security guard willfully detained him without his consent. Securitas argues there was no detention because Broadnax was never physically restrained and he consented to the security guard's search of his bag. Kroger argues Broadnax cannot maintain his false imprisonment claim because he was not willfully detained as a matter of law.

First, we address Broadnax's claim that he raised an issue of material fact regarding the element of willful detention for his false imprisonment claims against Kroger and Securitas. Broadnax relies on his deposition testimony to support his contentions.[5] He argues the following deposition testimony shows the security guard stood in front of him and blocked his path:

COUNSEL: How did this man tell you stop?

BROADNAX: At first approach it was not anything verbal. He just approached me and stood in front of me. There was no command to stop.

COUNSEL: What did you do in response to that?

BROADNAX: I stopped walking and I looked at him.

COUNSEL: Why did you stop walking?

BROADNAX: He invaded my progress from stepping forward by stepping out in front of me.

COUNSEL: When [the security guard] stood in front of you, did he block the entire path between the bank and the cash registers?

BROADNAX: No.



Also, Broadnax argues the following deposition testimony shows the security guard became loud and forcefully commanded Broadnax to allow him to search his bags:

COUNSEL: What did you do next?

BROADNAX: He stated that he wanted to search my bags.

COUNSEL: What are the words he used?

BROADNAX: That he wanted to search my bags.

COUNSEL: What did you do in response to that?

BROADNAX: I then asked him is this normal store policy for him to search my bags.

COUNSEL: Is that the way you said it?

BROADNAX: I said it in a normal tone.

COUNSEL: How did he respond to that?

BROADNAX: He said no. And then he began to command very loudly and very forcibly that he wanted to search my bags.

In addition, Broadnax argues the following deposition testimony shows the security guard's actions conveyed to him that he did not have a choice in the matter:

COUNSEL: What do you mean by you allowed him to search your bags?

BROADNAX: By his overtones I feel as though I didn't have a choice.

Further, Broadnax argues the following deposition testimony shows the security guard searched his bags:

COUNSEL: Did you hand him the bag?

BROADNAX: No. I stood there and I held the bag [sic] while he searched them. He also asked me for the receipt.

COUNSEL: Did you still have the bag in your hand?

BROADNAX: Yes.

COUNSEL: Did he take the bag from you to look in it?

BROADNAX: No.

COUNSEL: Now, after you say that he loudly told you he wanted to search the bag, did you simply-how-describe your actions next.

BROADNAX: As I was carrying the bags-there were two bags. I was carrying them in one of the hands [sic], which one I don't know. When he commanded that I show him the receipt and that he search the bags, I simply stood there-and this is the second command in which when I challenged him after the first-I just stood there, and I spread the bag [sic] open one at a time.



COUNSEL: Describe his search through your bags.

BROADNAX: As I recall he first pulled out the receipt as though he was checking the items listed on the receipt. Then he began to search the contents of the bag, looking as though he was matching the items listed on the receipt with the contents which were in the bags.

Broadnax does not assert that he was physically restrained, rather he claims that threats constituted his restraint. According to Broadnax, the confrontation lasted less than five minutes. Broadnax described the guard as being approximately 5'5" to 5'8" in height and 150 pounds, in contrast to Broadnax's 6'2" height and 250 pound weight. Much like *Fojtik,* "[n]one of the factors that are considered in evaluating whether threats are sufficient to overcome the plaintiff's free will, i.e., the relative size, age, experience, sex, and physical demeanor of the participants" weigh in Broadnax's favor.

Second, we address Broadnax's claims that he raised an issue of material fact regarding the element of consent for his false imprisonment claims against Kroger and Securitas. Broadnax focused his argument on the element of willful detention, claiming his affidavit proves he did not consent. We do not consider Broadnax's claim regarding consent with regard to Securitas because the only evidence he argues raised a fact issue on consent was his affidavit and the trial court's express ruling sustaining Securitas's objections to paragraph two of his affidavit was not brought forward on appeal. Nevertheless, we determined that Broadnax's affidavit could be considered when reviewing whether the trial court properly granted summary judgment in favor of Kroger.

Broadnax acknowledged in his deposition that the security guard did not tell him that he could not leave the store, rather he complains the security guard stood in front of him and did not block the entire aisle. Unlike *Fojtik,* Broadnax does not claim he was threatened with a call to the police. Additionally, the second paragraph of Broadnax's affidavit does not reflect that Broadnax was in a position where he could not exercise his free will to go when he may lawfully go. The affidavit addresses his consent by stating: (1) the security guard's actions "were done without my consent"; (2) the security guard "restricted my movement without my consent"; (3) the security guard "made it clear to me that I was not free to leave"; (4) the security guard "yelled" demanding that Broadnax permit his bags to be searched; and (5) this demand by the security was referred to by Broadnax as a "threat," which inspired in him a fear of injury. Finally, in the affidavit, Broadnax offers his opinion that the security guard had the "specific intent" to confine him. These allegations are insufficient to raise a fact issue. On this record, we cannot conclude that these facts "excuse his failure to insist on leaving when he felt he was falsely imprisoned." *See Fojtik,* 985 S.W.2d at 631; *see also Amburn,* 388 S.W.2d 446 (concluding that plaintiff was not falsely imprisoned despite confrontation that lasted "thirty to forty minutes").

We conclude the summary judgment evidence conclusively shows Broadnax was not willfully detained without consent. Rather, he voluntarily complied with a request to remain and establish his innocence. *See Martinez,* 651 S.W.2d at 21; *J.C. Penny Co.,* 318 S.W.2d at 130. Accordingly, we conclude the trial court did not err when it granted summary judgment in favor of Securitas and Kroger on Broadnax's false imprisonment claims.

We decide Broadnax's fifth and sixth issues against him.

## VI. TERMS OF THE CONTRACT

In his ninth issue, Broadnax contends the trial court erred when it granted Kroger's motion for traditional and no-evidence summary judgment on his breach of contract claim. He argues the phrase, "other security duties as agreed on," in the contract between Kroger and Securitas creates an issue of material fact that precludes summary judgment. Kroger responds that: (1) Broadnax did not raise a claim



against it that he was a third-party beneficiary of its contract with Securitas; (2) a third-party beneficiary contract cannot be created by implication; and (3) a third-party who receives only an incidental benefit does not have a right to enforce the contract. We agree with Kroger.

*A. Applicable Law*

To prove an action for breach of contract, a plaintiff must establish that he was in privity with the defendant at the time of the breach. *C & C Partners v. Sun Exploration & Prod.,* 783 S.W.2d 707, 721 (Tex. App.-Dallas 1989, writ denied), *overruled on other grounds, Formosa Plastics Corp. USA v. Presidio,* 960 S.W.2d 41 (Tex. 1998). A plaintiff can establish privity by proving that he was: (1) in direct privity with the defendant; or (2) a third-party beneficiary under the contract. *Id.*

It is axiomatic that a plaintiff must prove a contractual relationship in order to have standing to sue for breach. *See Citizens Real Estate & Mortgage Co. v. Sharp,* 246 S.W.2d 698, 701 (Tex. Civ. App.-Texarkana 1952, no writ); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.,* 848 S.W.2d 724, 730 (Tex. App.-Dallas 1992, writ denied) ("[g]enerally, only parties to a contract have a right to sue for its breach"); *IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C.,* 116 S.W.3d 888, 898 (Tex. App.-Houston [1st Dist] 2003, pet. denied) ([g]enerally, a plaintiff "may not enforce a contract to which he is not a party.").

*B. Application of the Law to the Facts*

Broadnax did not assert a third-party beneficiary claim against Kroger. Rather, he contends the terms of the contract, particularly the phrase "other security duties as agreed on," create an issue of material fact. We conclude Broadnax lacks standing to enforce the terms of the contract against Kroger because Broadnax is not a party to the contract between Kroger and Securitas and he did not assert a third-party beneficiary claim against Kroger. *See IP Petroleum Co.,* 116 S.W.3d at 898.; *see also C & C Partners,* 783 S.W.2d at 721.

We decide Broadnax's ninth issue against him.

## VII. THIRD-PARTY BENEFICIARY

In his eighth issue, Broadnax contends the trial court erred when it granted traditional summary judgment in favor of Securitas on his breach of contract claim. He argues he raised an issue of material fact regarding whether he was an intended third-party beneficiary of the contract between Securitas and Kroger. Securitas responds that Broadnax was not an intended third-party beneficiary of its contract with Kroger and he does not fall within any of the exceptions to the general rule regarding third-party beneficiaries. We agree with Securitas on this point.

*A. Applicable Law*

A third party may recover on a contract made between other parties only if: (1) the other parties intended to secure some benefit for that third party; and (2) the contracting parties entered into the contract directly for the third party's benefit. *Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex. 2002);*MCI Telecomm. Corp. v. Texas Util. Elec. Co.,* 995 S.W.2d 647, 651 (Tex. 1999). To show the other parties intended to secure some benefit for the third party, the third party must demonstrate he is either a donee or creditor beneficiary of the performance of the contract. *See Stine,* 80 S.W.3d at 589; *MCI,* 995 S.W.2d at 651;*Dallas Firefighters Ass'n v. Booth Research Group, Inc.,* 156 S.W.3d 188, 192-93 (Tex. App.-Dallas 2005, pet. denied). A third party is a donee beneficiary if the performance promised under the contract will, when rendered, come to the third party as a pure donation. *See Stine,* 80 S.W.3d at 589; *MCI,* 995



S.W.2d at 651. A third party is a creditor beneficiary if the performance comes to the third party in satisfaction of a legal duty owed to that third party by the promisee. *See Stine,* 80 S.W.3d at 589; *MCI,* 995 S.W.2d at 651. The legal duty owed to a creditor beneficiary by the promisee may be an indebtedness, contractual obligation, or other legally enforceable commitment. *See Stine,* 80 S.W.3d at 589; *MCI,* 995 S.W.2d at 651. The fact that a third party might receive an incidental benefit from a contract does not give that third party a right to enforce the contract. *See Stine,* 80 S.W.3d at 589; *MCI,* 995 S.W.2d at 651.

The intention to contract or confer a benefit to a third party must be clearly and fully spelled out in order to show the contracting parties entered into the contract directly for the third party's benefit. *See Stine,* 80 S.W.3d at 589; *MCI,* 995 S.W.2d at 651. A presumption exists that the parties contracted for themselves, unless it "clearly appears" that they intended a third party to benefit from the contract. *MCI,* 995 S.W.2d at 651;*Dallas Firefighters,* 156 S.W.3d at 193. A court will not create a third-party beneficiary contract by implication. *MCI,* 995 S.W.2d at 651; *Dallas Firefighters,* 156 S.W.3d at 193. If there is any reasonable doubt as to the intent of the contracting parties to confer a direct benefit on the third party, then the third-party beneficiary claim must fail. *Dallas Firefighters,* 156 S.W.3d at 193; *Whitten v. Vehicle Removal Corp.,* 56 S.W.3d 293, 312 (Tex. App.-Dallas 2001, pet. denied); *see MJR Corp. v. B&B Vending Co.,* 760 S.W.2d 4, 10 (Tex. App.-Dallas 1988, writ denied).

*B. Application of the Law to the Facts*

Broadnax argues the language of the contract between Kroger and Securitas does not establish their lack of intent to confer a benefit on him. He maintains Kroger owed him a legal duty to protect him, an invitee, from foreseeable, unreasonable risks of harm from criminal conduct. And to fulfill its duty, Kroger contracted with Securitas for security services. Also, Broadnax argues his situation is similar to a liability insurance contract, where a claimant against the insured becomes an intended third-party beneficiary.

First, we address Broadnax's claim that the language of the contract does not establish Kroger's and Securitas's lack of intent to confer a benefit on him. To do so, we scrutinize the contract between Kroger and Securitas. The contract for Securitas to provide security services to Kroger states, in part:

THIS AGREEMENT made the 3rd day of June 1994, [is] by and between [Securitas]. . . and [Kroger].

WHEREAS, [Securitas]. . . is offering to provide agreed upon security services to [Kroger]. . . to service the premises owned or leased by [Kroger], hereafter known as The Serviced Premises, at various locations in Texas to be specifically designated by [Kroger]. .

Also, article I of the contract under the heading "services provided" states, in part:

[Securitas] obligates itself and agrees as follows:

1. [Securitas] agrees to provide security services as requested by [Kroger] for the Serviced [sic] premises. The general security services provided herein shall include Uniformed [sic] security services on premises and other security duties as agreed on.

Neither Broadnax nor Kroger's patrons are identified in the contract as an intended third-party beneficiary. *See Stine,* 80 S.W.3d at 589; *MCI,* 995 S.W.2d at 651 (intention to contract or confer benefit to third party must be clearly and fully spelled out).



Second, we address Broadnax's claim that we should treat his situation like a liability insurance contract, where a claimant against the insured, as a judgment creditor, becomes an intended third-party beneficiary. Broadnax cites to *State Farm County Mut. Ins. Co. of Texas v. Ollis,* 768 S.W.2d 722 (Tex. 1989), to support his argument. However, *Ollis* involved a third party's claim under an automobile liability insurance policy. *See id.* at 723. The Texas Supreme Court has held that a party injured by the insured is a third-party beneficiary of a liability insurance policy. *Id.* However, that holding merely recognized than an injured party is a third-party beneficiary of statutorily required coverage. *Becker v. Allstate Ins.* Co., 678 S.W.2d 561, 562 (Tex. App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.); *see also Dairyland County Mut. Ins. Co. of Texas v. Childress,* 650 S.W.2d 770, 775 (Tex. 1983). There is no such statutory mandate in this case. We conclude the trial court did not err when it granted summary judgment in favor of Securitas finding, as a matter of law, that Broadnax was not an intended third-party beneficiary of the contract between Kroger and Securitas.

We decide Broadnax's eighth issue against him.

## VIII. VICARIOUS LIABILITY BASED ON AGENCY

In his fourth, seventh, and tenth issues, Broadnax argues the trial court erred when it granted no-evidence summary judgment in favor of Kroger on his DTPA and false imprisonment claims because Texas law does not require the establishment of an agency relationship to affix vicarious liability. Our conclusions on Broadnax's second, third, fifth, sixth, eighth, and ninth issues dispose of his claims against both Kroger and Securitas. Accordingly, we need not address Broadnax's fourth, seventh, and tenth issues. *See* Tex. R. App. P. 47.1.

## IX. GENERAL TRIAL COURT ERROR IN GRANTING SUMMARY JUDGMENT

In his first issue on appeal, Broadnax argues generally that the trial court erred when it granted summary judgment in favor of Kroger and Securitas. Our conclusions on Broadnax's second, third, fifth, sixth, eighth, and ninth issues dispose of his claims against both Kroger and Securitas. Accordingly, we need not address Broadnax's first issue. *See* Tex. R. App. P. 47.1.

## X. CONCLUSION

We conclude the trial court did not err when it granted summary judgment in favor of Securitas and Kroger because Broadnax did not raise an issue of material fact on his DTPA, false imprisonment, and breach of contract claims. We decide Broadnax's second, third, fifth, sixth, eighth, and ninth issues against him. Based on our resolution of those issues, we need not address Broadnax's first, fourth, seventh, and tenth issues. *See* Tex. R. App. P. 47.1.

The trial court's final summary judgment is affirmed.

---------------

Notes:

1. The record shows appellant's name is Bobby Broadnax and he is the founder and pastor of the nondenominational Cathedral of Prayer Church, Inc.

2. Securitas was formerly known as Wells Fargo Guard Services.

3. A party cannot file an affidavit that contradicts that party's own deposition testimony, without explanation, for the purpose of creating a fact issue to avoid summary judgment. When there is no explanation, it is assumed that the



sole purpose of the affidavit was to avoid summary judgment, and as such, the affidavit merely presents a "sham" fact issue. *Burkett v. Welborn,* 42 S.W.3d 282, 286 (Tex. App.-Texarkana 2001, no pet.). We recognize that there are variances between Broadnax's deposition testimony and his affidavit testimony. However, we decline to conclude these differences are so egregious that the trial court abused its discretion by not ruling on its objection that requested it strike the affidavit. *See Shaw v. Maddox Metal Works, Inc.,* 73 S.W.3d 472, 478 (Tex. App.-Dallas 2002, no pet.).

4. In his third amended petition, Broadnax alleged Kroger and Securitas violated the DTPA claiming: (1) he is a consumer because he sought to acquire goods from Kroger or, in the alternative, because he was a beneficiary of the services provided by Securitas to Kroger; (2) Kroger and Securitas committed wrongful acts, including misrepresenting that an agreement conferred rights, remedies, or obligations that it did not, and engaging in an unconscionable action or course of action; (3) the agreement conferred on him the right to be free of the kind of harassment that befell him and Kroger's and Securitas's pursuit of such harassment was unconscionable; (4) Kroger and Securitas intentionally and knowingly engaged in these deceptive practices; and (5) Kroger and Securitas are liable for the wrongful acts of their agents and employees under the doctrine of respondeat superior. In his second and third issues on appeal, Broadnax argues only that he raised an issue of material fact regarding his status as a consumer under the DTPA. Accordingly, we do not address the other elements of his DTPA claims.

5. To the extent that Broadnax relies on his affidavit to show he raised an issue of material fact regarding willful detention, we do not consider his affidavit with regard to his argument against Securitas because Broadnax has not appealed the trial court's ruling sustaining Securitas's objections to paragraph two

---------------



**Page 804**
**633 S.W.2d 804**
**David W. ROARK et ux., Petitioners,**
**v.**
**Dale ALLEN et al., Respondents.**
**No. C-940.**
**Supreme Court of Texas.**
**June 2, 1982.**
**Rehearing Denied June 30, 1982.**

**Page 806**

John H. Holloway, Houston, for petitioners.

Cantey, Hanger, Gooch, Munn & Collins, Richard L. Griffith and Rod Patterson, Fort Worth, Bailey, Williams, Westfall, Lee &

Page 807

Fowler, James A. Williams and Kevin J. Keith, Dallas, for respondents.

RAY, Justice.

This is a medical malpractice case arising from the use of forceps in the breech delivery of a child. David W. Roark and his former wife, Sherry L. Roark, individually and as the sole heirs of the estate of their deceased son, Robert Ryan Roark, sued Drs. Dale Allen and J. G. Matthews, the physicians who allegedly injured their son during delivery. [1] On the basis of jury findings of negligence, the trial court rendered judgment that the Roarks recover $10,000 against Drs. Allen and Matthews, jointly and severally. It was also adjudged that the Roarks recover $2,000 from Dr. Matthews, individually. The court of appeals affirmed the judgment as to Dr. Allen, but reversed and rendered a take nothing judgment as to Dr. Matthews. 625 S.W.2d 411. We reverse the court of appeals' judgment as to Dr. Allen and affirm its judgment as to Dr. Matthews.

On February 9, 1976, at about 6:10 p. m., Sherry L. Roark, the pregnant wife of David W. Roark, was admitted into Grand Prairie Community Hospital in Grand Prairie, Texas. She was in active labor. Her physician was Dr. Dale Allen, a general practitioner. At about 8:00 p. m., Dr. Allen ordered Sherry X-rayed. These X-rays revealed that the child was in the frank breech position-i.e., the child was in a scissorlike position with its legs pointing up toward its head. The child's buttocks were at the top of the birth canal. Dr. Allen determined from the X-rays that the child could be delivered vaginally and that a Caesarean section would be unnecessary. As Sherry was not yet sufficiently dilated for birth, Dr. Allen went home for the night. He returned at about 5:00 a. m. the following morning to find Sherry fully dilated. Beginning at 6:50 a. m., Dr. Allen worked unsuccessfully for about an hour trying to deliver the child. He then called in Dr. J. G. Matthews, an obstetrician, who immediately performed an episiotomy (surgical enlargement of the lower part of the birth canal). Dr. Matthews was then able to deliver the baby's legs, hips, torso and arms. However, the child's head became lodged in the mother's pelvis. In order to aid delivery, Dr. Matthews employed Piper forceps to grasp the child's head. As he was pulling on them, the forceps slipped off the child's head. Dr. Matthews reapplied the forceps and successfully delivered the child, a boy, who was named Robert Ryan Roark.



The infant Roark had an indentation on either side of its head. Dr. Matthews testified he was at first concerned that his use of the forceps might have fractured the child's skull. This fear was allayed when Dr. Roig, a pediatrician, examined the child and found no neurological damage. Drs. Roig, Matthews and Allen, together, concluded that these were soft-tissue indentations which would resolve themselves within a short time and Dr. Allen so advised the Roarks. The indentations did not, however, resolve themselves and, when the child was about five weeks old, Dr. Roig X-rayed Robert and determined that he suffered from bilateral fractures of the skull. Dr. Roig referred the Roarks to Dr. Morris Sanders, a neurosurgeon, who, on March 18, operated on Robert and successfully elevated the fractures. Robert fully recovered with no neurological impairment.

The Roarks sued Drs. Allen and Matthews, alleging they were negligent in their delivery of the child, in failing to obtain the Roarks' "informed consent" and in failing to refer Robert for surgery. [2] Trial was to a jury, which found the following: (1) Dr. Matthews used the forceps negligently in delivering Robert Roark, which negligence

Page 808

proximately caused the skull fracture; (2) Dr. Allen failed to inform the Roarks of the possibility of a skull fracture, which failure proximately caused injury to Robert Roark; (3) $2,000 would reasonably compensate David Roark for expenses he incurred in the treatment of Robert's fracture and $10,000 would have reasonably compensated Robert for the pain and mental anguish he suffered because of the fracture; and (4) Dr. Allen and Dr. Matthews were each 50% negligent. On the basis of these findings, the trial court rendered judgment that the Roarks recover $10,000 from Drs. Allen and Matthews, jointly and severally. It was also adjudged that the Roarks recover $2,000 from Dr. Matthews, individually.

The court of appeals affirmed the award against Dr. Allen but reversed the award against Dr. Matthews because the special issue on which he was found negligent had no basis in the Roarks' petition. This Court granted applications for writ of error from both the Roarks and Dr. Allen.

Dr. Allen's Application for Writ of Error

Dr. Allen's liability is predicated on an affirmative jury finding to the following Special Issue No. 8:

Do you find from a preponderance of the evidence that Dr. Dale Allen failed to obtain the 'informed consent' of the parents of Robert Ryan Roark concerning the possible injury to the infant's head?

In conjunction with this issue, the trial court submitted the following definition:

By the term 'INFORMED CONSENT', as used in this issue, is meant the furnishing by the physician to the parents of the infant sufficient information about the nature and extent of possible injuries sustained at his birth and the complications associated with such injuries, together with the information as to available medical or surgical means to diagnose such injuries, and the risks or dangers inherent in connection with such injuries or failure to diagnose such injuries, to permit the parents of the infant to make a knowledgeable and fully informed decision as to accepting or refusing other diagnostic procedures or suggested medical or surgical care or lack of medical or surgical care of fractures of the skull of an infant.

The jury also found that Dr. Allen's failure was the proximate cause of injury to the infant Roark.



Dr. Allen first argues that Special Issue No. 8 is an improper application of the doctrine of informed consent. We agree. In Wilson v. Scott, 412 S.W.2d 299 (Tex.1967), this state's fountainhead case in the area of informed consent, we stated that-

(p)hysicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. This duty is based upon the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure.

412 S.W.2d 299 at 301. It is apparent from this statement that the doctrine of informed consent applies only to medical procedures which have yet to be performed and that it is inapplicable in a situation such as this, where the patient has already undergone the proposed treatment and been injured. See also, Jacobs v. Theimer, 519 S.W.2d 846 (Tex.1975).

While Special Issue No. 8 contains the term "informed consent", the issue and the accompanying definition, when read together, inquire into a totally different cause of action-i.e., they inquire whether Dr. Allen failed to inform the Roarks of the possibility that their son's head was injured during birth. The Roarks' response brief indicates they were seeking to establish that Dr. Allen's failure to inform constituted negligence, although the trial court did not submit a special issue to this effect. There were, however, issues concerning causation and damages. Under Tex.R.Civ.Pro. 279, if an issue necessary to sustain a ground of recovery is omitted, without an objection or request, the trial court will be

Page 809

deemed to have found the issue in such manner as to support its judgment. No one requested a special issue inquiring whether Dr. Allen's failure to inform constituted negligence and no one objected to its omission. The trial court is, therefore, deemed to have found that Dr. Allen breached the applicable standard of care by his failure to inform.

Dr. Allen argues that there is no evidence to support this deemed finding. We agree. Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layman. See, Hood v. Phillips, 554 S.W.2d 160, 165 (Tex.1977). Such is the case here; the diagnosis of skull fractures is not within the experience of the ordinary layman. Accordingly, as in most medical malpractice actions, the Roarks had the burden of proving by expert medical testimony what information a reasonable practitioner of the same school and same or similar community under the same or similar circumstances would have disclosed to them. Wilson v. Scott, supra.

In evaluating the Roarks' "no evidence" point, we may consider only the evidence and inferences which tend to support the trial court's deemed finding and must disregard all evidence and inferences to the contrary. Stodghill v. Texas Employers Insurance Association, 582 S.W.2d 102, 103, (Tex.1979).

The court of appeals found that Dr. Allen's own testimony established the proper standard of care. The evidence most favorable to the court of appeal's conclusion is Dr. Allen's testimony that a reasonable physician would have advised the Roarks of the possibility of a skull fracture if he assumed the fracture existed. We are not convinced that this established the proper standard of care because of the way Dr. Allen qualified his statement. But assuming Dr. Allen's testimony does establish the proper standard of care, we find no evidence of a breach of that standard. Indeed, the evidence is uncontroverted that Dr. Allen assumed a fracture did not exist.



Dr. Allen testified that an X-ray of the child would have revealed the fractures and that X-rays were available in the Grand Prairie Community Hospital. However, both he and Dr. Matthews testified that it is relatively common for a child born with the aid of forceps to have indentations on the side of its head and that these are usually soft tissue indentations which resolve themselves in time. The record also indicates that Dr. Roig, a pediatrician, examined the infant and found no neurological impairment. On this basis, Drs. Roig, Matthews and Allen concluded that the child's skull was not fractured and that an X-ray was unnecessary. Thus, we can find no evidence to support the trial court's deemed finding of negligence; accordingly, we must reverse the court of appeals judgment against Dr. Allen.

The Roarks' Application for Writ of Error

The court of appeals held the Roarks' petition insufficient to support the submission of special issues inquiring whether Dr. Matthews was negligent in his use of the forceps. The court indicated the petition was defective because it did not allege that Matthews used the forceps negligently and that such negligence was a proximate cause of the child's injury. The Roarks argue that their petition was sufficient to raise the issue of Matthews' negligent delivery. We agree with the Roarks.

Dr. Matthews did not specially except to the Roarks' petition. When there are no special exceptions, a petition will be construed liberally in favor of the pleader. Stone v. Lawyers Title Insurance Corp., 554 S.W.2d 183, 186 (Tex.1977). Also, "(t)he court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every fact will be supplied that can reasonably be inferred from what is specifically stated." Gulf,

Page 810

Colorado & Santa Fe Railway Co. v. Bliss, 368 S.W.2d 594, 599 (Tex.1963). A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. Murray v. O & A Express, Inc., 630 S.W.2d 633 (Tex.1982); Castleberry v. Goolsby Building Corporation, 611 S.W.2d 665, 666 (Tex.1981); Stone v. Lawyers Title Insurance Corp., supra; Tex.R.Civ.Pro. 45 and 47.

The Roarks alleged that Dr. Matthews delivered the child and, as a result of the delivery, the child sustained a fractured skull; the fractures caused the child intense physical pain and mental anguish and caused the parents to incur additional medical expense. [3] We hold this was sufficient to give Dr. Matthews fair notice that he would have to defend against a claim involving the manner in which he delivered the child. We do not consider it fatal that the Roarks did not use the word "negligent" in connection with the delivery or otherwise specifically indicate that Dr. Matthews failed to exercise ordinary care. This can be inferred both from the petition as a whole and from the following specific language: "As a result of the delivery, or attempts at delivery, by the Defendants, jointly and severally, the infant sustained bilateral depressed skull fractures." (Emphasis added). The phrase "jointly and severally" usually refers to liability; if two defendants are jointly and severally liable, the plaintiff may sue one or the other or both of them for the entire amount of the damages. See: Black's Law Dictionary 972 (4th ed. 1957). Such legal terminology, although used vaguely, was sufficient to alert Dr. Matthews that the Roarks intended to hold him liable for some act connected with his delivery of the child. If Dr. Matthews considered the petition obscure, he should have specially excepted to it and he has waived any defect by his failure to do so. Tex.R.Civ.Pro. 90 and 91.

Dr. Matthews argues that the Roarks made a judicial admission that his delivery of the child was non-negligent when they stated in their petition: "(A)ccording to the information furnished to Plaintiffs,



Dr. Matthews effected the delivery of the child without difficulty to the head by use of forceps." (Emphasis added). We disagree. This statement merely indicates that the Roarks were told the delivery went without difficulty. The paragraph following this statement makes clear that all did not go well, that the child's skull was fractured as a result of the delivery.

Page 811

The court of appeals, because of its holding that the Roarks' petition was inadequate, found it unnecessary to reach Dr. Matthews' "no evidence" and "insufficient evidence" points. While it would have been better practice for Dr. Matthews to have assigned cross points in this Court, his failure to do so is not jurisdictional; Dr. Matthews is nevertheless entitled to have these points considered. We have the alternatives of (1) examining the points not considered by the court of appeals in order to determine whether any will support affirmance of that court's judgment, or (2) remanding the cause to the court of appeals for it to pass on those points. McKelvy v. Barber, 381 S.W.2d 59, 64 (Tex.1964); Hatchell and Calvert, Some Problems of Supreme Court Review, 6 St. Mary's L.J. 303, 315-317 (Summer 1974).

Of course, we are without jurisdiction to consider Dr. Matthews' insufficiency points; but we can and do pass on his several points of error which complain there is no evidence to support the trial court's judgment against him. David Roark, who was in the delivery room when young Robert was born, testified that he saw Dr. Matthews apply the forceps over the child's shoulders and lock the forcep handles above the child's body. Dr. Allen testified that it would be improper and impossible to apply the forceps from above the child's body. When asked to explain his comment, he stated that the shape of the forceps and the shape of the child's head would make it impossible for the forcep blades to fit over the child's head. He also stated that forceps "... are just not used in that manner." We do not take Dr. Allen's testimony to mean that a doctor, applying forceps from above the child's body, cannot insert the blades into the birth canal-only that he cannot fit them around the child's head as forceps are properly meant to fit. We hold that Dr. Allen's testimony constitutes some evidence of the standard of care to be used in delivering a frank breech birth with the aid of forceps and that David Roark's description of the birth is some evidence of a breach of that standard.

Although we find some evidence that Dr. Matthews breached the proper standard of care, we find no evidence that such breach was the proximate cause of young Robert's injuries. Dr. Matthews testified that, in his opinion, the child's skull was fractured as a result of the forceps' slipping. There is, however, no direct evidence that Dr. Matthews' alleged improper application of the forceps caused them to slip. Also, this area is sufficiently complex that a layman cannot infer, from these facts alone, the cause of the forceps' slipping. Accordingly, we must affirm the court of appeals judgment as to Dr. Matthews.

Because of the above holdings, we find it unnecessary to consider the Roarks' and Dr. Matthews' other points of error.

We reverse the court of appeals' judgment as to Dr. Allen and affirm its take-nothing judgment as to Dr. Matthews. Judgment is here rendered that the Roarks take nothing as against Dr. Allen.

---------------

1 Robert Ryan Roark died in a totally unrelated incident when he was about eleven months old.

2 Dr. Matthews argues that the Roarks' petition was insufficient to raise the issue of his negligent delivery of the child. We address this point later in the opinion.



3 The Roarks' petition reads in relevant part:

Following this attempt at delivery, Dr. Allen obtained the consultation of Dr. J. G. Matthews, and according to the information furnished to Plaintiffs, Dr. Matthews effected the delivery of the child without difficulty to the child's head by use of forceps, the time of delivery being recorded in the hospital records as 8:42 a. m. on February 10, 1976.

As a result of the delivery, or attempts at delivery, by the Defendants, jointly and severally, the infant sustained bilateral depressed skull fractures, with the left side of the head being more extensively depressed than the right side of the head, and requiring the admission of Robert Ryan Roark to the Children's Medical Center in Dallas, Texas, on March 18, 1976, where the child underwent surgery by Dr. Morris Sanders for the fractures of the skull. As a result of the injuries sustained by the infant, he suffered intense physical pain and mental anguish, and the parents were required to spend various sums of money for medical and surgical treatment.

Plaintiffs further allege that the Defendants were negligent in failing to obtain the parents' informed consent and were negligent in failing to refer the infant for surgery when the Defendants knew, or in the exercise of ordinary care should have known, that the infant had suffered fractures of the skull.

III.

As a direct and proximate cause of the negligence of the Defendants, jointly and severally, the Plaintiffs should recover damages for the injuries sustained by Robert Ryan Roark, Deceased, for physical pain, mental anguish, and physical injuries from the date of his birth to the date of his death, in the sum of $25,000.00 .... (Emphasis added).



**Page 398**

**829 S.W.2d 398**

**Mitch ZARSKY, d/b/a Zarsky Industries and John K. George, Appellants,**

**v.**

**ZURICH MANAGEMENT, INC., and Carter Bliss, and John T. Bowles, Appellees.**

**No. B14-91-00710-CV.**

**Court of Appeals of Texas,**

**Houston (14th Dist.).**

**April 30, 1992.**

John K. George, Houston, for appellant.

Page 399

Carter Bliss, John T. Bowles, Houston, for appellee.

Before PAUL PRESSLER, MURPHY and CANNON, JJ.

OPINION

PAUL PRESSLER, Justice.

This is an appeal from an order imposing sanctions against appellants Mitch Zarsky, d/b/a Zarsky Industries, and John K. George, attorney for Zarsky, pursuant to TEX.R.CIV.P. 13. Because the trial court abused its discretion by failing to point out with particularity the acts or omissions on which sanctions were based, the judgment is reversed and remanded for proceedings consistent with this opinion.

Appellant Zarsky sued appellee Zurich Management, Inc., on a sworn account for air-conditioning services rendered. Zurich counterclaimed for breach of contract, misrepresentations, and breach of warranties under the Texas Deceptive Trade Practices Act. Zurich later amended its counterclaim to include allegations of fraud and negligence. In response, Zarsky obtained leave of court to file a third party petition impleading appellees Carter Bliss and John T. Bowles, among others, for contribution on the negligence claim. Bliss answered and sought Rule 13 sanctions against Zarsky and attorney John K. George.

A jury found against Zarsky on its claim and for Zurich on its counterclaim. The jury also failed to find for Zarsky on its contribution claim against Bliss and Bowles.

After judgment, Bliss and Bowles filed motions for sanctions, alleging that the third party petition had been filed maliciously and in bad faith, that it was frivolous, and that it was brought solely for the purpose of harassment. After a hearing on the motions, the trial court imposed sanctions in the amount of $4,500, 75% to be paid by Zarsky and 25% to be paid by its attorney, John K. George.

In his sole point of error, appellant John K. George contends that the trial court abused its discretion by failing to point out in its order a sufficiently good cause for the imposition of sanctions. A trial court's decision to impose sanctions under TEX.R.CIV.P. 13 will not be overruled on appeal unless an abuse of discretion is shown. Cloughly v. NBC Bank-Seguin, N.A., 773 S.W.2d 652, 656 (Tex.App.--San Antonio 1989, no writ); Notgrass v. Equilease Corp., 666 S.W.2d 635, 638 (Tex.App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.).



TEX.R.CIV.P. 13 provides that if a court finds that a claim is groundless and brought in bad faith or for the purpose of harassment, it may, for good cause, impose sanctions available under TEX.R.CIV.P. 215-2 b, "the particulars of which must be stated in the sanction order." Here, the order signed by the trial judge recites in relevant part:

The Court heard argument of Counsel in open Court, and it appeared right, just and legal that/and this Court finds substantial evidence that this Third Party lawsuit which was filed against Carter Bliss and the other Third Party Defendant, John T. Bowles, by both the Plaintiff, Respondent here, Mitch Zarsky individually and d/b/a Zarsky Industries and his attorney of record, John K. George, Esq., was frivolous and of no merit. The Court finds, therefore, liability under Rule 13(TRCP) sanctions against both ... Zarsky ... and his attorney ... John K. George.... (emphasis added)

Rule 13 imposes a duty on the trial court to point out with particularity the acts or omissions on which sanctions are based. Kahn v. Garcia, 816 S.W.2d 131, 133 (Tex.App.--Houston [1st Dist.] 1991, n.w.h.); Watkins v. Pearson, 795 S.W.2d 257, 260 (Tex.App.--Houston [14th Dist.] 1990, writ denied). An order imposing sanctions under Rule 13 differs from an order imposing sanctions under Rule 215. Kahn, 816 S.W.2d at 133. Unlike Rule 215, Rule 13 requires a court to designate the particulars which create "good cause." Id.

The sanction orders in both Kahn and Watkins were held to be in violation of this requirement. In Kahn, the order recited

Page 400

that the motions for sanctions were "meritorious." Kahn, 816 S.W.2d at 132. In Watkins, the order merely stated that "for good cause being shown, monetary sanctions are hereby imposed ... pursuant to Rule 13." Watkins, 795 S.W.2d at 259. Similarly, the order signed by the trial judge states that "the Court finds substantial evidence that this Third Party lawsuit ... was frivolous and of no merit." The recitation here fails to satisfy the particularity requirements of Rule 13. There is no statement or description of what was done in bad faith, or a description of how Mr. George acted to bring about the improper purpose. The trial court failed to show with particularity its reason for finding the third party lawsuit frivolous and meritless. Thus the trial judge abused his discretion in entering the sanctions order. Such error was not harmless as it prevented Mr. George from making a proper presentation of his case to this court. TEX.R.APP.P. 81. Appellant's sole point of error is sustained.

The judgment of the trial court ordering sanctions is reversed and remanded for proceedings consistent with this opinion.



**Page 4**
**752 S.W.2d 4**
**Robert RANDALL, Petitioner,**
**v.**
**DALLAS POWER & LIGHT COMPANY, et al., Respondents.**
**No. C-7360.**
**Supreme Court of Texas.**
**June 15, 1988.**

L.L. "Mick" McBee and Michael T. Maher, Dallas, for petitioner.

Wm. Stephen Boyd and W. Stephen Cockerham, Worsham, Forsythe, Sampels & Wooldridge, Dallas, for respondents.

PER CURIAM

This case arises from an automobile collision between Randall and Prior, a Dallas Power & Light Co. (DPL) employee. The trial court granted summary judgment in favor of DPL. The court of appeals affirmed the trial court's judgment, holding that although Randall's affidavit alleged representations by DPL's claims agent concerning future damages, Randall's deposition testimony made it clear that the agent made no express representations about future damages. The court of appeals further held that the information in Randall's affidavit consisted of a unilateral or subjective determination of the facts, and that such information does not constitute summary judgment evidence. 745 S.W.2d 397. We reverse the judgment of the court of appeals and remand the cause to the trial court.

Randall and Prior were involved in an automobile collision. Randall sued Prior and DPL, alleging damages proximately caused by Prior's negligence. DPL and Prior moved for summary judgment asserting release and accord and satisfaction as complete defenses to Randall's negligence action. Randall then amended his pleadings alleging mutual mistake and fraud in response to the defenses of release and accord and satisfaction. In support of his opposition to the summary judgment, Randall filed an affidavit stating that Gerald Moore, a claims representative at DPL, made various representations to him regarding compensation for car repairs and his personal injuries. He further stated in

Page 5

his affidavit that Mr. Moore offered to compensate him for some of his losses suffered up to that point, and assured him that DPL would take care of any future problems. The trial court denied the first summary judgment motion. DPL subsequently deposed Randall concerning the representations he alleged in his affidavit. During the deposition, Randall stated that he could not remember any representations being made by the claims agent regarding future damages or expenses. After Randall's second deposition was taken, DPL filed its second motion for summary judgment which was granted by the trial court.

The focal point of this case evolves from the issue of whether conflicting statements made in an affidavit and deposition raise a fact question which would preclude summary judgment. In this case, the court of appeals acknowledged that Randall's affidavit alleged representations made by DPL's claims agent concerning future damages. However, the court of appeals ignored these statements, concluding that they were unilateral or subjective determinations of fact insufficient to raise a fact issue. 745 S.W.2d at 400. The reasoning used by the court of appeals to disregard the affidavit testimony of Randall is clearly erroneous. It is apparent from the statements made by Randall in the affidavit that he did not merely set



forth legal conclusions or subjective opinions, but rather, he attested to the facts regarding what he was told by defendant's claims agent.

The court of appeals completely ignores the well-established rule that a deposition does not have controlling effect over an affidavit in determining whether a motion for summary judgment should be granted. Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, 562 (1962). Thus, if conflicting inferences may be drawn from a deposition and from an affidavit filed by the same party in opposition to a motion for summary judgment, a fact issue is presented. Gaines, 358 S.W.2d at 562. In this instance, conflicting inferences can definitely be drawn from the deposition and affidavit testimony. In the affidavit, Randall testified that Moore made definite representations to him regarding future damages, whereas, in the deposition, he stated that he did not remember any representations pertaining to future damages. In the face of this conflicting evidence, we conclude that DPL and Prior did not meet their burden of showing that there was no genuine issue as to any material fact. City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 678 (Tex.1979). The question of whether or not Moore made a fraudulent representation to Randall regarding future damages was an issue of fact to be determined by a jury. Thus, summary judgment was improperly granted.

The opinion and judgment of the court of appeals are thus in conflict with this court's holding in City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671 (Tex.1979), and Gaines v. Hamman, 358 S.W.2d 557 (1962). Therefore, pursuant to Tex.R.App.P. 133(b), we grant the petitioner's application for writ of error, and without hearing oral argument, a majority of the court reverses the judgment of the court of appeals and remands the cause to the trial court.



**Page 528**
**40 S.W.3d 528 (Tex.App.-Houston [14th Dist.] 2000)**
**DONALD MANSFIELD, INDIVIDUALLY AND D/B/A BOSTON'S BAR SUPPLY & EQUIPMENT COMPANY, Appellant**
**v.**
**OHIO CASUALTY INSURANCE COMPANY, Appellee**
**NO. 14-99-00826-CV**
**Court of Appeals of Texas, Houston (14th Dist.)**
**November 22, 2000.**
**Rehearing Overruled March 29, 2001.**

On Appeal from the 61st District Court Harris County, Texas Trial Court Cause No. 97-34825

Page 529

Panel consists of Chief Justice Murphy and Justices Amidei, and Hudson.

OPINION

Maurice E. Amidei, Justice

This is an appeal from the grant of a no-evidence summary judgment for Appellee Ohio Casualty Insurance Company ("OCIC"). Presenting four issues for review, Appellant Donald Mansfield challenges the judgment of the trial court. We reverse.

Facts and Procedural Background

Prior to the instant suit, Mansfield operated a full-service bar and tavern supply company providing soft drinks from a number of manufacturers including Coca Cola, Inc. ("Coke"). Around 1994, Coke, alleging that Mansfield wrongfully acted as an authorized distributor of its products, filed suit in federal court seeking damages and an order enjoining Mansfield from purchasing its products for resale to the bar and tavern industry. Mansfield subsequently notified OCIC of the suit. After issuing a reservation of rights, OCIC hired the law firm of Fish & Richardson ("F&R") to conduct Mansfield's defense. In addition to acting as Mansfield's defense counsel, F&R, on May 1, 1995, filed third party complaints against Mansfield's suppliers of Coke products. The essence of these complaints was that Mansfield's suppliers - Sysco Food Services, Inc., White Swan, Inc. and Tony's Bar Supply Co. - conspired with Coke to restrict competition from Mansfield.

Shortly after filing suit, Coke amended its complaint and dropped its monetary

Page 530

claim for damages. This action then prompted OCIC to withdraw its defense of Mansfield under the terms of the policy so that F&R withdrew as counsel. One month after this withdrawal, the presiding federal court judge entered an order sanctioning F&R for bringing the third party claims, finding that such claims had no basis in fact or law. The federal court later entered a judgment granting the injunctive relief sought by Coke. Mansfield then filed this suit against F&R and OCIC, alleging that their decision to pursue his trade creditors via the frivolous third party complaints resulted in his creditors' decisions to terminate the trade discounts he previously enjoyed with them. After Mansfield settled his case with F&R, OCIC moved for summary judgment which the trial court granted. Mansfield now appeals the trial court's decision.



First Point of Error

<mark>In his first issue, Mansfield argues that the trial court erred in granting summary judgment because Appellee filed additional proof within the twenty-one day submission date required by Rule of Civil Procedure166a. In pertinent part, this Rule provides that "[e]xcept on leave of the court, with notice to opposing counsel, the [summary judgment] motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing."</mark> Tex. R. Civ. P. 166 a(d). <mark>Where a movant files summary judgment proof outside the twenty-one day period and without leave of the court, such proof is not properly before the trial court on the motion for summary judgment.</mark> See Benchmark Bank v. Crowder, 919 S.W.2d 657, 663 (Tex. 1996).

In the case at bar, OCIC filed two motions for summary judgment on August 26, 1998. One sought judgment on grounds that Mansfield's claims failed to raise any issue of material fact. The other moved for judgment on grounds that Mansfield could not demonstrate evidence sufficient to support its claim against OCIC - a "no evidence" summary judgment. On the same day, OCIC filed a notice with the trial court wherein it notified Mansfield that both motions for summary judgment were set for submission on September 21, 1998. Mansfield then timely filed a response to both OCIC's motion for summary judgment as well as its motion for no evidence summary judgment. OCIC followed by filing a September 18, 1998 reply to Mansfield's response which only addressed its motion for "regular" summary judgment. The trial court then granted OCIC's no evidence summary judgment on November 2, 1998.

<mark>We agree with Mansfield's assertion that OCIC's September 18 response was not timely as OCIC filed it only three days prior to the September 21 hearing date.</mark> Nevertheless, this response only addressed Mansfield's reply to OCIC's regular motion for summary judgment, while the record clearly shows that the trial court granted OCIC's no evidence summary judgment. Accordingly, the trial court's grant of the no evidence summary judgment did not violate the 21-day rule stated in Texas Rule of Civil Procedure 166a(d). Therefore, we overrule Mansfield's first issue.

Second Point of Error

Mansfield next argues that the trial court erred in its grant of the no evidence summary judgment because OCIC's motions only addressed his negligence and vicarious liability claim while failing to address his subsequently pleaded causes properly before the court.

Rule of Civil Procedure 63 provides that amended or supplemental pleadings may be filed within seven days of trial

Page 531

only with leave of court. TEX. R. CIV. P. 63. Rule 63 likewise applies to pleadings filed within seven days of a summary judgment hearing. See Sosa v. Central Power & Light, 909 S.W.2d 893, 895 (Tex.1995) (per curiam). In determining whether a trial court granted leave to file pleadings beyond the proscribed deadline, Texas courts follow the two part test laid out in Goswami v. Metropolitan Sav. and Loan. See,751 S.W.2d 487 (Tex. 1988); Wilson v. Korthauer, 21 S.W.3d 573, 577-578 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). Under the holding in Goswami, we must presume the trial court granted leave to file a late pleading even though the filer failed to request leave when: (1) the record fails to show that the trial court did not consider the amended pleading, and (2) there is not a sufficient showing of surprise or prejudice on the part of the opposing party. See Korthauer, 21 S.W.3d at 578. Finally, pursuant to Rule 65 and subject to certain exceptions not relevant here, a substituted instrument such as an amended pleading takes the place of its predecessor(s) such that "the instrument for which it is



substituted shall no longer be regarded as a part of the pleading in the record of the cause . . . ." Tex. R. Civ. P. 65.

In determining if the first prong of the Goswami presumption is satisfied, the reviewing court is to consider whether the amended petition was part of the record before the trial court and whether the judgment states that the trial court considered all the pleadings on file. See Goswami, 751 S.W.2d at 490; Korthauer, 21 S.W.3d at 578. If both of these questions are answered in the affirmative, the first prong of the test is met. See Korthauer, 21 S.W.3d at 578. Here, Mansfield's original petition, filed June 13, 1997, alleged that OCIC and F&R acted negligently in the handling of his defense of the Coke suit by pursuing claims that had no basis in fact or law. As stated previously, OCIC filed its two motions for summary judgment on August 26, 1998 as well as its notice of submission of the motions set for September 21, 1998. In his second amended petition, filed September 17, 1998, Mansfield dropped his negligent handling and vicarious liability claim but raised claims for breach of the covenant of good faith and fair dealing ("bad faith") and breach of contract.[1] On October 30, 1998, Mansfield then filed his third amended petition, re-urging his bad faith and breach of contract claims and adding claims under the DTPA and Article 21.21 of the Insurance Code. The trial court subsequently granted OCIC's no evidence summary judgment on November 2 1998, ordering that "Plaintiffs take nothing by way of their claims against [OCIC] . . . ."

In applying these rules to the present case, we first note that Mansfield's third amended petition was filed in the trial court and is part of the record; additionally, the final judgment states that the trial court considered "the pleadings, the motion, the response, affidavits and other evidence on file . . . ." Therefore, because the record does not show that the trial court failed to consider the amended petition, we find that the first prong of the test for application of the Goswami presumption is satisfied. In reaching this conclusion we further find that, based on Rule 65, Mansfield's only claims before the court were those spelled out in his third amended petition, viz: bad faith, breach of contract,

Page 532

and violations of the DTPA and Article 21.21. Accordingly, the first prong of the Goswami presumption is satisfied.

The second prong of the test focuses on the surprise or prejudice to the party opposing the filing of the amended pleading, including whether that party moved to strike the late-filed pleading. See Goswami, 751 S.W.2d 487, 490-91; Korthauer, 21 S.W.3d at 578. Where the record does not contain a motion to strike a late-filed pleading, a court presumes no prejudice resulted from such pleading. See Goswami, 751 S.W.2d at 490-91. Because the record in our case does not contain a motion to strike, we presume OCIC suffered no prejudice by Mansfield's late filing. Accordingly, we must presume that Mansfield's third amended petition was properly before the trial court; therefore, we treat it as the live pleading in the case.[2]

We now turn to consider whether Mansfield's third amended petition raised claims not addressed by OCIC's motion for summary judgment. Generally, summary judgment cannot be granted on a claim not addressed in the summary judgment proceeding. See Tex. R. Civ. P. 166a(c); Chessher v. Southwestern Bell Telephone, 658 S.W.2d 563, 564 (Tex.1983). However, summary judgment may be granted on later pled causes of action if the grounds asserted in the motion show that the plaintiff could not recover from the defendant on the later pled cause of action. See Lampasas v. Spring Center, Inc., 988 S.W.2d 428, 436-37 (Tex.App.--Houston [14th Dist.] 1999, no pet.). This "exception" arises where the amended petition merely reiterates the same essential elements in another fashion, and where the motion for summary judgment adequately covers these new variations. See id. (holding that the new variations in plaintiffs amended petition sounded in negligence and were composed of the same essential elements



previously challenged in defendant's motion). Therefore, if the grounds asserted in OCIC's motion for no evidence summary judgment show that Mansfield could not recover on the later pleaded claims in any event, it is not necessary to remand for further proceedings; rather, we may simply affirm the judgment.

In the present case, OCIC sought entry of a no evidence summary judgment on Mansfield's initial claim that OCIC was vicariously negligent in appointing F&R as Mansfield's trial counsel. In support of its motion, OCIC cited the four elements of a legal malpractice cause of action - duty, breach of duty, proximate causation, and damages - and argued that Mansfield failed to provide any evidence supporting the latter three. However, as already noted, Mansfield's claims of bad faith, breach of contract, and violations of the DTPA and Article 21.21 of the Insurance Code were the only claims properly before the trial court. Because OCIC failed to address these claims in its motion, the trial court's grant of summary judgment was improper. Neither can we apply the exception provided in Lampasas as we cannot characterize the claims in Mansfield's third amended petition as ones merely reiterating the same essential elements of his original negligence and vicarious liability causes of action. Appellant's second issue is sustained. Without reaching

Page 533

Mansfield's final two points of error, we reverse the judgment of the court below and remand for trial those issues pleaded in Appellant's third amended petition.

---------------

NOTES:

1. While Appellant included a filemarked copy of his second amended original petition with his brief as an attachment, the clerk's record contains no such filing. Because of this, Appellee argues that Mansfield has failed to bring forth an adequate record for our review. As discussed below, this point is moot.

2. Our presumption that the trial court granted leave for the filing of Mansfield's third amended petition draws further support from the record. On December 2, 1998, Mansfield filed a motion for rehearing of defendant's summary judgment. In this motion, Mansfield argued that OCIC's August 26, 1998 motion for summary judgment did not address the allegations contained in his third amended pleading and that summary judgment was therefore not proper. The court disagreed and denied Mansfield's motion for rehearing.

---------------

